# TAB A CONTINUED



## Health Care Financing Administration

**Medicare**      **Medicaid**      **SCHIP**      **What's New**      **Site Index**

# TENNESSEE STATEWIDE HEALTH REFORM DEMONSTRATION

## FACT SHEET

---

**Name of Section 1115 Demonstration:** TennCare

**Date Proposal Submitted:** June 16, 1993

**Date Proposal Approved:** November 18, 1993

**Date Implemented:** January 1, 1994

### SUMMARY

TennCare is a statewide program to provide health care benefits to Medicaid beneficiaries, uninsured State residents and those whose medical conditions make them uninsurable. Enrollment is capped at 1.4 million. If the cap is reached, those in the mandatory Medicaid coverage and uninsurable groups will continue to be enrolled, while enrollment of the currently uninsured groups will be limited. All enrollees are served in capitated managed care organizations (MCOs) that are health maintenance organizations (HMOs). Current enrollment is about 1.3 million.

### ELIGIBILITY

Three distinct groups are offered coverage:

- All persons meeting the eligibility requirements of the Medicaid program as it existed in fiscal year 1993. Current enrollment in this group is about 803,000.
- Persons with an existing or prior existing health conditions causing them to be uninsurable. This population is now nearly 10 percent of all enrollees.
- Persons who are not eligible -- either directly or as a dependent -- for an employer-sponsored or government-sponsored health plan as of March 1, 1993. While enrollment will not be restricted for those currently eligible for Medicaid or the uninsurable, the cap on total enrollment may limit the number of uninsured served. Current enrollment of uninsurable and previously uninsured individuals is about 546,000. Enrollment is currently open to uninsured children and uninsurables.

### BENEFIT PACKAGE

A standard benefit package is provided by managed care organizations (MCOs).

TennCare benefits are more generous than those offered under Medicaid for acute care, generally in that they remove most limitations on number of episodes covered. The plan emphasizes preventive care by providing all preventive care to adults and children without copayments or deductibles.

On June 30, 2000, HCFA approved the State=s request to carve out pharmacy benefits from the MCO capitation rate for those individuals also eligible for Medicare.

## ENROLLMENT/DISENROLLMENT PROCESS

Those deemed Medicaid-eligible are enrolled for a 1-year period. Those in the uninsured group are enrolled for a 1-year period as long as they continue to pay their premiums.

The State may involuntarily disenroll those in the uninsured group who fail to pay premiums.

Individuals who are severely and persistently mentally ill (SPMI) were brought into managed care in July 1996. They are now served by the same BHOs that provide behavioral health services to the rest of the TennCare population (See section on "TennCare Partners Program" below.)

Long term care is not included in the managed care plan.

## DELIVERY SYSTEM

The State has contracted with 10 MCOs. The MCOs contract with providers on a fee-for-service or capitation basis.

Services for Children's Plan enrollees (children in State custody or at risk of custody) are currently being provided through the existing State delivery system.

## QUALITY ASSURANCE

The State has a contract with an independent external quality review organization (EQRO). Yearly reviews have been completed and health plans have begun to implement changes in many of the areas that were identified as needing improvement.

## COST-SHARING

All adults and children with incomes above 100 percent of the Federal Poverty Level (FPL) are required to pay, except those in Medicaid eligibility groups. Cost-sharing is in the form of premiums, deductibles, and copayments based on income.

Participants with incomes over 100 percent FPL pay their premiums on a graduated fee schedule so that payments will increase as income increases. Premiums include individual premiums and family premiums.



Deductibles are on a graduated scale, but none are required for mandatory Medicaid eligibles. Deductibles are $250 for an individual and $500 for a family with incomes between 101 and 199 percent FPL.

Copayments are up to 10 percent of costs, based on a graduated scale for enrollees with incomes between 101 and 199 percent FPL (other than mandatory Medicaid eligibles) and would be 10 percent of the cost of a service for those at or above 200 percent FPL.

Cost-sharing expenditures are limited by annual out-of-pocket maximums of $1,250 per individual/family, excluding premium payments.

To encourage use of preventive services, no deductible or copayment is required for such services.

## TENNCARE PARTNERS PROGRAM

Implemented on July 1, 1996, as part of the TennCare section 1115 demonstration project, the TennCare Partners Program provides behavioral health and substance abuse services to all TennCare enrollees through a complete carve-out program. All mental health and substance abuse services that were previously offered by managed care organizations (MCOs), as well as those provided through the Tennessee Department of Mental Health and Mental Retardation, is provided under the new plan by one of two behavioral health organizations (BHOs).

Eligibility and Coverage: Eligibility is determined as currently defined by the TennCare program; however, BHO enrollees are divided into two groups, Basic and Priority participants. The Basic benefit package provides standard episodic care services, while the Priority package is an expanded group of services provided to those who are most severely ill.

The 1.3 million Basic participants are entitled to the basic service benefit package for mental health and substance abuse services which has been offered by MCOs since TennCare was implemented.

Priority participants are those who have been evaluated by the State and identified as SPMI. This group has traditionally been served by the Community Mental Health Centers (CMHCs) who were contracted by the Tennessee Department of Mental Health and Mental Retardation on a fee-for-service basis. All attempts have been made to preserve these existing provider relationships.

Delivery System: BHOs contract with the State to provide services and receive monthly capitation payments for each enrollee.

BHOs currently have the five State regional mental institutions in their networks, although they are not required to do so. In addition, CMHCs are used as safety net providers. Both BHOs have contracted with all CMHCs.

Coordination of care between the MCO and BHO is a contractual requirement for the plans. The State has required the plans to meet regularly to address issues that arise in providing care.

The State believes that virtually all current behavioral health providers are in at least one of the BHO networks.

Choice of Provider: The BHOs each associate with several of the MCOs, with some overlap. Initially, the State assigned beneficiaries to one of the two BHOs via the enrollees= associated MCO, while providing an option to change if a provider of long standing was not in the network. Enrollees have free choice of providers from within the assigned BHO network, and may change BHOs by changing MCOs at the annual change enrollment period.

10/20/00

**Contact:**
Clarke Cagey, 410-786-7700 or E-mail CCagey@hcfa.gov.



Medicare.gov **|** Department of Health and Human Services **|** NMEP

Home **|** Privacy Policy **|** Feedback **|** Help **|** Website Accessibility



**Methodist Healthcare - Memphis Hospitals**
**FYE 1999**

**Reimbursement Impact of DSH (Medicaid Days)**

| | |
|---|---:|
| Per NPR | |
| Total Medicaid Days | 57,546 |
| Total DSH Reimbursement | $ 18,236,878 |
| | |
| Additional Medicaid Waiver Days | 4,179 |
| | |
| Revised Total Medicaid Days | 61,725 |
| Revised Total DSH Reimbursement | $ 19,413,601 |
| | |
| Additional Reimbursement | $  1,176,723 |

**POWERS PYLES SUTTER & VERVILLE PC**
ATTORNEYS AT LAW

Twelfth Floor
1875 Eye Street, NW
Washington, DC  20006-5409
Phone: (202) 466-6550
Fax: (202) 785-1756
www.ppsv.com

MARY SUSAN PHILP
(202) 872-6735
Susan.Philp@ppsv.com

February 10, 2006

**VIA FEDERAL EXPRESS**

Suzanne Cochran, Esq., Chairperson
Provider Reimbursement Review Board
2520 Lord Baltimore Drive, Suite L
Baltimore, MD 21244-2670

      Re:   **REQUEST FOR EXPEDITED JUDICIAL REVIEW**
               Methodist Hospitals of Memphis;
               Provider No. 44-0049;
               FYE December 31, 2000;
               PRRB Case No. 05-0678

Dear Ms. Cochran:

       The Provider, Methodist Hospitals of Memphis ("Provider"), hereby requests that the Board grant expedited judicial review ("EJR") as to the disproportionate share hospital ("DSH") payment (Section 1115 waiver days) issue in the above appeal pursuant to Section 1878(f)(1) of the Social Security Act ("the Act").

       As discussed below, EJR should be granted because the Provider challenges the policy of the Secretary of Health and Human Services ("the Secretary") and the Centers for Medicare and Medicaid Services ("CMS") which excludes Section 1115 waiver days from the DSH payment calculation for patient discharges prior to January 20, 2000.  That policy was reflected in the determination of the Provider's intermediary in this appeal and was the subject of formal CMS pronouncements, including Program Memorandum A-99-62, which, subject to very limited exceptions, indicated that Section 1115 waiver days should be excluded from the DSH calculation.[1]  In addition, on January 20, 2000, CMS issued a regulation that instructed intermediaries to include Section 1115 waiver days in the DSH calculation, but only prospectively.  42 C.F.R. § 412.106(b)(4)(ii).[2]  This CMS policy and the regulation violate the Medicare statute.  42 U.S.C. § 1395ww(d).

---

[1] A copy of Program Memorandum A-99-62 is attached as Exhibit 1.
[2] A copy of 42 C.F.R. § 412.106(b)(4)(ii) is attached as Exhibit 2.

POWERS, PYLES, SUTTER & VERVILLE PC

Suzanne Cochran, Esq., Chairperson
February 10, 2006
Page 2

  Because the Board lacks the authority to decide questions involving the validity of a Medicare regulation or controlling CMS policy, EJR is appropriate. Furthermore, the Board has previously determined that it was without authority to decide the precise legal question raised in the present appeal and granted EJR, most recently in appeals for this Provider involving previous cost reporting periods. PRRB Case Nos. 03-0108 and 04-0110. The Provider requests that the Board follow its prior determination and grant EJR in the instant case.

## I.  FACTUAL AND LEGAL BACKGROUND

###   A.  Medicare DSH Calculation

  Since 1983, the Medicare program has paid most hospitals for the operating costs of inpatient hospital services under a prospective payment system ("PPS"). 42 U.S.C. § 1395ww(d)(1)-(5); 42 C.F.R. Part 412. Under PPS, Medicare pays hospitals a standardized amount per case subject to certain payment adjustments. Id. A hospital that serves a dispro-portionate share of low-income patients, or a DSH, is also entitled to an upward adjustment to the Medicare PPS payments. See 42 U.S.C. § 1395ww(d)(5)(F).

  The amount of the Medicare DSH payment due to a hospital is determined, in part, by its "disproportionate patient percentage" ("DSH patient percentage"), which is a proxy for the Provider's utilization by low-income patients. See 42 U.S.C. § 1395ww(d)(5)(F)(v). The DSH patient percentage is defined as the sum of two fractions expressed as percentages. 42 U.S.C. § 1395ww(d)(5)(F)(vi). One of these fractions is commonly known as the Medicaid percentage. The numerator of the fraction used to compute the Medicaid percentage consists of the number of the Provider's patient days attributable to patients who were "eligible for medical assistance under a State plan approved under Title XIX, but who were not entitled to benefits under Part A of [Medicare]." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

###   B.  Section 1115 Waiver Provision and TennCare

  Section 1115 of the Act allows the Secretary to approve State research and demonstration projects that promote the objectives of the Title XIX Medicaid program. 42 U.S.C. § 1315. Section 1115(a)(1) authorizes the Secretary to waive the requirements of section 1902 of the Act, which contains Medicaid State plan requirements, including requirements as to eligible populations. 42 U.S.C. § 1315(a)(1). Section 1115(a)(2)(A) allows a State to receive federal matching for medical assistance, including medical assistance provided to expanded eligibility populations, for which the State would not ordinarily be entitled to receive federal matching. 42 U.S.C. § 1315(a)(2).

  Under some Section 1115 waivers, the State furnishes medical assistance to a population that otherwise could have been made eligible for Medicaid; under others, the State furnishes

POWERS, PYLES, SUTTER ∪ VERVILLE PC

Suzanne Cochran, Esq., Chairperson
February 10, 2006
Page 3

medical assistance to expanded eligibility populations that could not otherwise have been made eligible for Medicaid. As stated by the Secretary, "the statute allows for the expansion populations to be treated as Medicaid beneficiaries." 65 Fed. Reg. 3137 (Jan. 20, 2000).

The State of Tennessee first received approval for its Section 1115 demonstration project, called TennCare, on November 19, 1993. On January 1, 1994, Tennessee became the first state to move its Medicaid program enrollees to a statewide demonstration project. In addition to Medicaid eligible persons, TennCare offered coverage to expansion populations of uninsured and uninsurable persons, regardless of income, who would not have been eligible for Medicaid under the program as it existed prior to the waiver.[3]

C.     CMS Treatment of Section 1115 Waiver Days Under DSH

Until early 2000, the Medicare regulations did not specifically address the treatment of Section 1115 waiver days under DSH. See 42 C.F.R. § 412.106 (1999). In 1999, however, CMS issued Program Memorandum A-99-62.[4] This memorandum instructed intermediaries, within certain parameters, to allow the inclusion of "ineligible waiver or demonstration population days," but only to the extent that the intermediaries had previously allowed their inclusion, i.e., allowing hospitals which had previously received payment for such days to be held harmless. To the extent that the very narrow parameters of Program Memorandum A-99-62 were not met, however, Section 1115 waiver days were excluded from the DSH calculation.

On January 20, 2000, CMS issued an "interim final rule with comment period" to address the treatment under DSH of Section 1115 waiver days. 65 Fed. Reg. 3136 (Jan. 20, 2000). Through this interim final rule, CMS established that, effective with discharges occurring on or after January 20, 2000, hospitals may include the patient days of all populations eligible for Title XIX matching payments through a State's Section 1115 waiver in calculating the Medicare DSH adjustment. 65 Fed. Reg. 3136-37; 65 Fed. Reg. 47086. The implementing regulation states:

> Effective with discharges occurring on or after January 20, 2000, for purposes of counting days under paragraph (b)(4)(i) of this section, hospitals may include all days attributable to populations eligible for Title XIX matching payments through a waiver approved under section 1115 of the Social Security Act.

42 C.F.R. § 412.106(b)(4)(ii). Thus, CMS's new policy allowing the inclusion of Section 1115 waiver days in the DSH calculation was effective for discharges occurring on or after January 20, 2000, but not with respect to discharges occurring prior to that date.

---

[3] Exhibit 3 (Tennessee Statewide Health Reform Demonstration Fact Sheet).
[4] "Clarification of Allowable Medicaid Days in the Medicare Disproportionate Share Hospital (DSH) Adjustment Calculation," Program Memorandum A-99-62 (Dec. 1, 1999).

POWERS, PYLES, SUTTER c. VERVILLE PC

Suzanne Cochran, Esq., Chairperson
February 10, 2006
Page 4

     D.    Provider's Position

The Provider contends that the plain language of the Act requires the inclusion in the DSH calculation of all Section 1115 waiver days. As noted above, the statute provides that the numerator of the DSH Medicaid fraction include days for patients who were "eligible for medical assistance under a State Plan approved under Title XIX." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). Thus, the DSH calculation should clearly include all patients who were eligible for medical assistance under a Medicaid State Plan implemented through a Section 1115 waiver, including patients in expansion populations. Therefore, CMS's policy of excluding Section 1115 waiver days from the DSH calculation prior to January 20, 2000, as reflected in Program Memorandum A-99-62 and CMS regulations at 42 C.F.R. § 412.106(b)(4)(ii), violates the Act and is invalid.

During fiscal year 2000, the Provider provided services to patients who were eligible for Medicaid payment under the TennCare program. When the intermediary determined the amount of the Provider's DSH payment, it excluded days attributable to patients covered under the Section 1115 waiver for that portion of the year occurring before January 20, 2000. Therefore, the Provider has been under-reimbursed as a result of the intermediary's application of the invalid CMS policy. Attached as Exhibit 4 is a calculation of the estimated reimbursement impact of the intermediary's exclusion of the Section 1115 waiver days, based on the information currently available to the Provider.

## II.    THE BOARD SHOULD GRANT EJR

Under Section 1878(f)(1) of the Act, 42 U.S.C. § 1395oo(f)(1), the Board may grant EJR as to an intermediary determination that involves a question of the validity of a law, regulation, or controlling CMS policy which the Board lacks authority to decide. See also 42 C.F.R. § 405.1842. As discussed above, this appeal involves the Provider's challenge to CMS's policy, as reflected in CMS pronouncements and regulations, that excluded Section 1115 waiver days from the DSH calculation prior to January 20, 2000; this matter is, therefore, properly the subject of EJR.

We note that the Board has previously granted EJR in cases that also involved the validity of CMS's policy regarding Section 1115 waiver days. First, EJR was granted in the Oregon Waiver Days Group Appeal, PRRB Case No. 00-3891G. That case subsequently came before the United States Court of Appeals for the Ninth Circuit, which last year ruled that Section 1115 waiver days must be included in the Medicaid fraction of the DSH calculation. Portland Adventist Medical Center v. Thompson, Medicare and Medicaid Guide (CCH) ¶ 301,592 (9th Cir. Mar. 2, 2005).

POWERS, PYLES, SUTTER & VERVILLE PC

Suzanne Cochran, Esq., Chairperson
February 10, 2006
Page 5


Second, the Board also granted EJR in a case involving TennCare program waiver days. Tennessee 96-00 TennCare Sub-Group Appeal, PRRB Case No. 03-1162G. The federal district court for the District of Columbia recently ruled in favor of the Tennessee hospitals in that case, finding that the TennCare waiver days should be included in the DSH calculation. <u>Cookeville Regional Medical Center, et al. v. Thompson</u>, Civil Action No. 04-1053 (D.D.C. Oct. 28, 2005), *appeal docketed,* No. 05-5495 (D.C. Cir. Jan. 5, 2006).

Finally, the Board recently granted EJR to the Provider in its appeals on this issue for its fiscal years 1998 and 1999. PRRB Case Nos. 03-0108 and 04-0110. Exhibit 5. The situation presented here is identical to that involved in these previous appeals. Accordingly, the same result should apply here, and the Board should grant the Provider's request for EJR.

Finally, we note that this appeal involves only a legal issue, <u>i.e.</u>, the validity of a CMS regulation and policy. There are no factual issues in dispute. Furthermore, the Board has jurisdiction in this appeal.

For the foregoing reasons, the Provider requests that the Board grant EJR as to the Provider's challenge to the exclusion of Section 1115 waiver days from the DSH calculation.

Sincerely,

Mary Susan Philp

Enclosures

Cc (w/enc.):    Gary Gerber, TriSpan Health Services (via Federal Express)
                Wilson Leong, Blue Cross Blue Shield Association
                Michael Nesbit

United States Home      Information Center | Customer Support | Site Map



| Search | Go! |

| Package / Envelope Services | Office / Print Services | Freight Services | Expedited Services |

| Ship | Track | Manage My Account | International Tools |

Track Shipments
## Detailed Results

▣ Printable Version    ⑦ Quick Help

| | |
|---|---|
| **Tracking number** | 856566061839 |
| **Signed for by** | C.LANGSTON |
| **Ship date** | Feb 10, 2006 |
| **Delivery date** | Feb 13, 2006 9:15 AM |
| **Status** | Delivered |

| | |
|---|---|
| **Reference** | |
| **Delivered to** | 83060 00015 Shipping/Receiving |
| **Service type** | Priority Envelope |

**Wrong Address?**
Reduce future mistakes by using FedEx Address Checker.

**Shipping Freight?**
FedEx has LTL, air freight, surface and air expedited freight, multi piece package deliveries, and ocean freight.

| Date/Time | | Activity | Location | Details |
|---|---|---|---|---|
| **Feb 13, 2006** | 9:15 AM | **Delivered** | | |
| | 8:43 AM | On FedEx vehicle for delivery | LINTHICUM HEIGHTS, MD | |
| | 7:11 AM | At local FedEx facility | LINTHICUM HEIGHTS, MD | |
| **Feb 11, 2006** | 10:36 AM | Delivery exception | LINTHICUM HEIGHTS, MD | Customer not available or business closed |
| | 8:49 AM | At dest sort facility | BALTIMORE, MD | |
| | 8:40 AM | On FedEx vehicle for delivery | LINTHICUM HEIGHTS, MD | |
| | 8:30 AM | At local FedEx facility | LINTHICUM HEIGHTS, MD | |
| | 5:19 AM | Departed FedEx location | MEMPHIS, TN | |
| | 12:50 AM | Arrived at FedEx location | MEMPHIS, TN | |
| **Feb 10, 2006** | 9:25 PM | Left origin | WASHINGTON, DC | |
| | 7:24 PM | Picked up | WASHINGTON, DC | |

Need to track a FedEx SmartPost shipment?
Click here

[ Signature proof ]    [ Email results ]    [ Track more shipments ]

Subscribe to tracking updates (optional)

**Your Name:** [          ]    **Your Email Address:** [          ]

| Email address | Language | Exception updates | Delivery updates | |
|---|---|---|---|---|
| | English | ☐ | ▣ | |
| | English | ☐ | ▣ | |
| | English | ☐ | ▣ | |
| | English | ☐ | ▣ | |

Select format: ◉ HTML ○ Text ○ Wireless
**Add personal message:** [          ]
Not available for Wireless or non-English characters.

services furnished to program beneficiaries during the reporting period (from intermediary records). *For final settlement, report on line 25.01 the amount on line 5.99 of Worksheet M-5.*

*Line 26*—Enter the total amount due to/from the program (lines 24 minus line 25). Transfer this amount to Worksheet S, Part II, column 3, line 9.

*Line 27*—Enter the program reimbursement effect of protested items. The reimbursement effect of the nonallowable items is estimated by applying reasonable methodology which closely approximates the actual effect of the item as if it had been determined through the normal cost finding process. (See § 115.2.) A schedule showing the supporting details and computations must be attached.

36-224                                  Rev. 6

### 3666. WORKSHEET M-5 – ANALYSIS OF PAYMENTS TO HOSPITAL-BASED RHC/ FQHC SERVICES RENDERED TO PROGRAM BENEFICIARIES

Complete this worksheet for Medicare interim payments only. If you have more than one hospital-based RHC/FQHC, complete a separate worksheet for each facility.

Complete the identifying information on lines 1 through 4. The remainder of the worksheet is completed by your fiscal intermediary.

*Line Descriptions*

*Line 1*—Enter the total program interim payments paid to the outpatient rehabilitation provider. The amount entered reflects the sum of all interim payments paid on individual bills (net of adjustment bills) for services rendered in this cost reporting period. The amount entered includes amounts withheld from the component's interim payments due to an offset against overpayments to the component applicable to prior cost reporting periods. It does not include

any retroactive lump sum adjustment amounts based on a subsequent revision of the interim rate, or tentative or net settlement amounts, nor does it include interim payments payable.

*Line 2*—Enter the total program interim payments payable on individual bills. Since the cost in the cost report is on an accrual basis, this line represents the amount of services rendered in the cost reporting period, but not paid as of the end of the cost reporting period. It does not include payments reported on line 1.

*Line 3*—Enter the amount of each retroactive lump sum adjustment and the applicable date.

*Line 4*—Transfer the total interim payments to the title XVIII Worksheet M-3, line 25.

**DO NOT COMPLETE THE REMAINDER OF WORKSHEET M-5. LINES 5 THROUGH 7 ARE FOR INTERMEDIARY USE ONLY.**

*Line 5*—List separately each tentative settlement payment after desk review together with the date of payment. If the cost report is reopened after the Notice of Program Reimbursement (NPR) has been issued, report all settlement payments prior to the current reopening settlement on line 5.

*Line 6*—Enter the net settlement amount (balance due to the provider or balance due to the program) for the NPR, or, if this settlement is after a reopening of the NPR, for this reopening.

**NOTE:** On lines 3, 5, and 6, when an amount is due from the provider to the program, show the amount and date on which the provider agrees to the amount of repayment, even though total repayment is not accomplished until a later date.

*Line 7*—Enter the sum of the amounts on lines 4, 5.99, and 6 in column 2. The amount in column 2 must equal the amount on Worksheet M-3, line 26.

Rev. 6                                  36-225

---

### [¶ 150,932]   Medicaid Days in Medicare DSHs.

*Program Memorandum,* HCFA-Pub. 60A, No. A-99-62, December 1, 1999.

#### Medicare: Disproportionate Share Hospitals

   Prospective payment system—Disproportionate share hospitals—Calculating Medicaid days.—Calculation of Medicaid days in Medicare disproportionate share hospitals (DSHs) depends on whether the patient, not the hospital is eligible for Medicaid. A Medicaid day is applicable for days the patient is eligible for Medicaid even if Medicaid did not make payment for any services. A day does not count against the Medicare DSH adjustment if the same day is also a Medicaid day. Certain errors made by hospitals in counting for DSH adjustments will be held harmless prior to Jan. 1, 2000.

   See ¶ 4260.

## [Text of Memorandum]

**SUBJECT: Clarification of Allowable Medicaid Days in the Medicare Disproportionate Share Hospital (DSH) Adjustment Calculation—ACTION**

A review of practices and policies regarding Medicare disproportionate share payment determinations led HCFA to conclude that it is necessary to clarify the definition of eligible Medicaid days in Medicare disproportionate share policy and communicate this information to fiscal intermediaries, hospitals, Medicaid State agencies, and Medicaid managed care organizations. **This clarification applies to cost reporting periods beginning on or after January 1, 2000.** The purpose of this memorandum is to address those details that may need clarification and also to communicate the hold harmless position for cost reporting periods beginning before January 1, 2000. A similar memorandum will be sent to the Medicaid State agencies.

## CLARIFICATION FOR COST REPORTING PERIODS BEGINNING ON OR AFTER JANUARY 1, 2000

### Background

Under section 1886(d)(5)(F) of the Social Security Act, the Medicare disproportionate share patient percentage is made up of two computations. The first computation includes patient days that were furnished to patients who, during a given month, were entitled to both Medicare Part A and Supplemental Security Income (SSI) (excluding State supplementation). This number is divided by the number of covered patient days utilized by patients under Medicare Part A for that same period. The second computation includes beneficiaries who were eligible for medical assistance (Medicaid) under a State plan approved under Title XIX but who were not entitled to Medicare Part A. (See: 42 CFR 412.106(b)(4).) This number is divided by the total number of patient days for that same period.

### Included Days

In calculating the number of Medicaid days, the hospital must determine whether the patient was eligible for Medicaid under a State plan approved under Title XIX on the day of service. If the patient was so eligible, the day counts in the Medicare disproportionate share adjustment calculation. The statutory formula for "Medicaid days" reflects several key concepts. First, the focus is on the *patient's* eligibility for Medicaid benefits as determined by the State, not the *hospital's* "eligibility" for some form of Medicaid payment. Second, the focus is on the patient's eligibility for *medical* assistance under an approved Title XIX State plan, not the patient's eligibility for *general* assistance under a State-only program. Third, the focus is on eligibility for *medical assistance under an approved Title XIX State plan,* not medical assistance under a State-only program or other program. Thus, for a day to be counted, the patient must be eligible on that day for medical assistance benefits under the Federal-State cooperative program known as Medicaid ( under an approved Title XIX State plan). In other words, for purposes of the Medicare disproportionate share adjustment calculation, the term "Medicaid days" refers to days on which the patient is eligible for medical assistance benefits under an approved Title XIX State plan. The term "Medicaid days" does *not* refer to all days that have some relation to the Medicaid program, through a matching payment or otherwise; if a patient is *not* eligible for medical assistance benefits under an approved Title XIX State plan, the patient day cannot become a "Medicaid day" simply by virtue of some other association with the Medicaid program.

#### HCFA-Pub. 60A

Medicaid days, for purposes of the Medicare disproportionate share adjustment calculation, include all days during which a patient is eligible, under a State plan approved under Title XIX, for Medicaid benefits, even if Medicaid did not make payment for any services. Thus, Medicaid days include, but are not limited to, days that are determined to be medically necessary but for which payment is denied by Medicaid because the provider did not bill timely, days that are beyond the number of days for which a State will pay, days that are utilized by a Medicaid beneficiary prior to an admission approval but for which a valid enrollment is determined within the prescribed period, and days for which payment is made by a third party. In addition, we recognize in the calculation days that are utilized by a Medicaid beneficiary who is eligible for Medicaid under a State plan approved under Title XIX through a managed care organization (MCO) or health maintenance organization (HMO). However, in accordance with 42 CFR 412.106(b)(4), a day does not count in the Medicare disproportionate share adjustment calculation if the patient was entitled to both Medicare Part A and Medicaid on that day. Therefore, once the eligibility of the patient for Medicaid under a State plan approved under Title XIX has been verified, you must determine whether any of the days are dual entitlement days and, to the extent that they are, subtract them from the other days in the calculation.

### Excluded Days

Many States operate programs that include both State-only and Federal-State eligibility groups in an integrated program. For example, some States provide medical assistance to bene-

¶ 150,932

©2000, CCH INCORPORATED

ficiaries of State-funded income support programs. These beneficiaries, however, are not eligible for Medicaid under a State plan approved under Title XIX, and, therefore, days utilized by these beneficiaries do not count in the Medicare disproportionate share adjustment calculation. If a hospital is unable to distinguish between Medicaid beneficiaries and other medical assistance beneficiaries, then it must contact the State for assistance in doing so.

In addition, if a given patient day affects the level of *Medicaid* DSH payments *to the hospital* but the patient is not eligible for Medicaid under a State plan approved under Title XIX on that day, the day is not included in the *Medicare* DSH calculation.

It should be noted that the types of days discussed above are not necessarily the only types of excluded days. Please see the attached chart, which summarizes some, but not necessarily all, of the types of days to be excluded from (or included in) the Medicare DSH adjustment calculation.

To provide consistency in both components of the calculation, any days that are added to the Medicaid day count must also be added to the total day count, to the extent that they have not been previously so added.

Regardless of the type of allowable Medicaid day, the hospital bears the burden of proof and must verify with the State that the patient was eligible under one of the allowable categories during each day of the patient's stay. The hospital is responsible for and must provide adequate documentation to substantiate the number of Medicaid days claimed. Days for patients that cannot be verified by State records to have fallen within a period wherein the patient was eligible for Medicaid as described in this memorandum cannot be counted.

## HOLD HARMLESS FOR COST REPORTING PERIODS BEGINNING BEFORE JANUARY 1, 2000

In accordance with the hold harmless position communicated by HCFA on October 15, 1999, for cost reporting periods beginning before January 1, 2000, you are not to disallow, within the parameters discussed below, the portion of Medicare DSH adjustment payments previously made to hospitals attributable to the erroneous inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or ineligible waiver or demonstration population days in the Medicaid days factor used in the Medicare DSH formula. This is consistent with HCFA's determination that hospitals and intermediaries relied, for the most part, on Medicaid days data obtained from State Medicaid agencies to compute Medicare DSH payments and that some of those agencies

commingled the types of otherwise ineligible days listed above with Medicaid Title XIX days in the data transmitted to hospitals and/or intermediaries. Although HCFA has decided to allow the hospitals to be held harmless for receiving additional payments resulting from the erroneous inclusion of these types of otherwise ineligible days, this decision is not intended to hold hospitals harmless for any other aspect of the calculation of Medicare DSH payments or any other Medicare payments.

### Hospitals That Received Payments Reflecting the Erroneous Inclusion of Days at Issue

In practical terms this means that you are not to reopen any cost reports for cost reporting periods beginning before January 1, 2000 to disallow the portions of Medicare DSH payments attributable to the erroneous inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or ineligible waiver or demonstration population days if the hospital received payments for those days based on those cost reports. If, prior to the issuance of this Program Memorandum, you reopened a settled cost report to disallow the portion of Medicare DSH payment attributable to the inclusion of these types of days, reopen that cost report again and refund the amounts (including interest) collected. Do not, however, pay the hospitals interest on the amounts previously recouped as result of the disallowance. Furthermore, on or after October 15, 1999, you are not to accept reopening requests for previously settled cost reports or amendments to previously submitted cost reports pertaining to the inclusion of these types of days in the Medicare DSH formula.

For cost reporting periods beginning before January 1, 2000, you are to continue to allow these types of days in the Medicare DSH calculation for all open cost reports only in accordance with the practice followed for the hospital at issue before October 15, 1999 (i.e., for open cost reports, you are to allow only those types of otherwise ineligible days that the hospital received payment for in previous cost reporting periods settled before October 15, 1999). For example, if, for a given hospital, a portion of Medicare DSH payment was attributable to the erroneous inclusion of general assistance days for only the out-of-State or HMO population in cost reports settled before October 15, 1999, you are to include the ineligible waiver days for only that population when settling open cost reports for cost reporting periods beginning before January 1, 2000. However, the actual number of general assistance and other State-only health program, charity care, Medicaid DSH, and/or ineligible waiver or demonstration days, as well as Medicaid Title XIX days, that you allow for the open cost reports must be supported by

**402,358**    Current Developments    1089    1-11-2000

auditable documentation provided by the hospital.

### Hospitals That Did Not Receive Payments Reflecting the Erroneous Inclusion of Days at Issue

If a hospital did not receive any payment based on the erroneous inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or waiver or demonstration population days for cost reports that were settled before October 15, 1999, and the hospital never filed a jurisdictionally proper appeal to the Provider Reimbursement Review Board (PRRB) on this issue, you are not to pay the hospital based on the inclusion of these types of days for any open cost report for cost reporting periods beginning before January 1, 2000. Furthermore, on or after October 15, 1999, you are not to accept reopening requests for previously settled cost reports or amendments to previously submitted cost reports pertaining to the inclusion of these types of days in the Medicare DSH formula.

If, for cost reporting periods beginning before January 1, 2000, a hospital that did not receive payments reflecting the erroneous inclusion of otherwise ineligible days filed a jurisdictionally proper appeal to the PRRB *on the issue of the exclusion of these types of days from the Medicare DSH formula* before October 15, 1999, reopen the cost report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days. If there are any questions or concerns regarding the qualifications for a "jurisdictionally proper appeal", please submit them in writing before rendering a decision in a specific case to Charles Booth, Director, Financial Services Group, Office of Financial Management, 7500 Security Boulevard, Location C3-14-16, Baltimore, Maryland 21244-1850. Where, for cost reporting periods beginning before January 1, 2000, a hospital filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days from the Medicare DSH formula *on or after* October 15, 1999, reopen the *settled* cost report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days, but only if the hospital appealed, before October 15, 1999, the denial of payment for the days in question in previous cost reporting periods. The actual number of these types of days that you use in this

revision must be properly supported by adequate documentation provided by the hospital. Do not reopen a cost report and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days if, on or after October 15, 1999, a hospital added the issue of the exclusion of these types of days to a jurisdictionally proper appeal already pending before PRRB on *other* Medicare DSH issues or *other* unrelated issues.

You are to continue paying the Medicare DSH adjustment reflecting the inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or waiver or demonstration population days for all open cost reports for cost reporting periods beginning before January 1, 2000, to any hospital that, before October 15, 1999, filed a jurisdictionally proper appeal to the PRRB specifically for this issue on *previously* settled cost reports.

Finally, you are reminded that, if a hospital has filed a jurisdictionally proper appeal with respect to the HCFA 97-2 ruling and the hospital has otherwise received payment for the portion of Medicare DSH adjustment attributable to the inclusion of general assistance or other State-only health programs, charity care, Medicaid DSH, and/or ineligible waiver or demonstration population days based on its *paid* Medicaid days, include these types of *unpaid* days in the Medicare DSH formula when revising the cost reports affected by the HCFA 97-2 appeal.

The *effective date* for this Program Memorandum (PM) is for cost reporting periods beginning on or after January 1, 2000.

The *implementation date* for this PM is January 1, 2000.

Funding is available through a Supplemental Budget Request for costs required for implementation.

PM may be discarded after January 31, 2001.

**SPECIAL INSTRUCTIONS TO THE INTERMEDIARIES FOR PUBLISHING THE PM:** The intermediaries are required to distribute the content of this PM to all the hospitals immediately upon receipt of the PM.

Attachment

¶ 150,932

©2000, CCH INCORPORATED

| TYPE OF DAY | DESCRIPTION | ELIGIBLE TITLE XIX DAY |
|---|---|---|
| General Assistance Patient Days | Days for patients covered under a State-only (or county-only) general assistance program (whether or not any payment is available for health care services under the program). These patients are not Medicaid-eligible under the State plan. | No. |
| Other State-Only Health Program Patient Days | Days for patients covered under a State-only health program. These patients are not Medicaid-eligible under the State plan. | No. |
| Charity Care Patient Days | Days for patients not eligible for Medicaid or any other third-party payer, and claimed as uncompensated care by a hospital. These patients are not Medicaid-eligible under the State plan. | No. |
| Actual 1902(r)(2) and 1931(b) Days | Days for patients eligible under a State plan based on a 1902(r)(2) or 1931(b) election. These patients are Medicaid-eligible under the Title XIX State plan under the authority of these provisions, which is exercised by the State in the context of the approved State plan. | Yes. |
| Medicaid Optional Targeted Low Income Children (CHIP-related) Days | Days for patients who are Title XIX-eligible and who meet the definition of "optional targeted low income children" under section 1905(u)(2). The difference between these children and other Title XIX children is the enhanced FMAP rate available to the State. These children are fully Medicaid-eligible under the State plan. | Yes. |
| Separate CHIP Days | Days for patients who are eligible for benefits under a non-Medicaid State program furnishing child health assistance to targeted low-income children. These children are, by definition, not Medicaid-eligible under a State plan. | No. |
| 1915(c) Eligible Patient (the "217" group) Days | Days for patients in the eligibility group under the State plan for individuals under a Home and Community Based Services waiver. This group includes individuals who would be Medicaid-eligible if they were in a medical institution. Under this special eligibility group, they are Medicaid-eligible under the State plan. | Yes. |
| Retroactive Eligible Days | Days for patients not enrolled in the Medicaid program at the time of service, but found retroactively eligible for Medicaid benefits for the days at issue. These patients are Medicaid-eligible under the State plan. | Yes. |
| Medicaid Managed Care Organization Days | Days for patients who are eligible for Medicaid under a State plan when the payment to the hospital is made by an MCO for the service. An MCO is the financing mechanism for Medicaid benefits, and payment for the service through the MCO does not affect eligibility. | Yes. |
| Medicaid DSH Days | Days for patients who are not eligible for Medicaid benefits, but are considered in the calculation of Medicaid DSH payments by the State. These patients are not Medicaid-eligible.<br>Sometimes Medicaid State plans specify that Medicaid DSH payments are based upon a hospital's amount of charity care or general assistance days. This, however, is not "payment" for those days, and does not mean that the patient is eligible for Medicaid benefits or can be counted as such in the Medicare formula. | No. |

by an official of the hospital and, if different, an official responsible for administering the residency program.

(i) A listing, by specialty, of all residents assigned to the hospital and providing services to the hospital during the cost reporting period.

(ii) The name and social security number of each resident.

(iii) The dates the resident is assigned to the hospital.

(iv) The dates the resident is assigned to other hospitals or other freestanding providers and any nonprovider setting during the cost reporting period.

(v) The proportion of the total time necessary to fill a residency slot that the resident is assigned to an area of the hospital listed under paragraph (f)(1)(ii) of this section.

(3) Fiscal intermediaries must verify the correct count of residents.

(g) *Indirect medical education payment for managed care enrollees.* For portions of cost reporting periods occurring on or after January 1, 1998, a payment is made to a hospital for indirect medical education costs, as determined under paragraph (e) of this section, for discharges associated with individuals who are enrolled under a risk-sharing contract with an eligible organization under section 1876 of the Act or with a Medicare+Choice organization under title XVIII, Part C of the Act during the period, according to the applicable payment percentages described in §§413.76(c)(1) through (c)(5) of this subchapter.

[50 FR 12741, Mar. 29, 1985. Redesignated at 56 FR 43241, Aug. 30, 1991]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting §412.105, see the List of Sections Affected, which appears in the Finding Aids section of the printed volume and on GPO Access.

**§412.106   Special treatment: Hospitals that serve a disproportionate share of low-income patients.**

(a) *General considerations.* (1) The factors considered in determining whether a hospital qualifies for a payment adjustment include the number of beds, the number of patient days, and the hospital's location.

(i) The number of beds in a hospital is determined in accordance with §412.105(b).

(ii) For purposes of this section, the number of patient days in a hospital includes only those days attributable to units or wards of the hospital providing acute care services generally payable under the prospective payment system and excludes patient days associated with—

(A) Beds in excluded distinct part hospital units;

(B) Beds otherwise countable under this section used for outpatient observation services, skilled nursing swing-bed services, or ancillary labor/delivery services. This exclusion would not apply if a patient treated in an observation bed is ultimately admitted for acute inpatient care, in which case the beds and days would be included in those counts;

(C) Beds in a unit or ward that is not occupied to provide a level of care that would be payable under the acute care hospital inpatient prospective payment system at any time during the 3 preceding months (the beds in the unit or ward are to be excluded from the determination of available bed days during the current month); and

(D) Beds in a unit or ward that is otherwise occupied (to provide a level of care that would be payable under the acute care hospital inpatient prospective payment system) that could not be made available for inpatient occupancy within 24 hours for 30 consecutive days.

(iii) The hospital's location, in an urban or rural area, is determined in accordance with the definitions in §412.62(f) or §412.64.

(2) The payment adjustment is applied to the hospital's DRG revenue for inpatient operating costs based on DRG-adjusted prospective payment rates for inpatient operating costs, excluding outlier payments for inpatient operating costs under subpart F of this part, and additional payments made under the provisions of §412.105.

(b) *Determination of a hospital's disproportionate patient percentage.* (1) *General rule.* A hospital's disproportionate patient percentage is determined by adding the results of two computations and expressing that sum as a percentage.

(2) *First computation: Federal fiscal year.* For each month of the Federal

§ 412.106         42 CFR Ch. IV (10–1–04 Edition)

fiscal year in which the hospital's cost reporting period begins, CMS—

(i) Determines the number of patient days that—

(A) Are associated with discharges occurring during each month; and

(B) Are furnished to patients who during that month were entitled to both Medicare Part A and SSI, excluding those patients who received only State supplementation;

(ii) Adds the results for the whole period; and

(iii) Divides the number determined under paragraph (b)(2)(ii) of this section by the total number of patient days that—

(A) Are associated with discharges that occur during that period; and

(B) Are furnished to patients entitled to Medicare Part A.

(3) *First computation: Cost reporting period.* If a hospital prefers that CMS use its cost reporting period instead of the Federal fiscal year, it must furnish to CMS, through its intermediary, a written request including the hospital's name, provider number, and cost reporting period end date. This exception will be performed once per hospital per cost reporting period, and the resulting percentage becomes the hospital's official Medicare Part A/SSI percentage for that period.

(4) *Second computation.* The fiscal intermediary determines, for the same cost reporting period used for the first computation, the number of the hospital's patient days of service for which patients were eligible for Medicaid but not entitled to Medicare Part A, and divides that number by the total number of patient days in the same period. For purposes of this second computation, the following requirements apply:

(i) For purposes of this computation, a patient is deemed eligible for Medicaid on a given day only if the patient is eligible for inpatient hospital services under an approved State Medicaid plan or under a waiver authorized under section 1115(a)(2) of the Act on that day, regardless of whether particular items or services were covered or paid under the State plan or the authorized waiver.

(ii) Effective with discharges occurring on or after January 20, 2000, for purposes of counting days under para-

graph (b)(4)(i) of this section, hospitals may include all days attributable to populations eligible for Title XIX matching payments through a waiver approved under section 1115 of the Social Security Act.

(iii) The hospital has the burden of furnishing data adequate to prove eligibility for each Medicaid patient day claimed under this paragraph, and of verifying with the State that a patient was eligible for Medicaid during each claimed patient hospital day.

(5) *Disproportionate patient percentage.* The intermediary adds the results of the first computation made under either paragraph (b)(2) or (b)(3) of this section and the second computation made under paragraph (b)(4) of this section and expresses that sum as a percentage. This is the hospital's disproportionate patient percentage, and is used in paragraph (c) of this section.

(c) *Criteria for classification.* A hospital is classified as a "disproportionate share" hospital under any of the following circumstances:

(1) The hospital's disproportionate patient percentage, as determined under paragraph (b)(5) of this section, is at least equal to one of the following:

(i) 15 percent, if the hospital is located in an urban area, and has 100 or more beds, or is located in a rural area and has 500 or more beds.

(ii) 30 percent for discharges occurring before April 1, 2001, and 15 percent for discharges occurring on or after April 1, 2001, if the hospital is located in a rural area and either has more than 100 beds and fewer than 500 beds or is classified as a sole community hospital under § 412.92;

(iii) 40 percent for discharges before April 1, 2001, and 15 percent for discharges occurring on or after April 1, 2001, if the hospital is located in an urban area and has fewer than 100 beds.

(iv) 45 percent for discharges before April 1, 2001, and 15 percent for discharges occurring on or after April 1, 2001, if the hospital is located in a rural area and has 100 or fewer beds.

(2) The hospital is located in an urban area, has 100 or more beds, and can demonstrate that, during its cost reporting period, more than 30 percent of its net inpatient care revenues are



**Health Care Financing Administration**

**Medicare**    **Medicaid**    **SCHIP**    **What's New**    **Site Index**

# TENNESSEE STATEWIDE HEALTH REFORM DEMONSTRATION

## FACT SHEET

---

**Name of Section 1115 Demonstration:** TennCare

**Date Proposal Submitted:** June 16, 1993

**Date Proposal Approved:** November 18, 1993

**Date Implemented:** January 1, 1994

### SUMMARY

TennCare is a statewide program to provide health care benefits to Medicaid beneficiaries, uninsured State residents and those whose medical conditions make them uninsurable. Enrollment is capped at 1.4 million. If the cap is reached, those in the mandatory Medicaid coverage and uninsurable groups will continue to be enrolled, while enrollment of the currently uninsured groups will be limited. All enrollees are served in capitated managed care organizations (MCOs) that are health maintenance organizations (HMOs). Current enrollment is about 1.3 million.

### ELIGIBILITY

Three distinct groups are offered coverage:

- All persons meeting the eligibility requirements of the Medicaid program as it existed in fiscal year 1993. Current enrollment in this group is about 803,000.
- Persons with an existing or prior existing health conditions causing them to be uninsurable. This population is now nearly 10 percent of all enrollees.
- Persons who are not eligible -- either directly or as a dependent -- for an employer-sponsored or government-sponsored health plan as of March 1, 1993. While enrollment will not be restricted for those currently eligible for Medicaid or the uninsurable, the cap on total enrollment may limit the number of uninsured served. Current enrollment of uninsurable and previously uninsured individuals is about 546,000. Enrollment is currently open to uninsured children and uninsurables.

### BENEFIT PACKAGE

A standard benefit package is provided by managed care organizations (MCOs).

TennCare benefits are more generous than those offered under Medicaid for acute care, generally in that they remove most limitations on number of episodes covered. The plan emphasizes preventive care by providing all preventive care to adults and children without copayments or deductibles.

On June 30, 2000, HCFA approved the State=s request to carve out pharmacy benefits from the MCO capitation rate for those individuals also eligible for Medicare.

## ENROLLMENT/DISENROLLMENT PROCESS

Those deemed Medicaid-eligible are enrolled for a 1-year period. Those in the uninsured group are enrolled for a 1-year period as long as they continue to pay their premiums.

The State may involuntarily disenroll those in the uninsured group who fail to pay premiums.

Individuals who are severely and persistently mentally ill (SPMI) were brought into managed care in July 1996. They are now served by the same BHOs that provide behavioral health services to the rest of the TennCare population (See section on "TennCare Partners Program" below.)

Long term care is not included in the managed care plan.

## DELIVERY SYSTEM

The State has contracted with 10 MCOs. The MCOs contract with providers on a fee-for-service or capitation basis.

Services for Children's Plan enrollees (children in State custody or at risk of custody) are currently being provided through the existing State delivery system.

## QUALITY ASSURANCE

The State has a contract with an independent external quality review organization (EQRO). Yearly reviews have been completed and health plans have begun to implement changes in many of the areas that were identified as needing improvement.

## COST-SHARING

All adults and children with incomes above 100 percent of the Federal Poverty Level (FPL) are required to pay, except those in Medicaid eligibility groups. Cost-sharing is in the form of premiums, deductibles, and copayments based on income.

Participants with incomes over 100 percent FPL pay their premiums on a graduated fee schedule so that payments will increase as income increases. Premiums include individual premiums and family premiums.

Deductibles are on a graduated scale, but none are required for mandatory Medicaid eligibles. Deductibles are $250 for an individual and $500 for a family with incomes between 101 and 199 percent FPL.

Copayments are up to 10 percent of costs, based on a graduated scale for enrollees with incomes between 101 and 199 percent FPL (other than mandatory Medicaid eligibles) and would be 10 percent of the cost of a service for those at or above 200 percent FPL.

Cost-sharing expenditures are limited by annual out-of-pocket maximums of $1,250 per individual/family, excluding premium payments.

To encourage use of preventive services, no deductible or copayment is required for such services.

## TENNCARE PARTNERS PROGRAM

Implemented on July 1, 1996, as part of the TennCare section 1115 demonstration project, the TennCare Partners Program provides behavioral health and substance abuse services to all TennCare enrollees through a complete carve-out program. All mental health and substance abuse services that were previously offered by managed care organizations (MCOs), as well as those provided through the Tennessee Department of Mental Health and Mental Retardation, is provided under the new plan by one of two behavioral health organizations (BHOs).

Eligibility and Coverage: Eligibility is determined as currently defined by the TennCare program; however, BHO enrollees are divided into two groups, Basic and Priority participants. The Basic benefit package provides standard episodic care services, while the Priority package is an expanded group of services provided to those who are most severely ill.

The 1.3 million Basic participants are entitled to the basic service benefit package for mental health and substance abuse services which has been offered by MCOs since TennCare was implemented.

Priority participants are those who have been evaluated by the State and identified as SPMI. This group has traditionally been served by the Community Mental Health Centers (CMHCs) who were contracted by the Tennessee Department of Mental Health and Mental Retardation on a fee-for-service basis. All attempts have been made to preserve these existing provider relationships.

Delivery System: BHOs contract with the State to provide services and receive monthly capitation payments for each enrollee.

BHOs currently have the five State regional mental institutions in their networks, although they are not required to do so. In addition, CMHCs are used as safety net providers. Both BHOs have contracted with all CMHCs.

Coordination of care between the MCO and BHO is a contractual requirement for the plans. The State has required the plans to meet regularly to address issues that arise in providing care.

The State believes that virtually all current behavioral health providers are in at least one of the BHO networks.

Choice of Provider: The BHOs each associate with several of the MCOs, with some overlap. Initially, the State assigned beneficiaries to one of the two BHOs via the enrollees= associated MCO, while providing an option to change if a provider of long standing was not in the network. Enrollees have free choice of providers from within the assigned BHO network, and may change BHOs by changing MCOs at the annual change enrollment period.

10/20/00

**Contact:**
Clarke Cagey, 410-786-7700 or E-mail CCagey@hcfa.gov.



Medicare.gov | Department of Health and Human Services | NMEP

Home | Privacy Policy | Feedback | Help | Website Accessibility



Methodist Hospitals of Memphis
Fiscal Year Ending December 31, 2000

Calculation of Reimbursement Impact of DSH Medicaid Days Issue

**Per Audit**

| | |
|---|---|
| Total Medicaid Days | 64,941 |
| Total DSH Reimbursement | $19,341,301 |
| | |
| Additional Waiver Days | 482 |

**Appeal**

| | |
|---|---|
| Revised Total Medicaid Days | 65,423 |
| Revised Total DSH Reimbursement | $19,470,280 |
| | |
| **Additional Reimbursement** | $128,979 |



**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671                    FAX: 410-786-5298

Suzanne Cochran, Esq., Chairperson
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West

Refer to:

03-0180

CERTIFIED MAIL

FEB - 2 2006

Mary Susan Philp, Esq.
Powers, Pyles, Sutter & Verville, PC
Twelfth Floor
1875 Eye Street, N.W.
Washington, D.C. 20006-5409



RECEIVED
FEB - 7 2006
P, PS, & V

RE:  Methodist Hospital of Memphis
     Provider No.44-0049
     FYE 12/31/98
     PRRB Case No. 03-0108

Dear Ms. Philp:

This is in response to the Provider's request that the Provider Reimbursement Review Board (Board), pursuant to 42 U.S.C. § 1395oo(f)(1), determine that it is without the authority to decide the question of whether the regulation, 42 C.F.R. § 412.106(b)(4)(ii), which excludes section 1115 expansion waiver days from the calculation of the disproportionate share (DSH) adjustment prior to January 20, 2000, is valid. The Provider is seeking to have section 1115 expansion waiver days included in the DSH calculation for period prior to January 20, 2000.

The Provider believes that this regulation conflicts with 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) and (II), ( the DSH calculation) which provides for two proxies as measures of the volume of low-income patients served by a hospital:

> (1) the percentage of the total Medicare inpatient days provided to low income Medicare patients (i.e., those patients entitled to supplemental security income under Title XVI of the Social Security Act); and

> (2) the percentage of total hospital days provided to "patients who (for such days) were eligible for medical assistance under a State plan approved under [the Medicaid program]."

The Provider believes that the regulation, 42 C.F.R. § 412.106(b)(4)(ii) is inconsistent with the statutory language of §1395ww(d)(5)(F)(vi)(II). Section 1395oo(f)(1) permits providers that have requested and are entitled to a hearing before the Board under 42 U.S.C. § 1395oo(a), to bypass the Board's hearing procedure and obtain judicial review of an issue involving a question of law or regulation where the Board determines that it is without the authority to decide such question.

The Board has reviewed the submissions of the Provider pertaining to the requests for hearing and expedited judicial review. The documentation shows that the estimated

Provider Reimbursement ___view Board
Page 2 Mary Susan Philp                                                CN 03-0180

amount in controversy for the appeal exceeds $10,000, as required. The estimated amount in controversy is subject to recalculation by the Intermediary for the actual final amount.

The Board finds that:

1) it has jurisdiction over the matter for the subject year and the Provider is entitled to a hearing before the Board;

2) based upon the Provider's assertions regarding the section 1115 waiver issue, there are no findings of fact for resolution by the Board;

3) it is bound by the applicable existing Medicare law and regulation (42 C.F.R. § 405.1867); and

4) it is without the authority to decide the legal question of whether the regulation, 42 C.F.R. § 412.106(b)(4)(ii), which excludes section 1115 expansion waiver days from the calculation of the disproportionate share adjustment prior to January 20, 2000, is valid.

Accordingly, the Board finds that the section 1115 waiver issue properly falls within the provisions of 42 U.S.C. § 1395oo (f)(1) and hereby grants the Provider's request for expedited judicial review for the issue and the subject year. The Provider has 60 days from the receipt of this decision to institute the appropriate action for judicial review. The graduate medical education issue will remain pending in this case.

Board Members Participating

     Suzanne Cochran, Esq.
     Gary B. Blodgett, DDS
     Elaine C. Powell, CPA
     Anjali Mulchandani-West
     Yvette C. Hayes

FOR THE BOARD:

Suzanne Cochran, ~~Esq.~~
Chairman

Enclosures:  42 U.S.C. § 1395oo (f)(1)

cc:  Gary Gerber, Tri-Span Health Services
     Wilson Leong, BCBSA)



Suzanne Cochran, Esq. Chairperson
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West

**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671        FAX: 410-786-5298

Refer to:

04-0110

CERTIFIED MAIL

FEB - 2 2006

RECEIVED
FEB - 7 2006
P, P S, & V

Mary Susan Philp, Esq.
Powers, Pyles, Sutter & Verville, PC
Twelfth Floor
1875 Eye Street, N.W.
Washington, D.C. 20006-5409

RE: Methodist Hospital of Memphis
     Provider No.44-0049
     FYE 12/31/99
     PRRB Case No. 04-0110

Dear Ms. Philp:

This is in response to the Provider's request that the Provider Reimbursement Review
Board (Board), pursuant to 42 U.S.C. § 1395oo(f)(1), determine that it is without the
authority to decide the question of whether the regulation, 42 C.F.R. § 412.106(b)(4)(ii),
which excludes section 1115 expansion waiver days from the calculation of the
disproportionate share (DSH) adjustment prior to January 20, 2000, is valid. The
Provider is seeking to have section 1115 expansion waiver days included in the DSH
calculation for period prior to January 20, 2000.

The Provider believes that this regulation conflicts with 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I)
and (II), ( the DSH calculation) which provides for two proxies as measures of the volume of
low-income patients served by a hospital:

> (1) the percentage of the total Medicare inpatient days provided to low income
> Medicare patients (i.e., those patients entitled to supplemental security income under
> Title XVI of the Social Security Act); and

> (2) the percentage of total hospital days provided to "patients who (for such days)
> were eligible for medical assistance under a State plan approved under [the Medicaid
> program]."

The Provider believes that the regulation, 42 C.F.R. § 412.106(b)(4)(ii) is inconsistent with
the statutory language of §1395ww(d)(5)(F)(vi)(II). Section 1395oo(f)(1) permits providers
that have requested and are entitled to a hearing before the Board under 42 U.S.C.
§ 1395oo(a), to bypass the Board's hearing procedure and obtain judicial review of an issue
involving a question of law or regulation where the Board determines that it is without the
authority to decide such question.

The Board has reviewed the submissions of the Provider pertaining to the requests for
hearing and expedited judicial review. The documentation shows that the estimated

Provider Reimbursement Review Board
Page 2 Mary Susan Philp                                          CN 04-0110

amount in controversy for the appeal exceeds $10,000, as required. The estimated amount
in controversy is subject to recalculation by the Intermediary for the actual final amount.

The Board finds that:

1) it has jurisdiction over the matter for the subject year and the Provider is entitled
   to a hearing before the Board;

2) based upon the Provider's assertions regarding the section 1115 waiver issue,
   there are no findings of fact for resolution by the Board;

3) it is bound by the applicable existing Medicare law and regulation (42 C.F.R. §
   405.1867); and

4) it is without the authority to decide the legal question of whether the regulation,
   42 C.F.R. § 412.106(b)(4)(ii), which excludes section 1115 expansion waiver
   days from the calculation of the disproportionate share adjustment prior to
   January 20, 2000, is valid.

Accordingly, the Board finds that the section 1115 waiver issue properly falls within the
provisions of 42 U.S.C. § 1395oo.(f)(1) and hereby grants the Provider's request for
expedited judicial review for the issue and the subject year. The Provider has 60 days
from the receipt of this decision to institute the appropriate action for judicial review.
The graduate medical education issue will remain pending in this case.

Board Members Participating

    Suzanne Cochran, Esq.
    Gary B. Blodgett, DDS
    Elaine C. Powell, CPA
    Anjali Mulchandani-West
    Yvette C. Hayes

FOR THE BOARD:

Suzanne Cochran, Esq.
Chairman

Enclosures: 42 U.S.C. § 1395oo (f)(1)

cc: Gary Gerber, Tri-Span Health Services
    Wilson Leong, BCBSA)