IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METHODIST HEALTHCARE - <br> MEMPHIS HOSPITAL <br><br>          Plaintiff, <br><br>     vs. <br><br> MICHAEL O. LEAVITT, <br> SECRETARY, DEPARTMENT OF <br> HEALTH AND HUMAN <br>         Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 1:06CV00579 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

# C E R T I F I C A T I O N

I, Jacqueline R. Vaughn, Attorney Advisor, Centers for Medicare & Medicaid Services, Department of Health and Human Services, under authority delegated by the Secretary, certify that the documents attached constitute a true and accurate transcript of the official file as furnished by the Provider Reimbursement Review Board (PRRB).   These documents are the record of the PRRB's proceedings and decision, granting the Provider's request for Expedited Judicial Review for fiscal years ending December 31, 1998, 1999 and 2000, under Title XVIII of the Social Security Act, as amended.


Date: June 7, 2006                   Jacqueline R. Vaughn

Methodist Hospital of Memphis

PRRB Case Nos. 03-0108, 04-0110 and 05-0678

## COURT TRANSCRIPT INDEX

Page No(s).

Documents pertaining to Case No. 03-0108:

| | Page No(s). |
|---|---|
| PRRB Decision, dated February 2, 2006, granting Expedited Judicial Review | 1-2 |
| Provider's Request, dated January 26, 2006, for Expedited Juridical Review, with Exhibits | 3-23 |
| Correspondence regarding Critical Due Dates | 24-25 |
| Provider's Request, dated November19, 2002, for Hearing, with Notice of Program Reimbursement and Supporting Documents | 26-40 |

Documents pertaining to Case No. 04-0110:

| | |
|---|---|
| PRRB Decision, dated February 2, 2006, granting Expedited Judicial Review | 41-42 |
| Provider's Request, dated January 26, 2006, for Expedited Juridical Review, with Exhibits | 43-63 |
| Correspondence regarding Critical Due Dates | 64-65 |
| Provider's Request, dated November 5, 2003, for Hearing, with Notice of Program Reimbursement and Supporting Documents | 66-77 |

Methodist Hospital of Memphis

PRRB Case Nos. 03-0108, 04-0110 and 05-0678

## COURT TRANSCRIPT INDEX

Page No(s).

Documents pertaining to Case No. 05-0678:

PRRB Letter, dated March 8, 2006, regarding Pending Issue                78

PRRB Decision, dated March 7, 2006, granting Expedited Judicial
    Review                                                               79-80

Provider's Request, dated February 10, 2006, for Expedited Juridical
    Review, with Exhibits                                                81-105

Portion of Provider's Position Paper regarding Disproportionate Share
    Issue, with Exhibits                                                 106-177

Portion of Intermediary's Position Paper regarding Disproportionate
    Share Issue                                                          178-189

Correspondence regarding Critical Due Dates                              190-191

Provider's Request, dated February 2, 2005, for Hearing, with Notice of
    Program Reimbursement and Supporting Documents                       192-207

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671          FAX: 410-786-5298

Suzanne Cochran, Esq., Chairperson
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West

Refer to:          03-0180

CERTIFIED MAIL                                        FEB - 2 2006

Mary Susan Philp, Esq.
Powers, Pyles, Sutter & Verville, PC
Twelfth Floor
1875 Eye Street, N.W.
Washington, D.C. 20006-5409

                    RE:  Methodist Hospital of Memphis
                         Provider No.44-0049
                         FYE 12/31/98
                         PRRB Case No. 03-0108

Dear Ms. Philp:

This is in response to the Provider's request that the Provider Reimbursement Review
Board (Board), pursuant to 42 U.S.C. § 1395oo(f)(1), determine that it is without the
authority to decide the question of whether the regulation, 42 C.F.R. § 412.106(b)(4)(ii),
which excludes section 1115 expansion waiver days from the calculation of the
disproportionate share (DSH) adjustment prior to January 20, 2000, is valid. The
Provider is seeking to have section 1115 expansion waiver days included in the DSH
calculation for period prior to January 20, 2000.

The Provider believes that this regulation conflicts with 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I)
and (II), ( the DSH calculation) which provides for two proxies as measures of the volume of
low-income patients served by a hospital:

          (1) the percentage of the total Medicare inpatient days provided to low income
          Medicare patients (i.e., those patients entitled to supplemental security income under
          Title XVI of the Social Security Act); and

          (2) the percentage of total hospital days provided to "patients who (for such days)
          were eligible for medical assistance under a State plan approved under [the Medicaid
          program]."

The Provider believes that the regulation, 42 C.F.R. § 412.106(b)(4)(ii) is inconsistent with
the statutory language of §1395ww(d)(5)(F)(vi)(II). Section 1395oo(f)(1) permits providers
that have requested and are entitled to a hearing before the Board under 42 U.S.C.
§ 1395oo(a), to bypass the Board's hearing procedure and obtain judicial review of an issue
involving a question of law or regulation where the Board determines that it is without the
authority to decide such question.

The Board has reviewed the submissions of the Provider pertaining to the requests for
hearing and expedited judicial review. The documentation shows that the estimated

                                                                                1

Provider Reimbursement Review Board
Page 2 Mary Susan Philp                                                    CN 03-0180

amount in controversy for the appeal exceeds $10,000, as required. The estimated amount in controversy is subject to recalculation by the Intermediary for the actual final amount.

The Board finds that:

1) it has jurisdiction over the matter for the subject year and the Provider is entitled to a hearing before the Board;

2) based upon the Provider's assertions regarding the section 1115 waiver issue, there are no findings of fact for resolution by the Board;

3) it is bound by the applicable existing Medicare law and regulation (42 C.F.R. § 405.1867); and

4) it is without the authority to decide the legal question of whether the regulation, 42 C.F.R. § 412.106(b)(4)(ii), which excludes section 1115 expansion waiver days from the calculation of the disproportionate share adjustment prior to January 20, 2000, is valid.

Accordingly, the Board finds that the section 1115 waiver issue properly falls within the provisions of 42 U.S.C. § 1395oo (f)(1) and hereby grants the Provider's request for expedited judicial review for the issue and the subject year. The Provider has 60 days from the receipt of this decision to institute the appropriate action for judicial review. The graduate medical education issue will remain pending in this case.

Board Members Participating

     Suzanne Cochran, Esq.
     Gary B. Blodgett, DDS
     Elaine C. Powell, CPA
     Anjali Mulchandani-West
     Yvette C. Hayes

                    FOR THE BOARD:

                    Suzanne Cochran, Esq.
                    Chairman

Enclosures:  42 U.S.C. § 1395oo (f)(1)

cc:  Gary Gerber, Tri-Span Health Services
     Wilson Leong, BCBSA)

**POWERS**
**PYLES**
**SUTTER &**
**VERVILLE PC**
ATTORNEYS AT LAW

Twelfth Floor
1875 Eye Street, NW
Washington, DC 20006-5409
Phone: (202) 466-6550
Fax: (202) 785-1756
www.ppsv.com

MARY SUSAN PHILP
(202) 872-6735
Susan.Philp@ppsv.com

January 26, 2006

**VIA FEDERAL EXPRESS**

Suzanne Cochran, Esq., Chairperson
Provider Reimbursement Review Board
2520 Lord Baltimore Drive, Suite L
Baltimore, MD 21244-2670

RECEIVED

JAN 27 2006

PROVIDER REIMBURSEMENT
REVIEW BOARD

Re:    **REQUEST FOR EXPEDITED JUDICIAL REVIEW**
Methodist Hospitals of Memphis;
Provider No. 44-0049;
FYE December 31, 1998;
PRRB Case No. 03-0180

Dear Ms. Cochran:

The Provider, Methodist Hospitals of Memphis ("Provider"), hereby requests that the Board grant expedited judicial review ("EJR") as to the disproportionate share hospital ("DSH") payment (Section 1115 waiver days) issue in the above appeal pursuant to Section 1878(f)(1) of the Social Security Act ("the Act").

As discussed below, EJR should be granted because the Provider challenges the policy of the Secretary of Health and Human Services ("the Secretary") and the Centers for Medicare and Medicaid Services ("CMS") which excludes Section 1115 waiver days from the DSH payment calculation for patient discharges prior to January 20, 2000. That policy was reflected in the determination of the Provider's intermediary in this appeal and was the subject of formal CMS pronouncements, including Program Memorandum A-99-62, which, subject to very limited exceptions, indicated that Section 1115 waiver days should be excluded from the DSH calculation.[1] In addition, on January 20, 2000, CMS issued a regulation that instructed intermediaries to include Section 1115 waiver days in the DSH calculation, but only prospectively. 42 C.F.R. § 412.106(b)(4)(ii).[2] This CMS policy and the regulation violate the Medicare statute. 42 U.S.C. § 1395ww(d).

---

[1] A copy of Program Memorandum A-99-62 is attached as Exhibit 1.
[2] A copy of 42 C.F.R. § 412.106(b)(4)(ii) is attached as Exhibit 2.

3

**POWERS, PYLE, SUTTER & VERVILLE PC**

Suzanne Cochran, Esq., Chairperson
January 26, 2006
Page 2

Because the Board lacks the authority to decide questions involving the validity of a Medicare regulation or controlling CMS policy, EJR is appropriate. Furthermore, the Board has previously determined that it was without authority to decide the precise legal question raised in the present appeal and granted EJR in at least two cases. Specifically, the Board granted the providers' request for EJR in the Oregon Waiver Days Group Appeal, PRRB Case No. 00-3891G, and in the Tennessee 96-00 TennCare Sub-Group Appeal, PRRB Case No. 03-1162G. Both cases involved the validity of CMS's policy of excluding Section 1115 waiver days from the DSH calculation, and, in fact, the latter case involved the same State Medicaid program waiver that is at issue here. The Provider requests that the Board follow its determination in these cases and grant EJR in the instant case.

## I.    FACTUAL AND LEGAL BACKGROUND

### A.    Medicare DSH Calculation

Since 1983, the Medicare program has paid most hospitals for the operating costs of inpatient hospital services under a prospective payment system ("PPS"). 42 U.S.C. § 1395ww(d)(1)-(5); 42 C.F.R. Part 412. Under PPS, Medicare pays hospitals a standardized amount per case subject to certain payment adjustments. Id. A hospital that serves a disproportionate share of low-income patients, or a DSH, is also entitled to an upward adjustment to the Medicare PPS payments. See 42 U.S.C. § 1395ww(d)(5)(F).

The amount of the Medicare DSH payment due to a hospital is determined, in part, by its "disproportionate patient percentage" ("DSH patient percentage"), which is a proxy for the Provider's utilization by low-income patients. See 42 U.S.C. § 1395ww(d)(5)(F)(v). The DSH patient percentage is defined as the sum of two fractions expressed as percentages. 42 U.S.C. § 1395ww(d)(5)(F)(vi). One of these fractions is commonly known as the Medicaid percentage. The numerator of the fraction used to compute the Medicaid percentage consists of the number of the Provider's patient days attributable to patients who were "eligible for medical assistance under a State plan approved under Title XIX, but who were not entitled to benefits under Part A of [Medicare]." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

### B.    Section 1115 Waiver Provision and TennCare

Section 1115 of the Act allows the Secretary to approve State research and demonstration projects that promote the objectives of the Title XIX Medicaid program. 42 U.S.C. § 1315. Section 1115(a)(1) authorizes the Secretary to waive the requirements of section 1902 of the Act, which contains Medicaid State plan requirements, including requirements as to eligible populations. 42 U.S.C. § 1315(a)(1). Section 1115(a)(2)(A) allows a State to receive federal matching for medical assistance, including medical assistance provided to expanded eligibility

POWERS, PYLE, SUTTER & VERVILLE PC

Suzanne Cochran, Esq., Chairperson
January 26, 2006
Page 3

populations, for which the State would not ordinarily be entitled to receive federal matching. 42
U.S.C. § 1315(a)(2).

Under some Section 1115 waivers, the State furnishes medical assistance to a population
that otherwise could have been made eligible for Medicaid; under others, the State furnishes
medical assistance to expanded eligibility populations that could not otherwise have been made
eligible for Medicaid. As stated by the Secretary, "the statute allows for the expansion popu-
lations to be treated as Medicaid beneficiaries." 65 Fed. Reg. 3137 (Jan. 20, 2000).

The State of Tennessee first received approval for its Section 1115 demonstration project,
called TennCare, on November 19, 1993. On January 1, 1994, Tennessee became the first state
to move its Medicaid program enrollees to a statewide demonstration project. In addition to
Medicaid eligible persons, TennCare offered coverage to expansion populations of uninsured and
uninsurable persons, regardless of income, who would not have been eligible for Medicaid under
the program as it existed prior to the waiver.[3]

C.    CMS Treatment of Section 1115 Waiver Days Under DSH

Until early 2000, the Medicare regulations did not specifically address the treatment of
Section 1115 waiver days under DSH. See 42 C.F.R. § 412.106 (1999). In 1999, however, CMS
issued Program Memorandum A-99-62.[4] This memorandum instructed intermediaries, within
certain parameters, to allow the inclusion of "ineligible waiver or demonstration population
days," but only to the extent that the intermediaries had previously allowed their inclusion, i.e.,
allowing hospitals which had previously received payment for such days to be held harmless. To
the extent that the very narrow parameters of Program Memorandum A-99-62 were not met,
however, Section 1115 waiver days were excluded from the DSH calculation.

On January 20, 2000, CMS issued an "interim final rule with comment period" to address
the treatment under DSH of Section 1115 waiver days. 65 Fed. Reg. 3136 (Jan. 20, 2000).
Through this interim final rule, CMS established that, effective with discharges occurring on or
after January 20, 2000, hospitals may include the patient days of all populations eligible for Title
XIX matching payments through a State's Section 1115 waiver in calculating the Medicare DSH
adjustment. 65 Fed. Reg. 3136-37; 65 Fed. Reg. 47086. The implementing regulation states:

> Effective with discharges occurring on or after January 20, 2000, for purposes of
> counting days under paragraph (b)(4)(i) of this section, hospitals may include all days
> attributable to populations eligible for Title XIX matching payments through a waiver
> approved under section 1115 of the Social Security Act.

---

[3] Exhibit 3 (Tennessee Statewide Health Reform Demonstration Fact Sheet).
[4] "Clarification of Allowable Medicaid Days in the Medicare Disproportionate Share Hospital (DSH) Adjustment
Calculation," Program Memorandum A-99-62 (Dec. 1, 1999).

POWERS, PYLE, SUTTER & VERVILLE PC

Suzanne Cochran, Esq., Chairperson
January 26, 2006
Page 4

42 C.F.R. § 412.106(b)(4)(ii). Thus, CMS's new policy allowing the inclusion of Section 1115 waiver days in the DSH calculation was effective for discharges occurring on or after January 20, 2000, but not with respect to discharges occurring prior to that date.

      D.    <u>Provider's Position</u>

      The Provider contends that the plain language of the Act requires the inclusion in the DSH calculation of all Section 1115 waiver days. As noted above, the statute provides that the numerator of the DSH Medicaid fraction include days for patients who were "eligible for medical assistance under a State Plan approved under Title XIX." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). Thus, the DSH calculation should clearly include all patients who were eligible for medical assistance under a Medicaid State Plan implemented through a Section 1115 waiver, including patients in expansion populations. Therefore, CMS's policy of excluding Section 1115 waiver days from the DSH calculation prior to January 20, 2000, as reflected in Program Memorandum A-99-62 and CMS regulations at 42 C.F.R. § 412.106(b)(4)(ii), violates the Act and is invalid.

      During the fiscal year at issue in this appeal, the Provider provided services to patients who were eligible for Medicaid payment under the TennCare program. When the intermediary determined the amount of the Provider's DSH payment, it excluded days attributable to patients covered under the Section 1115 waiver. Therefore, the Provider has been under-reimbursed as a result of the intermediary's application of the invalid CMS policy. Attached as Exhibit 4 is a calculation of the estimated reimbursement impact of the intermediary's exclusion of the Section 1115 waiver days, based on the information currently available to the Provider.

## II.    **THE BOARD SHOULD GRANT EJR**

      Under Section 1878(f)(1) of the Act, 42 U.S.C. § 1395oo(f)(1), the Board may grant EJR as to an intermediary determination that involves a question of the validity of a law, regulation, or controlling CMS policy which the Board lacks authority to decide. <u>See also</u> 42 C.F.R. § 405.1842. As discussed above, this appeal involves the Provider's challenge to CMS's policy, as reflected in CMS pronouncements and regulations, that excluded Section 1115 waiver days from the DSH calculation prior to January 20, 2000; this matter is, therefore, properly the subject of EJR.

      We note that the Board has previously granted EJR in at least two cases that also involved the validity of CMS's policy regarding Section 1115 waiver days. First, EJR was granted in the Oregon Waiver Days Group Appeal, PRRB Case No. 00-3891G. That case subsequently came before the United States Court of Appeals for the Ninth Circuit, which last year ruled that Section 1115 waiver days must be included in the Medicaid fraction of the DSH

POWERS, PYLE, SUTTER & VERVILLE PC

Suzanne Cochran, Esq., Chairperson
January 26, 2006
Page 5

calculation. <u>Portland Adventist Medical Center v. Thompson</u>, Medicare and Medicaid Guide (CCH) ¶ 301,592 (9th Cir. Mar. 2, 2005).

Second, the Board also granted EJR in a case involving TennCare program waiver days. Tennessee 96-00 TennCare Sub-Group Appeal, PRRB Case No. 03-1162G. The federal district court for the District of Columbia recently ruled in favor of the Tennessee hospitals in that case, finding that the TennCare waiver days should be included in the DSH calculation. <u>Cookeville Regional Medical Center, et al. v. Thompson</u>, Civil Action No. 04-1053 (D.D.C. Oct. 28, 2005), *appeal docketed,* No. 05-5495 (D.C. Cir. Jan. 5, 2006).

The situation presented here is identical to that involved in these previous appeals. Accordingly, the same result should apply here, and the Board should grant the Provider's request for EJR.

Finally, we note that this appeal involves only a legal issue, <u>i.e.</u>, the validity of a CMS regulation and policy. There are no factual issues in dispute. Furthermore, the Board has jurisdiction in this appeal.

For the foregoing reasons, the Provider requests that the Board grant EJR as to the Provider's challenge to the exclusion of Section 1115 waiver days from the DSH calculation.

Sincerely,

Mary Susan Philp

Enclosures

Cc (w/enc.):   Gary Gerber, TriSpan Health Services (via Federal Express)
               Wilson Leong, Blue Cross Blue Shield Association
               Michael Nesbit

Cc (w/o enc.): Lisa Ogilvie (via facsimile)

7

1

8

services furnished to program beneficiaries during the reporting period (from intermediary records). *For final settlement, report on line 25.01 the amount on line 5.99 of Worksheet M-5.*

*Line 26*—Enter the total amount due to/from the program (lines 24 minus line 25). Transfer this amount to Worksheet S, Part II, column 3, line 9.

*Line 27*—Enter the program reimbursement effect of protested items. The reimbursement effect of the nonallowable items is estimated by applying reasonable methodology which closely approximates the actual effect of the item as if it had been determined through the normal cost finding process. (See § 115.2.) A schedule showing the supporting details and computations must be attached.

36-224                                    Rev. 6

3666. WORKSHEET M-5 - ANALYSIS OF
    PAYMENTS TO HOSPITAL-BASED RHC/
    FQHC SERVICES RENDERED TO
    PROGRAM BENEFICIARIES

Complete this worksheet for Medicare interim payments only. If you have more than one hospital-based RHC/FQHC, complete a separate worksheet for each facility.

Complete the identifying information on lines 1 through 4. The remainder of the worksheet is completed by your fiscal intermediary.

*Line Descriptions*

*Line 1*—Enter the total program interim payments paid to the outpatient rehabilitation provider. The amount entered reflects the sum of all interim payments paid on individual bills (net of adjustment bills) for services rendered in this cost reporting period. The amount entered includes amounts withheld from the component's interim payments due to an offset against overpayments to the component applicable to prior cost reporting periods. It does not include

any retroactive lump sum adjustment amounts based on a subsequent revision of the interim rate, or tentative or net settlement amounts, nor does it include interim payments payable.

*Line 2*—Enter the total program interim payments payable on individual bills. Since the cost in the cost report is on an accrual basis, this line represents the amount of services rendered in the cost reporting period, but not paid as of the end of the cost reporting period. It does not include payments reported on line 1.

*Line 3*—Enter the amount of each retroactive lump sum adjustment and the applicable date.

*Line 4*—Transfer the total interim payments to the title XVIII Worksheet M-3, line 25.

DO NOT COMPLETE THE REMAINDER OF WORKSHEET M-5. LINES 5 THROUGH 7 ARE FOR INTERMEDIARY USE ONLY.

*Line 5*—List separately each tentative settlement payment after desk review together with the date of payment. If the cost report is re-opened after the Notice of Program Reimbursement (NPR) has been issued, report all settlement payments prior to the current reopening settlement on line 5.

*Line 6*—Enter the net settlement amount (balance due to the provider or balance due to the program) for the NPR, or, if this settlement is after a reopening of the NPR, for this reopening.

**NOTE:** On lines 3, 5, and 6, when an amount is due from the provider to the program, show the amount and date on which the provider agrees to the amount of repayment, even though total repayment is not accomplished until a later date.

*Line 7*—Enter the sum of the amounts on lines 4, 5.99, and 6 in column 2. The amount in column 2 must equal the amount on Worksheet M-3, line 26.

Rev. 6                                    36-225

---

**[¶ 150,932]   Medicaid Days in Medicare DSHs.**

*Program Memorandum*, HCFA-Pub. 60A, No. A-99-62, December 1, 1999.

**Medicare: Disproportionate Share Hospitals**

**Prospective payment system—Disproportionate share hospitals—Calculating Medicaid days.**—Calculation of Medicaid days in Medicare disproportionate share hospitals (DSHs) depends on whether the patient, not the hospital is eligible for Medicaid. A Medicaid day is applicable for days the patient is eligible for Medicaid even if Medicaid did not make payment for any services. A day does not count against the Medicare DSH adjustment if the same day is also a Medicaid day. Certain errors made by hospitals in counting for DSH adjustments will be held harmless prior to Jan. 1, 2000.

See ¶ 4260.

**Medicare and Medicaid Guide**                              **¶ 150,932**

### [Text of Memorandum]

**SUBJECT: Clarification of Allowable Medicaid Days in the Medicare Disproportionate Share Hospital (DSH) Adjustment Calculation—ACTION**

A review of practices and policies regarding Medicare disproportionate share payment determinations led HCFA to conclude that it is necessary to clarify the definition of eligible Medicaid days in Medicare disproportionate share policy and communicate this information to fiscal intermediaries, hospitals, Medicaid State agencies, and Medicaid managed care organizations. **This clarification applies to cost reporting periods beginning on or after January 1, 2000.** The purpose of this memorandum is to address those details that may need clarification and also to communicate the hold harmless position for cost reporting periods beginning before January 1, 2000. A similar memorandum will be sent to the Medicaid State agencies.

### CLARIFICATION FOR COST REPORTING PERIODS BEGINNING ON OR AFTER JANUARY 1, 2000

*Background*

Under section 1886(d)(5)(F) of the Social Security Act, the Medicare disproportionate share patient percentage is made up of two computations. The first computation includes patient days that were furnished to patients who, during a given month, were entitled to both Medicare Part A and Supplemental Security Income (SSI) (excluding State supplementation). This number is divided by the number of covered patient days utilized by patients under Medicare Part A for that same period. The second computation includes patient days associated with beneficiaries who were eligible for medical assistance (Medicaid) under a State plan approved under Title XIX but who were not entitled to Medicare Part A. (See 42 CFR 412.106(b)(4).) This number is divided by the total number of patient days for that same period.

*Included Days*

In calculating the number of Medicaid days, the hospital must determine whether the patient was eligible for Medicaid under a State plan approved under Title XIX on the day of service. If the patient was so eligible, the day counts in the Medicare disproportionate share adjustment calculation. The statutory formula for "Medicaid days" reflects several key concepts. First, the focus is on the *patient's* eligibility for Medicaid benefits as determined by the State, not the *hospital's* "eligibility" for some form of Medicaid payment. Second, the focus is on the patient's eligibility for *medical* assistance under an approved Title XIX State plan, not the patient's eligibility for *general* assistance under a

State-only program. Third, the focus is on eligibility for *medical assistance under an approved Title XIX State plan*, not medical assistance under a State-only program or other program. Thus, for a day to be counted, the patient must be eligible on that day for medical assistance benefits under the Federal-State cooperative program known as Medicaid ( under an approved Title XIX State plan). In other words, for purposes of the Medicare disproportionate share adjustment calculation, the term "Medicaid days" refers to days on which the patient is eligible for medical assistance benefits under an approved Title XIX State plan. The term "Medicaid days" does *not* refer to all days that have some relation to the Medicaid program, through a matching payment or otherwise; if a patient is *not* eligible for medical assistance benefits under an approved Title XIX State plan, the patient day cannot become a "Medicaid day" simply by virtue of some other association with the Medicaid program.

### HCFA-Pub. 60A

Medicaid days, for purposes of the Medicare disproportionate share adjustment calculation, include all days during which a patient is eligible, under a State plan approved under Title XIX, for Medicaid benefits, even if Medicaid did not make payment for any services. Thus, Medicaid days include, but are not limited to, days that are determined to be medically necessary but for which payment is denied by Medicaid because the provider did not bill timely, days that are beyond the number of days for which a State will pay, days that are utilized by a Medicaid beneficiary prior to an admission approval but for which a valid enrollment is determined within the prescribed period, and days for which payment is made by a third party. In addition, we recognize in the calculation days that are utilized by a Medicaid beneficiary who is eligible for Medicaid under a State plan approved under Title XIX through a managed care organization (MCO) or health maintenance organization (HMO). However, in accordance with 42 CFR 412.106(b)(4), a day does not count in the Medicare disproportionate share adjustment calculation if the patient was entitled to both Medicare Part A and Medicaid on that day. Therefore, once the eligibility of the patient for Medicaid under a State plan approved under Title XIX has been verified, you must determine whether any of the days are dual entitlement days and, to the extent that they are, subtract them from the other days in the calculation.

*Excluded Days*

Many States operate programs that include both State-only and Federal-State eligibility groups in an integrated program. For example, some States provide medical assistance to bene-

©2000, CCH INCORPORATED

ficiaries of State-funded income support programs. These beneficiaries, however, are not eligible for Medicaid under a State plan approved under Title XIX, and, therefore, days utilized by these beneficiaries do not count in the Medicare disproportionate share adjustment calculation. If a hospital is unable to distinguish between Medicaid beneficiaries and other medical assistance beneficiaries, then it must contact the State for assistance in doing so.

In addition, if a given patient day affects the level of *Medicaid* DSH payments *to the hospital* but the patient is not eligible for Medicaid under a State plan approved under Title XIX on that day, the day is not included in the *Medicare* DSH calculation.

It should be noted that the types of days discussed above are not necessarily the only types of excluded days. Please see the attached chart, which summarizes some, but not necessarily all, of the types of days to be excluded from (or included in) the Medicare DSH adjustment calculation.

To provide consistency in both components of the calculation, any days that are added to the Medicaid day count must also be added to the total day count, to the extent that they have not been previously so added.

Regardless of the type of allowable Medicaid day, the hospital bears the burden of proof and must verify with the State that the patient was eligible under one of the allowable categories during each day of the patient's stay. The hospital is responsible for and must provide adequate documentation to substantiate the number of Medicaid days claimed. Days for patients that cannot be verified by State records to have fallen within a period wherein the patient was eligible for Medicaid as described in this memorandum cannot be counted.

## HOLD HARMLESS FOR COST REPORTING PERIODS BEGINNING BEFORE JANUARY 1, 2000

In accordance with the hold harmless position communicated by HCFA on October 15, 1999, for cost reporting periods beginning before January 1, 2000, you are not to disallow, within the parameters discussed below, the portion of Medicare DSH adjustment payments previously made to hospitals attributable to the erroneous inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or ineligible waiver or demonstration population days in the Medicaid days factor used in the Medicare DSH formula. This is consistent with HCFA's determination that hospitals and intermediaries relied, for the most part, on Medicaid days data obtained from State Medicaid agencies to compute Medicare DSH payments and that some of those agencies

commingled the types of otherwise ineligible days listed above with Medicaid Title XIX days in the data transmitted to hospitals and/or intermediaries. Although HCFA has decided to allow the hospitals to be held harmless for receiving additional payments resulting from the erroneous inclusion of these types of otherwise ineligible days, this decision is not intended to hold hospitals harmless for any other aspect of the calculation of Medicare DSH payments or any other Medicare payments.

### Hospitals That Received Payments Reflecting the Erroneous Inclusion of Days at Issue

In practical terms this means that you are not to reopen any cost reports for cost reporting periods beginning before January 1, 2000 to disallow the portions of Medicare DSH payments attributable to the erroneous inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or ineligible waiver or demonstration population days if the hospital received payments for those days based on those cost reports. If, prior to the issuance of this Program Memorandum, you reopened a settled cost report to disallow the portion of Medicare DSH payment attributable to the inclusion of these types of days, reopen that cost report again and refund the amounts (including interest) collected. Do not, however, pay the hospitals interest on the amounts previously recouped as result of the disallowance. Furthermore, on or after October 15, 1999, you are not to accept reopening requests for previously settled cost reports or amendments to previously submitted cost reports pertaining to the inclusion of these types of days in the Medicare DSH formula.

For cost reporting periods beginning before January 1, 2000, you are to continue to allow these types of days in the Medicare DSH calculation for all open cost reports only in accordance with the practice followed for the hospital at issue before October 15, 1999 (i.e., for open cost reports, you are to allow only those types of otherwise ineligible days that the hospital received payment for in previous cost reporting periods settled before October 15, 1999). For example, if, for a given hospital, a portion of Medicare DSH payment was attributable to the erroneous inclusion of general assistance days for only the out-of-State or HMO population in cost reports settled before October 15, 1999, you are to include the ineligible waiver days for only that population when settling open cost reports for cost reporting periods beginning before January 1, 2000. However, the actual number of general assistance and other State-only health program, charity care, Medicaid DSH, and/or ineligible waiver or demonstration days, as well as Medicaid Title XIX days, that you allow for the open cost reports must be supported by

**402,358**    Current Developments    1089    1-11-2000

auditable documentation provided by the hospital.

### Hospitals That Did Not Receive Payments Reflecting the Erroneous Inclusion of Days at Issue

If a hospital did not receive any payment based on the erroneous inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or waiver or demonstration population days for cost reports that were settled before October 15, 1999, and the hospital never filed a jurisdictionally proper appeal to the Provider Reimbursement Review Board (PRRB) on this issue, you are not to pay the hospital based on the inclusion of these types of days for any open cost report for cost reporting periods beginning before January 1, 2000. Furthermore, on or after October 15, 1999, you are not to accept reopening requests for previously settled cost reports or amendments to previously submitted cost reports pertaining to the inclusion of these types of days in the Medicare DSH formula.

If, for cost reporting periods beginning before January 1, 2000, a hospital that did not receive payments reflecting the erroneous inclusion of otherwise ineligible days filed a jurisdictionally proper appeal to the PRRB *on the issue of the exclusion of these types of days from the Medicare DSH formula* before October 15, 1999, reopen the cost report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days. If there are any questions or concerns regarding the qualifications for a "jurisdictionally proper appeal", please submit them in writing before rendering a decision in a specific case to Charles Booth, Director, Financial Services Group, Office of Financial Management, 7500 Security Boulevard, Location C3-14-16, Baltimore, Maryland 21244-1850. Where, for cost reporting periods beginning before January 1, 2000, a hospital filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days from the Medicare DSH formula *on or after* October 15, 1999, reopen the *settled* cost report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days, but only if the hospital appealed, before October 15, 1999, the denial of payment for the days in question in previous cost reporting periods. The actual number of these types of days that you use in this

revision must be properly supported by adequate documentation provided by the hospital. Do not reopen a cost report and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days if, on or after October 15, 1999, a hospital added the issue of the exclusion of these types of days to a jurisdictionally proper appeal already pending before PRRB on *other* Medicare DSH issues or *other* unrelated issues.

You are to continue paying the Medicare DSH adjustment reflecting the inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or waiver or demonstration population days for all open cost reports for cost reporting periods beginning before January 1, 2000, to any hospital that, before October 15, 1999, filed a jurisdictionally proper appeal to the PRRB specifically for this issue on *previously* settled cost reports.

Finally, you are reminded that, if a hospital has filed a jurisdictionally proper appeal with respect to the HCFA 97-2 ruling and the hospital has otherwise received payment for the portion of Medicare DSH adjustment attributable to the inclusion of general assistance or other State-only health programs, charity care, Medicaid DSH, and/or ineligible waiver or demonstration population days based on its *paid* Medicaid days, include these types of *unpaid* days in the Medicare DSH formula when revising the cost reports affected by the HCFA 97-2 appeal.

The *effective date* for this **Program Memorandum (PM)** is for cost reporting periods beginning on or after January 1, 2000.

The *implementation date* for this PM is **January 1, 2000.**

**Funding is available through a Supplemental Budget Request for costs required for implementation.**

**PM may be discarded after January 31, 2001.**

**SPECIAL INSTRUCTIONS TO THE INTERMEDIARIES FOR PUBLISHING THE PM: The intermediaries are required to distribute the content of this PM to all the hospitals immediately upon receipt of the PM.**

Attachment

¶ 150,932

1089   1-11-2000          HCFA Manual Revisions—Transmittals          **402,359**

| TYPE OF DAY | DESCRIPTION | ELIGIBLE TITLE XIX DAY |
|---|---|---|
| General Assistance Patient Days | Days for patients covered under a State-only (or county-only) general assistance program (whether or not any payment is available for health care services under the program). These patients are not Medicaid-eligible under the State plan. | No. |
| Other State-Only Health Program Patient Days | Days for patients covered under a State-only health program. These patients are not Medicaid-eligible under the State plan. | No. |
| Charity Care Patient Days | Days for patients not eligible for Medicaid or any other third-party payer, and claimed as uncompensated care by a hospital. These patients are not Medicaid-eligible under the State plan. | No. |
| Actual 1902(r)(2) and 1931(b) Days | Days for patients eligible under a State plan based on a 1902(r)(2) or 1931(b) election. These patients are Medicaid-eligible under the Title XIX State plan under the authority of these provisions, which is exercised by the State in the context of the approved State plan. | Yes. |
| Medicaid Optional Targeted Low Income Children (CHIP-related) Days | Days for patients who are Title XIX-eligible and who meet the definition of "optional targeted low income children" under section 1905(u)(2). The difference between these children and other Title XIX children is the enhanced FMAP rate available to the State. These children are fully Medicaid-eligible under the State plan. | Yes. |
| Separate CHIP Days | Days for patients who are eligible for benefits under a non-Medicaid State program furnishing child health assistance to targeted low-income children. These children are, by definition, not Medicaid-eligible under a State plan. | No. |
| 1915(c) Eligible Patient (the "217" group) Days | Days for patients in the eligibility group under the State plan for individuals under a Home and Community Based Services waiver. This group includes individuals who would be Medicaid-eligible if they were in a medical institution. Under this special eligibility group, they are Medicaid-eligible under the State plan. | Yes. |
| Retroactive Eligible Days | Days for patients not enrolled in the Medicaid program at the time of service, but found retroactively eligible for Medicaid benefits for the days at issue. These patients are Medicaid-eligible under the State plan. | Yes. |
| Medicaid Managed Care Organization Days | Days for patients who are eligible for Medicaid under a State plan when the payment to the hospital is made by an MCO for the service. An MCO is the financing mechanism for Medicaid benefits, and payment for the service through the MCO does not affect eligibility. | Yes. |
| Medicaid DSH Days | Days for patients who are not eligible for Medicaid benefits, but are considered in the calculation of Medicaid DSH payments by the State. These patients are not Medicaid-eligible. Sometimes Medicaid State plans specify that Medicaid DSH payments are based upon a hospital's amount of charity care or general assistance days. This, however, is not "payment" for those days, and does not mean that the patient is eligible for Medicaid benefits or can be counted as such in the Medicare formula. | No. |

13

**Medicare and Medicaid Guide**          **¶ 150,932**

2

14

ovisions

a tem-
ull-time
esidents
al's clo-
(h)(2) of
al that
program
its FTE
ipecified
of this
may re-
t to its
lded be-
esidency
a speci-
) of this

; estab-
n (as de-
hapter),
rogram,
tegrated
its FTE
racks in
e provi-
ipter.
s occur-
s begin-
, 1999, a
ment to
lditional
lditional
inted as
poses of
the fact
were on
r a simi-
, in ac-
ons of

ig on or
Veterans
eceive a
FTE cap
een pre-
ital and
t to the
il meets
sions of

the full-
irticular
hospital
informa-
certified

by an official of the hospital and, if different, an official responsible for administering the residency program.

(i) A listing, by specialty, of all residents assigned to the hospital and providing services to the hospital during the cost reporting period.

(ii) The name and social security number of each resident.

(iii) The dates the resident is assigned to the hospital.

(iv) The dates the resident is assigned to other hospitals or other freestanding providers and any nonprovider setting during the cost reporting period.

(v) The proportion of the total time necessary to fill a residency slot that the resident is assigned to an area of the hospital listed under paragraph (f)(1)(ii) of this section.

(3) Fiscal intermediaries must verify the correct count of residents.

(g) *Indirect medical education payment for managed care enrollees.* For portions of cost reporting periods occurring on or after January 1, 1998, a payment is made to a hospital for indirect medical education costs, as determined under paragraph (e) of this section, for discharges associated with individuals who are enrolled under a risk-sharing contract with an eligible organization under section 1876 of the Act or with a Medicare+Choice organization under title XVIII, Part C of the Act during the period, according to the applicable payment percentages described in §§413.76(c)(1) through (c)(5) of this subchapter.

[50 FR 12741, Mar. 29, 1985. Redesignated at 56 FR 43241, Aug. 30, 1991]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting §412.105, see the List of Sections Affected, which appears in the Finding Aids section of the printed volume and on GPO Access.

§412.106  **Special treatment: Hospitals that serve a disproportionate share of low-income patients.**

(a) *General considerations.* (1) The factors considered in determining whether a hospital qualifies for a payment adjustment include the number of beds, the number of patient days, and the hospital's location.

(i) The number of beds in a hospital is determined in accordance with §412.105(b).

(ii) For purposes of this section, the number of patient days in a hospital includes only those days attributable to units or wards of the hospital providing acute care services generally payable under the prospective payment system and excludes patient days associated with—

(A) Beds in excluded distinct part hospital units;

(B) Beds otherwise countable under this section used for outpatient observation services, skilled nursing swing-bed services, or ancillary labor/delivery services. This exclusion would not apply if a patient treated in an observation bed is ultimately admitted for acute inpatient care, in which case the beds and days would be included in those counts;

(C) Beds in a unit or ward that is not occupied to provide a level of care that would be payable under the acute care hospital inpatient prospective payment system at any time during the 3 preceding months (the beds in the unit or ward are to be excluded from the determination of available bed days during the current month); and

(D) Beds in a unit or ward that is otherwise occupied (to provide a level of care that would be payable under the acute care hospital inpatient prospective payment system) that could not be made available for inpatient occupancy within 24 hours for 30 consecutive days.

(iii) The hospital's location, in an urban or rural area, is determined in accordance with the definitions in §412.62(f) or §412.64.

(2) The payment adjustment is applied to the hospital's DRG revenue for inpatient operating costs based on DRG-adjusted prospective payment rates for inpatient operating costs, excluding outlier payments for inpatient operating costs under subpart F of this part and additional payments made under the provisions of §412.105.

(b) *Determination of a hospital's disproportionate patient percentage.* (1) *General rule.* A hospital's disproportionate patient percentage is determined by adding the results of two computations and expressing that sum as a percentage.

(2) *First computation: Federal fiscal year.* For each month of the Federal

455

fiscal year in which the hospital's cost reporting period begins, CMS—

(i) Determines the number of patient days that—

(A) Are associated with discharges occurring during each month; and

(B) Are furnished to patients who during that month were entitled to both Medicare Part A and SSI, excluding those patients who received only State supplementation;

(ii) Adds the results for the whole period; and

(iii) Divides the number determined under paragraph (b)(2)(ii) of this section by the total number of patient days that—

(A) Are associated with discharges that occur during that period; and

(B) Are furnished to patients entitled to Medicare Part A.

(3) *First computation: Cost reporting period.* If a hospital prefers that CMS use its cost reporting period instead of the Federal fiscal year, it must furnish to CMS, through its intermediary, a written request including the hospital's name, provider number, and cost reporting period end date. This exception will be performed once per hospital per cost reporting period, and the resulting percentage becomes the hospital's official Medicare Part A/SSI percentage for that period.

(4) *Second computation.* The fiscal intermediary determines, for the same cost reporting period used for the first computation, the number of the hospital's patient days of service for which patients were eligible for Medicaid but not entitled to Medicare Part A, and divides that number by the total number of patient days in the same period. For purposes of this second computation, the following requirements apply:

(i) For purposes of this computation, a patient is deemed eligible for Medicaid on a given day only if the patient is eligible for inpatient hospital services under an approved State Medicaid plan or under a waiver authorized under section 1115(a)(2) of the Act on that day, regardless of whether particular items or services were covered or paid under the State plan or the authorized waiver.

(ii) Effective with discharges occurring on or after January 20, 2000, for purposes of counting days under para-

graph (b)(4)(i) of this section, hospitals may include all days attributable to populations eligible for Title XIX matching payments through a waiver approved under section 1115 of the Social Security Act.

(iii) The hospital has the burden of furnishing data adequate to prove eligibility for each Medicaid patient day claimed under this paragraph, and of verifying with the State that a patient was eligible for Medicaid during each claimed patient hospital day.

(5) *Disproportionate patient percentage.* The intermediary adds the results of the first computation made under either paragraph (b)(2) or (b)(3) of this section and the second computation made under paragraph (b)(4) of this section and expresses that sum as a percentage. This is the hospital's disproportionate patient percentage, and is used in paragraph (c) of this section.

(c) *Criteria for classification.* A hospital is classified as a "disproportionate share" hospital instead under any of the following circumstances:

(1) The hospital's disproportionate patient percentage, as determined under paragraph (b)(5) of this section, is at least equal to one of the following:

(i) 15 percent, if the hospital is located in an urban area, and has 100 or more beds, or is located in a rural area and has 500 or more beds.

(ii) 30 percent for discharges occurring before April 1, 2001, and 15 percent for discharges occurring on or after April 1, 2001, if the hospital is located in a rural area and either has more than 100 beds and fewer than 500 beds or is classified as a sole community hospital under § 412.92.

(iii) 40 percent for discharges before April 1, 2001, and 15 percent for discharges occurring on or after April 1, 2001, if the hospital is located in an urban area and has fewer than 100 beds.

(iv) 45 percent for discharges before April 1, 2001, and 15 percent for discharges occurring on or after April 1, 2001, if the hospital is located in a rural area and has 100 or fewer beds.

(2) The hospital is located in an urban area, has 100 or more beds, and can demonstrate that, during its cost reporting period, more than 30 percent of its net inpatient care revenues are

16

derived
ment p
indigen
(d)  *F
Method
duction
(e) of tl
disprop
patient
tient o
an adj
paragr;
(2)  *P*
the hos
graph (
ment a
of the 1
(A) I
patien
percen
justme
(1)  I
after  /
1, 1991
the dii
the ho
percen
(2)  1
after  -
ber 1,
of the
and th
tient 1
(3)
after
ber 1,
of the
and tl
tient
(4)
after
82.5 p
20.2  1
propo
(B)
patiel
cent,
ment
(1)
after
1993,
differ
hospi
cents
(2)
after
perce
perce
tions

3

17



**Health Care Financing Administration**

**Medicare**      **Medicaid**      **SCHIP**      **What's New**      **Site Index**

# TENNESSEE STATEWIDE HEALTH REFORM DEMONSTRATION

## FACT SHEET

---

**Name of Section 1115 Demonstration:** TennCare

**Date Proposal Submitted:** June 16, 1993

**Date Proposal Approved:** November 18, 1993

**Date Implemented:** January 1, 1994

### SUMMARY

TennCare is a statewide program to provide health care benefits to Medicaid beneficiaries, uninsured State residents and those whose medical conditions make them uninsurable. Enrollment is capped at 1.4 million. If the cap is reached, those in the mandatory Medicaid coverage and uninsurable groups will continue to be enrolled, while enrollment of the currently uninsured groups will be limited. All enrollees are served in capitated managed care organizations (MCOs) that are health maintenance organizations (HMOs). Current enrollment is about 1.3 million.

### ELIGIBILITY

Three distinct groups are offered coverage:

- All persons meeting the eligibility requirements of the Medicaid program as it existed in fiscal year 1993. Current enrollment in this group is about 803,000.
- Persons with an existing or prior existing health conditions causing them to be uninsurable. This population is now nearly 10 percent of all enrollees.
- Persons who are not eligible -- either directly or as a dependent -- for an employer-sponsored or government-sponsored health plan as of March 1, 1993. While enrollment will not be restricted for those currently eligible for Medicaid or the uninsurable, the cap on total enrollment may limit the number of uninsured served. Current enrollment of uninsurable and previously uninsured individuals is about 546,000. Enrollment is currently open to uninsured children and uninsurables.

18

### BENEFIT PACKAGE

A standard benefit package is provided by managed care organizations (MCOs).

TennCare benefits are more generous than those offered under Medicaid for acute care, generally in that they remove most limitations on number of episodes covered. The plan emphasizes preventive care by providing all preventive care to adults and children without copayments or deductibles.

On June 30, 2000, HCFA approved the State=s request to carve out pharmacy benefits from the MCO capitation rate for those individuals also eligible for Medicare.

## ENROLLMENT/DISENROLLMENT PROCESS

Those deemed Medicaid-eligible are enrolled for a 1-year period. Those in the uninsured group are enrolled for a 1-year period as long as they continue to pay their premiums.

The State may involuntarily disenroll those in the uninsured group who fail to pay premiums.

Individuals who are severely and persistently mentally ill (SPMI) were brought into managed care in July 1996. They are now served by the same BHOs that provide behavioral health services to the rest of the TennCare population (See section on "TennCare Partners Program" below.)

Long term care is not included in the managed care plan.

## DELIVERY SYSTEM

The State has contracted with 10 MCOs. The MCOs contract with providers on a fee-for-service or capitation basis.

Services for Children's Plan enrollees (children in State custody or at risk of custody) are currently being provided through the existing State delivery system.

## QUALITY ASSURANCE

The State has a contract with an independent external quality review organization (EQRO). Yearly reviews have been completed and health plans have begun to implement changes in many of the areas that were identified as needing improvement.

## COST-SHARING

All adults and children with incomes above 100 percent of the Federal Poverty Level (FPL) are required to pay, except those in Medicaid eligibility groups. Cost-sharing is in the form of premiums, deductibles, and copayments based on income.

Participants with incomes over 100 percent FPL pay their premiums on a graduated fee schedule so that payments will increase as income increases. Premiums include individual premiums and family premiums.

19

Deductibles are on a graduated scale, but none are required for mandatory Medicaid eligibles. Deductibles are $250 for an individual and $500 for a family with incomes between 101 and 199 percent FPL.

Copayments are up to 10 percent of costs, based on a graduated scale for enrollees with incomes between 101 and 199 percent FPL (other than mandatory Medicaid eligibles) and would be 10 percent of the cost of a service for those at or above 200 percent FPL.

Cost-sharing expenditures are limited by annual out-of-pocket maximums of $1,250 per individual/family, excluding premium payments.

To encourage use of preventive services, no deductible or copayment is required for such services.

## TENNCARE PARTNERS PROGRAM

Implemented on July 1, 1996, as part of the TennCare section 1115 demonstration project, the TennCare Partners Program provides behavioral health and substance abuse services to all TennCare enrollees through a complete carve-out program. All mental health and substance abuse services that were previously offered by managed care organizations (MCOs), as well as those provided through the Tennessee Department of Mental Health and Mental Retardation, is provided under the new plan by one of two behavioral health organizations (BHOs).

Eligibility and Coverage: Eligibility is determined as currently defined by the TennCare program; however, BHO enrollees are divided into two groups, Basic and Priority participants. The Basic benefit package provides standard episodic care services, while the Priority package is an expanded group of services provided to those who are most severely ill.

The 1.3 million Basic participants are entitled to the basic service benefit package for mental health and substance abuse services which has been offered by MCOs since TennCare was implemented.

Priority participants are those who have been evaluated by the State and identified as SPMI. This group has traditionally been served by the Community Mental Health Centers (CMHCs) who were contracted by the Tennessee Department of Mental Health and Mental Retardation on a fee-for-service basis. All attempts have been made to preserve these existing provider relationships.

Delivery System: BHOs contract with the State to provide services and receive monthly capitation payments for each enrollee.

BHOs currently have the five State regional mental institutions in their networks, although they are not required to do so. In addition, CMHCs are used as safety net providers. Both BHOs have contracted with all CMHCs.

Coordination of care between the MCO and BHO is a contractual requirement for the plans. The State has required the plans to meet regularly to address issues that arise in providing care.

20

Page 4 of 4

The State believes that virtually all current behavioral health providers are in at least one of the BHO networks.

Choice of Provider: The BHOs each associate with several of the MCOs, with some overlap. Initially, the State assigned beneficiaries to one of the two BHOs via the enrollees= associated MCO, while providing an option to change if a provider of long standing was not in the network. Enrollees have free choice of providers from within the assigned BHO network, and may change BHOs by changing MCOs at the annual change enrollment period.

10/20/00

**Contact:**
Clarke Cagey, 410-786-7700 or E-mail CCagey@hcfa.gov.





Medicare.gov | Department of Health and Human Services | NMEP

Home | Privacy Policy | Feedback | Help | Website Accessibility



21

4

22

**Methodist Healthcare - Memphis Hospitals**
**FYE 1998**

**Reimbursement Impact of DSH (Medicaid Days)**

| | |
|---|---:|
| Per NPR | |
| Total Medicaid Days | 55,845 |
| Total DSH Reimbursement | $ 17,311,206 |
| | |
| Additional Medicaid Waiver Days | 8,229 |
| | |
| Revised Total Medicaid Days | 64,074 |
| Revised Total DSH Reimbursement | $ 19,609,422 |
| | |
| Additional Reimbursement | $  2,298,216 |

23



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
PROVIDER REIMBURSEMENT REVIEW BOARD
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671          FAX: 410-786-5298

Suzanne Cochran, Esq., Chairperson
Henry C. Wessman, Esq.
Stanley J. Sokolove, C.P.A.
Gary B. Blodgett, D.D.S.

Refer to:

CERTIFIED MAIL
--------------

                                                    10 5 DEC 2002

Powers, Pyles, Sutter & Verville, P.C.
Mary Susan Philp, Esq.
Twelfth Floor
1875 Eye Street, N.W.
Washington, DC 20006 5409

Re: PRRB Appeals Pilot Program Acknowledgment and Critical Due Dates
    Case Number: 03-0180
    Date Filed: 11/19/02
    Provider Name: Methodist Hospitals of Memphis
    Provider Number: 44-0049
    Appealed Year - FYE: 12/31/98

The Provider Reimbursement Review Board ("Board") has received your
request for a hearing.  Your appeal is being processed as part of a
special pilot project.  The intent of the pilot project is to improve
communication between parties and to improve due process.  Consequently,
the cost of executing your appeal should be reduced and the appeal
should be processed more timely.  If you have not received prior
notification of this pilot project from your intermediary, please contact
your intermediary to obtain the complete details of this program.

You must reference the case number, provider name, provider number
and fiscal year end on all future correspondence with the Board.
If any of the above information is incorrect, you must inform the
Board and your intermediary, in writing, within 30 days of this letter.

DUE DATES
---------

1st of March 2003: Provider's Position Statement due to the Board and
        the intermediary.  Provider must request any additional
        documentation it needs from the intermediary and submit
        proposals to resolve issues.

1st of July 2003: Intermediary's Position Statement due to the Board
        and the provider.  Intermediary must address each issue, request
        any additional documentation it needs from the provider, submit
        proposals to resolve issues and furnish requested documentation,
        as appropriate.  Jurisdiction motions are due to the Board and
        the provider at this point.

1st of October 2003: Provider's response to the intermediary's
        position statement, proposals to resolve and requests for
        documentation are due.  Jurisdiction briefs are due to the Board
        and the intermediary at this point.

1st of April 2004: Provider's Hearing Brief, which contains
        the provider's final position on the remaining issues, due to
        the Board and the intermediary.

                                                    24

Certified Article Number

7160 3901 9844 9403 2154

SENDERS RECORD

Certified Article Number

7160 3901 9844 9403 2161

SENDERS RECORD

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671        FAX: 410-786-5298

Suzanne Cochran, Esq., Chairpe
Henry C. Wessman, Esq.
Stanley J. Sokolove, C.P.A.
Gary B. Blodgett, D.D.S.

Refer to: 1st of June 2004: Intermediary's Hearing Brief, which contains the intermediary's final position on the remaining issues, due the Board and the provider.

DISMISSALS
----------

You are responsible for pursuing your appeal in accordance with the Board's procedures and the due dates assigned. You must file your position statement and hearing brief regardless of any outstanding jurisdictional challenges, motions or subpoena requests. If you miss either of these two due dates, the Board will dismiss your appeal. The Board will not send a due date reminder. Accordingly, if the intermediary fails to file its hearing brief timely, the Board will contact the Centers for Medicare & Medicaid Services (CMS) about contract compliance and will move to a hearing date.

HEARING DATE AND OPTIONS
------------------------

August 2004: Month of hearing.

The Board will send you a Notice of Board Hearing to notify you of the specific time, date and location of the hearing. While we realize that the regulations only call for a 30 day Notice of Hearing, we will attempt to issue the Notice of Hearing at least 90 days prior to the actual hearing date and will have attached hearing instructions.

You may make a written request, at any time, that:
    your case be heard based on the submitted record;
    your case be conducted by video or teleconference;
    your case be resolved through mediation;
    your case be reviewed in a pre-hearing conference with a Board membe

If you request any of these options, you must continue to meet the due dates set forth in this letter until you are advised by the Board regarding your request.

General instructions may be obtained from the Board's website, www.hcfa.gov/regs/prrb.htm. Instructions regarding the pilot program may be obtained from your intermediary.

If you have questions about the pilot program, please call your intermediary. You may also call Brooke McClurg of the Blue Cross & Blue Shield Association at (312) 297-5925.

Steven R. Kirsh
Division of Jurisdiction and Case Management

cc: BC & BS Association
    Wilson C. Leong
    225 North Michigan Avenue
    Chicago, IL 60601-7680

TriSpan Health Services
Gary Gerber, CPA
Director, Provider Audit
P.O. Box 23046
Jackson, MS 39225 3046

25

**POWERS**
**PYLES**
**SUTTER &**
**VERVILLE PC**
ATTORNEYS AT LAW

REBECCA L. BURKE
HAROLD DAMELIN
MARK R. FITZGERALD
STANLEY A. FREEMAN
SHERRY MASTROSTEFANO GRAY
ADAM H. GREENE
JOEL M. HAMME
JUSTIN R. HUNTER'
THOMAS J. HYLDEN
JOHN D. KEMP
CHRISTOPHER L. KEOUGH
EDITH S. MARSHALL
DIANE S. MILLMAN
AMY E. NORDENG

MARY SUSAN PHILP
GALEN D. POWERS
JAMES C. PYLES
JOEL M. RUDNICK
C. ANTHONY RUSSO
ROBERT J. SANER II
MARLA P. SPINDEL
RONALD N. SUTTER
D. BENSON TESDAHL
PETER W. THOMAS
RICHARD E. VERVILLE
WILLIAM H. VON OEHSEN, III
STEPHANIE A. WEBSTER
BARBARA STRAUB WILLIAMS

DIRECTOR PUBLIC POLICY AND LEGISLATION
JUDITH A. BUCKALEW

LEGISLATIVE DIRECTORS
DUSTIN W.C. MAY
TED SLAFSKY

SENIOR PROJECT MANAGER
CHRISTINE HARRIS

HIGHER EDUCATION SPECIALIST
SHARON H. BOB, Ph.D.

'Member Tennessee Bar Only

November 19, 2002


**FEDERAL EXPRESS**


Suzanne Cochran, Esq.
Chairman
Provider Reimbursement Review Board
2520 Lord Baltimore Drive, Suite L
Baltimore, Maryland 21244-2670

      Re:    Methodist Hospitals of Memphis;
              Provider No. 44-0049;
              <u>Fiscal Year Ending December 31, 1998</u>

Dear Mr. Kues:

      Pursuant to Section 1878(a) of the Social Security Act, the above-captioned provider hereby appeals the notice of program reimbursement ("NPR") issued for its fiscal year ending December 31, 1998. A copy of the NPR is attached as Exhibit 1.

      The provider appeals the following issues:

      (1)    Adjustment of inpatient and outpatient bad debts; audit adjustment numbers 49 and 51; approximate reimbursement effect - $725,173

             The provider contends that the adjustment is contrary to 42 C.F.R. § 413.80. Specifically, the Intermediary improperly disallowed Medicare bad debts claimed by the Provider. The Provider will furnish appropriate documentation supporting the bad debts in question. The audit adjustments for this issue, which reflect that the amount of bad debts disallowed was $966,897, are attached as Exhibit 2. Because hospital bad debts were subject to a 25 percent reduction during fiscal year 1998, the amount in controversy for this issue is $725,173.

26

POWERS, PYLES, SUTTER & VERVILLE PC

Suzanne Cochran, Esq.
November 19, 2002
Page 2

(2)    Adjustment of GME per-resident amount; audit adjustment number 34; approximate reimbursement effect - $157,356;

The Provider contends that the Intermediary's use of a weighted average per-resident amount following the Provider's merger with LeBonheur Children's Hospital is contrary to the Medicare statute and regulations. 42 U.S.C. § 1395ww(h); 42 C.F.R. § 413.86(e)(1). The Intermediary should have used the Provider's pre-merger per-resident amount. The audit adjustment for this issue and calculations showing the approximate reimbursement impact are attached as Exhibit 3.

(3)    Adjustment of disproportionate share ("DSH") payment (Medicaid days percentage); audit adjustment number 44; approximate reimbursement effect - $2,298,216.

The Provider contends that the Intermediary's calculation of the Provider's DSH payment is contrary to the Medicare statute and regulations. 42 U.S.C. § 1395ww(d)(5)(F); 42 C.F.R. § 412.106. Specifically, the Provider contends that the days attributable to all patients eligible for Medicaid through the State of Tennessee's Section 1115 waiver program, not just the days for patients who could have been eligible for Medicaid absent the waiver, should have been included in the number of Medicaid eligible days used for purposes of the DSH calculation. The audit adjustment for this issue and calculation showing the approximate reimbursement impact are attached as Exhibit 4. In addition, the Provider notified the Intermediary of its position on this issue prior to the issuance of the NPR. Exhibit 5.

The amount in controversy exceeds the required jurisdictional amount of $10,000. The NPR is dated August 29, 2002. Therefore, this appeal is timely filed.

The provider contends that the intermediary's determinations on these items were arbitrary and capricious, contrary to the Medicare statute, regulations and manual provisions, and otherwise contrary to law. The provider reserves the right to add other appeal items prior to the commencement of the hearing.

27

POWERS, PYLES, SUTTER & VERVILLE PC

Suzanne Cochran, Esq.
November 19, 2002
Page 3

The provider appoints as its legal representative the law firm of Powers, Pyles, Sutter & Verville, P.C., located at 1875 Eye Street, N.W., Twelfth Floor, Washington, D.C. 20006 (Exhibit 6).

Sincerely,

Mary Susan Philp

Enclosures

cc:     TriSpan Health Services
        Blue Cross and Blue Shield Association
        Marybeth Nagle

28

**TRISPAN**                                              *www.trispan.com*

HEALTH SERVICES                          *P. O. Box 23046 • Jackson, MS • 39225-3046*
MEDICARE PART A INTERMEDIARY             *1064 Flynt Drive • Jackson, MS • 39232-9570*
A CMS Contracted Intermediary.           *(601) 936-0105*

FIRST REQUEST

August 29, 2002

                    Certified Mail 7001 2510 0009 3076 2126
                          Return Receipt Requested

                          NOTICE OF AMOUNT OF
                          PROGRAM REIMBURSEMENT

Ms. Marybeth Nagle, Director of Reimburs
Methodist Healthcare- Memphis Hospitals
1211 Union Avenue
Suite 600
Memphis, TN  38104

RE:  Provider: Methodist Healthcare- Memphis Hospitals
     Provider Number: 440049
     Fiscal Year End: 12/31/98
     Subunits:  443500  445225  44S049

Dear Ms. Nagle:

This is a Medicare **NOTICE OF AMOUNT OF PROGRAM REIMBURSEMENT** for the cost
report ended 12/31/98.  This review is based on:

    (   )  Audit Settlement

    ( X )  No Audit Settlement (based on Desk Review)

Our final determination in accordance with 42 CFR 405.1803 shows an amount due
the Medicare Program as follows:

        Net Amount Due the Program:  $ (1,564,985)

        See Attached Transaction Summary

        INTEREST                                    (52,329.18)


**PLEASE MAKE YOUR CHECK PAYABLE TO: TRISPAN HEALTH SERVICES, POST OFFICE BOX
1043, JACKSON, MISSISSIPPI 39215-1043.**

In accordance with procedures of 42 CFR 405.376FF, interest will be assessed on
the amount due HCFA unless full recovery of this payment is made within 30 days
from the date of this Notice.  Interest will be assessed for each 30 day
period, or part thereof, that payment is delayed.  **IF YOU ARE UNABLE TO REFUND
THE ENTIRE AMOUNT AT THIS TIME, PLEASE CONTACT THIS OFFICE IMMEDIATELY AT (601)
936-0105.**



                                                    29

Methodist Healthcare- Memphis Hospitals
440049 12/31/98


**IF PAYMENT HAS NOT BEEN RECEIVED IN THIS OFFICE OR WE HAVE NOT BEEN CONTACTED WITHIN 15 DAYS FROM THE DATE OF THIS LETTER, YOUR PAYMENT WILL BE REDUCED BY 100% ON THE 16TH DAY.** If you are requesting a repayment schedule, please contact this office immediately so that we may determine if you are eligible for a repayment schedule. A list of the information which should be submitted is enclosed. ANY REPAYMENT SCHEDULE WOULD RUN FROM THE DATE OF THIS LETTER. If an overpayment is repaid in installments or recouped by withholding from several payments due the Provider, each payment will be applied first to accrued interest and then to the principal. With respect to repayment schedules, interest will be assessed on the higher of the private consumer rate or the current value of funds rate of interest on overpayments and underpayments to health care providers and suppliers.


**WITHIN 15 DAYS OF THIS BILLING, IF FULL PAYMENT IS NOT RECEIVED, NOTICE GIVEN THAT FULL PAYMENT WILL BE MADE WITHIN 30 DAYS, OR NO REPAYMENT PLAN IS ESTABLISHED, A REDUCTION OF 100% OF YOUR PAYMENTS WILL BE NECESSARY TO RECOVER THIS OVERPAYMENT.**


We have issued our report on your cost statement for this reporting period, and your copy is enclosed. This is a final report subject to interpretations of the "Principles of Reimbursement for Provider Cost" by the Health Care Financing Administration. These adjustments include the appropriate reference to applicable laws, regulations, and general instructions used as a basis for these adjustments. Please be informed that the Intermediary Determination communicated by this NPR may be revised in accordance with 42 CFR 405.1885.

If you disagree with the cost report adjustments which have been made by this office, you have the right to appeal in writing within 180 days from the date of this notice. If you disagree with adjustments aggregating $10,000 or more in Program reimbursement, your appeal should be made to the Provider Reimbursement Review Board (PRRB). To request a group appeal, the amount in controversy must be at least $50,000 for any group of providers, including those under common ownership or control, where the matters in controversy involve a common question of fact, law or regulation, or HCFA ruling. Appeal information and procedures are available in HCFA Pub. 15-I, Chapter 29, and in the CCH Medicare and Medicaid Guide, paragraphs 7679-7791. Copies of the HCFA Pub. 15-I sections may be obtained from:

        National Technical Information Service
        5858 Port Royal Road
        Springfield, VA  22161
        (703) 487-4650


30

2

Methodist Healthcare- Memphis Hospitals
440049 12/31/98

Should you request an appeal to the PRRB, your written request should be
directed to:

        Chairman
        Provider Reimbursement Review Board
        P.O. Box 31712
        Baltimore, MD  21207-8712
        (410) 786-2671

Please also submit copies of your request to Mr. Gary Gerber, Director of
Provider Audit, at our office and to the following address:

        Provider Reimbursement Review Board
        Appeals Coordinator
        Blue Cross Blue Shield Association
        225 North Michigan Avenue
        Chicago, IL  60601-7680

If you disagree with adjustments aggregating at least $1,000 but less than
$10,000, your appeal should be made to the Blue Cross Blue Shield Association
under its Medicare Provider Appeals Procedures and is referred to as an
Intermediary Appeal.  Your written request should be directed to the following
address:

        Intermediary Hearing Officer
        Reimbursement and Provider Appeals Department
        Blue Cross Blue Shield Association
        225 North Michigan Avenue
        Chicago, IL  60601-7680

A copy of this request should also be submitted to Mr. Gary Gerber, Director of
Provider Audit, at this office.

For information on the proper form and required content of an appeal request,
please refer to 42 CFR 405.1809 - 405.1833 and HCFA Pub. 15-I, Section
2910-2918 for Intermediary Appeals and 42 CFR 405.1835 - 405.1890 and HCFA Pub.
15-I, Section 2920-2929 for PRRB Appeals. The appeal requests for either an
Intermediary or PRRB Appeal must include the following:

        1.)  Identification of items in dispute by adjustment number,
 amount, and description.

        2.)  Reasons for disagreement with the Intermediary's
 determination on these items.

        3.)  One copy of the NPR, or determination disputed and the
 pertinent portion of the adjustment report.

In addition, Intermediary Appeal requests must include an estimate of the
reimbursement in controversy for each item appealed.

31

3

Methodist Healthcare- Memphis Hospitals
440049 12/31/98

We strongly urge that you discuss with us any questions concerning the
adjustments we have made. As you have 180 days from the date of the Notice of
Corrected Program Reimbursement to formally file a request for appeal, there is
ample opportunity for discussion without risk of any prejudice to your appeal
rights.

If you have any questions regarding this settlement, please contact our
Provider Settlement Department at (601) 936-0105, extension 4713. For questions
regarding specific audit adjustments, please contact our Louisiana Audit Office
at (504) 343-0276.


Sincerely,

Eddie Price
Supervisor, Provider Reimbursement

Attachments

32

TriSpan Health Services                          HCFA-2552-96 AUDIT ADJUSTMENT REPORT                    √N DATE: 08/13/2002   PAGE 1
ROVIDER NAME: METHODIST HOSP\    .S OF MEMPHIS         PROVIDER NUMBER: 44-0049              FISCAL √ JD: 01/01/1998 TO 12/31/1998

| ADJ # | WS P F T | LINE | COLUMN | A6/A8 LTR LINE | EXPLANATION OF AUDIT ADJUSTMENTS | AS REPORTED | INCREASE/ DECREASE | AS ADJUSTED |
|---|---|---|---|---|---|---|---|---|
| 48 | B1 | 18 | 1.06 | | SOCIAL SERVICE | 1379 | -1379 | 0 |
| 48 | B1 | 23 | 1.06 | | I/R SERVICES-OTHER PRGM COSTS APPRVD | 3931 | -3931 | 0 |
| 48 | B1 | 25 | 1.06 | | ADULTS & PEDIATRICS | 117115 | -117115 | 0 |
| 48 | B1 | 30.05 | 1.06 | | SCU LEBONHEUR | 22618 | -22618 | 0 |
| 48 | B1 | 37 | 1.06 | | OPERATING ROOM | 28596 | -28596 | 0 |
| 48 | B1 | 40 | 1.06 | | ANESTHESIOLOGY | 2394 | -2394 | 0 |
| 48 | B1 | 41 | 1.06 | | RADIOLOGY-DIAGNOSTIC | 49935 | -49935 | 0 |
| 48 | B1 | 44 | 1.06 | | LABORATORY | 17292 | -17292 | 0 |
| 48 | B1 | 49 | 1.06 | | RESPIRATORY THERAPY | 2073 | -2073 | 0 |
| 48 | B1 | 50 | 1.06 | | PHYSICAL THERAPY | 3931 | -3931 | 0 |
| 48 | B1 | 53 | 1.06 | | ELECTROCARDIOLOGY | 3789 | -3789 | 0 |
| 48 | B1 | 54 | 1.06 | | ELECTROENCEPHALOGRAPHY | 4134 | -4134 | 0 |
| 48 | B1 | 55 | 1.06 | | MED SUPPLIES CHARGED TO PATIENTS | 3594 | -3594 | 0 |
| 48 | B1 | 56 | 1.06 | | DRUGS CHARGED TO PATIENTS | 4430 | -4430 | 0 |
| 48 | B1 | 57 | 1.06 | | RENAL DIALYSIS | 3490 | -3490 | 0 |
| 48 | B1 | 60.05 | 1.06 | | PEDIATRIC CLINICS | 18554 | -18554 | 0 |
| 48 | B1 | 61 | 1.06 | | EMERGENCY | 18121 | -18121 | 0 |
| 48 | B1 | 96 | 1.06 | | GIFT, FLOWER, COFFEE SHOP & CANTEEN | 1235 | -1235 | 0 |
| 48 | B1 | 98 | 1.06 | | PHYSICIANS' PRIVATE OFFICES | 6984 | -6984 | 0 |
| 48 | B1 | 100.17 | 1.06 | | LEAD PROGRAM To remove Lebonheur hospital's Old Capital Related Cost from the as-filed cost report. PRM-1:2304, 42 CFR 413.24 WP reference A-5.28A1 | 13574 | -13574 | 0 |
| 49 | E A 1 | 21 | 1 | | REIMBURSABLE BAD DEBTS To properly report Medicare inpatient bad debts per audit testwork. PRM-1:302, 42 CFR 413.80 WP reference P-4-1 | 4011710 | -497075 | 3514635 |

33

| ADJ # | WS P F T | LINE | COLUMN | A6/A8 LTR LINE | EXPLANATION OF AUDIT ADJUSTMENTS | AS REPORTED | INCREASE/ DECREASE | AS ADJUSTED |
|---|---|---|---|---|---|---|---|---|
| 50 | S3 1 | 1 | 6 | | HOSPITAL ADULTS & PEDS | 241499 | -3928 | 237571 |
| 50 | S3 1 | 10.03 | 6 | | SCU NORTH<br>To properly state total days on the<br>as-filed cost report.<br>PRM-1:2408.4, 42 CFR 412.110/413.20<br>WP reference D-1 | 10123 | 3928 | 14051 |
| 51 | E B 1 | 27 | 1 | | REIMB BAD DEBTS-ALL OTHER<br>To properly report Medicare<br>outpatient bad debts.<br>PRM-1:302, 42 CFR 413.80<br>WP reference P-4-2 | 2656133 | -469822 | 2186311 |
| 52 | I5 | 5 | 1 | | BAD DEBTS FOR DEDUCTIBLES AND COINSURANC<br>To properly report Medicare<br>Renal bad debts.<br>PRM-1:302, 42 CFR 413.80<br>WP reference P-4-3 | 779325 | 314461 | 1093786 |
| 53 | E3 4 | 8 | 3.01 | 1 | UNWEIGHTED FTE COUNT <= 12/31/96 | 173.89 | -.79 | 173.10 |
| 53 | E3 4 | 8 | 3.03 | 1 | | 11.46 | -2.85 | 8.61 |
| 53 | E3 4 | 8 | 3.05 | 1 | UNWEIGHTED FTE COUNT CURRENT YEAR | 185.35 | -2.15 | 183.20 |
| 53 | E3 4 | 8 | 3.07 | 1 | WEIGHTED FTE COUNT PRIMARY CARE CY | 96.78 | -2.40 | 94.38 |
| 53 | E3 4 | 8 | 3.08 | 1 | WEIGHTED FTE COUNT ALL OTHER CY<br>To properly update GME FTEs per<br>audit work performed<br>PRM-1:2832.4, 42 CFR 413.86<br>WP reference O-8I | 71.92 | 6.87 | 78.79 |
| 54 | S3 1 | 12 | 7 | | TOTAL HOSPITAL<br>To properly report IME FTE count<br>per audit work performed<br>PRM-1:2832.4, 42 CFR 412.105<br>WP reference Q-8 | 185.52 | -2.15 | 183.37 |
| 55 | E A 1 | 3.04 | 1 | | FTE COUNT <= 12/31/96 | 173.89 | -.95 | 172.94 |
| 55 | E A 1 | 3.06 | 1 | | | 11.46 | -2.79 | 8.67 |
| 55 | E A 1 | 3.08 | 1 | | FTE COUNT CURRENT YEAR | 185.35 | -2.15 | 183.20 |
| 55 | E A 1 | 3.15 | 1 | | TOTAL FTE COUNT PRIOR YEAR | 173.67 | -2.38 | 171.29 |
| 55 | E A 1 | 3.19 | 1 | | PRIOR YEAR PER RESIDENT TO BED RATIO<br>To adjust IME FTE count and other<br>information for proper calculation of | .153148 | .004274 | .157422 |

34

TriSpan Health Services                    HCFA-2552-96 AUDIT ADJUSTMENT REPORT              RUN DATE: 08/13/2002    PAGE 1
ROVIDER NAME: METHODIST HOSP    ES OF MEMPHIS          PROVIDER NUMBER: 44-0049            FISCAL    OD: 01/01/1998 TO 12/31/1998

| ADJ # | WS P F T LINE | COLUMN | A6/A8 LTR | A6/A8 LINE | EXPLANATION OF AUDIT ADJUSTMENTS | AS REPORTED | INCREASE/ DECREASE | AS ADJUSTED |
|---|---|---|---|---|---|---|---|---|
| 33 | B1      100.07 | 9 | | | SHARED SERVICES MHS<br>To properly report the laundry & linen stats for Shared Services<br>PRM 1:2306, 42 CFR 413.24<br>WP reference A-5.28C1 | 0 | 1009230 | 1009230 |
| 34 | E3 4    8  3.19 | 1 | | | PRIMARY CARE PER RESIDENT AMOUNT | 50235 | 6998 | 57233 |
| 34 | E3 4    8  3.20 | 1 | | | OTHER PROGRAM PER RESIDENT AMOUNT<br>To properly report GME per resident amount.<br>PRM-1:2120, 42 CFR 413.86<br>WP reference  A-5.39 | 52267 | 2680 | 54947 |
| 35 | S3 1    27 | 4 | | | AMBULANCE TRIPS | 678 | -40 | 638 |
| 35 | S3 1    27.01 | 4 | | | AMBULANCE TRIPS<br>To properly report ambulance trips<br>PRM 1:2215, 42 CFR 410.40<br>WP reference A-18A | 226 | 41 | 267 |
| 36 | D1 2 2 8  58.01 | 1 | | | TRENDED COST | 0 | 5670 | 5670 |
| 36 | D1 2 2 8  58.02 | 1 | | | EXPECTED COST<br>To prperly report the trended and expected cost<br>PRM 1:3622.2, 42 CFR 413.40(d)(5)<br>WP reference A-18B | 0 | 5670 | 5670 |
| 37 | | | | | MEMO ADJUSTMENT<br>Adjustment Deleted<br>WP Reference A-5.25b | | | |
| 38 | A6    5    18 | 5 | V | 90 | RECL TO: OTHER CAPITAL RELATED COSTS | 0 | 342162 | 342162 |
| 38 | A6    5    18 | 9 | V | 6.06 | RECL FROM: OTHER ADMIN & GENERAL | 0 | -342162 | -342162 |
| 38 | A7 3    5 | 6 | | | TOTAL<br>To reclass property taxes from A&G to Capital Related Costs.<br>PRM-1:2328, 42 CFR 413.90<br>WP reference A-5.24 | 0 | 342162 | 342162 |
| 39 | B1    98 | 1.05 | | | PHYSICIANS' PRIVATE OFFICES | 71473 | -48121 | 23352 |
| 39 | B1    98 | 3.05 | | | PHYSICIANS' PRIVATE OFFICES<br>To properly report Square Feet Statistics used in the allocation of Old and New CRC-Germantown for the Physician Private Office.<br>PRM-1:2306, 42 CFR 413.24 | 71473 | -48121 | 23352 |

35

Methodist Hospitals of Memphis
Provider No. 44-0049
Fiscal Year Ending December 31, 1998

Calculation of Reimbursement Impact of
GME Per Resident Amount Issue

| | | |
|---|---|---:|
| Primary Care Resident FTEs | | 94.38 |
| MHM Primary Care Per Resident Amount | $ | 60,454.17 |
| Total Primary Care GME Payment | $ | 5,705,664.56 |
| | | |
| All Other Resident FTEs | | 78.96 |
| MHM All Other Per Resident Amount | $ | 55,604.43 |
| Total All Other GME Payment | $ | 4,390,525.79 |
| | | |
| Total Unadjusted GME Payment | | $10,096,190.35 |
| Average Per Resident Amount | $ | 58,245.01 |
| 3-Year Rolling Average FTE Resident Count | | 167.23 |
| Total Allowable GME Payment | $ | 9,740,313.33 |
| Ratio of Program Inpatient Days/Total Inpatient Days | | 0.458258 |
| Total Program GME Payment | $ | 4,463,576 |
| | | |
| Total Program GME Payment Allowed | $ | 4,306,220 |
| | | |
| Difference | $ | 157,356 |

36

TriSpan Health Services           HCFA-2552-96 AUDIT ADJUSTMENT REPORT        RUN DATE: 08/13/2002    PAGE 1
PROVIDER NAME: METHODIST HOSPITALS OF MEMPHIS       PROVIDER NUMBER: 44-0049        FISCAL PERIOD: 01/01/1998 TO 12/31/1998

| ADJ # | WS | P | F | T | LINE | COLUMN | A6/A8 LTR | A6/A8 LINE | EXPLANATION OF AUDIT ADJUSTMENTS | AS REPORTED | INCREASE/ DECREASE | AS ADJUSTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | WP reference M-1B | | | |
| 40 | C | 1 | | | 44 | 7 | | | LABORATORY<br>To adjust the gross up of MedLab revenue<br>to reflect a uniform charge structure.<br>PRM-1:2304, 42 CFR 413.24<br>WP reference A-5.3b | 54632956 | -4126840 | 50506116 |
| 41 | A6 | 5 | | | 19 | 4 | Y | 54 | RECL TO: ELECTROENCEPHALOGRAPHY | 0 | 281763 | 281763 |
| 41 | A6 | 5 | | | 19 | 5 | Y | 54 | RECL TO: ELECTROENCEPHALOGRAPHY | 0 | 133720 | 133720 |
| 41 | A6 | 5 | | | 19 | 8 | Y | 49 | RECL FROM: RESPIRATORY THERAPY | 0 | -281763 | -281763 |
| 41 | A6 | 5 | | | 19 | 9 | Y | 49 | RECL FROM: RESPIRATORY THERAPY<br>To properly reclass the cost for Sleep<br>Sleep Disorder from Respiratory<br>Therapy to EEG.<br>PRM-1:2136, 42 CFR 413.9<br>WP reference C-2B | 0 | -133720 | -133720 |
| 42 | A8 | | | | 49.22 | 2 | A | 6.06 | ADJ TO: OTHER ADMIN & GENERAL<br>To properly report total expenses to<br>reconcile with the Audited Financial<br>Statements.<br>PRM-1:2304, 42 CFR 413.53<br>WP reference A-5.3a-1 | 0 | -31831 | -31831 |
| 43 | S3 | 1 | | | 26 | 6 | | | OBSERVATION BED DAYS<br>To properly report observation<br>bed days on the cost report.<br>PRM-1:2408, 42 CFR 413.53<br>WP reference D-1A | 7961 | -358 | 7603 |
| 44 | E | A | 1 | | 4 | 1 | | | PERCENT OF SSI RECIP PAT DAYS TO MEDICAR | 16.37 | -1.34 | 15.03 |
| 44 | E | A | 1 | | 4.03 | 1 | | | ALLOWABLE DISPROPOR SHARE PERCENTAGE<br>To properly state the Disproportionate<br>Share Adjustment factor and SSI% per<br>audit testwork.<br>PRM-1:2408.4, 42 CFR 412.110/413.20<br>WP reference Q-7F | 17.87 | -1.57 | 16.30 |
| 45 | S3 | 1 | | | 1 | 1 | | | HOSPITAL ADULTS & PEDS | 930 | -7 | 923 |
| 45 | S3 | 1 | | | 10.03 | 1 | | | SCU NORTH<br>To adjust number of beds on w/s S-3.<br>PRM-1:2408, 42 CFR 413.53<br>WP reference B-7 | 38 | 12 | 50 |
| 46 | S3 | 1 | | | 1 | 2 | | | HOSPITAL ADULTS & PEDS | 335161 | -2552 | 332609 |

37

**METHODIST HOSPITAL OF MEMPHIS**
**FYE DECEMBER 31, 1998**
CALCULATION OF REIMBURSEMENT
IMPACT OF DSH MEDICAID DAYS ISSUE

|  |  | Before 10/1/98 | 10/1/98 & After |
|---|---|---|---|
| SSI % FED F/Y 1998 |  | 15.03% | 15.03% |

COMPUTATION OF MEDICAID %:

| MEDICAID DAYS PER AUDIT |  | 55,845 |
|---|---|---|
| TENNCARE UNINSURED DAYS |  | 5,944 |
| TENNCARE UNINSURABLE DAYS |  | 2,285 |
| TOTAL MEDICAID DAYS |  | 64,074 |

| TOTAL DAYS |  |  |
|---|---|---|
| ACUTE (Per F/S) | 301,536 |  |
| NURSERY (Per F/S) | 12,143 |  |
| TOTAL PATIENT DAYS |  | 313,679 |

MEDICAID %

|  | Before 10/1/98 | 10/1/98 & After |
|---|---|---|
| TOTAL QUALIFYING DSH  PATIENT % | 20.43% | 20.43% |
| ADD-ON THRESHOLD |  |  |
|  | 35.46% | 35.46% |
| ADD-ON ADJUSTMENT % | 20.20% | 20.20% |
|  | 15.26% | 15.26% |
| ADJUSTED ADD-ON | 82.50% | 82.50% |
| BASE DSH % |  |  |
|  | 12.59% | 12.59% |
| TOTAL MHM DSH % | 5.88% | 5.88% |
| YEARLY WEIGHTED AVERAGE | 18.47% | 18.47% |
| TOTAL DRG PAYMENTS (Excl. Outlier) | 18.47% |  |

|  | FFY '98 | FFY '99 |  |
|---|---|---|---|
| CALCULATED DSH |  |  | 107,532,126 |
| LESS:  BBA REDUCTION % | 1.0% | 2.0% | 19,857,643 |
| TOTAL DSH  REIMBURSEMENT |  |  |  |
|  |  |  | 248,221 |
| TOTAL DSH PAYMENTS PER AUDIT |  |  | 19,609,422 |
| DIFFERENCE |  |  |  |
|  |  |  | 17,311,206 |
|  |  |  | 2,298,216 |

38


**Methodist**
*Healthcare*

July 29, 2002

<u>Federal Express 8349 0004 8374</u>

TriSpan Health Services
Post Office Box 23046,
1064 Flynt Drive
Jackson, Mississippi 39208

   Re: Treatment of Section 1115 Waiver Days under Medicare DSH

Dear Sirs,

Please be aware that Methodist Healthcare Memphis Hospitals (Provider No. 44-0049) hereby reserves its right to appeal the 1998 cost report based upon the exclusion of a percentage of DSH days eligible under the Section 1115 waiver. We argue that days attributable to all patients eligible for Medicaid through the Section 1115 waiver program, not just the days for patients who could have been eligible for Medicaid absent the waiver, should have been included in the number of Medicaid eligible days used for purposes of the DSH calculations.

Additional statements from our legal counsel, Mary Susan Philip, will follow. However, if you have any questions at this time, please do not hesitate to contact me at 901-516-0703.

Sincerely,

Marybeth Nagle,
Director of Revenue Management

cc: Mary Susan Philip

39



**Methodist**
*Healthcare*

P, P, S & V

October 28, 2002

Mr. Steven R. Kirsh, Director
Jurisdiction and Case Management Staff
Provider Reimbursement Review Board
7500 Security Blvd., Room C1-09-13
Baltimore, Maryland 21244-1850

Re: 1998 Methodist Healthcare – Memphis Hospitals
    Provider Number: 44-0049
    Fiscal Year Ending 12/31/1998

Dear Mr. Kirsh,

Through this letter, The Provider is designating the following party as their Provider
Representative related to appeals for the above mentioned hospital and fiscal year. Forward all
correspondence related to appeals for this hospital to:

Ms. Susan Philp,
Powers, Pyle, Sutter and Verville
1875 Eye Street, NW
12th Floor
Washington, DC 20006-5409

Sincerely,

Marybeth Nagle,
Director of Reimbursement for Methodist Healthcare

40

DEPARTMENT OF HEALTH AND HUMAN SERVICES
PROVIDER REIMBURSEMENT REVIEW BOARD
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671          FAX: 410-786-5298

Suzanne Cochran, Esq., Chairperson
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West

Refer to:

04-0110
CERTIFIED MAIL

FEB - 2 2006

Mary Susan Philp, Esq.
Powers, Pyles, Sutter & Verville, PC
Twelfth Floor
1875 Eye Street, N.W.
Washington, D.C. 20006-5409

RE: Methodist Hospital of Memphis
    Provider No.44-0049
    FYE 12/31/99
    PRRB Case No. 04-0110

Dear Ms. Philp:

This is in response to the Provider's request that the Provider Reimbursement Review Board (Board), pursuant to 42 U.S.C. § 1395oo(f)(1), determine that it is without the authority to decide the question of whether the regulation, 42 C.F.R. § 412.106(b)(4)(ii), which excludes section 1115 expansion waiver days from the calculation of the disproportionate share (DSH) adjustment prior to January 20, 2000, is valid. The Provider is seeking to have section 1115 expansion waiver days included in the DSH calculation for period prior to January 20, 2000.

The Provider believes that this regulation conflicts with 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) and (II), ( the DSH calculation) which provides for two proxies as measures of the volume of low-income patients served by a hospital:

(1) the percentage of the total Medicare inpatient days provided to low income Medicare patients (i.e., those patients entitled to supplemental security income under Title XVI of the Social Security Act); and

(2) the percentage of total hospital days provided to "patients who (for such days) were eligible for medical assistance under a State plan approved under [the Medicaid program]."

The Provider believes that the regulation, 42 C.F.R. § 412.106(b)(4)(ii) is inconsistent with the statutory language of §1395ww(d)(5)(F)(vi)(II). Section 1395oo(f)(1) permits providers that have requested and are entitled to a hearing before the Board under 42 U.S.C. § 1395oo(a), to bypass the Board's hearing procedure and obtain judicial review of an issue involving a question of law or regulation where the Board determines that it is without the authority to decide such question.

The Board has reviewed the submissions of the Provider pertaining to the requests for hearing and expedited judicial review. The documentation shows that the estimated

Provider Imbursement Review Board
Page 2 Mary Susan Philp                                          CN 04-0110

amount in controversy for the appeal exceeds $10,000, as required. The estimated amount in controversy is subject to recalculation by the Intermediary for the actual final amount.

The Board finds that:

1) it has jurisdiction over the matter for the subject year and the Provider is entitled to a hearing before the Board;

2) based upon the Provider's assertions regarding the section 1115 waiver issue, there are no findings of fact for resolution by the Board;

3) it is bound by the applicable existing Medicare law and regulation (42 C.F.R. § 405.1867); and

4) it is without the authority to decide the legal question of whether the regulation, 42 C.F.R. § 412.106(b)(4)(ii), which excludes section 1115 expansion waiver days from the calculation of the disproportionate share adjustment prior to January 20, 2000, is valid.

Accordingly, the Board finds that the section 1115 waiver issue properly falls within the provisions of 42 U.S.C. § 1395oo (f)(1) and hereby grants the Provider's request for expedited judicial review for the issue and the subject year. The Provider has 60 days from the receipt of this decision to institute the appropriate action for judicial review. The graduate medical education issue will remain pending in this case.

Board Members Participating

    Suzanne Cochran, Esq.
    Gary B. Blodgett, DDS
    Elaine C. Powell, CPA
    Anjali Mulchandani-West
    Yvette C. Hayes

                    FOR THE BOARD:

                    Suzanne Cochran, Esq.
                    Chairman

Enclosures:  42 U.S.C. § 1395oo (f)(1)

cc:  Gary Gerber, Tri-Span Health Services
     Wilson Leong, BCBSA)

**POWERS**
**PYLES**
**SUTTER &**
**VERVILLE PC**
ATTORNEYS AT LAW

Twelfth Floor
1875 Eye Street, NW
Washington, DC 20006-5409
Phone: (202) 466-6550
Fax: (202) 785-1756
www.ppsv.com

*AMF/LO*

MARY SUSAN PHILP
(202) 872-6735
Susan.Philp@ppsv.com

January 26, 2006

**RECEIVED**

JAN 2 7 2006

PROVIDER REIMBURSEMENT
REVIEW BOARD

**VIA FEDERAL EXPRESS**

Suzanne Cochran, Esq., Chairperson
Provider Reimbursement Review Board
2520 Lord Baltimore Drive, Suite L
Baltimore, MD 21244-2670

Re:    **REQUEST FOR EXPEDITED JUDICIAL REVIEW**
       Methodist Hospitals of Memphis;
       Provider No. 44-0049;
       FYE December 31, 1999;
       PRRB Case No. 04-0110

Dear Ms. Cochran:

The Provider, Methodist Hospitals of Memphis ("Provider"), hereby requests that the Board grant expedited judicial review ("EJR") as to the disproportionate share hospital ("DSH") payment (Section 1115 waiver days) issue in the above appeal pursuant to Section 1878(f)(1) of the Social Security Act ("the Act").

As discussed below, EJR should be granted because the Provider challenges the policy of the Secretary of Health and Human Services ("the Secretary") and the Centers for Medicare and Medicaid Services ("CMS") which excludes Section 1115 waiver days from the DSH payment calculation for patient discharges prior to January 20, 2000. That policy was reflected in the determination of the Provider's intermediary in this appeal and was the subject of formal CMS pronouncements, including Program Memorandum A-99-62, which, subject to very limited exceptions, indicated that Section 1115 waiver days should be excluded from the DSH calculation.[1] In addition, on January 20, 2000, CMS issued a regulation that instructed intermediaries to include Section 1115 waiver days in the DSH calculation, but only prospectively. 42 C.F.R. § 412.106(b)(4)(ii).[2] This CMS policy and the regulation violate the Medicare statute. 42 U.S.C. § 1395ww(d).

---

[1] A copy of Program Memorandum A-99-62 is attached as Exhibit 1.
[2] A copy of 42 C.F.R. § 412.106(b)(4)(ii) is attached as Exhibit 2.

POWERS, PYLES, SUTTER & VERVILLE PC

Suzanne Cochran, Esq., Chairperson
January 26, 2006
Page 2

Because the Board lacks the authority to decide questions involving the validity of a
Medicare regulation or controlling CMS policy, EJR is appropriate. Furthermore, the Board has
previously determined that it was without authority to decide the precise legal question raised in
the present appeal and granted EJR in at least two cases. Specifically, the Board granted the
providers' request for EJR in the Oregon Waiver Days Group Appeal, PRRB Case No. 00-
3891G, and in the Tennessee 96-00 TennCare Sub-Group Appeal, PRRB Case No. 03-1162G.
Both cases involved the validity of CMS's policy of excluding Section 1115 waiver days from
the DSH calculation, and, in fact, the latter case involved the same State Medicaid program
waiver that is at issue here. The Provider requests that the Board follow its determination in
these cases and grant EJR in the instant case.

## I.    FACTUAL AND LEGAL BACKGROUND

### A.    Medicare DSH Calculation

Since 1983, the Medicare program has paid most hospitals for the operating costs
of inpatient hospital services under a prospective payment system ("PPS"). 42 U.S.C.
§ 1395ww(d)(1)-(5); 42 C.F.R. Part 412. Under PPS, Medicare pays hospitals a standardized
amount per case subject to certain payment adjustments. Id. A hospital that serves a dispro-
portionate share of low-income patients, or a DSH, is also entitled to an upward adjustment to
the Medicare PPS payments. See 42 U.S.C. § 1395ww(d)(5)(F).

The amount of the Medicare DSH payment due to a hospital is determined, in part, by its
"disproportionate patient percentage" ("DSH patient percentage"), which is a proxy for the
Provider's utilization by low-income patients. See 42 U.S.C. § 1395ww(d)(5)(F)(v). The DSH
patient percentage is defined as the sum of two fractions expressed as percentages. 42 U.S.C.
§ 1395ww(d)(5)(F)(vi). One of these fractions is commonly known as the Medicaid percentage.
The numerator of the fraction used to compute the Medicaid percentage consists of the number
of the Provider's patient days attributable to patients who were "eligible for medical assistance
under a State plan approved under Title XIX, but who were not entitled to benefits under Part A
of [Medicare]." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

### B.    Section 1115 Waiver Provision and TennCare

Section 1115 of the Act allows the Secretary to approve State research and demonstration
projects that promote the objectives of the Title XIX Medicaid program. 42 U.S.C. § 1315.
Section 1115(a)(1) authorizes the Secretary to waive the requirements of section 1902 of the
Act, which contains Medicaid State plan requirements, including requirements as to eligible
populations. 42 U.S.C. § 1315(a)(1). Section 1115(a)(2)(A) allows a State to receive federal
matching for medical assistance, including medical assistance provided to expanded eligibility

**POWERS, PYLE, SUTTER & VERVILLE PC**

Suzanne Cochran, Esq., Chairperson
January 26, 2006
Page 3

populations, for which the State would not ordinarily be entitled to receive federal matching. 42
U.S.C. § 1315(a)(2).

Under some Section 1115 waivers, the State furnishes medical assistance to a population
that otherwise could have been made eligible for Medicaid; under others, the State furnishes
medical assistance to expanded eligibility populations that could not otherwise have been made
eligible for Medicaid. As stated by the Secretary, "the statute allows for the expansion popu-
lations to be treated as Medicaid beneficiaries." 65 Fed. Reg. 3137 (Jan. 20, 2000).

The State of Tennessee first received approval for its Section 1115 demonstration project,
called TennCare, on November 19, 1993. On January 1, 1994, Tennessee became the first state
to move its Medicaid program enrollees to a statewide demonstration project. In addition to
Medicaid eligible persons, TennCare offered coverage to expansion populations of uninsured and
uninsurable persons, regardless of income, who would not have been eligible for Medicaid under
the program as it existed prior to the waiver.[3]

C.    CMS Treatment of Section 1115 Waiver Days Under DSH

Until early 2000, the Medicare regulations did not specifically address the treatment of
Section 1115 waiver days under DSH. See 42 C.F.R. § 412.106 (1999). In 1999, however, CMS
issued Program Memorandum A-99-62.[4] This memorandum instructed intermediaries, within
certain parameters, to allow the inclusion of "ineligible waiver or demonstration population
days," but only to the extent that the intermediaries had previously allowed their inclusion, i.e.,
allowing hospitals which had previously received payment for such days to be held harmless. To
the extent that the very narrow parameters of Program Memorandum A-99-62 were not met,
however, Section 1115 waiver days were excluded from the DSH calculation.

On January 20, 2000, CMS issued an "interim final rule with comment period" to address
the treatment under DSH of Section 1115 waiver days. 65 Fed. Reg. 3136 (Jan. 20, 2000).
Through this interim final rule, CMS established that, effective with discharges occurring on or
after January 20, 2000, hospitals may include the patient days of all populations eligible for Title
XIX matching payments through a State's Section 1115 waiver in calculating the Medicare DSH
adjustment. 65 Fed. Reg. 3136-37; 65 Fed. Reg. 47086. The implementing regulation states:

> Effective with discharges occurring on or after January 20, 2000, for purposes of
> counting days under paragraph (b)(4)(i) of this section, hospitals may include all days
> attributable to populations eligible for Title XIX matching payments through a waiver
> approved under section 1115 of the Social Security Act.

---

[3] Exhibit 3 (Tennessee Statewide Health Reform Demonstration Fact Sheet).
[4] "Clarification of Allowable Medicaid Days in the Medicare Disproportionate Share Hospital (DSH) Adjustment
Calculation," Program Memorandum A-99-62 (Dec. 1, 1999).

POWERS, PYLE, SUTTER & VERVILLE PC

Suzanne Cochran, Esq., Chairperson
January 26, 2006
Page 4

42 C.F.R. § 412.106(b)(4)(ii). Thus, CMS's new policy allowing the inclusion of Section 1115 waiver days in the DSH calculation was effective for discharges occurring on or after January 20, 2000, but not with respect to discharges occurring prior to that date.

> D.    Provider's Position

The Provider contends that the plain language of the Act requires the inclusion in the DSH calculation of all Section 1115 waiver days. As noted above, the statute provides that the numerator of the DSH Medicaid fraction include days for patients who were "eligible for medical assistance under a State Plan approved under Title XIX." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). Thus, the DSH calculation should clearly include all patients who were eligible for medical assistance under a Medicaid State Plan implemented through a Section 1115 waiver, including patients in expansion populations. Therefore, CMS's policy of excluding Section 1115 waiver days from the DSH calculation prior to January 20, 2000, as reflected in Program Memorandum A-99-62 and CMS regulations at 42 C.F.R. § 412.106(b)(4)(ii), violates the Act and is invalid.

During the fiscal year at issue in this appeal, the Provider provided services to patients who were eligible for Medicaid payment under the TennCare program. When the intermediary determined the amount of the Provider's DSH payment, it excluded days attributable to patients covered under the Section 1115 waiver. Therefore, the Provider has been under-reimbursed as a result of the intermediary's application of the invalid CMS policy. Attached as Exhibit 4 is a calculation of the estimated reimbursement impact of the intermediary's exclusion of the Section 1115 waiver days, based on the information currently available to the Provider.

## II.    THE BOARD SHOULD GRANT EJR

Under Section 1878(f)(1) of the Act, 42 U.S.C. § 1395oo(f)(1), the Board may grant EJR as to an intermediary determination that involves a question of the validity of a law, regulation, or controlling CMS policy which the Board lacks authority to decide. See also 42 C.F.R. § 405.1842. As discussed above, this appeal involves the Provider's challenge to CMS's policy, as reflected in CMS pronouncements and regulations, that excluded Section 1115 waiver days from the DSH calculation prior to January 20, 2000; this matter is, therefore, properly the subject of EJR.

We note that the Board has previously granted EJR in at least two cases that also involved the validity of CMS's policy regarding Section 1115 waiver days. First, EJR was granted in the Oregon Waiver Days Group Appeal, PRRB Case No. 00-3891G. That case subsequently came before the United States Court of Appeals for the Ninth Circuit, which last year ruled that Section 1115 waiver days must be included in the Medicaid fraction of the DSH

**POWERS, PYLES, SUTTER & VERVILLE PC**

Suzanne Cochran, Esq., Chairperson
January 26, 2006
Page 5

calculation. <u>Portland Adventist Medical Center v. Thompson</u>, Medicare and Medicaid Guide (CCH) ¶ 301,592 (9th Cir. Mar. 2, 2005).

Second, the Board also granted EJR in a case involving TennCare program waiver days. Tennessee 96-00 TennCare Sub-Group Appeal, PRRB Case No. 03-1162G. The federal district court for the District of Columbia recently ruled in favor of the Tennessee hospitals in that case, finding that the TennCare waiver days should be included in the DSH calculation. <u>Cookeville Regional Medical Center, et al. v. Thompson</u>, Civil Action No. 04-1053 (D.D.C. Oct. 28, 2005), *appeal docketed,* No. 05-5495 (D.C. Cir. Jan. 5, 2006).

The situation presented here is identical to that involved in these previous appeals. Accordingly, the same result should apply here, and the Board should grant the Provider's request for EJR.

Finally, we note that this appeal involves only a legal issue, <u>i.e.</u>, the validity of a CMS regulation and policy. There are no factual issues in dispute. Furthermore, the Board has jurisdiction in this appeal.

For the foregoing reasons, the Provider requests that the Board grant EJR as to the Provider's challenge to the exclusion of Section 1115 waiver days from the DSH calculation.

Sincerely,

Mary Susan Philp

Enclosures

Cc (w/enc.):    Gary Gerber, TriSpan Health Services (via Federal Express)
                Wilson Leong, Blue Cross Blue Shield Association
                Michael Nesbit

Cc (w/o enc.): Lisa Ogilvie (via facsimile)

47

48

services furnished to program beneficiaries during the reporting period (from intermediary records). *For final settlement, report on line 25.01 the amount on line 5.99 of Worksheet M-5.*

*Line 26*—Enter the total amount due to/from the program (lines 24 minus line 25). Transfer this amount to Worksheet S, Part II, column 3, line 9.

*Line 27*—Enter the program reimbursement effect of protested items. The reimbursement effect of the nonallowable items is estimated by applying reasonable methodology which closely approximates the actual effect of the item as if it had been determined through the normal cost finding process. (See § 115.2.) A schedule showing the supporting details and computations must be attached.

36-224    Rev. 6

3666. WORKSHEET M-5 - ANALYSIS OF PAYMENTS TO HOSPITAL-BASED RHC/ FQHC SERVICES RENDERED TO PROGRAM BENEFICIARIES

Complete this worksheet for Medicare interim payments only. If you have more than one hospital-based RHC/FQHC, complete a separate worksheet for each facility.

Complete the identifying information on lines 1 through 4. The remainder of the worksheet is completed by your fiscal intermediary.

*Line Descriptions*

*Line 1*—Enter the total program interim payments paid to the outpatient rehabilitation provider. The amount entered reflects the sum of all interim payments paid on individual bills (net of adjustment bills) for services rendered in this cost reporting period. The amount entered includes amounts withheld from the component's interim payments due to an offset against overpayments to the component applicable to prior cost reporting periods. It does not include

any retroactive lump sum adjustment amounts based on a subsequent revision of the interim rate, or tentative or net settlement amounts, nor does it include interim payments payable.

*Line 2*—Enter the total program interim payments payable on individual bills. Since the cost in the cost report is on an accrual basis, this line represents the amount of services rendered in the cost reporting period, but not paid as of the end of the cost reporting period. It does not include payments reported on line 1.

*Line 3*—Enter the amount of each retroactive lump sum adjustment and the applicable date.

*Line 4*—Transfer the total interim payments to the title XVIII Worksheet M-3, line 25.

DO NOT COMPLETE THE REMAINDER OF WORKSHEET M-5. LINES 5 THROUGH 7 ARE FOR INTERMEDIARY USE ONLY.

*Line 5*—List separately each tentative settlement payment after desk review together with the date of payment. If the cost report is reopened after the Notice of Program Reimbursement (NPR) has been issued, report all settlement payments prior to the current reopening settlement on line 5.

*Line 6*—Enter the net settlement amount (balance due to the provider or balance due to the program) for the NPR, or, if this settlement is after a reopening of the NPR, for this reopening.

**NOTE:** On lines 3, 5, and 6, when an amount is due from the provider to the program, show the amount and date on which the provider agrees to the amount of repayment, even though total repayment is not accomplished until a later date.

*Line 7*—Enter the sum of the amounts on lines 4, 5.99, and 6 in column 2. The amount in column 2 must equal the amount on Worksheet M-3, line 26.

Rev. 6    36-225

---

**[¶ 150,932]  Medicaid Days in Medicare DSHs.**

*Program Memorandum*, HCFA-Pub. 60A, No. A-99-62, December 1, 1999.

**Medicare: Disproportionate Share Hospitals**

**Prospective payment system—Disproportionate share hospitals—Calculating Medicaid days.**—Calculation of Medicaid days in Medicare disproportionate share hospitals (DSHs) depends on whether the patient, not the hospital is eligible for Medicaid. A Medicaid day is applicable for days the patient is eligible for Medicaid even if Medicaid did not make payment for any services. A day does not count against the Medicare DSH adjustment if the same day is also a Medicaid day. Certain errors made by hospitals in counting for DSH adjustments will be held harmless prior to Jan. 1, 2000.

See ¶ 4260.

**Medicare and Medicaid Guide**    **¶ 150,932**

## [Text of Memorandum]

**SUBJECT: Clarification of Allowable Medicaid Days in the Medicare Disproportionate Share Hospital (DSH) Adjustment Calculation—ACTION**

A review of practices and policies regarding Medicare disproportionate share payment determinations led HCFA to conclude that it is necessary to clarify the definition of eligible Medicaid days in Medicare disproportionate share policy and communicate this information to fiscal intermediaries, hospitals, Medicaid State agencies, and Medicaid managed care organizations. **This clarification applies to cost reporting periods beginning on or after January 1, 2000.** The purpose of this memorandum is to address those details that may need clarification and also to communicate the harmless position for cost reporting periods beginning before January 1, 2000. A similar memorandum will be sent to the Medicaid State agencies.

## CLARIFICATION FOR COST REPORTING PERIODS BEGINNING ON OR AFTER JANUARY 1, 2000

### Background

Under section 1886(d)(5)(F) of the Social Security Act, the Medicare disproportionate share patient percentage is made up of two computations. The first computation includes patient days that were furnished to patients who, during a given month, were entitled to both Medicare Part A and Supplemental Security Income (SSI) (excluding State supplementation). This number is divided by the number of covered patient days utilized by patients under Medicare Part A for that same period. The second computation includes patient days associated with beneficiaries who were eligible for medical assistance (Medicaid) under a State plan approved under Title XIX but who were not entitled to Medicare Part A. (See 42 CFR 412.106(b)(4).) This number is divided by the total number of patient days for that same period.

### Included Days

In calculating the number of Medicaid days, the hospital must determine whether the patient was eligible for Medicaid under a State plan approved under Title XIX on the day of service. If the patient was so eligible, the day counts in the Medicare disproportionate share adjustment calculation. The statutory formula for "Medicaid days" reflects several key concepts. First, the focus is on the *patient's* eligibility for Medicaid benefits as determined by the State, not the *hospital's* "eligibility" for some form of Medicaid payment. Second, the focus is on the patient's eligibility for *medical* assistance under an approved Title XIX State plan, not the patient's eligibility for *general* assistance under a

State-only program. Third, the focus is on eligibility for *medical assistance under an approved Title XIX State plan*, not medical assistance under a State-only program or other program. Thus, for a day to be counted, the patient must be eligible on that day for medical assistance benefits under the Federal-State cooperative program known as Medicaid ( under an approved Title XIX State plan). In other words, for purposes of the Medicare disproportionate share adjustment calculation, the term "Medicaid days" refers to days on which the patient is eligible for medical assistance benefits under an approved Title XIX State plan. The term "Medicaid days" does *not* refer to all days that have some relation to the Medicaid program, through a matching payment or otherwise; if a patient is *not* eligible for medical assistance benefits under an approved Title XIX State plan, the patient day cannot become a "Medicaid day" simply by virtue of some other association with the Medicaid program.

### HCFA-Pub. 60A

Medicaid days, for purposes of the Medicare disproportionate share adjustment calculation, include all days during which a patient is eligible, under a State plan approved under Title XIX, for Medicaid benefits, even if Medicaid did not make payment for any services. Thus, Medicaid days include, but are not limited to, days that are determined to be medically necessary but for which payment is denied by Medicaid because the provider did not bill timely, days that are beyond the number of days for which a State will pay, days that are utilized by a Medicaid beneficiary prior to an admission approval but for which a valid enrollment is determined within the prescribed period, and days for which payment is made by a third party. In addition, we recognize in the calculation days that are utilized by a Medicaid beneficiary who is eligible for Medicaid under a State plan approved under Title XIX through a managed care organization (MCO) or health maintenance organization (HMO). However, in accordance with 42 CFR 412.106(b)(4), a day does not count in the Medicare disproportionate share adjustment calculation if the patient was entitled to both Medicare Part A and Medicaid on that day. Therefore, once the eligibility of the patient for Medicaid under a State plan approved under Title XIX has been verified, you must determine whether any of the days are dual entitlement days and, to the extent that they are, subtract them from the other days in the calculation.

### Excluded Days

Many States operate programs that include both State-only and Federal-State eligibility groups in an integrated program. For example, some States provide medical assistance to bene-

¶ **150,932**

©2000, CCH INCORPORATED

ficiaries of State-funded income support programs. These beneficiaries, however, are not eligible for Medicaid under a State plan approved under Title XIX, and, therefore, days utilized by these beneficiaries do not count in the Medicare disproportionate share adjustment calculation. If a hospital is unable to distinguish between Medicaid beneficiaries and other medical assistance beneficiaries, then it must contact the State for assistance in doing so.

In addition, if a given patient day affects the level of *Medicaid* DSH payments *to the hospital* but the patient is not eligible for Medicaid under a State plan approved under Title XIX on that day, the day is not included in the *Medicare* DSH calculation.

It should be noted that the types of days discussed above are not necessarily the only types of excluded days. Please see the attached chart, which summarizes some, but not necessarily all, of the types of days to be excluded from (or included in) the Medicare DSH adjustment calculation.

To provide consistency in both components of the calculation, any days that are added to the Medicaid day count must also be added to the total day count, to the extent that they have not been previously so added.

Regardless of the type of allowable Medicaid day, the hospital bears the burden of proof and must verify with the State that the patient was eligible under one of the allowable categories during each day of the patient's stay. The hospital is responsible for and must provide adequate documentation to substantiate the number of Medicaid days claimed. Days for patients that cannot be verified by State records to have fallen within a period wherein the patient was eligible for Medicaid as described in this memorandum cannot be counted.

## HOLD HARMLESS FOR COST REPORTING PERIODS BEGINNING BEFORE JANUARY 1, 2000

In accordance with the hold harmless position communicated by HCFA on October 15, 1999, for cost reporting periods beginning before January 1, 2000, you are not to disallow, within the parameters discussed below, the portion of Medicare DSH adjustment payments previously made to hospitals attributable to the erroneous inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or ineligible waiver or demonstration population days in the Medicaid days factor used in the Medicare DSH formula. This is consistent with HCFA's determination that hospitals and intermediaries relied, for the most part, on Medicaid days data obtained from State Medicaid agencies to compute Medicare DSH payments and that some of those agencies

commingled the types of otherwise ineligible days listed above with Medicaid Title XIX days in the data transmitted to hospitals and/or intermediaries. Although HCFA has decided to allow the hospitals to be held harmless for receiving additional payments resulting from the erroneous inclusion of these types of otherwise ineligible days, this decision is not intended to hold hospitals harmless for any other aspect of the calculation of Medicare DSH payments or any other Medicare payments.

### *Hospitals That Received Payments Reflecting the Erroneous Inclusion of Days at Issue*

In practical terms this means that you are not to reopen any cost reports for cost reporting periods beginning before January 1, 2000, to disallow the portions of Medicare DSH payments attributable to the erroneous inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or ineligible waiver or demonstration population days if the hospital received payments for those days based on those cost reports. If, prior to the issuance of this Program Memorandum, you reopened a settled cost report to disallow the portion of Medicare DSH payment attributable to the inclusion of these types of days, reopen that cost report again and refund the amounts (including interest) collected. Do not, however, pay the hospitals interest on the amounts previously recouped as result of the disallowance. Furthermore, on or after October 15, 1999, you are not to accept reopening requests for previously settled cost reports or amendments to previously submitted cost reports pertaining to the inclusion of these types of days in the Medicare DSH formula.

For cost reporting periods beginning before January 1, 2000, you are to continue to allow these types of days in the Medicare DSH calculation for all open cost reports only in accordance with the practice followed for the hospital at issue before October 15, 1999 (i.e., for open cost reports, you are to allow only those types of otherwise ineligible days that the hospital received payment for in previous cost reporting periods settled before October 15, 1999). For example, if, for a given hospital, a portion of Medicare DSH payment was attributable to the erroneous inclusion of general assistance days for only the out-of-State or HMO population in cost reports settled before October 15, 1999, you are to include the ineligible waiver days for only that population when settling open cost reports for cost reporting periods beginning before January 1, 2000. However, the actual number of general assistance and other State-only health program, charity care, Medicaid DSH, and/or ineligible waiver or demonstration days, as well as Medicaid Title XIX days, that you allow for the open cost reports must be supported by

**¶ 150,932**

**402,358**    Current Developments    1089    1-11-2000

auditable documentation provided by the hospital.

### Hospitals That Did Not Receive Payments Reflecting the Erroneous Inclusion of Days at Issue

If a hospital did not receive any payment based on the erroneous inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or waiver or demonstration population days for cost reports that were settled before October 15, 1999, and the hospital never filed a jurisdictionally proper appeal to the Provider Reimbursement Review Board (PRRB) on this issue, you are not to pay the hospital based on the inclusion of these types of days for any open cost reports for cost reporting periods beginning before January 1, 2000. Furthermore, on or after October 15, 1999, you are not to accept reopening requests for previously settled cost reports or amendments to previously submitted cost reports pertaining to the inclusion of these types of days in the Medicare DSH formula.

If, for cost reporting periods beginning before January 1, 2000, a hospital that did not receive payments reflecting the erroneous inclusion of otherwise ineligible days filed a jurisdictionally proper appeal to the PRRB *on the issue of the exclusion of these types of days from the Medicare DSH formula* before October 15, 1999, reopen the cost report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days. If there are any questions or concerns regarding the qualifications for a "jurisdictionally proper appeal", please submit them in writing before rendering a decision in a specific case to Charles Booth, Director, Financial Services Group, Office of Financial Management, 7500 Security Boulevard, Location C3-14-16, Baltimore, Maryland 21244-1850. Where, for cost reporting periods beginning before January 1, 2000, a hospital filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days from the Medicare DSH formula *on or after* October 15, 1999, reopen the *settled* cost report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days, but only if the hospital appealed, before October 15, 1999, the denial of payment for the days in question in previous cost reporting periods. The actual number of these types of days that you use in this revision must be properly supported by adequate documentation provided by the hospital. Do not reopen a cost report and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days if, on or after October 15, 1999, a hospital added the issue of the exclusion of these types of days to a jurisdictionally proper appeal already pending before PRRB on *other* Medicare DSH issues or *other* unrelated issues.

You are to continue paying the Medicare DSH adjustment reflecting the inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or waiver or demonstration population days for all open cost reports for cost reporting periods beginning before January 1, 2000, to any hospital that, before October 15, 1999, filed a jurisdictionally proper appeal to the PRRB specifically for this issue on *previously* settled cost reports.

Finally, you are reminded that, if a hospital has filed a jurisdictionally proper appeal with respect to the HCFA 97-2 ruling and the hospital has otherwise received payment for the portion of Medicare DSH adjustment attributable to the inclusion of general assistance or other State-only health programs, charity care, Medicaid DSH, and/or ineligible waiver or demonstration population days based on its *paid* Medicaid days, include these types of *unpaid* days in the Medicare DSH formula when revising the cost reports affected by the HCFA 97-2 appeal.

The *effective date* for this Program Memorandum (PM) is for cost reporting periods beginning on or after January 1, 2000.

The *implementation date* for this PM is January 1, 2000.

Funding is available through a Supplemental Budget Request for costs required for implementation.

PM may be discarded after January 31, 2001.

SPECIAL INSTRUCTIONS TO THE INTERMEDIARIES FOR PUBLISHING THE PM: The intermediaries are required to distribute the content of this PM to all the hospitals immediately upon receipt of the PM.

Attachment

¶ 150,932

©2000, CCH INCORPORATED

| TYPE OF DAY | DESCRIPTION | ELIGIBLE TITLE XIX DAY |
|---|---|---|
| General Assistance Patient Days | Days for patients covered under a State-only (or county-only) general assistance program (whether or not any payment is available for health care services under the program). These patients are not Medicaid-eligible under the State plan. | No. |
| Other State-Only Health Program Patient Days | Days for patients covered under a State-only health program. These patients are not Medicaid-eligible under the State plan. | No. |
| Charity Care Patient Days | Days for patients not eligible for Medicaid or any other third-party payer, and claimed as uncompensated care by a hospital. These patients are not Medicaid-eligible under the State plan. | No. |
| Actual 1902(r)(2) and 1931(b) Days | Days for patients eligible under a State plan based on a 1902(r)(2) or 1931(b) election. These patients are Medicaid-eligible under the Title XIX State plan under the authority of these provisions, which is exercised by the State in the context of the approved State plan. | Yes. |
| Medicaid Optional Targeted Low Income Children (CHIP-related) Days | Days for patients who are Title XIX-eligible and who meet the definition of "optional targeted low income children" under section 1905(u)(2). The difference between these children and other Title XIX children is the enhanced FMAP rate available to the State. These children are fully Medicaid-eligible under the State plan. | Yes. |
| Separate CHIP Days | Days for patients who are eligible for benefits under a non-Medicaid State program furnishing child health assistance to targeted low-income children. These children are, by definition, not Medicaid-eligible under a State plan. | No. |
| 1915(c) Eligible Patient (the "217" group) Days | Days for patients in the eligibility group under the State plan for individuals under a Home and Community Based Services waiver. This group includes individuals who would be Medicaid-eligible if they were in a medical institution. Under this special eligibility group, they are Medicaid-eligible under the State plan. | Yes. |
| Retroactive Eligible Days | Days for patients not enrolled in the Medicaid program at the time of service, but found retroactively eligible for Medicaid benefits for the days at issue. These patients are Medicaid-eligible under the State plan. | Yes. |
| Medicaid Managed Care Organization Days | Days for patients who are eligible for Medicaid under a State plan when the payment to the hospital is made by an MCO for the service. An MCO is the financing mechanism for Medicaid benefits, and payment for the service through the MCO does not affect eligibility. | Yes. |
| Medicaid DSH Days | Days for patients who are not eligible for Medicaid benefits, but are considered in the calculation of Medicaid DSH payments by the State. These patients are not Medicaid-eligible. Sometimes Medicaid State plans specify that Medicaid DSH payments are based upon a hospital's amount of charity care or general assistance days. This, however, is not "payment" for those days, and does not mean that the patient is eligible for Medicaid benefits or can be counted as such in the Medicare formula. | No. |

**53**

2

54

| Edition)

:ovisions

: a tem-
full-time
:esidents
tal's clo-
criteria
(h)(2) of
tal that
program
its FTE
specified
of this
) may re-
it to its
idded be-
:esidency
·ia speci-
i) of this

.t estab-
n (as de-
chapter),
program,
itegrated
its FTE
tracks in
le provi-
.apter.

·s occur-
ls begin-
), 1999, a
tment to
dditional
dditional
unted as
rposes of
· the fact
were on
)r a simi-
e, in ac-
:ions of

ng on or
·Veterans
·eceive a
FTE cap
been pre-
pital and
d to the
:al meets
isions of

the full-
·articular
hospital
informa-
certified

by an official of the hospital and, if different, an official responsible for administering the residency program.

(i) A listing, by specialty, of all residents assigned to the hospital and providing services to the hospital during the cost reporting period.

(ii) The name and social security number of each resident.

(iii) The dates the resident is assigned to the hospital.

(iv) The dates the resident is assigned to other hospitals or other freestanding providers and any nonprovider setting during the cost reporting period.

(v) The proportion of the total time necessary to fill a residency slot that the resident is assigned to an area of the hospital listed under paragraph (f)(1)(ii) of this section.

(3) Fiscal intermediaries must verify the correct count of residents.

(g) *Indirect medical education payment for managed care enrollees.* For portions of cost reporting periods occurring on or after January 1, 1998, a payment is made to a hospital for indirect medical education costs, as determined under paragraph (e) of this section, for discharges associated with individuals who are enrolled under a risk-sharing contract with an eligible organization under section 1876 of the Act or with a Medicare+Choice organization under title XVIII, Part C of the Act during the period, according to the applicable payment percentages described in §§413.76(c)(1) through (c)(5) of this subchapter.

[50 FR 12741, Mar. 29, 1985. Redesignated at 56 FR 43241, Aug. 30, 1991]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting §412.105, see the List of Sections Affected, which appears in the Finding Aids section of the printed volume and on GPO Access.

### §412.106  Special treatment: Hospitals that serve a disproportionate share of low-income patients.

(a) *General considerations.* (1) The factors considered in determining whether a hospital qualifies for a payment adjustment include the number of beds, the number of patient days, and the hospital's location.

(i) The number of beds in a hospital is determined in accordance with §412.105(b).

(ii) For purposes of this section, the number of patient days in a hospital includes only those days attributable to units or wards of the hospital providing acute care services generally payable under the prospective payment system and excludes patient days associated with—

(A) Beds in excluded distinct part hospital units;

(B) Beds otherwise countable under this section used for outpatient observation services, skilled nursing swing-bed services, or ancillary labor/delivery services. This exclusion would not apply if a patient treated in an observation bed is ultimately admitted for acute inpatient care, in which case the beds and days would be included in those counts;

(C) Beds in a unit or ward that is not occupied to provide a level of care that would be payable under the acute care hospital inpatient prospective payment system at any time during the 3 preceding months (the beds in the unit or ward are to be excluded from the determination of available bed days during the current month); and

(D) Beds in a unit or ward that is otherwise occupied (to provide a level of care that would be payable under the acute care hospital inpatient prospective payment system) that could not be made available for inpatient occupancy within 24 hours for 30 consecutive days.

(iii) The hospital's location, in an urban or rural area, is determined in accordance with the definitions in §412.62(f) or §412.64.

(2) The payment adjustment is applied to the hospital's DRG revenue for inpatient operating costs based on DRG-adjusted prospective payment rates for inpatient operating costs, excluding outlier payments for inpatient operating costs under subpart F of this part and additional payments made under the provisions of §412.105.

(b) *Determination of a hospital's disproportionate patient percentage.* (1) *General rule.* A hospital's disproportionate patient percentage is determined by adding the results of two computations and expressing that sum as a percentage.

(2) *First computation: Federal fiscal year.* For each month of the Federal

455

§412.106

fiscal year in which the hospital's cost reporting period begins, CMS—

(i) Determines the number of patient days that—

(A) Are associated with discharges occurring during each month; and

(B) Are furnished to patients who during that month were entitled to both Medicare Part A and SSI, excluding those patients who received only State supplementation;

(ii) Adds the results for the whole period; and

(iii) Divides the number determined under paragraph (b)(2)(ii) of this section by the total number of patient days that—

(A) Are associated with discharges that occur during that period; and

(B) Are furnished to patients entitled to Medicare Part A.

(3) *First computation: Cost reporting period.* If a hospital prefers that CMS use its cost reporting period instead of the Federal fiscal year, it must furnish to CMS, through its intermediary, a written request including the hospital's name, provider number, and cost reporting period end date. This exception will be performed once per hospital per cost reporting period, and the resulting percentage becomes the hospital's official Medicare Part A/SSI percentage for that period.

(4) *Second computation.* The fiscal intermediary determines, for the same cost reporting period used for the first computation, the number of the hospital's patient days of service for which patients were eligible for Medicaid but not entitled to Medicare Part A, and divides that number by the total number of patient days in the same period. For purposes of this second computation, the following requirements apply:

(i) For purposes of this computation, a patient is deemed eligible for Medicaid on a given day only if the patient is eligible for inpatient hospital services under an approved State Medicaid plan or under a waiver authorized under section 1115(a)(2) of the Act on that day, regardless of whether particular items or services were covered or paid under the State plan or the authorized waiver.

(ii) Effective with discharges occurring on or after January 20, 2000, for purposes of counting days under para-

graph (b)(4)(i) of this section, hospitals may include all days attributable to populations eligible for Title XIX matching payments through a waiver approved under section 1115 of the Social Security Act.

(iii) The hospital has the burden of furnishing data adequate to prove eligibility for each Medicaid patient day claimed under this paragraph, and of verifying with the State that a patient was eligible for Medicaid during each claimed patient hospital day.

(5) *Disproportionate patient percentage.* The intermediary adds the results of the first computation made under either paragraph (b)(2) or (b)(3) of this section and the second computation made under paragraph (b)(4) of this section and expresses that sum as a percentage. This is the hospital's disproportionate patient percentage, and is used in paragraph (c) of this section.

(c) *Criteria for classification.* A hospital is classified as a "disproportionate share" hospital under any of the following circumstances:

(1) The hospital's disproportionate patient percentage, as determined under paragraph (b)(5) of this section, is at least equal to one of the following:

(i) 15 percent, if the hospital is located in an urban area, and has 100 or more beds, or is located in a rural area and has 500 or more beds.

(ii) 30 percent for discharges occurring before April 1, 2001, and 15 percent for discharges occurring on or after April 1, 2001, if the hospital is located in a rural area and either has more than 100 beds and fewer than 500 beds or is classified as a sole community hospital under §412.92.

(iii) 40 percent for discharges before April 1, 2001, and 15 percent for discharges occurring on or after April 1, 2001, if the hospital is located in an urban area and has fewer than 100 beds.

(iv) 45 percent for discharges before April 1, 2001, and 15 percent for discharges occurring on or after April 1, 2001, if the hospital is located in a rural area and has 100 or fewer beds.

(2) The hospital is located in an urban area, has 100 or more beds, and can demonstrate that, during its cost reporting period, more than 30 percent of its net inpatient care revenues are

3



## Health Care Financing Administration

**Medicare**       **Medicaid**       **SCHIP**       **What's New**       **Site Index**

# TENNESSEE STATEWIDE HEALTH REFORM DEMONSTRATION

**FACT SHEET**

**Name of Section 1115 Demonstration:** TennCare

**Date Proposal Submitted:** June 16, 1993

**Date Proposal Approved:** November 18, 1993

**Date Implemented:** January 1, 1994

## SUMMARY

TennCare is a statewide program to provide health care benefits to Medicaid beneficiaries, uninsured State residents and those whose medical conditions make them uninsurable. Enrollment is capped at 1.4 million. If the cap is reached, those in the mandatory Medicaid coverage and uninsurable groups will continue to be enrolled, while enrollment of the currently uninsured groups will be limited. All enrollees are served in capitated managed care organizations (MCOs) that are health maintenance organizations (HMOs). Current enrollment is about 1.3 million.

## ELIGIBILITY

Three distinct groups are offered coverage:

- All persons meeting the eligibility requirements of the Medicaid program as it existed in fiscal year 1993. Current enrollment in this group is about 803,000.
- Persons with an existing or prior existing health conditions causing them to be uninsurable. This population is now nearly 10 percent of all enrollees.
- Persons who are not eligible -- either directly or as a dependent -- for an employer-sponsored or government-sponsored health plan as of March 1, 1993. While enrollment will not be restricted for those currently eligible for Medicaid or the uninsurable, the cap on total enrollment may limit the number of uninsured served. Current enrollment of uninsurable and previously uninsured individuals is about 546,000. Enrollment is currently open to uninsured children and uninsurables.

## BENEFIT PACKAGE

58

A standard benefit package is provided by managed care organizations (MCOs).

TennCare benefits are more generous than those offered under Medicaid for acute care, generally in that they remove most limitations on number of episodes covered. The plan emphasizes preventive care by providing all preventive care to adults and children without copayments or deductibles.

On June 30, 2000, HCFA approved the State=s request to carve out pharmacy benefits from the MCO capitation rate for those individuals also eligible for Medicare.

## ENROLLMENT/DISENROLLMENT PROCESS

Those deemed Medicaid-eligible are enrolled for a 1-year period. Those in the uninsured group are enrolled for a 1-year period as long as they continue to pay their premiums.

The State may involuntarily disenroll those in the uninsured group who fail to pay premiums.

Individuals who are severely and persistently mentally ill (SPMI) were brought into managed care in July 1996. They are now served by the same BHOs that provide behavioral health services to the rest of the TennCare population (See section on "TennCare Partners Program" below.)

Long term care is not included in the managed care plan.

## DELIVERY SYSTEM

The State has contracted with 10 MCOs. The MCOs contract with providers on a fee-for-service or capitation basis.

Services for Children's Plan enrollees (children in State custody or at risk of custody) are currently being provided through the existing State delivery system.

## QUALITY ASSURANCE

The State has a contract with an independent external quality review organization (EQRO). Yearly reviews have been completed and health plans have begun to implement changes in many of the areas that were identified as needing improvement.

## COST-SHARING

All adults and children with incomes above 100 percent of the Federal Poverty Level (FPL) are required to pay, except those in Medicaid eligibility groups. Cost-sharing is in the form of premiums, deductibles, and copayments based on income.

Participants with incomes over 100 percent FPL pay their premiums on a graduated fee schedule so that payments will increase as income increases. Premiums include individual premiums and family premiums.

**59**

Deductibles are on a graduated scale, but none are required for mandatory Medicaid eligibles. Deductibles are $250 for an individual and $500 for a family with incomes between 101 and 199 percent FPL.

Copayments are up to 10 percent of costs, based on a graduated scale for enrollees with incomes between 101 and 199 percent FPL (other than mandatory Medicaid eligibles) and would be 10 percent of the cost of a service for those at or above 200 percent FPL.

Cost-sharing expenditures are limited by annual out-of-pocket maximums of $1,250 per individual/family, excluding premium payments.

To encourage use of preventive services, no deductible or copayment is required for such services.

## TENNCARE PARTNERS PROGRAM

Implemented on July 1, 1996, as part of the TennCare section 1115 demonstration project, the TennCare Partners Program provides behavioral health and substance abuse services to all TennCare enrollees through a complete carve-out program. All mental health and substance abuse services that were previously offered by managed care organizations (MCOs), as well as those provided through the Tennessee Department of Mental Health and Mental Retardation, is provided under the new plan by one of two behavioral health organizations (BHOs).

Eligibility and Coverage: Eligibility is determined as currently defined by the TennCare program; however, BHO enrollees are divided into two groups, Basic and Priority participants. The Basic benefit package provides standard episodic care services, while the Priority package is an expanded group of services provided to those who are most severely ill.

The 1.3 million Basic participants are entitled to the basic service benefit package for mental health and substance abuse services which has been offered by MCOs since TennCare was implemented.

Priority participants are those who have been evaluated by the State and identified as SPMI. This group has traditionally been served by the Community Mental Health Centers (CMHCs) who were contracted by the Tennessee Department of Mental Health and Mental Retardation on a fee-for-service basis. All attempts have been made to preserve these existing provider relationships.

Delivery System: BHOs contract with the State to provide services and receive monthly capitation payments for each enrollee.

BHOs currently have the five State regional mental institutions in their networks, although they are not required to do so. In addition, CMHCs are used as safety net providers. Both BHOs have contracted with all CMHCs.

Coordination of care between the MCO and BHO is a contractual requirement for the plans. The State has required the plans to meet regularly to address issues that arise in providing care.

860

The State believes that virtually all current behavioral health providers are in at least one of the BHO networks.

Choice of Provider: The BHOs each associate with several of the MCOs, with some overlap. Initially, the State assigned beneficiaries to one of the two BHOs via the enrollees= associated MCO, while providing an option to change if a provider of long standing was not in the network. Enrollees have free choice of providers from within the assigned BHO network, and may change BHOs by changing MCOs at the annual change enrollment period.

10/20/00

**Contact:**
Clarke Cagey, 410-786-7700 or E-mail CCagey@hcfa.gov.



Medicare.gov | Department of Health and Human Services | NMEP

Home | Privacy Policy | Feedback | Help | Website Accessibility





4

62

**Methodist Healthcare - Memphis Hospitals**
**FYE 1999**

**Reimbursement Impact of DSH (Medicaid Days)**

| | |
|---|---:|
| Per NPR | |
| Total Medicaid Days | 57,546 |
| Total DSH Reimbursement | $ 18,236,878 |
| | |
| Additional Medicaid Waiver Days | 4,179 |
| | |
| Revised Total Medicaid Days | 61,725 |
| Revised Total DSH Reimbursement | $ 19,413,601 |
| | |
| Additional Reimbursement | $  1,176,723 |



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671                    FAX: 410-786-5298

Suzanne Cochran, Chairperson
Martin W. Hoover, Jr., Esq.
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA

### CERTIFIED MAIL

Powers, Pyles, Sutter & Verville, P.C.
Mary Susan Philp, Esq.
Twelfth Floor
1875 Eye Street, N.W.
Washington, DC 20006 5409

NOV 2 1 2003

Certified Article Number
7160 3901 9848 1765 9198
SENDERS RECORD

Certified Article Number
7160 3901 9848 1765 9204
SENDERS RECORD

RE: Acknowledgement and Critical Due Dates
    Case Number: 04-0110
    Date Filed: 11/5/2003
    Provider Name: Methodist Hospitals of Memphis
    Provider Number: 44-0049
    Appealed Year – FYE: 12/31/1999

The Provider Reimbursement Review Board ("Board") has received your request for a hearing. You will need to obtain a copy of the Board's instructions which are located on the Board's web site at http://www.cms.hhs.gov/providers/prrb/prrb.asp. If internet access is not available to you, you may call the Board at (410) 786-2671 and request that a copy be mailed to you.

You must reference the case number and provider information on all correspondence with the Board. If any of the above information is incorrect, you must inform the Board, in writing, within 30 days of this letter.

<u>DUE DATES</u>

**1st of March 2004**
Provider's Preliminary Position Papers due to Intermediary (with letter to the Board certifying that preliminary position paper due date has been met and copy of the first page only of the preliminary position paper).

**1st of May 2004**
Intermediary's Preliminary Position Papers due to Provider (with letter to the Board certifying that preliminary position paper due date has been met and copy of the first page only of the preliminary position paper).

**1st of July 2004**
Final position papers due to the Board from both Parties.

64

Page 2

DISMISSALS

You are responsible for pursuing your appeal in accordance with the Board's procedures, which are outlined in the Board's Instructions. You must file your position papers, regardless of any outstanding jurisdictional challenges, motions or subpoena requests. If you miss any of your due dates including meeting either position paper due date, the Board will dismiss your appeal. The Board will not send a due date reminder. If the Intermediary fails to meet its deadlines, the Board will contact the Centers for Medicare and Medicaid Services (CMS) about contract compliance and will schedule a hearing date.

TENTATIVE HEARING DATE

November 2004: Tentative month and year of hearing.

The Board will send you a Notice of Board Hearing to notify you of the specific time, date and location of the hearing. The Notice of Hearing will be issued at least 30 days prior to the actual hearing date.

OPTIONS

You may make a written request, at any time, that:

Your month of hearing be rescheduled to an earlier month;
Your case be heard based on the submitted record;
Your case be conducted by video or teleconference;
Your case be resolved through alternative dispute resolution/mediation;
Your case be reviewed in a pre-hearing conference with a Board member.

If you request any of these options, you must continue to meet with the due dates set forth in this letter until you are advised regarding your request by the Board.

Steven R. Kirsh, Director
Division of Jurisdiction & Case Management

cc:    TriSpan Health Services
       Gary Gerber, CPA
       Director, Provider Audit
       P.O. Box 23046
       Jackson, MS 39225

       Wilson C. Leong
       BC & BS Association
       225 North Michigan Avenue
       Chicago, IL 60601-7680 3046

65

**POWERS**
**PYLES**
**SUTTER &**
**VERVILLE PC**
ATTORNEYS AT LAW

elfth Floor
1875 Eye Street, NW
Washington, DC 20006-5409
Phone: (202) 466-6550
Fax: (202) 785-1756
www.ppsv.com

**RECEIVED**

NOV - 6 2003

PROVIDER REIMBURSEMENT
REVIEW BOARD

MARY SUSAN PHILP

(202) 872-6735

Susan.Philp@ppsv.com

November 5, 2003

**FEDERAL EXPRESS**

Suzanne Cochran, Esq.
Chairman
Provider Reimbursement Review Board
2520 Lord Baltimore Drive, Suite L
Baltimore, Maryland 21244-2670

      Re:     Methodist Hospitals of Memphis;
                 Provider No. 44-0049;
                 <u>Fiscal Year Ending December 31, 1999</u>

Dear Mr. Kues:

Pursuant to Section 1878(a) of the Social Security Act, the above-captioned provider hereby appeals the notice of program reimbursement ("NPR") issued for its fiscal year ending December 31, 1999. A copy of the NPR is attached as Exhibit 1.

The provider appeals the following issues:

      (1)     Adjustment of GME per-resident amount; audit adjustment number 49; approximate reimbursement effect - $223,174.37;

             The Provider contends that the Intermediary's use of a weighted average per-resident amount following the Provider's merger with LeBonheur Children's Hospital is contrary to the Medicare statute and regulations. 42 U.S.C. § 1395ww(h); 42 C.F.R. § 413.86(e)(1). The Intermediary should have used the Provider's pre-merger per-resident amount. The audit adjustment for this issue and calculations showing the approximate reimbursement impact are attached as Exhibit 2.

66

POWERS, PYLES, SUTTER & VERVILLE PC

Suzanne Cochran, Esq.
November 5, 2003
Page 2

      (2)    Adjustment of disproportionate share ("DSH") payment (Medicaid days percentage); audit adjustment numbers 67 and 68; approximate reimbursement effect - $1,176,723.

               The Provider contends that the Intermediary's calculation of the Provider's DSH payment is contrary to the Medicare statute and regulations. 42 U.S.C. § 1395ww(d)(5)(F); 42 C.F.R. § 412.106. Specifically, the Provider contends that the days attributable to all patients eligible for Medicaid through the State of Tennessee's Section 1115 waiver program, not just the days for patients who would have been eligible for Medicaid absent the waiver, should have been included in the number of Medicaid eligible days used for purposes of the DSH calculation. The audit adjustment for this issue and calculation showing the approximate reimbursement impact are attached as Exhibit 3.

The amount in controversy exceeds the required jurisdictional amount of $10,000. The NPR is dated August 28, 2003. Therefore, this appeal is timely filed.

The provider contends that the intermediary's determinations on these items were arbitrary and capricious, contrary to the Medicare statute, regulations and manual provisions, and otherwise contrary to law. The provider reserves the right to add other appeal items prior to the commencement of the hearing.

The provider appoints as its legal representative the law firm of Powers, Pyles, Sutter & Verville, P.C., located at 1875 Eye Street, N.W., Twelfth Floor, Washington, D.C. 20006 (Exhibit 4).

               Sincerely,

               Mary Susan Philp

Enclosures

cc:    TriSpan Health Services
       Blue Cross and Blue Shield Association
       Marybeth Nagle

**TRISPAN**

**HEALTH SERVICES**
**MEDICARE PART A INTERMEDIARY**
*A CMS Contracted Intermediary.*

*www.trispan.com*

P. O. Box 23046 • Jackson, MS • 39225-3046
1064 Flynt Drive • Jackson, MS • 39232-9570
(601) 936-0105

**FIRST REQUEST**

August 28, 2003

Certified Mail 7001 2510 0009 3075 7955
Return Receipt Requested

NOTICE OF AMOUNT OF
PROGRAM REIMBURSEMENT

Ms. Marybeth Nagle, Director of Reimburs
Methodist Healthcare- Memphis Hospitals
1211 Union Avenue
Suite 600
Memphis, TN  38104

RE:  Provider: Methodist Healthcare- Memphis Hospitals
     Provider Number: 440049
     Fiscal Year End: 12/31/99
     Subunits:  443500  445225  44S049

Dear Ms. Nagle:

This is a Medicare **NOTICE OF AMOUNT OF PROGRAM REIMBURSEMENT** for the cost
report ended 12/31/99.  This review is based on:

     (   )  Audit Settlement

     ( X )  No Audit Settlement (based on Desk Review)

Our final determination in accordance with 42 CFR 405.1803 shows an amount due
the Medicare Program as follows:

          Net Amount Due the Program:   $ (2,336,417)

          See Attached Transaction Summary

**PLEASE MAKE YOUR CHECK PAYABLE TO: TRISPAN HEALTH SERVICES, POST OFFICE BOX
1043, JACKSON, MISSISSIPPI 39215-1043.**

In accordance with procedures of 42 CFR 405.376FF, interest will be assessed on
the amount due HCFA unless full recovery of this payment is made within 30 days
from the date of this Notice.   Interest will be assessed for each 30 day
period, or part thereof, that payment is delayed.  **IF YOU ARE UNABLE TO REFUND
THE ENTIRE AMOUNT AT THIS TIME, PLEASE CONTACT THIS OFFICE IMMEDIATELY AT (601)
936-0105.**



Methodist Healthcare- Memphis Hospitals
440049 12/31/99

**IF PAYMENT HAS NOT BEEN RECEIVED IN THIS OFFICE OR WE HAVE NOT BEEN CONTACTED
WITHIN 15 DAYS FROM THE DATE OF THIS LETTER, YOUR PAYMENT WILL BE REDUCED BY
100% ON THE 16TH DAY.**  If you are requesting a repayment schedule, please
contact this office immediately so that we may determine if you are eligible
for a repayment schedule.  A list of the information which should be submitted
is enclosed. ANY REPAYMENT SCHEDULE WOULD RUN FROM THE DATE OF THIS LETTER. If
an overpayment is repaid in installments or recouped by withholding from
several payments due the Provider, each payment will be applied first to
accrued interest and then to the principal.  With respect to repayment
schedules, interest will be assessed on the higher of the private consumer rate
or the current value of funds rate of interest on overpayments and
underpayments to health care providers and suppliers.

**WITHIN 15 DAYS OF THIS BILLING, IF FULL PAYMENT IS NOT RECEIVED, NOTICE GIVEN
THAT FULL PAYMENT WILL BE MADE WITHIN 30 DAYS, OR NO REPAYMENT PLAN IS
ESTABLISHED, A REDUCTION OF 100% OF YOUR PAYMENTS WILL BE NECESSARY TO RECOVER
THIS OVERPAYMENT.**

We have issued our report on your cost statement for this reporting period, and
your copy is enclosed.  This is a final report subject to interpretations of
the "Principles of Reimbursement for Provider Cost" by the Health Care
Financing Administration.  These adjustments include the appropriate reference
to applicable laws, regulations, and general instructions used as a basis for
these adjustments. Please be informed that the Intermediary Determination
communicated by this NPR may be revised in accordance with 42 CFR 405.1885.

If you disagree with the cost report adjustments which have been made by this
office, you have the right to appeal in writing within 180 days from the date
of this notice.  If you disagree with adjustments aggregating $10,000 or more
in Program reimbursement, your appeal should be made to the Provider
Reimbursement Review Board (PRRB).  To request a group appeal, the amount in
controversy must be at least $50,000 for any group of providers, including
those under common ownership or control, where the matters in controversy
involve a common question of fact, law or regulation, or HCFA ruling.  Appeal
information and procedures are available in HCFA Pub. 15-I, Chapter 29, and in
the CCH Medicare and Medicaid Guide, paragraphs 7679-7791. Copies of the HCFA
Pub. 15-I sections may be obtained from:

        National Technical Information Service
        5858 Port Royal Road
        Springfield, VA  22161
        (703) 487-4650

Methodist Healthcare- Memphis Hospitals
440049 12/31/99

Should you request an appeal to the PRRB, your written request should be
directed to:

>       Chairman
>       Provider Reimbursement Review Board
>       P.O. Box 31712
>       Baltimore, MD  21207-8712
>       (410) 786-2671

Please also submit copies of your request to Mr. Gary Gerber, Director of
Provider Audit, at our office and to the following address:

>       Provider Reimbursement Review Board
>       Appeals Coordinator
>       Blue Cross Blue Shield Association
>       225 North Michigan Avenue
>       Chicago, IL  60601-7680

If you disagree with adjustments aggregating at least $1,000 but less than
$10,000, your appeal should be made to the Blue Cross Blue Shield Association
under its Medicare Provider Appeals Procedures and is referred to as an
Intermediary Appeal.  Your written request should be directed to the following
address:

>       Intermediary Hearing Officer
>       Reimbursement and Provider Appeals Department
>       Blue Cross Blue Shield Association
>       225 North Michigan Avenue
>       Chicago, IL  60601-7680

A copy of this request should also be submitted to Mr. Gary Gerber, Director of
Provider Audit, at this office.

For information on the proper form and required content of an appeal request,
please refer to 42 CFR 405.1809 - 405.1833 and HCFA Pub. 15-I, Section
2910-2918 for Intermediary Appeals and 42 CFR 405.1835 - 405.1890 and HCFA Pub.
15-I, Section 2920-2929 for PRRB Appeals. The appeal requests for either an
Intermediary or PRRB Appeal must include the following:

>       1.)   Identification of items in dispute by adjustment number,
> amount, and description.

>       2.)   Reasons for disagreement with the Intermediary's
> determination on these items.

>       3.)   One copy of the NPR, or determination disputed and the
> pertinent portion of the adjustment report.

In addition, Intermediary Appeal requests must include an estimate of the
reimbursement in controversy for each item appealed.

Methodist Healthcare- Memphis Hospitals
440049 12/31/99

We strongly urge that you discuss with us any questions concerning the
adjustments we have made. As you have 180 days from the date of the Notice of
Corrected Program Reimbursement to formally file a request for appeal, there is
ample opportunity for discussion without risk of any prejudice to your appeal
rights.

If you have any questions regarding this settlement, please contact our
Provider Settlement Department at (601) 936-0105, extension 4713. For questions
regarding specific audit adjustments, please contact our Louisiana Audit Office
at (504) 343-0276.


Sincerely,

Eddie Price
Supervisor, Provider Reimbursement

Attachments

4

TRISPAN HEALTH SERVICES                    HCFA-2552-96 AUDIT ADJUSTMENT REPORT              RUN DATE: 08/13/2003    PAGE 1
PROVIDER NAME: METHODIST HU  RE-MEMPHIS HOSP        PROVIDER NUMBER: 44-0049         FISCA  RIOD: 01/01/1999 TO 12/31/1999

| ADJ # | WS | P | F | T | LINE | COLUMN | A6/AB LTR | A6/AB LINE | EXPLANATION OF AUDIT ADJUSTMENTS | AS REPORTED | INCREASE/ DECREASE | AS ADJUSTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | A&G to capital related cost center PRM 1:2328, 42 CFR 413 WP reference A-5-24 | | | |
| 48 | | | | | | | | | MEMO ADJUSTMENT Adjustment deleted WP reference A-5.27 | | | |
| 49 | E3 | 4 | | 8 | 3.19 | 1 | | | PRIMARY CARE PER RESIDENT AMOUNT | 61970.87 | -3169.69 | 58801.18 |
| 49 | E3 | 4 | | 8 | 3.20 | 1 | | | OTHER PROGRAM PER RESIDENT AMOUNT To properly report the GME per resident amount on the OCR PRM 1:2120, 42 CFR 413.86 WP reference A-5-39 | 58680.95 | -2228.40 | 56452.55 |
| 50 | S2 | | | | 56.01 | 2 | | | AMBULANCE LIMIT | 325.61 | 7.81 | 333.42 |
| 50 | S3 | 1 | | | 27 | 4 | | | AMBULANCE TRIPS | 331 | 94 | 425 |
| 50 | S3 | 1 | | | 27.01 | 4 | | | AMBULANCE TRIPS To properly report the provider's ambulance trips and Medicare per trip limit PRM 1:2215, 42 CFR 413.24 WP reference A-17-1 | 110 | -98 | 12 |
| 51 | S2 | | | | 28.01 | 2 | | | To properly report the provider's SNF Wage Index Adjustment Factor PRM 1:2408, 42 CFR 413.53 WP reference A-17-16 | .8529 | -.0060 | .8529 |
| 52 | E | | A | 1 | 30 | 1 | | | PROTESTED AMOUNTS | 628019 | -628019 | 0 |
| 52 | E | | B | 1 | 36 | 1 | | | PROTESTED AMOUNTS To remove protested amounts from the settlement worksheets of the cost report PRM 1:115.2, 42 CFR 413.60 WP reference A-17-27 | 477658 | -477658 | 0 |
| 53 | E | | B | 1 | 27 | 1 | | | REIMB BAD DEBTS-ALL OTHER To properly report outpatient bad debts PRM 1:304, 42 CFR 413.80 WP reference P-4A | 2419782 | 273202 | 2692984 |
| 54 | E | | A | 1 | 21 | 1 | | | REIMBURSABLE BAD DEBTS To properly report inpatient bad debts | 4227294 | -828764 | 3398530 |

**Methodist Healthcare – Memphis Hospitals**
**Fiscal Year Ending December 31, 1999**

**Calculation of Reimbursement Impact of**
**GME Per Resident Amount Issue**

| 1999 | Methodist | Average (Methodist & Lebonheur) | difference |
|---|---|---|---|
| Primary care FTE's | 92.21 | 92.21 | |
| Primary care per resident amount | $61,947.39 | $58,658.71 | |
| Primay care reimbursement | $5,712,168.84 | $5,408,919.29 | |
| | | | |
| all other FTE's | 65.12 | 65.12 | |
| all other per resident amount | 58801.18 | 56452.55 | |
| all other reimbursement | $3,829,132.84 | $3,676,190.06 | |
| | | | |
| Unadjusted approved amount | $9,541,301.68 | $9,085,109.34 | |
| Average per resident amount | $60,645.15 | $57,745.56 | |
| 3 year rolling average Resident count | 162.48 | 162.48 | |
| Aggregate approved amount | $9,853,624.21 | $9,382,498.99 | |
| Progam IP days/Total IP days | 0.473705 | 0.473705 | |
| **Total Progam GME Payment** | **$4,667,711.05** | **$4,444,536.68** | |
| **Total 1999 Difference** | | | $223,174.37 |

G:\DATA\Reimb\1998ye\mhm\[gme comparison.xls]Sheet2

TRISPAN HEALTH SERVICES                    HCFA-2552-96 AUDIT ADJUSTMENT REPORT              RUN DATE: 08/13/2003    PAGE 2
PROVIDER NAME: METHODIST HL{ }E-MEMPHIS HOSP      PROVIDER NUMBER: 44-0049       FISCA{ }RIOD: 01/01/1999 TO 12/31/1999

| ADJ # | WS | P | F | T | LINE | COLUMN | A6/A8 LTR | LINE | EXPLANATION OF AUDIT ADJUSTMENTS | AS REPORTED | INCREASE/ DECREASE | AS ADJUSTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 63 | D | 5 | 1 | 8 | 60.02 | 2 | | | WOUND CARE CENTER | 187039 | 474846 | 661885 |
| 63 | D | 5 | 1 | 8 | 61 | 2 | | | EMERGENCY | 49336 | 28386 | 77722 |
| 63 | D | 5 | 1 | 8 | 62 | 2 | | | OBSERVATION BEDS (NON-DISTINCT PART) To properly report revenue code 761 in the proper cost centers PRM 1:2408, 42 CFR 413.20 WP reference A-5-2NA5 | 661376 | -660150 | 1226 |
| 64 | E3 | 4 | | 8 | 3.01 | 1 | | | UNWEIGHTED FTE COUNT <= 12/31/96 | 173.89 | -.79 | 173.10 |
| 64 | E3 | 4 | | 8 | 3.05 | 1 | | | UNWEIGHTED FTE COUNT CURRENT YEAR | 179.41 | -1.05 | 178.36 |
| 64 | E3 | 4 | | 8 | 3.07 | 1 | | | WEIGHTED FTE COUNT PRIMARY CARE CY | 91.97 | .24 | 92.21 |
| 64 | E3 | 4 | | 8 | 3.08 | 1 | | | WEIGHTED FTE COUNT ALL OTHER CY | 73.57 | -8.45 | 65.12 |
| 64 | E3 | 4 | | 8 | 3.11 | 1 | | | | .33 | -.04 | .29 |
| 64 | E3 | 4 | | 8 | 3.13 | 1 | | | TOTAL WEIGHTED FTE COUNT PRIOR YEAR | 162.52 | 9.41 | 171.93 |
| 64 | E3 | 4 | | 8 | 3.14 | 1 | | | TOTAL WEIGHTED FTE COUNT PENULTIMATE YEA To proerly update GME FTEs on worksheet E-3 Part IV PRM 1:2823.4, 42 CFR 413.86 WP reference O-8I | 168.87 | -6.35 | 162.52 |
| 65 | E | A | 1 | | 3.04 | 1 | | | FTE COUNT <= 12/31/96 | 173.89 | -.95 | 172.94 |
| 65 | E | A | 1 | | 3.08 | 1 | | | FTE COUNT CURRENT YEAR | 175.97 | .94 | 176.91 |
| 65 | E | A | 1 | | 3.15 | 1 | | | TOTAL FTE COUNT PRIOR YEAR | 174.06 | 7.72 | 181.78 |
| 65 | E | A | 1 | | 3.19 | 1 | | | PRIOR YEAR PER RESIDENT TO BED RATIO To adjust IME FTE count and other IME information for proper calculation of IME payment PRM 1:3630.1, 42 CFR 413.9 WP reference Q-8a | .153460 | .002257 | .155717 |
| 66 | D | 5 | 1 | 8 | 57 | 5 | | | RENAL DIALYSIS To remove Title 18 Part B charges related to CMR review PRM 1:2408, 42 CFR 413.53, MIM3940 WP reference A-5-2NA3a | 2444246 | -149426 | 2294820 |
| 67 | E | A | 1 | | 4 | 1 | | | PERCENT OF SSI RECIP PAT DAYS TO MEDICAR | 15.62 | -.29 | 15.33 |
| 67 | E | A | 1 | | 4.03 | 1 | | | ALLOWABLE DISPROPOR SHARE PERCENTAGE To properly report SSI % and DSH Payment | 19.47 | -2.70 | 16.77 |

74

TRISPAN HEALTH SERVICES                    HCFA-2552-96 AUDIT ADJUSTMENT REPORT              RUN DATE: 08/13/2003    PAGE 2
PROVIDER NAME: METHODIST HL\_.RE-MEMPHIS HOSP        PROVIDER NUMBER: 44-0049        FISCA\_RIOD: 01/01/1999 TO 12/31/1999

| ADJ # | WS P F T | LINE | COLUMN | A6/A8 LTR LINE | EXPLANATION OF AUDIT ADJUSTMENTS | AS REPORTED | INCREASE/ DECREASE | AS ADJUSTED |
|-------|----------|------|--------|----------------|----------------------------------|-------------|--------------------|-------------|
| | | | | | Percentage<br>PRM 1:2408.4, 42 CFR 413.20<br>See Workpaper Q-7 | | | |
| 68 | S3 1 | 1 | 5 | | HOSPITAL ADULTS & PEDS | 35961 | -2166 | 33795 |
| 68 | S3 1 | 6 | 5 | | INTENSIVE CARE UNIT | 8730 | -526 | 8204 |
| 68 | S3 1 | 7 | 5 | | CORONARY CARE UNIT | 55 | -3 | 52 |
| 68 | S3 1 | 10 | 5 | | CVICU | 560 | -34 | 526 |
| 68 | S3 1 | 10.01 | 5 | | TRAUMA ICU | 930 | -56 | 874 |
| 68 | S3 1 | 10.02 | 5 | | ICU SOUTH | 1368 | -82 | 1286 |
| 68 | S3 1 | 10.03 | 5 | | ICU NORTH | 898 | -54 | 844 |
| 68 | S3 1 | 10.04 | 5 | | ICU G'TOWN | 293 | -18 | 275 |
| 68 | S3 1 | 10.05 | 5 | | ICU LEBONHEUR | 6468 | -390 | 6078 |
| 68 | S3 1 | 11 | 5 | | NURSERY<br>To adjust Title XIX days<br>PRM 1:2408.4, 42 CFR 413.20<br>See Workpaper Q-7 | 5971 | -360 | 5611 |

**Methodist Healthcare – Memphis Hospitals**
**Fiscal Year December 31, 1999**

**Calculation of Reimbursement Impact of**
**Disproportionate Share (Medicaid Days) Issue**

| | |
|---|---:|
| Per NPR | |
| Total Medicaid Days | 57,546 |
| Total DSH Reimbursement | $18,236,878 |
| | |
| Additional Medicaid Waiver Days | 4,179 |
| | |
| Revised Total Medicaid Days | 61,725 |
| Revised Total DSH Reimbursement | $19,413,601 |
| | |
| Additional Reimbursement | $1,176,723 |

76



September 19, 2003

Mr. Steven R. Kirsh, Director
Jurisdiction and Case Management Staff
Provider Reimbursement Review Board
7500 Security Blvd., Room C1-09-13
Baltimore, Maryland 21244-1850

Re: 1999 Methodist Healthcare – Memphis Hospitals
    Provider Number: 44-0049
    Fiscal Year Ending 12/31/1999

Dear Mr. Kirsh,

Through this letter, The Provider is designating the following party as their Provider Representative related to appeals for the above mentioned hospital and fiscal year. Forward all correspondence related to appeals for this hospital to:

Ms. Susan Philip,
Powers, Pyle, Sutter and Verville
1875 Eye Street, NW
12th Floor
Washington, DC 20006-5409

Sincerely,

Marybeth Nagle,
Director of Reimbursement for Methodist Healthcare

77



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671            FAX: 410-786-5298

Suzanne Cochran, Esq., Chairperson
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes

Refer to:

05-0678

CERTIFIED MAIL

Mary Susan Philp, Esq.                                    MAR 0 8 2006
Powers, Pyles, Sutter & Verville, PC
Twelfth Floor
1875 Eye Street, N.W.
Washington, D.C. 20006-5409

                    RE: Methodist Hospital of Memphis
                        Provider No. 44-0049
                        FYE 12/31/00
                        PRRB Case No. 05-0678

Dear Ms. Philp:

On March 7, 2006, the Board issued a decision finding that expedited judicial review was
appropriate for the issue of whether section 1115 expansion waiver days should be
included in the disproportion share adjustment for periods prior to January 20, 2000. In
that letter, we mistakenly closed the case, stating that the section 1115 waiver days issue
was the only issue remaining under appeal. A review of the file indicates the Provider
has an issue related to graduate medical education reimbursement pending in the case.
Consequently, the case has not been closed. We apologize for an inconvenience this
error has caused.

                              Sincerely,

                              Gary B. Blodgett

                              Gary B. Blodgett, DDS
                              Board Member

cc: Gary Gerber, Tri-Span Health Services
    Wilson Leong, BCBSA

78



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671                    FAX: 410-786-5298

anne Cochran, Esq., Chairperson
y B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes

Refer to:

05-0678
CERTIFIED MAIL

MAR - 7 2006

Mary Susan Philp, Esq.
Powers, Pyles, Sutter & Verville, PC
Twelfth Floor
1875 Eye Street, N.W.
Washington, D.C. 20006-5409

                    RE:  Methodist Hospital of Memphis
                         Provider No. 44-0049
                         FYE 12/31/00
                         PRRB Case No. 05-0678

Dear Ms. Philp:

This is in response to the Provider's request that the Provider Reimbursement Review Board (Board), pursuant to 42 U.S.C. § 1395oo(f)(1), determine that it is without the authority to decide the question of whether the regulation, 42 C.F.R. § 412.106(b)(4)(ii), which excludes section 1115 expansion waiver days from the calculation of the disproportionate share (DSH) adjustment prior to January 20, 2000, is valid. The Provider is seeking to have section 1115 expansion waiver days included in the DSH calculation for period priors to January 20, 2000.

The Provider believes that this regulation conflicts with 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) and (II), ( the DSH calculation) which provides for two proxies as measures of the volume of low-income patients served by a hospital:

> (1) the percentage of the total Medicare inpatient days provided to low income Medicare patients (i.e., those patients entitled to supplemental security income under Title XVI of the Social Security Act); and

> (2) the percentage of total hospital days provided to "patients who (for such days) were eligible for medical assistance under a State plan approved under [the Medicaid program]."

The Provider believes that the regulation, 42 C.F.R. § 412.106(b)(4)(ii), is inconsistent with the statutory language of §1395ww(d)(5)(F)(vi)(II). Section 1395oo(f)(1) permits providers that have requested and are entitled to a hearing before the Board under 42 U.S.C. § 1395oo(a), to bypass the Board's hearing procedure and obtain judicial review of an issue involving a question of law or regulation where the Board determines that it is without the authority to decide such question.

The Board has reviewed the submissions of the Provider pertaining to the request for hearing and expedited judicial review. The documentation shows that the estimated amount in controversy for the appeal exceeds $10,000, as required for an appeal. The

79

Provider Reimbursement Review Board
Page 2 Mary Susan Philp

CN05-0678

estimated amount in controversy is subject to recalculation by the Intermediary for the actual final amount.

The Board finds that:

1) it has jurisdiction over the matter for the subject year and the Provider is entitled to a hearing before the Board;

2) based upon the Provider's assertions regarding the section 1115 waiver issue, there are no findings of fact for resolution by the Board;

3) it is bound by the applicable existing Medicare law and regulation (42 C.F.R. § 405.1867); and

4) it is without the authority to decide the legal question of whether the regulation, 42 C.F.R. § 412.106(b)(4)(ii), which excludes section 1115 expansion waiver days from the calculation of the disproportionate share adjustment prior to January 20, 2000, is valid.

Accordingly, the Board finds that the section 1115 waiver issue properly falls within the provisions of 42 U.S.C. § 1395oo (f)(1) and hereby grants the Provider's request for expedited judicial review for the issue and the subject year. The Provider has 60 days from the receipt of this decision to institute the appropriate action for judicial review. Since this is the only issue under dispute, the Board hereby closes the case.

Board Members Participating

Suzanne Cochran, Esq.
Gary B. Blodgett, DDS
Elaine C. Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes

FOR THE BOARD:

Gary B. Blodgett for

Suzanne Cochran, Esq.
Chairman

Enclosures: 42 U.S.C. § 1395oo (f)(1)

cc: Gary Gerber, Tri-Span Health Services
Wilson Leong, BCBSA

80

**POWERS**
**PYLES**
**SUTTER &**
**VERVILLE PC**
ATTORNEYS AT LAW

Twelfth Floor
1875 Eye Street, NW
Washington, DC 20006-5409
Phone: (202) 466-6550
Fax: (202) 785-1756
www.ppsv.com

MARY SUSAN PHILP
(202) 872-6735
Susan.Philp@ppsv.com

February 10, 2006

**VIA FEDERAL EXPRESS**

Suzanne Cochran, Esq., Chairperson
Provider Reimbursement Review Board
2520 Lord Baltimore Drive, Suite L
Baltimore, MD 21244-2670

RECEIVED

FEB 13 2006

PROVIDER REIMBURSEMENT
REVIEW BOARD

Re:    **REQUEST FOR EXPEDITED JUDICIAL REVIEW**
Methodist Hospitals of Memphis;
Provider No. 44-0049;
FYE December 31, 2000;
PRRB Case No. 05-0678

Dear Ms. Cochran:

The Provider, Methodist Hospitals of Memphis ("Provider"), hereby requests that the Board grant expedited judicial review ("EJR") as to the disproportionate share hospital ("DSH") payment (Section 1115 waiver days) issue in the above appeal pursuant to Section 1878(f)(1) of the Social Security Act ("the Act").

As discussed below, EJR should be granted because the Provider challenges the policy of the Secretary of Health and Human Services ("the Secretary") and the Centers for Medicare and Medicaid Services ("CMS") which excludes Section 1115 waiver days from the DSH payment calculation for patient discharges prior to January 20, 2000. That policy was reflected in the determination of the Provider's intermediary in this appeal and was the subject of formal CMS pronouncements, including Program Memorandum A-99-62, which, subject to very limited exceptions, indicated that Section 1115 waiver days should be excluded from the DSH calculation.[1] In addition, on January 20, 2000, CMS issued a regulation that instructed intermediaries to include Section 1115 waiver days in the DSH calculation, but only prospectively. 42 C.F.R. § 412.106(b)(4)(ii).[2] This CMS policy and the regulation violate the Medicare statute. 42 U.S.C. § 1395ww(d).

---

[1] A copy of Program Memorandum A-99-62 is attached as Exhibit 1.
[2] A copy of 42 C.F.R. § 412.106(b)(4)(ii) is attached as Exhibit 2.

81

POWERS, PYLES, SUTTER & VERVILLE PC

Suzanne Cochran, Esq., Chairperson
February 10, 2006
Page 2

Because the Board lacks the authority to decide questions involving the validity of a Medicare regulation or controlling CMS policy, EJR is appropriate. Furthermore, the Board has previously determined that it was without authority to decide the precise legal question raised in the present appeal and granted EJR, most recently in appeals for this Provider involving previous cost reporting periods. PRRB Case Nos. 03-0108 and 04-0110. The Provider requests that the Board follow its prior determination and grant EJR in the instant case.

## I.    FACTUAL AND LEGAL BACKGROUND

### A.    Medicare DSH Calculation

Since 1983, the Medicare program has paid most hospitals for the operating costs of inpatient hospital services under a prospective payment system ("PPS"). 42 U.S.C. § 1395ww(d)(1)-(5); 42 C.F.R. Part 412. Under PPS, Medicare pays hospitals a standardized amount per case subject to certain payment adjustments. Id. A hospital that serves a dispro-portionate share of low-income patients, or a DSH, is also entitled to an upward adjustment to the Medicare PPS payments. See 42 U.S.C. § 1395ww(d)(5)(F).

The amount of the Medicare DSH payment due to a hospital is determined, in part, by its "disproportionate patient percentage" ("DSH patient percentage"), which is a proxy for the Provider's utilization by low-income patients. See 42 U.S.C. § 1395ww(d)(5)(F)(v). The DSH patient percentage is defined as the sum of two fractions expressed as percentages. 42 U.S.C. § 1395ww(d)(5)(F)(vi). One of these fractions is commonly known as the Medicaid percentage. The numerator of the fraction used to compute the Medicaid percentage consists of the number of the Provider's patient days attributable to patients who were "eligible for medical assistance under a State plan approved under Title XIX, but who were not entitled to benefits under Part A of [Medicare]." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

### B.    Section 1115 Waiver Provision and TennCare

Section 1115 of the Act allows the Secretary to approve State research and demonstration projects that promote the objectives of the Title XIX Medicaid program. 42 U.S.C. § 1315. Section 1115(a)(1) authorizes the Secretary to waive the requirements of section 1902 of the Act, which contains Medicaid State plan requirements, including requirements as to eligible populations. 42 U.S.C. § 1315(a)(1). Section 1115(a)(2)(A) allows a State to receive federal matching for medical assistance, including medical assistance provided to expanded eligibility populations, for which the State would not ordinarily be entitled to receive federal matching. 42 U.S.C. § 1315(a)(2).

Under some Section 1115 waivers, the State furnishes medical assistance to a population that otherwise could have been made eligible for Medicaid; under others, the State furnishes

POWERS, PYLES, SUTTER & VERVILLE PC

Suzanne Cochran, Esq., Chairperson
February 10, 2006
Page 3

medical assistance to expanded eligibility populations that could not otherwise have been made eligible for Medicaid.  As stated by the Secretary, "the statute allows for the expansion populations to be treated as Medicaid beneficiaries." 65 Fed. Reg. 3137 (Jan. 20, 2000).

The State of Tennessee first received approval for its Section 1115 demonstration project, called TennCare, on November 19, 1993.  On January 1, 1994, Tennessee became the first state to move its Medicaid program enrollees to a statewide demonstration project.  In addition to Medicaid eligible persons, TennCare offered coverage to expansion populations of uninsured and uninsurable persons, regardless of income, who would not have been eligible for Medicaid under the program as it existed prior to the waiver.[3]

C.    CMS Treatment of Section 1115 Waiver Days Under DSH

Until early 2000, the Medicare regulations did not specifically address the treatment of Section 1115 waiver days under DSH.  See 42 C.F.R. § 412.106 (1999).  In 1999, however, CMS issued Program Memorandum A-99-62.[4]  This memorandum instructed intermediaries, within certain parameters, to allow the inclusion of "ineligible waiver or demonstration population days," but only to the extent that the intermediaries had previously allowed their inclusion, i.e., allowing hospitals which had previously received payment for such days to be held harmless.  To the extent that the very narrow parameters of Program Memorandum A-99-62 were not met, however, Section 1115 waiver days were excluded from the DSH calculation.

On January 20, 2000, CMS issued an "interim final rule with comment period" to address the treatment under DSH of Section 1115 waiver days.  65 Fed. Reg. 3136 (Jan. 20, 2000). Through this interim final rule, CMS established that, effective with discharges occurring on or after January 20, 2000, hospitals may include the patient days of all populations eligible for Title XIX matching payments through a State's Section 1115 waiver in calculating the Medicare DSH adjustment.  65 Fed. Reg. 3136-37; 65 Fed. Reg. 47086.  The implementing regulation states:

> Effective with discharges occurring on or after January 20, 2000, for purposes of counting days under paragraph (b)(4)(i) of this section, hospitals may include all days attributable to populations eligible for Title XIX matching payments through a waiver approved under section 1115 of the Social Security Act.

42 C.F.R. § 412.106(b)(4)(ii).  Thus, CMS's new policy allowing the inclusion of Section 1115 waiver days in the DSH calculation was effective for discharges occurring on or after January 20, 2000, but not with respect to discharges occurring prior to that date.

---

[3] Exhibit 3 (Tennessee Statewide Health Reform Demonstration Fact Sheet).
[4] "Clarification of Allowable Medicaid Days in the Medicare Disproportionate Share Hospital (DSH) Adjustment Calculation," Program Memorandum A-99-62 (Dec. 1, 1999).

POWERS, PYLE, SUTTER & VERVILLE PC

Suzanne Cochran, Esq., Chairperson
February 10, 2006
Page 4

D.    Provider's Position

The Provider contends that the plain language of the Act requires the inclusion in the DSH calculation of all Section 1115 waiver days. As noted above, the statute provides that the numerator of the DSH Medicaid fraction include days for patients who were "eligible for medical assistance under a State Plan approved under Title XIX." 42 U.S.C. § 1395ww(d)(5) (F)(vi)(II). Thus, the DSH calculation should clearly include all patients who were eligible for medical assistance under a Medicaid State Plan implemented through a Section 1115 waiver, including patients in expansion populations. Therefore, CMS's policy of excluding Section 1115 waiver days from the DSH calculation prior to January 20, 2000, as reflected in Program Memorandum A-99-62 and CMS regulations at 42 C.F.R. § 412.106(b)(4)(ii), violates the Act and is invalid.

During fiscal year 2000, the Provider provided services to patients who were eligible for Medicaid payment under the TennCare program. When the intermediary determined the amount of the Provider's DSH payment, it excluded days attributable to patients covered under the Section 1115 waiver for that portion of the year occurring before January 20, 2000. Therefore, the Provider has been under-reimbursed as a result of the intermediary's application of the invalid CMS policy. Attached as Exhibit 4 is a calculation of the estimated reimbursement impact of the intermediary's exclusion of the Section 1115 waiver days, based on the information currently available to the Provider.

II.    **THE BOARD SHOULD GRANT EJR**

Under Section 1878(f)(1) of the Act, 42 U.S.C. § 1395oo(f)(1), the Board may grant EJR as to an intermediary determination that involves a question of the validity of a law, regulation, or controlling CMS policy which the Board lacks authority to decide. See also 42 C.F.R. § 405.1842. As discussed above, this appeal involves the Provider's challenge to CMS's policy, as reflected in CMS pronouncements and regulations, that excluded Section 1115 waiver days from the DSH calculation prior to January 20, 2000; this matter is, therefore, properly the subject of EJR.

We note that the Board has previously granted EJR in cases that also involved the validity of CMS's policy regarding Section 1115 waiver days. First, EJR was granted in the Oregon Waiver Days Group Appeal, PRRB Case No. 00-3891G. That case subsequently came before the United States Court of Appeals for the Ninth Circuit, which last year ruled that Section 1115 waiver days must be included in the Medicaid fraction of the DSH calculation. Portland Adventist Medical Center v. Thompson, Medicare and Medicaid Guide (CCH) ¶ 301,592 (9th Cir. Mar. 2, 2005).

POWERS, PYLE, SUTTER & VERVILLE PC

Suzanne Cochran, Esq., Chairperson
February 10, 2006
Page 5

Second, the Board also granted EJR in a case involving TennCare program waiver days. Tennessee 96-00 TennCare Sub-Group Appeal, PRRB Case No. 03-1162G. The federal district court for the District of Columbia recently ruled in favor of the Tennessee hospitals in that case, finding that the TennCare waiver days should be included in the DSH calculation. Cookeville Regional Medical Center, et al. v. Thompson, Civil Action No. 04-1053 (D.D.C. Oct. 28, 2005), *appeal docketed,* No. 05-5495 (D.C. Cir. Jan. 5, 2006).

Finally, the Board recently granted EJR to the Provider in its appeals on this issue for its fiscal years 1998 and 1999. PRRB Case Nos. 03-0108 and 04-0110. Exhibit 5. The situation presented here is identical to that involved in these previous appeals. Accordingly, the same result should apply here, and the Board should grant the Provider's request for EJR.

Finally, we note that this appeal involves only a legal issue, i.e., the validity of a CMS regulation and policy. There are no factual issues in dispute. Furthermore, the Board has jurisdiction in this appeal.

For the foregoing reasons, the Provider requests that the Board grant EJR as to the Provider's challenge to the exclusion of Section 1115 waiver days from the DSH calculation.

Sincerely,

Mary Susan Philp

Enclosures

Cc (w/enc.):    Gary Gerber, TriSpan Health Services (via Federal Express)
                Wilson Leong, Blue Cross Blue Shield Association
                Michael Nesbit

85

services furnished to program beneficiaries during the reporting period (from intermediary records). *For final settlement, report on line 25.01 the amount on line 5.99 of Worksheet M-5.*

*Line 26*—Enter the total amount due to/from the program (lines 24 minus line 25). Transfer this amount to Worksheet S, Part II, column 3, line 9.

*Line 27*—Enter the program reimbursement effect of protested items. The reimbursement effect of the nonallowable items is estimated by applying reasonable methodology which closely approximates the actual effect of the item as if it had been determined through the normal cost finding process. (See § 115.2.) A schedule showing the supporting details and computations must be attached.

36-224    Rev. 6

3666. WORKSHEET M-5 - ANALYSIS OF PAYMENTS TO HOSPITAL-BASED RHC/FQHC SERVICES RENDERED TO PROGRAM BENEFICIARIES

Complete this worksheet for Medicare interim payments only. If you have more than one hospital-based RHC/FQHC, complete a separate worksheet for each facility.

Complete the identifying information on lines 1 through 4. The remainder of the worksheet is completed by your fiscal intermediary.

*Line Descriptions*

*Line 1*—Enter the total program interim payments paid to the outpatient rehabilitation provider. The amount entered reflects the sum of all interim payments paid on individual bills (net of adjustment bills) for services rendered in this cost reporting period. The amount entered includes amounts withheld from the component's interim payments due to an offset against overpayments to the component applicable to prior cost reporting periods. It does not include

any retroactive lump sum adjustment amounts based on a subsequent revision of the interim rate, or tentative or net settlement amounts, nor does it include interim payments payable.

*Line 2*—Enter the total program interim payments payable on individual bills. Since the cost in the cost report is on an accrual basis, this line represents the amount of services rendered in the cost reporting period, but not paid as of the end of the cost reporting period. It does not include payments reported on line 1.

*Line 3*—Enter the amount of each retroactive lump sum adjustment and the applicable date.

*Line 4*—Transfer the total interim payments to the title XVIII Worksheet M-3, line 25.

DO NOT COMPLETE THE REMAINDER OF WORKSHEET M-5. LINES 5 THROUGH 7 ARE FOR INTERMEDIARY USE ONLY.

*Line 5*—List separately each tentative settlement payment after desk review together with the date of payment. If the cost report is reopened after the Notice of Program Reimbursement (NPR) has been issued, report all settlement payments prior to the current reopening settlement on line 5.

*Line 6*—Enter the net settlement amount (balance due to the provider or balance due to the program) for the NPR, or, if this settlement is after a reopening of the NPR, for this reopening.

NOTE: On lines 3, 5, and 6, when an amount is due from the provider to the program, show the amount and date on which the provider agrees to the amount of repayment, even though total repayment is not accomplished until a later date.

*Line 7*—Enter the sum of the amounts on lines 4, 5.99, and 6 in column 2. The amount in column 2 must equal the amount on Worksheet M-3, line 26.

Rev. 6    36-225

---

[¶ 150,932]    Medicaid Days in Medicare DSHs.

*Program Memorandum,* HCFA-Pub. 60A, No. A-99-62, December 1, 1999.

### Medicare: Disproportionate Share Hospitals

**Prospective payment system—Disproportionate share hospitals—Calculating Medicaid days.**—Calculation of Medicaid days in Medicare disproportionate share hospitals (DSHs) depends on whether the patient, not the hospital is eligible for Medicaid. A Medicaid day is applicable for days the patient is eligible for Medicaid even if Medicaid did not make payment for any services. A day does not count against the Medicare DSH adjustment if the same day is also a Medicaid day. Certain errors made by hospitals in counting for DSH adjustments will be held harmless prior to Jan. 1, 2000.

See ¶ 4260.

[Text of Memorandum]

**SUBJECT: Clarification of Allowable Medicaid Days in the Medicare Disproportionate Share Hospital (DSH) Adjustment Calculation—ACTION**

A review of practices and policies regarding Medicare disproportionate share payment determinations led HCFA to conclude that it is necessary to clarify the definition of eligible Medicaid days in Medicare disproportionate share policy and communicate this information to fiscal intermediaries, hospitals, Medicaid State agencies, and Medicaid managed care organizations. **This clarification applies to cost reporting periods beginning on or after January 1, 2000.** The purpose of this memorandum is to address those details that may need clarification and also to communicate the hold harmless position for cost reporting periods beginning before January 1, 2000. A similar memorandum will be sent to the Medicaid State agencies.

**CLARIFICATION FOR COST REPORTING PERIODS BEGINNING ON OR AFTER JANUARY 1, 2000**

*Background*

Under section 1886(d)(5)(F) of the Social Security Act, the Medicare disproportionate share patient percentage is made up of two computations. The first computation includes patient days that were furnished to patients who, during a given month, were entitled to both Medicare Part A and Supplemental Security Income (SSI) (excluding State supplementation). This number is divided by the number of covered patient days utilized by patients under Medicare Part A for that same period. The second computation includes patient days associated with beneficiaries who were eligible for medical assistance (Medicaid) under a State plan approved under Title XIX but who were not entitled to Medicare Part A. (Sec 42 CFR 412.106(b)(4).) This number is divided by the total number of patient days for that same period.

*Included Days*

In calculating the number of Medicaid days, the hospital must determine whether the patient was *eligible for Medicaid* under a State plan approved under Title XIX on the day of service. If the patient was so eligible, the day counts in the Medicare disproportionate share adjustment calculation. The statutory formula for "Medicaid days" reflects several key concepts. First, the focus is on the *patient's* eligibility for Medicaid benefits as determined by the State, not the *hospital's* "eligibility" for some form of Medicaid payment. Second, the focus is on the patient's eligibility for *medical* assistance under an approved Title XIX State plan, not the patient's eligibility for *general* assistance under a

State-only program. Third, the focus is on eligibility for *medical assistance under an approved Title XIX State plan*, not medical assistance under a State-only program or other program. Thus, for a day to be counted, the patient must be eligible on that day for medical assistance benefits under the Federal-State cooperative program known as Medicaid ( under an approved Title XIX State plan). In other words, for purposes of the Medicare disproportionate share adjustment calculation, the term "Medicaid days" refers to days on which the patient is eligible for medical assistance benefits under an approved Title XIX State plan. The term "Medicaid days" does *not* refer to all days that have some relation to the Medicaid program, through a matching payment or otherwise; if a patient is *not* eligible for medical assistance benefits under an approved Title XIX State plan, the patient day cannot become a "Medicaid day" simply by virtue of some other association with the Medicaid program.

*HCFA-Pub. 60A*

Medicaid days, for purposes of the Medicare disproportionate share adjustment calculation, include all days during which a patient is eligible, under a State plan approved under Title XIX, for Medicaid benefits, even if Medicaid did not make payment for any services. Thus, Medicaid days include, but are not limited to, days that are determined to be medically necessary but for which payment is denied by Medicaid because the provider did not bill timely, days that are beyond the number of days for which a State will pay, days that are utilized by a Medicaid beneficiary prior to an admission approval but for which a valid enrollment is determined within the prescribed period, and days for which payment is made by a third party. In addition, we recognize in the calculation days that are utilized by a Medicaid beneficiary who is eligible for Medicaid under a State plan approved under Title XIX through a managed care organization (MCO) or health maintenance organization (HMO). However, in accordance with 42 CFR 412.106(b)(4), a day does not count in the Medicare disproportionate share adjustment calculation if the patient was entitled to both Medicare Part A and Medicaid on that day. Therefore, once the eligibility of the patient for Medicaid under a State plan approved under Title XIX has been verified, you must determine whether any of the days are dual entitlement days and, to the extent that they are, subtract them from the other days in the calculation.

*Excluded Days*

Many States operate programs that include both State-only and Federal-State eligibility groups in an integrated program. For example, some States provide medical assistance to bene-

¶ **150,932**

©2000, CCH INCORPORATED

ficiaries of State-funded income support pro-
grams. These beneficiaries, however, are not
eligible for Medicaid under a State plan ap-
proved under Title XIX, and, therefore, days
utilized by these beneficiaries do not count in
the Medicare disproportionate share adjustment
calculation. If a hospital is unable to distinguish
between Medicaid beneficiaries and other medi-
cal assistance beneficiaries, then it must contact
the State for assistance in doing so.

In addition, if a given patient day affects the
level of *Medicaid* DSH payments *to the hospital*
but the patient is not eligible for Medicaid
under a State plan approved under Title XIX on
that day, the day is not included in the *Medi-
care* DSH calculation.

It should be noted that the types of days
discussed above are not necessarily the only
types of excluded days. Please see the attached
chart, which summarizes some, but not neces-
sarily all, of the types of days to be excluded
from (or included in) the Medicare DSH adjust-
ment calculation.

To provide consistency in both components of
the calculation, any days that are added to the
Medicaid day count must also be added to the
total day count, to the extent that they have not
been previously so added.

Regardless of the type of allowable Medicaid
day, the hospital bears the burden of proof and
must verify with the State that the patient was
eligible under one of the allowable categories
during each day of the patient's stay. The hospi-
tal is responsible for and must provide adequate
documentation to substantiate the number of
Medicaid days claimed. Days for patients that
cannot be verified by State records to have
fallen within a period wherein the patient was
eligible for Medicaid as described in this memo-
randum cannot be counted.

## HOLD HARMLESS FOR COST
## REPORTING PERIODS BEGINNING
## BEFORE JANUARY 1, 2000

In accordance with the hold harmless position
communicated by HCFA on October 15, 1999,
for cost reporting periods beginning before Janu-
ary 1, 2000, you are not to disallow, within the
parameters discussed below, the portion of
Medicare DSH adjustment payments previously
made to hospitals attributable to the erroneous
inclusion of general assistance or other State-
only health program, charity care, Medicaid
DSH, and/or ineligible waiver or demonstration
population days in the Medicaid days factor
used in the Medicare DSH formula. This is
consistent with HCFA's determination that hos-
pitals and intermediaries relied, for the most
part, on Medicaid days data obtained from
State Medicaid agencies to compute Medicare
DSH payments and that some of those agencies

commingled the types of otherwise ineligible
days listed above with Medicaid Title XIX days
in the data transmitted to hospitals and/or in-
termediaries. Although HCFA has decided to
allow the hospitals to be held harmless for re-
ceiving additional payments resulting from the
erroneous inclusion of these types of otherwise
ineligible days, this decision is not intended to
hold hospitals harmless for any other aspect of
the calculation of Medicare DSH payments or
any other Medicare payments.

## *Hospitals That Received Payments
## Reflecting the Erroneous Inclusion of
## Days at Issue*

In practical terms this means that you are
not to reopen any cost reports for cost reporting
periods beginning before January 1, 2000 to
disallow the portions of Medicare DSH pay-
ments attributable to the erroneous inclusion of
general assistance or other State-only health
program, charity care, Medicaid DSH, and/or
ineligible waiver or demonstration population
days if the hospital received payments for those
days based on those cost reports. If, prior to the
issuance of this Program Memorandum, you re-
opened a settled cost report to disallow the por-
tion of Medicare DSH payment attributable to
the inclusion of these types of days, reopen that
cost report again and refund the amounts (in-
cluding interest) collected. Do not, however, pay
the hospitals interest on the amounts previously
recouped as result of the disallowance. Further-
more, on or after October 15, 1999, you are not
to accept reopening requests for previously set-
tled cost reports or amendments to previously
submitted cost reports pertaining to the inclu-
sion of these types of days in the Medicare DSH
formula.

For cost reporting periods beginning before
January 1, 2000, you are to continue to allow
these types of days in the Medicare DSH calcu-
lation for all open cost reports only in accor-
dance with the practice followed for the hospital
at issue before October 15, 1999 (i.e., for open
cost reports, you are to allow only those types of
otherwise ineligible days that the hospital re-
ceived payment for in previous cost reporting
periods settled before October 15, 1999). For
example, if, for a given hospital, a portion of
Medicare DSH payment was attributable to the
erroneous inclusion of general assistance days
for only the out-of-State or HMO population in
cost reports settled before October 15, 1999, you
are to include the ineligible waiver days for only
that population when settling open cost reports
for cost reporting periods beginning before Janu-
ary 1, 2000. However, the actual number of
general assistance and other State-only health
program, charity care, Medicaid DSH, and/or
ineligible waiver or demonstration days, as well
as Medicaid Title XIX days, that you allow for
the open cost reports must be supported by

**402,358**  Current Developments  1089  1-11-2000

auditable documentation provided by the hospital.

### Hospitals That Did Not Receive Payments Reflecting the Erroneous Inclusion of Days at Issue

If a hospital did not receive any payment based on the erroneous inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or waiver or demonstration population days for cost reports that were settled before October 15, 1999, and the hospital never filed a jurisdictionally proper appeal to the Provider Reimbursement Review Board (PRRB) on this issue, you are not to pay the hospital based on the inclusion of these types of days for any open cost reports for cost reporting periods beginning before January 1, 2000. Furthermore, on or after October 15, 1999, you are not to accept reopening requests for previously settled cost reports or amendments to previously submitted cost reports pertaining to the inclusion of these types of days in the Medicare DSH formula.

If, for cost reporting periods beginning before January 1, 2000, a hospital that did not receive payments reflecting the erroneous inclusion of otherwise ineligible days filed a jurisdictionally proper appeal to the PRRB *on the issue of the exclusion of these types of days from the Medicare DSH formula* before October 15, 1999, reopen the cost report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days. If there are any questions or concerns regarding the qualifications for a "jurisdictionally proper appeal", please submit them in writing before rendering a decision in a specific case to Charles Booth, Director, Financial Services Group, Office of Financial Management, 7500 Security Boulevard, Location C3-14-16, Baltimore, Maryland 21244-1850. Where, for cost reporting periods beginning before January 1, 2000, a hospital filed a jurisdictionally proper appeal to the PRRB on the issue of the exclusion of these types of days from the Medicare DSH formula *on or after* October 15, 1999, reopen the *settled* cost report and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days, but only if the hospital appealed, before October 15, 1999, the denial of payment for the days in question in previous cost reporting periods. The actual number of these types of days that you use in this

revision must be properly supported by adequate documentation provided by the hospital. Do not reopen a cost report and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days if, on or after October 15, 1999, a hospital added the issue of the exclusion of these types of days to a jurisdictionally proper appeal already pending before PRRB on *other* Medicare DSH issues or *other* unrelated issues.

You are to continue paying the Medicare DSH adjustment reflecting the inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or waiver or demonstration population days for all open cost reports for cost reporting periods beginning before January 1, 2000, to any hospital that, before October 15, 1999, filed a jurisdictionally proper appeal to the PRRB specifically for this issue on *previously* settled cost reports.

Finally, you are reminded that, if a hospital has filed a jurisdictionally proper appeal with respect to the HCFA 97-2 ruling and the hospital has otherwise received payment for the portion of Medicare DSH adjustment attributable to the inclusion of general assistance or other State-only health programs, charity care, Medicaid DSH, and/or ineligible waiver or demonstration population days based on its *paid* Medicaid days, include these types of *unpaid* days in the Medicare DSH formula when revising the cost reports affected by the HCFA 97-2 appeal.

The *effective date* for this Program Memorandum (PM) is for cost reporting periods beginning on or after January 1, 2000.

The *implementation date* for this PM is January 1, 2000.

Funding is available through a Supplemental Budget Request for costs required for implementation.

PM may be discarded after January 31, 2001.

**SPECIAL INSTRUCTIONS TO THE INTERMEDIARIES FOR PUBLISHING THE PM: The intermediaries are required to distribute the content of this PM to all the hospitals immediately upon receipt of the PM.**

Attachment

¶ 150,932

©2000, CCH INCORPORATED

1089   1-11-2000        **HCFA Manual Revisions—Transmittals**        **402,359**

| TYPE OF DAY | DESCRIPTION | ELIGIBLE TITLE XIX DAY |
|---|---|---|
| General Assistance Patient Days | Days for patients covered under a State-only (or county-only) general assistance program (whether or not any payment is available for health care services under the program). These patients are not Medicaid-eligible under the State plan. | No. |
| Other State-Only Health Program Patient Days | Days for patients covered under a State-only health program. These patients are not Medicaid-eligible under the State plan. | No. |
| Charity Care Patient Days | Days for patients not eligible for Medicaid or any other third-party payer, and claimed as uncompensated care by a hospital. These patients are not Medicaid-eligible under the State plan. | No. |
| Actual 1902(r)(2) and 1931(b) Days | Days for patients eligible under a State plan based on a 1902(r)(2) or 1931(b) election. These patients are Medicaid-eligible under the Title XIX State plan under the authority of these provisions, which is exercised by the State in the context of the approved State plan. | Yes. |
| Medicaid Optional Targeted Low Income Children (CHIP-related) Days | Days for patients who are Title XIX-eligible and who meet the definition of "optional targeted low income children" under section 1905(u)(2). The difference between these children and other Title XIX children is the enhanced FMAP rate available to the State. These children are fully Medicaid-eligible under the State plan. | Yes. |
| Separate CHIP Days | Days for patients who are eligible for benefits under a non-Medicaid State program furnishing child health assistance to targeted low-income children. These children are, by definition, not Medicaid-eligible under a State plan. | No. |
| 1915(c) Eligible Patient (the "217" group) Days | Days for patients in the eligibility group under the State plan for individuals under a Home and Community Based Services waiver. This group includes individuals who would be Medicaid-eligible if they were in a medical institution. Under this special eligibility group, they are Medicaid-eligible under the State plan. | Yes. |
| Retroactive Eligible Days | Days for patients not enrolled in the Medicaid program at the time of service, but found retroactively eligible for Medicaid benefits for the days at issue. These patients are Medicaid-eligible under the State plan. | Yes. |
| Medicaid Managed Care Organization Days | Days for patients who are eligible for Medicaid under a State plan when the payment to the hospital is made by an MCO for the service. An MCO is the financing mechanism for Medicaid benefits, and payment for the service through the MCO does not affect eligibility. | Yes. |
| Medicaid DSH Days | Days for patients who are not eligible for Medicaid benefits, but are considered in the calculation of Medicaid DSH payments by the State. These patients are not Medicaid-eligible. Sometimes Medicaid State plans specify that Medicaid DSH payments are based upon a hospital's amount of charity care or general assistance care. This, however, is not "payment" for those days, and does not mean that the patient is eligible for Medicaid benefits or can be counted as such in the Medicare formula. | No. |

2

**Edition)**

**ovisions**

a tem-
all-time
esidents
al's clo-
criteria
h)(2) of
al that
rogram
ts FTE
pecified
of this
may re-
to its
lded be-
sidency
a speci-
of this

estab-
(as de-
hapter),
rogram,
egrated
ts FTE
acks in
provi-
pter.

occur-
begin-
1999, a
ment to
litional
litional
nted as
poses of
the fact
vere on
a simi-
in ac-
ons of

g on or
eterans
ceive a
TE cap
en-pre-
tal and
to the
l meets
ions of

he full-
rticular
hospital
nforma-
ertified

by an official of the hospital and, if dif-
ferent, an official responsible for ad-
ministering the residency program.

(i) A listing, by specialty, of all resi-
dents assigned to the hospital and pro-
viding services to the hospital during
the cost reporting period.

(ii) The name and social security
number of each resident.

(iii) The dates the resident is as-
signed to the hospital.

(iv) The dates the resident is assigned
to other hospitals or other freestanding
providers and any nonprovider setting
during the cost reporting period.

(v) The proportion of the total time
necessary to fill a residency slot that
the resident is assigned to an area of
the hospital listed under paragraph
(f)(1)(ii) of this section.

(3) Fiscal intermediaries must verify
the correct count of residents.

(g) *Indirect medical education payment
for managed care enrollees.* For portions
of cost reporting periods occurring on
or after January 1, 1998, a payment is
made to a hospital for indirect medical
education costs, as determined under
paragraph (e) of this section, for dis-
charges associated with individuals
who are enrolled under a risk-sharing
contract with an eligible organization
under section 1876 of the Act or with a
Medicare+Choice organization under
title XVIII, Part C of the Act during
the period, according to the applicable
payment percentages described in
§§413.76(c)(1) through (c)(5) of this sub-
chapter.

[50 FR 12741, Mar. 29, 1985. Redesignated at 56
FR 43241, Aug. 30, 1991]

EDITORIAL NOTE: For FEDERAL REGISTER ci-
tations affecting §412.106, see the List of Sec-
tions Affected, which appears in the Finding
Aids section of the printed volume and on
GPO Access.

## §412.106 Special treatment: Hospitals that serve a disproportionate share of low-income patients.

(a) *General considerations.* (1) The fac-
tors considered in determining whether
a hospital qualifies for a payment ad-
justment include the number of beds,
the number of patient days, and the
hospital's location.

(i) The number of beds in a hospital
is determined in accordance with
§412.105(b).

(ii) For purposes of this section, the
number of patient days in a hospital
includes only those days attributable
to units or wards of the hospital pro-
viding acute care services generally
payable under the prospective payment
system and excludes patient days asso-
ciated with—

(A) Beds in excluded distinct part
hospital units;

(B) Beds otherwise countable under
this section used for outpatient obser-
vation services, skilled nursing swing-
bed services, or ancillary labor/delivery
services. This exclusion would not
apply if a patient treated in an obser-
vation bed is ultimately admitted for
acute inpatient care, in which case the
beds and days would be included in
those counts;

(C) Beds in a unit or ward that is not
occupied to provide a level of care that
would be payable under the acute care
hospital inpatient prospective payment
system at any time during the 3 pre-
ceding months (the beds in the unit or
ward are to be excluded from the deter-
mination of available bed days during
the current month); and

(D) Beds in a unit or ward that is oth-
erwise occupied (to provide a level of
care that would be payable under the
acute care hospital inpatient prospec-
tive payment system) that could not be
made available for inpatient occupancy
within 24 hours for 30 consecutive days.

(iii) The hospital's location, in an
urban or rural area, is determined in
accordance with the definitions in
§412.62(f) or §412.64.

(2) The payment adjustment is ap-
plied to the hospital's DRG revenue for
inpatient operating costs based on
DRG-adjusted prospective payment
rates for inpatient operating costs, ex-
cluding outlier payments for inpatient
operating costs under subpart F of this
part and additional payments made
under the provisions of §412.105.

(b) *Determination of a hospital's dis-
proportionate patient percentage.* (1) Gen-
eral rule. A hospital's disproportionate
patient percentage is determined by
adding the results of two computations
and expressing that sum as a percent-
age.

(2) *First computation: Federal fiscal
year.* For each month of the Federal

fiscal year in which the hospital's cost reporting period begins, CMS—

(i) Determines the number of patient days that—

(A) Are associated with discharges occurring during each month; and

(B) Are furnished to patients who during that month were entitled to both Medicare Part A and SSI, excluding those patients who received only State supplementation;

(ii) Adds the results for the whole period; and

(iii) Divides the number determined under paragraph (b)(2)(ii) of this section by the total number of patient days that—

(A) Are associated with discharges that occur during that period; and

(B) Are furnished to patients entitled to Medicare Part A.

(3) *First computation: Cost reporting period.* If a hospital prefers that CMS use its cost reporting period instead of the Federal fiscal year, it must furnish to CMS, through its intermediary, a written request including the hospital's name, provider number, and cost reporting period end date. This exception will be performed once per hospital per cost reporting period, and the resulting percentage becomes the hospital's official Medicare Part A/SSI percentage for that period.

(4) *Second computation.* The fiscal intermediary determines, for the same cost reporting period used for the first computation, the number of the hospital's patient days of service for which patients were eligible for Medicaid but not entitled to Medicare Part A, and divides that number by the total number of patient days in the same period. For purposes of this second computation, the following requirements apply:

(i) For purposes of this computation, a patient is deemed eligible for Medicaid on a given day only if the patient is eligible for inpatient hospital services under an approved State Medicaid plan or under a waiver authorized under section 1115(a)(2) of the Act on that day, regardless of whether particular items or services were covered or paid under the State plan or the authorized waiver.

(ii) Effective with discharges occurring on or after January 20, 2000, for purposes of counting days under para-

graph (b)(4)(i) of this section, hospitals may include all days attributable to populations eligible for Title XIX matching payments through a waiver approved under section 1115 of the Social Security Act.

(iii) The hospital has the burden of furnishing data adequate to prove eligibility for each Medicaid patient day claimed under this paragraph, and of verifying with the State that a patient was eligible for Medicaid during each claimed patient day.

(5) *Disproportionate patient percentage.* The intermediary adds the results of the first computation made under either paragraph (b)(2) or (b)(3) of this section and the second computation made under paragraph (b)(4) of this section and expresses that sum as a percentage. This is the hospital's disproportionate patient percentage, and is used in paragraph (c) of this section.

(c) *Criteria for classification.* A hospital is classified as a "disproportionate share" hospital under any of the following circumstances:

(1) The hospital's disproportionate patient percentage, as determined under paragraph (b)(5) of this section, is at least equal to one of the following:

(i) 15 percent, if the hospital is located in an urban area, and has 100 or more beds, or is located in a rural area and has 500 or more beds.

(ii) 30 percent for discharges occurring before April 1, 2001, and 15 percent for discharges occurring on or after April 1, 2001, if the hospital is located in a rural area and either has more than 100 beds and fewer than 500 beds or is classified as a sole community hospital under § 412.92.

(iii) 40 percent for discharges before April 1, 2001, and 15 percent for discharges occurring on or after April 1, 2001, if the hospital is located in an urban area and has fewer than 100 beds.

(iv) 45 percent for discharges before April 1, 2001, and 15 percent for discharges occurring on or after April 1, 2001, if the hospital is located in a rural area and has 100 or fewer beds.

(2) The hospital is located in an urban area, has 100 or more beds, and can demonstrate that, during its cost reporting period, more than 30 percent of its net inpatient care revenues are

Centers

derived
ment p
indigen
(d)  *F*
*Method*
duction
(e) of th
disprop
patient
tient o
an adj
paragra
(2)  *P*
the hos
graph (
ment a
of the 1
(A) I
patient
percen
justme
(1)  I
after *A*
1, 1991
the dif
the ho
percen
(2)  I
after *A*
ber 1,
of the
and tl
tient j
(3)  
after
ber 1,
of the
and tl
tient
(4)  
after
82.5 p
20.2  j
propo
(B)
patiei
cent,
ment
(1)  
after
1993,
differ
hospi
cents
(2)  
after
perce
perce
tiona

**3**

## Health Care Financing Administration

**HCFA**

**Medicare**   **Medicaid**   **SCHIP**   **What's New**   **Site Index**

# TENNESSEE STATEWIDE HEALTH REFORM DEMONSTRATION

## FACT SHEET

---

**Name of Section 1115 Demonstration:** TennCare

**Date Proposal Submitted:** June 16, 1993

**Date Proposal Approved:** November 18, 1993

**Date Implemented:** January 1, 1994

### SUMMARY

TennCare is a statewide program to provide health care benefits to Medicaid beneficiaries, uninsured State residents and those whose medical conditions make them uninsurable. Enrollment is capped at 1.4 million. If the cap is reached, those in the mandatory Medicaid coverage and uninsurable groups will continue to be enrolled, while enrollment of the currently uninsured groups will be limited. All enrollees are served in capitated managed care organizations (MCOs) that are health maintenance organizations (HMOs). Current enrollment is about 1.3 million.

### ELIGIBILITY

Three distinct groups are offered coverage:

- All persons meeting the eligibility requirements of the Medicaid program as it existed in fiscal year 1993. Current enrollment in this group is about 803,000.
- Persons with an existing or prior existing health conditions causing them to be uninsurable. This population is now nearly 10 percent of all enrollees.
- Persons who are not eligible -- either directly or as a dependent -- for an employer-sponsored or government-sponsored health plan as of March 1, 1993. While enrollment will not be restricted for those currently eligible for Medicaid or the uninsurable, the cap on total enrollment may limit the number of uninsured served. Current enrollment of uninsurable and previously uninsured individuals is about 546,000. Enrollment is currently open to uninsured children and uninsurables.

### BENEFIT PACKAGE

96

A standard benefit package is provided by managed care organizations (MCOs).

TennCare benefits are more generous than those offered under Medicaid for acute care, generally in that they remove most limitations on number of episodes covered. The plan emphasizes preventive care by providing all preventive care to adults and children without copayments or deductibles.

On June 30, 2000, HCFA approved the State=s request to carve out pharmacy benefits from the MCO capitation rate for those individuals also eligible for Medicare.

## ENROLLMENT/DISENROLLMENT PROCESS

Those deemed Medicaid-eligible are enrolled for a 1-year period. Those in the uninsured group are enrolled for a 1-year period as long as they continue to pay their premiums.

The State may involuntarily disenroll those in the uninsured group who fail to pay premiums.

Individuals who are severely and persistently mentally ill (SPMI) were brought into managed care in July 1996. They are now served by the same BHOs that provide behavioral health services to the rest of the TennCare population (See section on "TennCare Partners Program" below.)

Long term care is not included in the managed care plan.

## DELIVERY SYSTEM

The State has contracted with 10 MCOs. The MCOs contract with providers on a fee-for-service or capitation basis.

Services for Children's Plan enrollees (children in State custody or at risk of custody) are currently being provided through the existing State delivery system.

## QUALITY ASSURANCE

The State has a contract with an independent external quality review organization (EQRO). Yearly reviews have been completed and health plans have begun to implement changes in many of the areas that were identified as needing improvement.

## COST-SHARING

All adults and children with incomes above 100 percent of the Federal Poverty Level (FPL) are required to pay, except those in Medicaid eligibility groups. Cost-sharing is in the form of premiums, deductibles, and copayments based on income.

Participants with incomes over 100 percent FPL pay their premiums on a graduated fee schedule so that payments will increase as income increases. Premiums include individual premiums and family premiums.

97

Deductibles are on a graduated scale, but none are required for mandatory Medicaid eligibles. Deductibles are $250 for an individual and $500 for a family with incomes between 101 and 199 percent FPL.

Copayments are up to 10 percent of costs, based on a graduated scale for enrollees with incomes between 101 and 199 percent FPL (other than mandatory Medicaid eligibles) and would be 10 percent of the cost of a service for those at or above 200 percent FPL.

Cost-sharing expenditures are limited by annual out-of-pocket maximums of $1,250 per individual/family, excluding premium payments.

To encourage use of preventive services, no deductible or copayment is required for such services.

## TENNCARE PARTNERS PROGRAM

Implemented on July 1, 1996, as part of the TennCare section 1115 demonstration project, the TennCare Partners Program provides behavioral health and substance abuse services to all TennCare enrollees through a complete carve-out program. All mental health and substance abuse services that were previously offered by managed care organizations (MCOs), as well as those provided through the Tennessee Department of Mental Health and Mental Retardation, is provided under the new plan by one of two behavioral health organizations (BHOs).

Eligibility and Coverage: Eligibility is determined as currently defined by the TennCare program; however, BHO enrollees are divided into two groups, Basic and Priority participants. The Basic benefit package provides standard episodic care services, while the Priority package is an expanded group of services provided to those who are most severely ill.

The 1.3 million Basic participants are entitled to the basic service benefit package for mental health and substance abuse services which has been offered by MCOs since TennCare was implemented.

Priority participants are those who have been evaluated by the State and identified as SPMI. This group has traditionally been served by the Community Mental Health Centers (CMHCs) who were contracted by the Tennessee Department of Mental Health and Mental Retardation on a fee-for-service basis. All attempts have been made to preserve these existing provider relationships.

Delivery System: BHOs contract with the State to provide services and receive monthly capitation payments for each enrollee.

BHOs currently have the five State regional mental institutions in their networks, although they are not required to do so. In addition, CMHCs are used as safety net providers. Both BHOs have contracted with all CMHCs.

Coordination of care between the MCO and BHO is a contractual requirement for the plans. The State has required the plans to meet regularly to address issues that arise in providing care.

98

The State believes that virtually all current behavioral health providers are in at least one of the BHO networks.

**Choice of Provider:** The BHOs each associate with several of the MCOs, with some overlap. Initially, the State assigned beneficiaries to one of the two BHOs via the enrollees= associated MCO, while providing an option to change if a provider of long standing was not in the network. Enrollees have free choice of providers from within the assigned BHO network, and may change BHOs by changing MCOs at the annual change enrollment period.

10/20/00

**Contact:**
Clarke Cagey, 410-786-7700 or E-mail CCagey@hcfa.gov.



Medicare.gov | Department of Health and Human Services | NMEP

Home | Privacy Policy | Feedback | Help | Website Accessibility





99

4

Methodist Hospitals of Memphis
Fiscal Year Ending December 31, 2000

## Calculation of Reimbursement Impact of DSH Medicaid Days Issue

**Per Audit**

| | |
|---|---|
| Total Medicaid Days | 64,941 |
| Total DSH Reimbursement | $19,341,301 |
| Additional Waiver Days | 482 |

**Appeal**

| | |
|---|---|
| Revised Total Medicaid Days | 65,423 |
| Revised Total DSH Reimbursement | $19,470,280 |
| **Additional Reimbursement** | $128,979 |

101

5

Suzanne Cochran, Esq., Chairperson
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671        FAX: 410-786-5298

Refer to:

03-0180
CERTIFIED MAIL

FEB - 2 2006

Mary Susan Philp, Esq.
Powers, Pyles, Sutter & Verville, PC
Twelfth Floor
1875 Eye Street, N.W.
Washington, D.C. 20006-5409



RECEIVED
FEB - 7 2006
P, P S, & V

RE:  Methodist Hospital of Memphis
     Provider No.44-0049
     FYE 12/31/98
     PRRB Case No. 03-0108

Dear Ms. Philp:

This is in response to the Provider's request that the Provider Reimbursement Review Board (Board), pursuant to 42 U.S.C. § 1395oo(f)(1), determine that it is without the authority to decide the question of whether the regulation, 42 C.F.R. § 412.106(b)(4)(ii), which excludes section 1115 expansion waiver days from the calculation of the disproportionate share (DSH) adjustment prior to January 20, 2000, is valid. The Provider is seeking to have section 1115 expansion waiver days included in the DSH calculation for period prior to January 20, 2000.

The Provider believes that this regulation conflicts with 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) and (II), ( the DSH calculation) which provides for two proxies as measures of the volume of low-income patients served by a hospital:

> (1) the percentage of the total Medicare inpatient days provided to low income Medicare patients (i.e., those patients entitled to supplemental security income under Title XVI of the Social Security Act); and

> (2) the percentage of total hospital days provided to "patients who (for such days) were eligible for medical assistance under a State plan approved under [the Medicaid program]."

The Provider believes that the regulation, 42 C.F.R. § 412.106(b)(4)(ii) is inconsistent with the statutory language of §1395ww(d)(5)(F)(vi)(II). Section 1395oo(f)(1) permits providers that have requested and are entitled to a hearing before the Board under 42 U.S.C. § 1395oo(a), to bypass the Board's hearing procedure and obtain judicial review of an issue involving a question of law or regulation where the Board determines that it is without the authority to decide such question.

The Board has reviewed the submissions of the Provider pertaining to the requests for hearing and expedited judicial review. The documentation shows that the estimated

 **103**

Provider Reimbursement Review Board
Page 2 Mary Susan Philp

CN 03-0180

amount in controversy for the appeal exceeds $10,000, as required. The estimated amount in controversy is subject to recalculation by the Intermediary for the actual final amount.

The Board finds that:

1) it has jurisdiction over the matter for the subject year and the Provider is entitled to a hearing before the Board;

2) based upon the Provider's assertions regarding the section 1115 waiver issue, there are no findings of fact for resolution by the Board;

3) it is bound by the applicable existing Medicare law and regulation (42 C.F.R. § 405.1867); and

4) it is without the authority to decide the legal question of whether the regulation, 42 C.F.R. § 412.106(b)(4)(ii), which excludes section 1115 expansion waiver days from the calculation of the disproportionate share adjustment prior to January 20, 2000, is valid.

Accordingly, the Board finds that the section 1115 waiver issue properly falls within the provisions of 42 U.S.C. § 1395oo (f)(1) and hereby grants the Provider's request for expedited judicial review for the issue and the subject year. The Provider has 60 days from the receipt of this decision to institute the appropriate action for judicial review. The graduate medical education issue will remain pending in this case.

Board Members Participating

Suzanne Cochran, Esq.
Gary B. Blodgett, DDS
Elaine C. Powell, CPA
Anjali Mulchandani-West
Yvette C. Hayes

FOR THE BOARD:

Suzanne Cochran, Esq.
Chairman

Enclosures:  42 U.S.C. § 1395oo (f)(1)

cc:  Gary Gerber, Tri-Span Health Services
      Wilson Leong, BCBSA)

104



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

PROVIDER REIMBURSEMENT REVIEW BOARD
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670

Phone: 410-786-2671          FAX: 410-786-5298

George Cohran, Esq. Chairperson
Suzy B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Anjali Mulchandani-West

Refer to:

04-0110
CERTIFIED MAIL

FEB - 2 2006

Mary Susan Philp, Esq.
Powers, Pyles, Sutter & Verville, PC
Twelfth Floor
1875 Eye Street, N.W.
Washington, D.C. 20006-5409

RE: Methodist Hospital of Memphis
Provider No.44-0049
FYE 12/31/99
PRRB Case No. 04-0110

RECEIVED
FEB - 7 2006
P, P S, & V

Dear Ms. Philp:

This is in response to the Provider's request that the Provider Reimbursement Review
Board (Board), pursuant to 42 U.S.C. § 1395oo(f)(1), determine that it is without the
authority to decide the question of whether the regulation, 42 C.F.R. § 412.106(b)(4)(ii),
which excludes section 1115 expansion waiver days from the calculation of the
disproportionate share (DSH) adjustment prior to January 20, 2000, is valid. The
Provider is seeking to have section 1115 expansion waiver days included in the DSH
calculation for period prior to January 20, 2000.

The Provider believes that this regulation conflicts with 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I)
and (II), ( the DSH calculation) which provides for two proxies as measures of the volume of
low-income patients served by a hospital:

> (1) the percentage of the total Medicare inpatient days provided to low income
> Medicare patients (i.e., those patients entitled to supplemental security income under
> Title XVI of the Social Security Act); and

> (2) the percentage of total hospital days provided to "patients who (for such days)
> were eligible for medical assistance under a State plan approved under [the Medicaid
> program]."

The Provider believes that the regulation, 42 C.F.R. § 412.106(b)(4)(ii) is inconsistent with
the statutory language of §1395ww(d)(5)(F)(vi)(II). Section 1395oo(f)(1) permits providers
that have requested and are entitled to a hearing before the Board under 42 U.S.C.
§ 1395oo(a), to bypass the Board's hearing procedure and obtain judicial review of an issue
involving a question of law or regulation where the Board determines that it is without the
authority to decide such question.

The Board has reviewed the submissions of the Provider pertaining to the requests for
hearing and expedited judicial review. The documentation shows that the estimated

105

amount in controversy for the appeal exceeds $10,000, as required. The estimated amount in controversy is subject to recalculation by the Intermediary for the actual final amount.

The Board finds that:

1) it has jurisdiction over the matter for the subject year and the Provider is entitled to a hearing before the Board;

2) based upon the Provider's assertions regarding the section 1115 waiver issue, there are no findings of fact for resolution by the Board;

3) it is bound by the applicable existing Medicare law and regulation (42 C.F.R. § 405.1867); and

4) it is without the authority to decide the legal question of whether the regulation, 42 C.F.R. § 412.106(b)(4)(ii), which excludes section 1115 expansion waiver days from the calculation of the disproportionate share adjustment prior to January 20, 2000, is valid.

Accordingly, the Board finds that the section 1115 waiver issue properly falls within the provisions of 42 U.S.C. § 1395oo (f)(1) and hereby grants the Provider's request for expedited judicial review for the issue and the subject year. The Provider has 60 days from the receipt of this decision to institute the appropriate action for judicial review. The graduate medical education issue will remain pending in this case.

Board Members Participating

      Suzanne Cochran, Esq.
      Gary B. Blodgett, DDS
      Elaine C. Powell, CPA
      Anjali Mulchandani-West
      Yvette C. Hayes

FOR THE BOARD:

Suzanne Cochran, Esq.
Chairman

Enclosures: 42 U.S.C. § 1395oo (f)(1)

cc: Gary Gerber, Tri-Span Health Services
    Wilson Leong, BCBSA)

**POWERS**
**PYLES**
**SUTTER &**
**VERVILLE PC**
ATTORNEYS AT LAW

Twelfth Floor
1875 Eye Street, NW
Washington, DC  20006-5409
Phone: (202) 466-6550
Fax: (202) 785-1756
www.ppsv.com

MARY SUSAN PHILP

(202) 872-6735

Susan.Philp@ppsv.com

September 28, 2005

**FEDERAL EXPRESS**

**RECEIVED**

SEP 2 9 2005

PROVIDER REIMBURSEMENT
REVIEW BOARD

Suzanne Cochran, Esq.
Chairperson
Provider Reimbursement Review Board
2520 Lord Baltimore Drive, Suite L
Baltimore, Maryland  21244-2670

Re:    Methodist Hospitals of Memphis; Provider No. 44-0049;
       PRRB Case 05-0678; Fiscal Year Ending December 31, 2000

Dear Ms. Cochran:

Enclosed please find the provider's position paper in the above case.  The position
paper addresses the following issues:

(1)    GME per resident amount; and
(2)    Disproportionate share payment (Medicaid days percentage).

If you have any questions, please feel free to call me.

Sincerely,

Mary Susan Philp

Enclosure
cc (w/encl.):    Gary Gerber
                 Wilson Leong
                 Lewis T. Peeples

**106**

**BEFORE THE**

**PROVIDER REIMBURSEMENT REVIEW BOARD**

|  |  |  |
|---|---|---|
| In the Appeal of | ) | |
| | ) | PRRB Case No. 05-0678; |
| METHODIST HOSPITALS OF MEMPHIS | ) | FYE December 31, 2000 |
| | ) | |

**PROVIDER'S POSITION PAPER**

**I.    ISSUES PRESENTED**

(1)    Whether the Intermediary's adjustment of the graduate medical education per

resident amount was proper? (Approximate reimbursement effect - $236,137).

(2)    Whether the Intermediary's adjustment of the disproportionate share ("DSH")

payment (Medicaid days percentage) was proper?  (Approximate reimbursement

effect - $128,979).

**II.    PARTIES**

Methodist Hospitals of Memphis ("the Hospital") (Provider No. 44-0049) is an acute care

hospital located in Memphis, Tennessee.  The Hospital is one of several hospitals and other

providers which are part of Methodist Healthcare (previously known as Methodist Health

Systems), a multi-provider health care system headquartered in Memphis.  TriSpan Health

Services was the Hospital's Medicare intermediary ("the Intermediary") for the fiscal year

ending December 31, 2000.

107

## III.  **PROCEDURAL BACKGROUND**

The Intermediary issued a Notice of Program Reimbursement ("NPR") for the Hospital's

fiscal year ending December 31, 2000, on August 23, 2004. The Hospital filed a timely appeal

on February 2, 2005.

## IV.  **ISSUE 1 – GME PER RESIDENT AMOUNT**

### A.  Factual Background

During fiscal year 2000, the Provider operated a graduate medical education ("GME")

program through an affiliation with the University of Tennessee. Under this program, residents

in various medical specialties received training and provided services in the Provider.

In October of 1995, the Provider merged with LeBonheur Children's Hospital

("LeBonheur"), a nearby children's hospital, which also had a GME program. After the merger,

the facilities were certified as a single provider and operated under the Medicare provider

number of the Provider; the LeBonheur provider number was no longer used. Provider Exhibit 1

(HCFA Tie-In Notice, dated May 2, 1996).

During the audit of the Provider's fiscal year 1995 cost report, the Intermediary calcu-

lated the Provider's Medicare GME payment by using two different GME per resident amounts.

Specifically, for residents who were located at the Provider's pre-merger facilities, it used the

GME per resident amount previously established for the Provider, while for those residents who

were at the LeBonheur facility, it used the GME per resident amount which had been established

for LeBonheur prior to the merger. For fiscal year 1995, this resulted in an aggregate weighted

average per resident amount of $53,480.98 for primary care/OB-GYN residents and $51,346.10

for all other residents. Provider Exhibit 2 (Intermediary Workpapers for Fiscal Year 1995 on

GME Per Resident Amount). When the Intermediary computed the Provider's allowable GME

payment for fiscal year 1996, it used the weighted average per resident amounts derived from the

FY 1995 calculation. Provider Exhibit 3 (Intermediary Workpapers for Fiscal Year 1996 on

2

**108**

GME Per Resident Amount). Similarly, the GME payments for fiscal years 1997, 1998, 1999, and 2000 were computed based on these same weighted average per resident amounts, trended forward. Provider Exhibit 4 (Intermediary Workpapers for Fiscal Year 1997 on GME Per Resident Amount); Provider Exhibit 5 (Intermediary Workpapers for Fiscal Year 1998 on GME Per Resident Amount); Provider Exhibit 6 (Intermediary Workpapers for Fiscal Year 1999 on GME Per Resident Amount); Provider Exhibit 7 (Intermediary Workpapers for Fiscal Year 2000 on GME Per Resident Amount) .

The reimbursement effect of the Intermediary's use of a weighted average per resident amount (which reflects LeBonheur's GME per resident amount), rather than using the Provider's per resident amount, was approximately $236,137. Provider Exhibit 8 (Calculation of Reimbursement Impact of GME Per Resident Amount Issue).

B.    Provider's Position

Under Medicare reimbursement principles, a hospital is entitled to payment for the direct costs associated with its GME program. 42 U.S.C. § 1395ww(h); 42 C.F.R. § 413.86. The amount of a hospital's GME payment is calculated by multiplying the number of FTE residents working in the hospital during a fiscal year by the hospital's "per resident" amount (the average cost per resident based on costs in the hospital's GME base year and updated by an inflation factor). 42 U.S.C. § 1395ww(h).

The Medicare GME statute requires that a hospital-specific, approved per resident amount be determined for each hospital, based on the hospital's GME costs during the cost reporting period that began during government fiscal year 1984. 42 U.S.C. § 1395ww(h)(2)(A). Similarly, Medicare regulations require the determination of a base-period per resident amount for each hospital. 42 C.F.R. § 413.86(e)(1).

An approved per resident amount was determined for the Provider based on its GME costs during its fiscal year ending December 31, 1984. After LeBonheur was merged into the

3

Provider, the surviving provider number was that of the Provider. Provider Exhibit 1.

Accordingly, the Provider's GME per resident amount should have been used for all residents in

the Provider's facilities (including those in the LeBonheur location). As discussed in greater

detail below, the Intermediary's use of a weighted average per resident amount (which takes into

account LeBonheur's prior GME per resident amount) in computing the Provider's allowable

GME payment is contrary to the Medicare statute and regulations and is otherwise invalid.

1. The Intermediary's Use of a Weighted Average GME Per Resident
   Amount is Contrary to the Medicare Statute and Regulations.

The Intermediary's averaging of the Provider's per resident amount with that of

LeBonheur is contrary to the text of the Social Security Act ("the Act") and Medicare

regulations. Section 1886(h)(2)(A) of the Act states that "[t]he Secretary shall determine, for the

hospital's cost reporting period that began during fiscal year 1984, the average amount

recognized as reasonable under this title for direct graduate medical education costs of the

hospital for each full-time-equivalent resident." 42 U.S.C. § 1395ww(h)(2)(A). The statute

refers to a single average per resident amount for each hospital, based on the costs incurred

during the Provider's base year.

In accordance with the statutory requirements, a GME per resident amount was

determined for the Provider based on its base year costs. After the merger with LeBonheur, the

Medicare state agency certified the Provider and LeBonheur as a single hospital, and the

Provider was the surviving entity.[1] The Provider continued to use its existing Medicare provider

---

[1]    State Operations Manual § 2024 directs state agencies to determine whether a merger
between two hospitals result in one hospital or two: "When two or more hospitals merge, the
[state agency] ascertains whether to continue to certify the hospitals separately or to certify them
as a single hospital (i.e., hospital with a main campus and an additional location." In this case,
the state agency determined that the Provider and LeBonheur were a single hospital, with the
Provider the surviving entity. Thereafter, LeBonheur (and its provider number) ceased to exist
as a separate entity.

4

110

number. Accordingly, the Provider remained, after the merger, the same provider as before the merger. The plain language of the Act refers to a determination of the amount of GME costs of "the hospital." 42 U.S.C. § 1395ww(h)(2)(A). The use of the singular evidences Congress' intent to establish a single per resident amount for each "hospital" that applies as long as that hospital continues in operation. Thus, the Provider's GME per resident amount must remain the same after the merger with LeBonheur, and the Intermediary's recalculation of the GME per resident amount after the merger is contrary to the plain meaning of the statute.

The Intermediary's calculation also is contrary to the plain language of the Medicare regulation governing reimbursement for GME costs. See 42 C.F.R. § 413.86. The regulation states that, "[e]xcept as provided in paragraph (e)(4) of this section, the intermediary determines a base-period per resident amount for each hospital...." See 42 C.F.R. § 413.86(e). In the instructions that follow, the regulation states that the intermediary must determine each hospital's allowable GME costs and divide this amount by the number of FTE residents in the hospital's base year. See id. The regulation makes no allowance for including the GME cost and resident count of another hospital or otherwise changing a hospital's GME per resident amount based on a subsequent corporate transaction.

It is a fundamental principle of administrative law that an agency is required to follow its own regulations. Cherokee Nation of Oklahoma v. Babbit, 117 F.3d 1489, 1499 (D.C. Cir. 1997); Mylan Pharmaceuticals, Inc. v. Henney, 94 F.Supp.2d 36, 48 (D.D.C. 2000) (an "agency's failure to follow its own regulation is fatal to the deviant action...."). The Intermediary's inclusion of LeBonheur's base year GME costs and resident count in calculating the Provider's per resident amount is contrary to the language of the Medicare statute and regulations, and accordingly, is invalid. 5 U.S.C. § 706(2)(A) (agency action must be set aside where it is "not in accordance with law"); Bowen v. Massachusetts, 108 S. Ct. 2722, 2741 (1988).

111

5

2.  The Intermediary's Application of the "Weighted Average" Methodology
    Violates APA Notice and Comment Rulemaking Requirements.

The Intermediary may attempt to support its adjustment to the Provider's GME per

resident amount by referencing language in the preamble to the Medicare hospital inpatient

prospective payment system ("PPS") regulations for fiscal year 1998. In this preamble, the

Centers for Medicare and Medicaid Services ("CMS") (formerly the Health Care Financing

Administration) stated that:

> [I]n implementing the COBRA 1985 provision establishing a per resident amount
> in the situation of a merger, we have calculated the revised per resident amount
> for the merged hospital using an FTE weighted average of each of the respective
> hospital's per resident amount which is part of the merger.

63 Fed. Reg. 26,329 (May 12, 1998).

Assuming that the above Federal Register language amounts to a CMS policy that a

weighted average GME per resident amount will be used in the case of hospital mergers, then

CMS is attempting to adopt a substantive rule in violation of the Administrative Procedure Act

("APA"). The APA states that an agency must promulgate all substantive rules through notice

and comment rulemaking. See 5 U.S.C. § 553. The proposed rule must be published in the

Federal Register, the agency must receive comments regarding the proposed rule from the

general public, and then the agency must publish a final rule, including a preamble that addresses

the received comments. See 5 U.S.C. § 553; Marshall v. W and W Steel Co., 604 F.2d 1322,

1326 (10th Cir. 1979); Wagner Elec. Corp. v. Volpe, 466 F. 2d 1013, 1020 (3d Cir. 1972);

Community Nutrition Inst. v. Butz, 420 F. Supp. 751, 754 (D.D.C. 1976).

The application of a weighted average GME per resident amount in the case of hospital

mergers constitutes a substantive rule, thus requiring adherence to APA rulemaking procedures.

See Connecticut Dept. of Children and Youth Services v. Dept. of Health and Human Services,

788 F. Supp. 573 (D.D.C.), aff'd, 9 F.3d 981 (D.C. Cir. 1992) (compliance with APA rulemaking

procedures required for rules by which agency seeks to fill gaps left by statutory scheme);    **112**

6

Associated Builders & Contractors, Inc. v. Reich, 922 F. Supp. 676 (D.D.C. 1996) (rules are subject to notice and comment requirements if they finally determine rights and do not leave agency free to exercise discretion). Because CMS did not publish this supposed rule in conformance with the APA's notice and comment requirements, it is invalid, and the Intermediary's adjustment must be reversed.

3.    The Intermediary's Adjustment of the Provider's GME Per Resident Amount is Arbitrary and Capricious Because it is Inconsistent with General CMS Policy Regarding Changes in Ownership.

The Intermediary's use of an average GME per resident amount after the merger with LeBonheur is inconsistent with CMS's general approach to the reimbursement consequences of changes in ownership. This inconsistency in approach is arbitrary and capricious.

The Medicare regulations at 42 C.F.R. § 489.18 govern the effect of a change of ownership on a provider's agreement with the Medicare program. See State Operations Manual § 3210. Under 42 C.F.R. § 489.18(a), a provider's agreement with the program and provider identification number are automatically assigned to the new owner of the provider after a change of ownership unless the new owner specifically declines the automatic assignment and elects to submit a new application to participate in the program. See United States v. Vernon Home Health, 21 F.3d 693, 696 (5th Cir. 1994). Section 489.18(d) addresses the conditions applicable to an assigned provider agreement and provider number. Specifically, it states that "[a]n assigned agreement is subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued." 42 C.F.R. § 489.18(d); 21 F.3d at 696.

In Vernon Home Health, both CMS and the Fifth Circuit construed 42 C.F.R. § 489.18(d) in accordance with its literal meaning. See 21 F.3d at 696. In that case, the new owner of a provider entered into a contract to purchase the assets but not the liabilities of the provider. Id. at 694. Nonetheless, pursuant to 42 C.F.R. § 489.18(d), CMS sought to hold the provider and its new owner liable for Medicare overpayments made to the provider under its prior ownership. **113**

7

21 F.3d at 694. The Fifth Circuit affirmed CMS' construction of the regulation as "eminently reasonable." Id. at 696. Accord Deerbrook Pavilion, LLC v. Shalala, 235 F.3d 1100, 1104 (8th Cir. 2000) (following Vernon Health Care in finding that CMPs carry over to a subsequent owner when the new owner accepts transfer of the existing provider agreement).

Here, where the provider agreement and number of LeBonheur no longer exist, the transaction between the Provider and LeBonheur should not affect the application of the Provider's per resident amount as calculated for it pursuant 42 U.S.C. § 1395ww(h) and 42 C.F.R. § 413.86. The operative effect of 42 C.F.R. § 489.18 is that all the statutes and regulations and terms and conditions that applied to a provider under its prior ownership continue to apply to the provider after a change in ownership if the new owner accepts transfer of the existing provider agreement. See Vernon Home Health, 23 F.3d at 696. Under these regulations, the per resident amount of a hospital thus survives a change of ownership unless the new owner declines assignment of the provider agreement. Importantly, in this case, the provider agreement and provider number of LeBonheur did not survive the transaction. Instead, LeBonheur now operates under the agreement and number of the Provider, which survived the transaction. In effect, the Provider declined assignment of Lebonheur's provider agreement. Accordingly, LeBonheur's per resident amount should have no bearing on the GME calculation for the Provider. The Intermediary's adjustment should therefore be reversed.

4.      The Intermediary's Adjustment of the Provider's GME Per Resident Amount is Arbitrary and Capricious Because it is Inconsistent with Other CMS Policies.

The Intermediary's approach to the calculation of the GME per resident amount after a hospital merger is inconsistent with analogous CMS rules applied in the context of TEFRA limits and cost-to-charge ratios. The Intermediary's dissimilar treatment of similar situations is arbitrary and capricious.

8

114

In 1982, Congress passed the Tax Equity and Fiscal Responsibility Act ("TEFRA"), Pub. L. No. 97-248. Pursuant to TEFRA, CMS limits the rate of increase in a hospital's operating costs based upon the hospital's average cost per discharge during a base year. See Section 1886(b) of the Act; see also 42 C.F.R. § 413.40.

In response to proposed changes to hospital inpatient PPS for 1999, "[o]ne commenter recommended that the [Medicare] regulations be revised to state that where two hospitals who are subject to different caps on TEFRA limits merge, the TEFRA cap that applies is the cap of the surviving hospital." See 63 Fed. Reg. 41,001 (July 31, 1998) CMS' response to this comment was that "[i]f two hospitals merge, the cap that applies depends on the status of the surviving hospital." See id. In fact, CMS stated that "[it] do[es] not believe that the regulations as described above, can be interpreted any other way." See id.

Thus, when two hospitals merge, CMS does not average their TEFRA limits and apply a new limit. Instead, CMS uses the TEFRA limit previously established for the survivor hospital. CMS indicated that any other interpretation would be directly contrary to the regulations. As with the GME per resident amount regulation, the TEFRA regulation does not address the calculation of the limit in the case of the merger of two hospitals. See 42 C.F.R. § 413.40. CMS concluded that the absence of a regulatory provision regarding the merger of two hospitals unambiguously requires that the post-merger TEFRA limit must be that of the surviving hospital. See 63 Fed. Reg. 41,001 (July 31, 1998).

Similarly, under outpatient PPS, each hospital is subject to a cost-to-charge ratio ("CCR") that is used to determine outlier payments, interim transitional corridor payments, and device pass-through payments. See Program Memorandum, HCFA Pub. 60A, Transmittal No. A-00-63, [2000-1 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 151,400 (Sept. 8, 2000). As with the calculation of the post-merger TEFRA limit, CMS states that, "[i]n the case of hospital

**115**

9

mergers, acquisitions or other such changes, the CCR for the surviving provider number should be used." See id.

It is arbitrary and capricious for an agency to adopt inconsistent regulations or policies or to treat similar situations in a different manner. See Motor Vehicle Mfrs. Ass'n v. State Farm Mutual, 103 S. Ct. 2856, 2874 (1983) ("an agency changing its course must supply a reasoned analysis"); Yetman v. Garvey, 261 F.3d 664, 669 (7th Cir. 2001) ("[a] long line of precedent has established that any agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently"); Transactive Corp. v. United States, 91 F.3d 232, 236 (D.C. Cir. 1996). As stated by the court in Mylan Pharmaceuticals, Inc. v. Henney, "[i]nternally inconsistent reasoning by a governmental agency is not entitled to any deference by the courts, and is inherently arbitrary and capricious...." 94 F. Supp. 2d at 48. Accordingly, CMS' dissimilar treatment of the GME per resident amount from the TEFRA limit and the CCR is arbitrary and capricious, and the Intermediary's adjustment must be reversed.

5.    The Intermediary's Adjustment is Arbitrary and Capricious Because the
       Provider Did Not Have Notice of the "Weighted Average" Methodology.

The Intermediary's averaging of the Provider's per resident amount with that of LeBonheur also is arbitrary and capricious because the Provider had no notice of the Intermediary's interpretation of the regulation. As the Court of Appeals for the District of Columbia Circuit held in General Electric Co. v. United States Environmental Protection Agency, 53 F.3d 1324, 1330 (D.C. Cir. 1995), an agency's interpretation is invalid as applied when it "is so far from a reasonable person's understanding of the regulations that they could not have fairly informed [the party] of the agency's perspective."

Prior to the May 12, 1998 Federal Register, the Provider had no notice of CMS' interpretation of the regulations. The text of 42 C.F.R. § 413.86 does not address the calculation of the GME per resident amount after a hospital merger and gives no indication that a hospital's

10                                                                    **116**

per resident amount may change after a merger. Rather, the statute and regulation state that a

GME per resident amount is determined for a hospital based on its GME costs and FTE count

during its base year. Based on CMS' treatment of TEFRA limits after hospital mergers and the

text of the statute and regulation, the Provider had no reasonable way of knowing, when it

entered into the merger with LeBonheur, that the Intermediary would apply a weighted average

methodology in calculating a new per resident amount for post-merger cost reporting periods.

Accordingly, the Intermediary's application of a weighted average per resident amount is

arbitrary and capricious, and its adjustment must be reversed.

6.    The Intermediary Is Impermissibly Applying CMS' "Weighted Average"
      Rule Retroactively.

The Provider's merger with LeBonheur occurred in October of 1995. Yet, the

Intermediary's adjustment is apparently based on CMS language that was published in the

Federal Register on May 12, 1998. Therefore, the Intermediary is improperly applying this

supposed CMS' rule retroactively.

The Supreme Court has held that Congress or an agency must explicitly state that a

statute or regulation is to be applied retroactively. In the absence of such an unambiguous

statement, legislation and administrative rules are not to be applied retroactively. As the

Supreme Court has stated:

> Retroactivity is not favored in the law. Thus, congressional enactments and
> administrative rules will not be construed to have retroactive effect unless their
> language requires this result.

Bowen v. Georgetown Univ. Hosp., 109 S. Ct. 468, 471 (1988).

Prior to May 12, 1998, CMS did not provide hospitals with notice that it would apply a

weighted average per resident amount for a survivor hospital after two or more hospitals merged.

As discussed above, the May 12, 1998 statement does not comport with APA requirements and

therefore is not a valid rule. Regardless of this, however, the Intermediary is attempting to apply

11                                    117

this rule retroactively, in violation of the legal principle established in <u>Bowen v. Georgetown</u> <u>University Hospital</u>. Accordingly, the Intermediary's adjustment must be reversed.

## V.    ISSUE NO. 2 – DISPROPORTIONATE SHARE PAYMENT

The Provider was entitled to payment as a disproportionate share hospital ("DSH") for FY 2000. When the Intermediary calculated the Provider's FY 2000 DSH payment, for that portion of the year occurring before January 20, 2000,[2] it excluded certain days attributable to patients who were eligible for Medicaid through the Tennessee Medicaid Section 1115 waiver program. Specifically, it excluded days attributable to patients who would not have been eligible for Medicaid absent the waiver. The Medicare reimbursement effect of the Intermediary's exclusion of these days was approximately $128,979. Provider Exhibit 9 (Calculation of Reimbursement Impact of DSH Medicaid Days Issue).

The Provider contends that its inpatient days attributable to all patients eligible for Medicaid through the Tennessee Medicaid Section 1115 waiver program, not just the days for patients who would have been eligible for Medicaid even absent the waiver, should have been included in the number of Medicaid eligible days used for purposes of calculating its DSH payment. The following sections set forth the statutory and regulatory background on Medicaid Section 1115 waivers and Medicare DSH payments, the relevant details of Tennessee's Section 1115 program and the audit adjustment at issue, and the Provider's position on this issue.

---

[2]     In January 2000, the Medicare DSH regulation was revised so that, effective with discharges occurring on or after January 20, 2000, days attributable to patients eligible for Medicaid under a Section 1115 waiver are included in the DSH calculation. 42 C.F.R. § 412.106(b)(4)(ii); 65 Fed.Reg. 3139 (2000). Thus, this appeal only involves the first 19 days of the Hospital's FY 2000.

12

· 118

## A.    STATUTORY AND REGULATORY BACKGROUND

### 1.    The Medicaid Program and the State Plan

Medicaid is a joint federal and state program established in Title XIX of the Social

Security Act ("the Act") to provide "medical assistance" to indigent persons who meet certain

eligibility criteria. 42 U.S.C. § 1396; 42 C.F.R. § 430.0. The term "medical assistance" means

"payment of part or all of the cost" of 25 different types of health care services listed in the

statute, including inpatient hospital services. 42 U.S.C. § 1396d(a). To participate in the

Medicaid program and receive Federal funding, a State must submit a "State plan" that meets

federal requirements for approval by the Secretary of the U.S. Department of Health and Human

Services ("the Secretary"). 42 U.S.C. §§ 1396, 1396a; 42 C.F.R. Part 430. Under an approved

State plan, a State receives Federal matching funds according to a "Federal medical assistance

percentage," or "FMAP," for State expenditures on medical assistance. 42 U.S.C. §§ 1396,

1396d(b); 42 C.F.R. § 433.10.

### 2.    Section 1115 "Waivers"

Section 1115 of the Social Security Act allows the Secretary to approve State research

and demonstration projects that promote the objectives of the Title XIX Medicaid program.

42 U.S.C. § 1315. Section 1115, in relevant part, reads as follows:

(a) In the case of any experimental, pilot, or demonstration project which, in the
judgment of the Secretary, is likely to assist in promoting the objectives of title
. . . XIX, . . . in a State or States--

(1) the Secretary may waive compliance with any of the requirements of
section . . . 1902 as the case may be, to the extent and for the period he finds
necessary to enable such State or States to carry out such project, and

(2)(A) costs of such project which would not otherwise be included as
expenditures under section . . . 1903 . . . shall, to the extent and for the period
prescribed by the Secretary, be regarded as expenditures under the State plan or
plans approved under such title, or for administration of such State plan or plans,
as may be appropriate . . .

13

119

Id. Section 1115(a)(1) allows the Secretary to waive the requirements of section 1902, which contains Medicaid State plan requirements, including requirements as to eligible populations. 42 U.S.C. § 1315(a)(1). Section 1115(a)(2)(A) allows a State to receive federal matching for medical assistance, including medical assistance provided to expanded eligibility populations, for which the State would not ordinarily be entitled to receive federal matching. 42 U.S.C. § 1315(a)(2).[3]

Under some Section 1115 waivers, the State furnishes medical assistance to a population that otherwise could have been made eligible for Medicaid; under others, the State furnishes medical assistance to expanded eligibility populations that could not otherwise have been made eligible for Medicaid.[4] As stated by the Secretary, "the statute allows for the expansion populations to be treated as Medicaid beneficiaries." 65 Fed. Reg. 3137 (Jan. 20, 2000).

### 3. DSH Payments to Hospitals and the Medicaid Percentage

Since 1983, the Medicare program has paid most hospitals for the operating costs of inpatient hospital services under a prospective payment system ("PPS"). 42 U.S.C. § 1395ww(d)(1)-(5); 42 C.F.R. Part 412. Under PPS, Medicare pays hospitals a standardized amount per case subject to certain payment adjustments. Id. A hospital that serves a disproportionate share of low-income patients, or a DSH, is also entitled to an upward adjustment to the Medicare PPS payments. See 42 U.S.C. § 1395ww(d)(5)(F). Congress

---

3       Section 1903, cited in Section 1115(a)(2)(A), governs payment to States of the FMAP. 42 U.S.C. § 1396b.

4       Medicare Program; Medicare Inpatient Disproportionate Share Hospital (DSH) Adjustment Calculation: Change in the Treatment of Certain Medicaid Patient Days in States with 1115 Expansion Waivers, 65 Fed. Reg. 3136 (interim final rule Jan. 20, 2000) (codified at 42 C.F.R. § 412.106(b)(4)(ii)).

14

120

established the DSH adjustment to account for the relatively higher costs associated with furnishing health care services to low-income patients, who tend to be sicker than other patients.

The amount of the Medicare DSH payment due to a hospital is determined, in part, by its "disproportionate patient percentage" ("DSH patient percentage"), which is a proxy for the Provider's utilization by low-income patients. See 42 U.S.C. § 1395ww(d)(5)(F)(v). The DSH patient percentage is defined as the sum of two fractions expressed as percentages. 42 U.S.C. § 1395ww(d)(5)(F)(vi). One of these fractions is commonly known as the Medicaid percentage. The numerator of the fraction used to compute the Medicaid percentage consists of the number of the Provider's patient days attributable to patients who were "eligible for medical assistance under a State plan approved under Title XIX, but who were not entitled to benefits under Part A of [Medicare]." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).[5]

### 4.    Eligible Medicaid Days for Purposes of Medicare DSH

The meaning of the statutory language "eligible for medical assistance under a State plan approved under Title XIX" is key to the analysis of the Provider's DSH payment issue. From 1986 through 1997, CMS interpreted this language to exclude inpatient days attributable to patients who were eligible for Medicaid benefits if Medicaid did not actually make payment for those inpatient days. See 42 C.F.R. § 412.106(b)(4) (1996); 51 Fed. Reg. 16,777 (May 6, 1986); 51 Fed. Reg. 31460-61 (Sept. 3, 1986). This policy centered on whether Medicaid payment had been received for a patient's inpatient days. On February 27, 1997, through HCFA Ruling 97-2,

---

[5]    The Medicare regulations implementing this section of the statute track the statutory language and provide that, to calculate the Medicaid percentage, the fiscal intermediary determines "the number of the Provider's patient days of service for which patients were eligible for Medicaid but not entitled to Medicare Part A." 42 C.F.R. § 412.106(b)(4).

15

CMS rescinded the policy of excluding eligible-but-unpaid Medicaid patient days from the numerator of the Medicaid fraction.[6]

## 5.    Treatment of Section 1115 Waiver Days under DSH

Until early 2000, the Medicare regulations did not specifically address the treatment of Section 1115 waiver days under DSH. See 42 C.F.R. § 412.106 (1999). Prior to that time, some hospitals were allowed to include in the DSH calculation days attributable to Section 1115 expansion populations, while others were not.[7] On January 20, 2000, CMS issued an "interim final rule with comment period" to address the treatment under DSH of inpatient days attributable to patients who were eligible for Medicaid in a State with a Section 1115 Medicaid waiver. 65 Fed. Reg. 3136 (Jan. 20, 2000).

---

[6]    HCFA Ruling 97-2 (Feb. 27, 1997). Under the new policy announced through HCFA Ruling 97-2, "the Medicare disproportionate share adjustment under the Provider inpatient prospective payment system [is] calculated to include all inpatient hospital days of service for patients who were eligible on that day for Medical assistance under a State Medicaid plan in the Medicaid fraction, whether or not the Provider received payment for those inpatient hospital services." This policy is now reflected in the Medicare regulations at 42 C.F.R. § 412.106(b)(4)(1).

[7]    See 65 Fed. Reg. 3136 (prior to January 2000, "because [CMS'] prior guidance on certain aspects of [the] Medicare DSH policy was insufficiently clear, many hospitals in States with approved Section 1115 expansion waivers [had] been receiving Medicare DSH payments reflecting the inclusion of expansion population days"); see also "Clarification of Allowable Medicaid Days in the Medicare Disproportionate Share Hospital (DSH) Adjustment Calculation," Health Care Financing Administration Program Memorandum A-99-62 (Dec. 1, 1999) (PM A-99-62) (instructing the intermediaries, within certain parameters, to allow the inclusion of ineligible waiver or demonstration population days to the extent that they had previously allowed their inclusion). While PM A-99-62 mentions that some hospitals had received erroneous DSH payments as a result of including "ineligible waiver or demonstration population days" in the number of Medicaid days used for DSH calculations, it does not expressly state CMS' policy on the treatment of Section 1115 waiver days. Attached to PM A-99-62 is a chart that "summarizes some, but not necessarily all, of the types of days to be excluded from (or included in) the Medicare DSH adjustment calculation." Absent from this detailed list is any reference to "Section 1115 waiver days."

16

**122**

Through this interim final rule, CMS established that effective with discharges occurring

on or after January 20, 2000, hospitals may include the patient days of all populations eligible for

Title XIX matching payments through a State's Section 1115 waiver in calculating the

Provider's Medicare DSH adjustment. 65 Fed. Reg. 3136-37; 65 Fed. Reg. 47086. The

regulations codifying the policy change are found at 42 C.F.R. § 412.106(b)(4)(ii).[8]

When it finalized the interim final rule as part of the 2001 inpatient PPS rule, CMS

described its Section 1115 waiver days policy as follows:

> While [CMS] initially determined that States under a Medicaid expansion waiver
> could not include those expansion waiver days as part of the Medicare DSH
> adjustment calculation, we have since consulted extensively with Medicaid staff
> and determined that section 1115 expansion waiver days are utilized by patients
> whose care is considered to be an approved expenditure under Title XIX. . . .
> [T]hese days are considered to be Title XIX days by Medicaid standards.

65 Fed. Reg. 47087 (Aug. 1, 2000).

## B.    FACTUAL BACKGROUND

### 1.    TennCare

The State of Tennessee first received approval for its Section 1115 demonstration

project, called TennCare, on November 19, 1993.[9]  On January 1, 1994, Tennessee became the

first state to move its Medicaid program enrollees to a statewide demonstration project.[10]  In

addition to Medicaid eligible persons, TennCare offered coverage to expansion populations of

---

[8]    The implementing regulations read as follows: "Effective with discharges occurring on or after January 20, 2000, for purposes of counting days under paragraph (b)(4)(1) of this section, hospitals may include all days attributable to populations eligible for Title XIX matching payments through a waiver approved under section 1115 of the Social Security Act." 42 C.F.R. § 412.106(b)(4)(ii).

[9]    Provider Exhibit 10 (Tennessee Statewide Health Reform Demonstration Fact Sheet (http://www.hcfa.gov/medicaid/1115/tnfact.ntm) ("TennCare Fact Sheet")).

[10]    Provider Exhibit 11 (Medicaid: Tennessee's Program Broadens Coverage but Faces Uncertain Future, GAO Report No. GAO/HEHS-95-186 (Sept. 1, 1995) ("GAO TennCare Report")).

17

**123**

uninsured and uninsurable persons, regardless of income, who would not have been eligible for

Medicaid under the program as it existed prior to the waiver.[11]

Under TennCare, as described in a letter from HCFA Administrator Thomas Scully to the

State of Tennessee, the State is entitled to receive Title XIX federal matching for expenditures

for the populations who would not have otherwise been eligible for Medicaid in that State.[12]

HCFA invoked Section 1115 in describing this entitlement:

> Under the authority of section 1115(a)(2) of the Social Security Act, expenditures
> made by the State for [certain] items . . . (which are not otherwise included as
> expenditures under section 1903) shall, for the period of the project, be regarded
> as expenditures under the State's Title XIX plan.

The first of these items listed in the letter is: "Expenditures for the following eligibility groups:

those who are uninsurable because of pre-existing conditions, and those who are uninsured."

According to the "Special Terms and Conditions" ("STCs") governing TennCare[13], the State

receives federal matching for "actual cash capitation payments . . . made by the State to MCOs

for each TennCare enrollee[,]" and "[t]he Standard Medicaid funding process [is] used during the

TennCare demonstration."[14]

---

[11]    Provider Exhibit 11 (GAO TennCare Report) at 1; Provider Exhibit 10 (TennCare Fact
Sheet).

[12]    Provider Exhibit 12 (Letter from Thomas A. Scully, Administrator, Centers for Medicare
and Medicaid Services, to John F. Tighe, Deputy to the Governor for Health Policy, Deputy
Commissioner of Finance and Administration, Tennessee Department of Finance and
Administration (Jan. 31, 2002) ("Jan. 2002 Scully Letter")).

[13]    Provider Exhibit 13 (Centers for Medicare and Medicaid Services, Special Terms and
Conditions, No. 11-W-0000216, Tennessee Tenncare Demonstration, Tennessee Department of
Health ("STCs")). Our understanding is that HCFA issues STCs to States along with the HCFA
letter approving the section 1115 project. HCFA updates the STCs as necessary to reflect .
changes in the project requested by the State and approved by HCFA.

[14]    Id. at paragraphs 12 and 13.

18

──── **124**

2.    Audit Adjustment At Issue

On its as-filed Medicare cost report, the Provider included all of its Tennessee Section 1115 waiver days in the number of Medicaid eligible days used to calculate the DSH payment. More specifically, it included in this number the inpatient days attributable to patients who would have been eligible for Medicaid before the waiver, as well as days attributable to expansion populations of uninsured and uninsurable patients who became eligible for Medicaid by virtue of the waiver.

When the Intermediary settled the FY 2000 cost report, it excluded the Section 1115 waiver days for the period prior to January 20, 2000. This reduced the number of Medicaid eligible days by 482, resulting in a reimbursement impact of \$128,979. Provider Exhibit 9 (Calculation of Reimbursement Impact of DSH Medicaid Days Issue).

C.    PROVIDER'S POSITION

The Provider contends that the plain language of the Social Security Act requires the inclusion in the DSH calculation of all Section 1115 waiver days. As noted above, the statute provides that the numerator of the DSH Medicaid fraction includes days for patients who were "eligible for medical assistance under a State Plan approved under Title XIX." Thus, the DSH calculation should clearly include all patients who were eligible for medical assistance under a Medicaid State Plan implemented through a Section 1115 waiver, including patients in expansion populations.

As described above, under the Medicaid statute, "medical assistance" means "payment of part or all of the cost" of 25 different types of health care services. 42 U.S.C. § 1396d(a). All

**125**

19

TennCare enrollees, including those in expansion populations, are eligible to receive this kind of assistance from managed care organizations under contract with the State.[15]

Moreover, pursuant to the clear language of Section 1115 of the Social Security Act, costs of a demonstration project approved under Title XIX are "regarded as expenditures under the State plan." 42 U.S.C. § 1315.[16] Accordingly, the State of Tennessee receives federal matching for payments for medical assistance furnished to each TennCare enrollee.[17] CMS basically treats the expenditures for the TennCare waiver as "expenditures under the State's Title XIX plan."[18] In addition, nothing in the Medicare regulations effective for cost reporting periods prior to 2000 required expansion waiver days to be excluded from the DSH calculation. See 42 C.F.R. § 412.106 (1999). Further, HCFA expressly acknowledged during the 2000 rulemaking on this issue that Section 1115 days "are considered to be Title XIX days by Medicaid standards." 65 Fed. Reg. 47086 (Aug. 1, 2000). HCFA also acknowledged that Section 1115 "allows for the expansion populations to be treated as Medicaid beneficiaries." 65 Fed. Reg. 3137 (Jan. 20, 2000).

The Provider's position is supported by case law on the subject. First, the United States Court of Appeals for the Ninth Circuit recently ruled that Section 1115 days must be included in

---

[15]    Provider Exhibit 13 (STCs) at paragraph 12. Even if a specific patient is no longer entitled to payment for a particular inpatient stay due to coverage limitations, the patient is still generally "eligible" for "medical assistance." See Cabell-Huntington Hospital, Inc. v. Shalala, 101 F.3d 984, 987-88 (4th Cir. 1996).

[16]    As noted above, a State must submit a "State plan," to be approved by the Secretary, in order to participate in the Medicaid program and receive Federal funding. 42 U.S.C. §§ 1396, 1396a; 42 C.F.R. Part 430. Under an approved State plan, a State receives Federal matching funds according to a "Federal medical assistance percentage," or "FMAP," for State expenditures on medical assistance. 42 U.S.C. §§ 1396, 1396d(b); 42 C.F.R. § 433.10.

[17]    Provider Exhibit 13 (STCs) at paragraph 12.

[18]    Provider Exhibit 12 (Jan. 2002 Scully Letter).

126

20

the Medicaid fraction of the DSH calculation. Portland Adventist Medical Center v. Thompson, Medicare and Medicaid Guide (CCH) ¶ 301,592 (9th Cir. Mar. 2, 2005). In affirming a prior district court decision, the Ninth Circuit concluded that "[t]he text of the statute, the intent of Congress, and the decisions of this and other courts make it plain that the entire low-income population actually served by the hospitals – including § 1115 expansion populations – must be accounted for in the DSH Medicaid fraction." Id. at p. 806,061. Second, in a case involving several DSH issues for a provider's fiscal year ending 1994, the PRRB held that "the plain language of the governing Medicare statutory provisions requires all [Section] 1115 waiver days to be included in the Medicaid proxy for purposes of calculating the Provider's DSH payment." Castle Medical Center v. Blue Cross and Blue Shield Association/United Government Services, LLC-CA, PRRB Dec. No. 2003-D36, Case No. 98-1973 at 15 (July 16, 2003) ("Castle Medical Center").[19] The PRRB found that "with the implementation of the Title XIX waiver, these patients became Medicaid eligible patients." Castle Medical Center at 15.

In addition, the Provider's position is supported by CMS' prior policy in the context of the State Children's Health Insurance Program ("SCHIP"). That program, established in 1997 through Section 4911 of the Balanced Budget Act, allows States to receive an enhanced FMAP for expansions of Medicaid eligibility to an additional, optional group -- "optional targeted low-income children." Sections 1902(a)(10)(A)(ii)(XIV) and 1905(u)(2)(B) of the Social Security Act. Section 1905(u)(2)(B) of the Act defines an "optional targeted low-income child" as a child who, among other requirements, "would not qualify for medical assistance under the State plan under this title [Title XIX] as in effect on March 31, 1997." The latter part of this section,

---

[19] The CMS Administrator rejected the Board's reasoning with respect to the waiver days. Castle Medical Center v. Blue Cross and Blue Shield Association/United Government Services, LLC-CA, Centers for Medicare and Medicaid Services, Decision of the Administrator (Sept. 12, 2003). We disagree with the Administrator's decision and believe the Board's decision is correct.

.127

21

which is typically known as the SCHIP "maintenance of effort" provision, is relevant here. After the enactment of SCHIP, CMS generally interpreted this provision to mean that a child who would "qualify for medical assistance under the State plan under this title" includes a child who would receive medical assistance by virtue of a Section 1115 waiver. See Letter from Tim Westmoreland, Director, Center for Medicaid and State Operations, Health Care Financing Administration, to State Health Officials (July 10, 2000) ("the Department has generally interpreted this [maintenance of effort] restriction to apply to statewide section 1115 demonstration projects in effect on that date") (Provider Exhibit 14). If under SCHIP a child who would "qualify for medical assistance under the State plan under [Title XIX]" includes a child who would qualify through a waiver, then under DSH a person who is "eligible for medical assistance under at State plan approved under Title XIX" should include a person eligible for Medicaid through a waiver.

For the foregoing reasons, the Provider contends that all Section 1115 waiver days, including expansion days, should be included in its DSH calculation for fiscal year 1998. Therefore, it requests that the Intermediary revise its calculation of the DSH payment to include all Section 1115 waiver days.

Respectfully submitted,

Mary Susan Philp
Powers Pyles Sutter & Verville P.C.
1875 Eye Street, N.W., 12th Floor
Washington, D.C. 20006
(202) 466-6550

Counsel for Provider Methodist Healthcare -
Memphis Hospital

Date:   September 28, 2005

128

22

## PROVIDER'S LIST OF EXHIBITS

Provider Exhibit 1       HCFA Tie-In Notice, dated May 2, 1996

Provider Exhibit 2       Intermediary Workpapers for Fiscal Year 1995 on GME
                         Per Resident Amount

Provider Exhibit 3       Intermediary Workpapers for Fiscal Year 1996 on GME
                         Per Resident Amount

Provider Exhibit 4       Intermediary Workpapers for Fiscal Year 1997 on GME
                         Per Resident Amount

Provider Exhibit 5       Intermediary Workpapers for Fiscal Year 1998 on GME
                         Per Resident Amount

Provider Exhibit 6       Intermediary Workpapers for Fiscal Year 1999 on GME
                         Per Resident Amount

Provider Exhibit 7       Intermediary Workpapers for Fiscal Year 2000 on GME Per
                         Resident Amount

Provider Exhibit 8       Calculation of Reimbursement Impact of GME Per Resident
                         Amount Issue

Provider Exhibit 9       Calculation of Reimbursement Impact of DSH Medicaid Days
                         Issue

Provider Exhibit 10      Tennessee Statewide Health Reform Demonstration Fact Sheet

Provider Exhibit 11      Medicaid: Tennessee's Program Broadens Coverage But
                         Faces Uncertain Future, GAO Report No. GAO/HEHS-95-186
                         (Sept. 1, 1995)

Provider Exhibit 12      Letter from Thomas A. Scully, Administrator, Centers for
                         Medicare and Medicaid Services, to John F. Tighe, Deputy to
                         the Governor for Health Policy, Deputy Commissioner of Finance
                         and Administration, Tennessee Department of Finance and
                         Administration (Jan. 31, 2002)

Provider Exhibit 13      Centers for Medicare and Medicaid Services, Special Terms and
                         Conditions, No. 11-W-0000216, Tennessee Tenncare
                         Demonstration, Tennessee Department of Health

Provider Exhibit 14    Letter from Tim Westmoreland, Director, Center for Medicaid and
State Operations, Health Care Financing Administration, to State
Health Officials (July 10, 2000)

Methodist Hospitals of Memphis
Fiscal Year Ending December 31, 2000

## Calculation of Reimbursement Impact of DSH Medicaid Days Issue

**Per Audit**

|  |  |
|---|---|
| Total Medicaid Days | 64,941 |
| Total DSH Reimbursement | $19,341,301 |
| Additional Waiver Days | 482 |

**Appeal**

|  |  |
|---|---|
| Revised Total Medicaid Days | 65,423 |
| Revised Total DSH Reimbursement | $19,470,280 |
| **Additional Reimbursement** | $128,979 |

P-10

# HCFA Health Care Financing Administration

**Medicare      Medicaid      SCHIP      What's New      Site Index**

# TENNESSEE STATEWIDE HEALTH REFORM DEMONSTRATION

## FACT SHEET

**Name of Section 1115 Demonstration:** TennCare

**Date Proposal Submitted:** June 16, 1993

**Date Proposal Approved:** November 18, 1993

**Date Implemented:** January 1, 1994

## SUMMARY

TennCare is a statewide program to provide health care benefits to Medicaid beneficiaries, uninsured State residents and those whose medical conditions make them uninsurable. Enrollment is capped at 1.4 million. If the cap is reached, those in the mandatory Medicaid coverage and uninsurable groups will continue to be enrolled, while enrollment of the currently uninsured groups will be limited. All enrollees are served in capitated managed care organizations (MCOs) that are health maintenance organizations (HMOs). Current enrollment is about 1.3 million.

## ELIGIBILITY

Three distinct groups are offered coverage:

- All persons meeting the eligibility requirements of the Medicaid program as it existed in fiscal year 1993. Current enrollment in this group is about 803,000.
- Persons with an existing or prior existing health conditions causing them to be uninsurable. This population is now nearly 10 percent of all enrollees.
- Persons who are not eligible -- either directly or as a dependent -- for an employer-sponsored or government-sponsored health plan as of March 1, 1993. While enrollment will not be restricted for those currently eligible for Medicaid or the uninsurable, the cap on total enrollment may limit the number of uninsured served. Current enrollment of uninsurable and previously uninsured individuals is about 546,000. Enrollment is currently open to uninsured children and uninsurables.

## BENEFIT PACKAGE

**133**

A standard benefit package is provided by managed care organizations (MCOs).

TennCare benefits are more generous than those offered under Medicaid for acute care, generally in that they remove most limitations on number of episodes covered. The plan emphasizes preventive care by providing all preventive care to adults and children without copayments or deductibles.

On June 30, 2000, HCFA approved the State=s request to carve out pharmacy benefits from the MCO capitation rate for those individuals also eligible for Medicare.

## ENROLLMENT/DISENROLLMENT PROCESS

Those deemed Medicaid-eligible are enrolled for a 1-year period. Those in the uninsured group are enrolled for a 1-year period as long as they continue to pay their premiums.

The State may involuntarily disenroll those in the uninsured group who fail to pay premiums.

Individuals who are severely and persistently mentally ill (SPMI) were brought into managed care in July 1996. They are now served by the same BHOs that provide behavioral health services to the rest of the TennCare population (See section on "TennCare Partners Program" below.)

Long term care is not included in the managed care plan.

## DELIVERY SYSTEM

The State has contracted with 10 MCOs. The MCOs contract with providers on a fee-for-service or capitation basis.

Services for Children's Plan enrollees (children in State custody or at risk of custody) are currently being provided through the existing State delivery system.

## QUALITY ASSURANCE

The State has a contract with an independent external quality review organization (EQRO). Yearly reviews have been completed and health plans have begun to implement changes in many of the areas that were identified as needing improvement.

## COST-SHARING

All adults and children with incomes above 100 percent of the Federal Poverty Level (FPL) are required to pay, except those in Medicaid eligibility groups. Cost-sharing is in the form of premiums, deductibles, and copayments based on income.

134

Participants with incomes over 100 percent FPL pay their premiums on a graduated fee schedule so that payments will increase as income increases. Premiums include individual premiums and family premiums.

Deductibles are on a graduated scale, but none are required for mandatory Medicaid eligibles. Deductibles are $250 for an individual and $500 for a family with incomes between 101 and 199 percent FPL.

Copayments are up to 10 percent of costs, based on a graduated scale for enrollees with incomes between 101 and 199 percent FPL (other than mandatory Medicaid eligibles) and would be 10 percent of the cost of a service for those at or above 200 percent FPL.

Cost-sharing expenditures are limited by annual out-of-pocket maximums of $1,250 per individual/family, excluding premium payments.

To encourage use of preventive services, no deductible or copayment is required for such services.

## TENNCARE PARTNERS PROGRAM

Implemented on July 1, 1996, as part of the TennCare section 1115 demonstration project, the TennCare Partners Program provides behavioral health and substance abuse services to all TennCare enrollees through a complete carve-out program. All mental health and substance abuse services that were previously offered by managed care organizations (MCOs), as well as those provided through the Tennessee Department of Mental Health and Mental Retardation, is provided under the new plan by one of two behavioral health organizations (BHOs).

Eligibility and Coverage: Eligibility is determined as currently defined by the TennCare program; however, BHO enrollees are divided into two groups, Basic and Priority participants. The Basic benefit package provides standard episodic care services, while the Priority package is an expanded group of services provided to those who are most severely ill.

The 1.3 million Basic participants are entitled to the basic service benefit package for mental health and substance abuse services which has been offered by MCOs since TennCare was implemented.

Priority participants are those who have been evaluated by the State and identified as SPMI. This group has traditionally been served by the Community Mental Health Centers (CMHCs) who were contracted by the Tennessee Department of Mental Health and Mental Retardation on a fee-for-service basis. All attempts have been made to preserve these existing provider relationships.

Delivery System: BHOs contract with the State to provide services and receive monthly capitation payments for each enrollee.

BHOs currently have the five State regional mental institutions in their networks, although they are not required to do so. In addition, CMHCs are used as safety net providers. Both BHOs have contracted with all CMHCs.

Coordination of care between the MCO and BHO is a contractual requirement for the plans. The State has required the plans to meet regularly to address issues that arise in providing care.

**135**

The State believes that virtually all current behavioral health providers are in at least one of the BHO networks.

Choice of Provider: The BHOs each associate with several of the MCOs, with some overlap. Initially, the State assigned beneficiaries to one of the two BHOs via the enrollees= associated MCO, while providing an option to change if a provider of long standing was not in the network. Enrollees have free choice of providers from within the assigned BHO network, and may change BHOs by changing MCOs at the annual change enrollment period.

10/20/00

**Contact:**
Clarke Cagey, 410-786-7700 or E-mail CCagey@hcfa.gov.



Medicare.gov | Department of Health and Human Services | NMEP

Home | Privacy Policy | Feedback | Help | Website Accessibility



P-11

GAO Report on TennCare, (Sep. 01, 1995)
COPYRIGHT 2003, CCH Incorporated

**GAO Report on TennCare.**

**GAO Report, No. GAO/HEHS-95-186 , Sept. 1, 1995**

### Medicaid: Waiver of Requirements

**Tennessee—TennCare demonstration project.—**
Reproduced below is a report issued by the General Accounting Office reviewing TennCare, Tennessee's Medicaid waiver program. While TennCare has provided coverage to most of the state's uninsured and reduced Medicaid cost increases, concerns have been raised about TennCare's (1) rapid approval and implementation, (2) lack of provider buy-in to the program, and (3) delays in implementing systems for monitoring TennCare's access and quality of care. Critics have also questioned the soundness of TennCare's methodology for determining the program's capitation rates and the resulting adequacy of those rates. The report found that, while TennCare has met its initial objectives of expanding health care coverage to the state's uninsured and controlling total program and state costs, its long-range success is uncertain. The program's success will depend on the health care community's willingness to continue to participate in TennCare. If providers decide to reduce their TennCare participation or to leave the program in significant numbers, the viability of managed care organizations and TennCare could be seriously threatened.

See ¶14,625, ¶15,642.

### [Text of Report]

Subject: "Medicaid: Tennessee's Program Broadens Coverage but Faces Uncertain Future."

September 1, 1995

The Honorable John Dingell

Ranking Minority Member

Committee on Commerce House of Representatives

Dear Mr. Dingell:

In early 1993, Tennessee projected that increases in state Medicaid expenditures and the loss of certain tax revenues used to help finance Medicaid costs would cause a financial crisis. Meanwhile, state officials believed that a portion of the medical costs for as many as three-quarters of a million uninsured persons were being shifted to the Medicaid program and other payers. To avert a financial crisis, control its Medicaid expenditures, and extend health insurance coverage to most state residents, Tennessee got federal permission to replace its fee-for-service Medicaid program with a capitated managed care program called TennCare.

Since then, Tennessee's Medicaid waiver program has generated both praise and criticism. TennCare has provided coverage to most of the uninsured persons in the state, while reducing Medicaid cost increases. However, concerns have been raised about TennCare's rapid approval and implementation, lack of provider buy-in to the program, and delays in implementing systems for monitoring TennCare's access and quality of care. In addition, the soundness of the methodology for determining and the resulting adequacy of the program's capitation rates have been questioned.

In response to your concerns about the controversy over TennCare, we examined the available information on (1) TennCare's basic design and objectives, (2) the degree to which the program is meeting these objectives, and (3) the experiences of TennCare insurers and medical providers and their implications for TennCare's future.

**Results in Brief**

In seeking its 5-year waiver approval from the Department of Health and Human Services (HHS), Tennessee had several objectives. Two of these were to expand health care coverage to the state's uninsured and to control total program and state costs. Specifically, Tennessee requested permission to mandate Medicaid enrollment in managed care and to cover certain uninsured previously not determined eligible for Medicaid. In granting the waiver, HHS required that Tennessee implement measures to monitor and ensure access to quality care. In addition, HHS and Tennessee agreed that federal payments for the 5 years would be no more than $12.165 billion to ensure that federal costs not exceed what they would have been without the

Case 1:06-cv-00579-RJL   Document 201-14   Filed 06/22/2006   Page 143 of 212

waiver.

In less than 2 months after receiving approval, Tennessee had contracted with 12 managed care organizations (MCO) to place its entire Medicaid population in its new capitated managed health care program, TennCare, and to open enrollment to uninsured persons in the state. By the end of the first year, Tennessee had enrolled approximately 800,000 Medicaid-eligible persons and over 400,000 uninsured persons who were not determined to be eligible for Medicaid in TennCare, with two of the MCOs accounting for nearly three-quarters of the over 1.2 million enrollees.

Despite this increase in the number of persons covered, federal and state reported expenditures for Tennessee's Medicaid program increased less than 1 percent in state fiscal year 1994, much below the national average. Excluding long-term care and administrative costs, which are not capitated, program costs actually declined. These reductions were realized largely from capitation rates paid to MCOs that were substantially below prior Medicaid per beneficiary costs. The rate-setting methodology understated historical Medicaid costs by approximately 25 percent, and, further, the state applied an additional discount of 22 percent on the assumption that more extensive insurance coverage would reduce charity care costs. Meanwhile, the state effectively reduced its share of Medicaid costs by claiming losses incurred by hospitals in caring for TennCare eligibles as federally reimbursable expenses without reimbursing the hospitals. In addition, the state recouped some federal dollars paid to MCOs through a state tax on capitation payments and retained a substantial share of premiums paid by TennCare enrollees.

Although TennCare essentially met its objectives to provide health care coverage to many uninsured individuals while controlling costs, concerns remain about TennCare. Primary among these concerns are enrollee access to quality care and MCO financial performance. Facts about access and quality of care are largely unknown due to delays in the MCOs' and state's implementation of adequate monitoring systems. One beneficiary survey, however, indicates that significant numbers of enrollees are less than satisfied with the program. Almost half of the beneficiaries surveyed felt that the care they received under TennCare was worse than under Medicaid because their choice of doctors was limited and finding providers was difficult. In another survey, almost one-third of the physicians who were signed up with at least one MCO and said that their practices were accepting new patients also said that they did not accept new TennCare patients.

Concerns also have been raised about the MCOs' financial performance. Overall, MCOs lost money in 1994, even after receiving substantial supplementary payments in addition to their usual capitation payments. The largest MCO, with almost 50 percent of TennCare enrollees, lost almost $9 million in its first year in TennCare and is projecting a fourfold increase in losses for its second year primarily because some supplemental payments were discontinued on January 1, 1995, and utilization is expected to be higher. And although the second largest MCO reported a slight gain for 1994, concerns persist that its financial condition may be worse than reported.

So far, TennCare has met its initial objectives, but its long-range success is uncertain. Success will depend on the health care community's willingness to continue to participate. The largest MCO has stated that without a 10-percent increase in the capitation rate, it will have to reassess its participation in TennCare. To compensate for past losses and avoid future losses, some MCOs may act to contain costs that could reduce payments to providers. Institutional providers, already claiming large losses, face elimination of substantial state subsidies. Moreover, physicians have reported widespread dissatisfaction with the program, and a significant number of them have indicated that, overall, their practices are financially worse off under TennCare than under Medicaid. Further, many of the physicians in the largest MCO reportedly felt coerced to participate in TennCare because the MCO implemented a policy that required its network physicians to participate in TennCare. If providers decide to reduce their TennCare participation or leave the program in significant numbers, the viability of the MCOs and TennCare could be seriously threatened.

## Background

Medicaid was established in 1965 as a jointly funded federal-state program providing medical assistance to qualified low-income persons. Each state designs and administers its own Medicaid program, subject to federal requirements for eligibility, services covered, and provider payments. States decide whether to cover optional services and how much to reimburse providers for a particular service. The federal government pays a portion of whatever qualifying expenditures a state Medicaid program incurs. At the federal level, the program is administered by the Health Care Financing Administration (HCFA), an HHS agency.

In recent years, Medicaid costs have escalated. To control these costs, some states have sought to move some or most of their Medicaid population into a capitated managed care system. However, certain provisions of the Medicaid law--such as freedom of choice and the "75-25" beneficiary requirements [1]--inhibit states' use of managed care. States may obtain waivers of these provisions from HCFA under the authority of section 1115 of the Social Security Act . [2] Section 1115 of the act offers HCFA

COPYRIGHT 2003, CCH Incorporated

for Medicaid, they can continue in TennCare, subject to the same requirements as the formerly uninsured. In addition, TennCare expanded services to include inpatient psychiatric facility services for persons between 21 and 65 years old and outpatient substance abuse treatment programs. TennCare also lifted many restrictions and limitations, such as the allowable number of inpatient physician services, outpatient visits, home health visits, and prescriptions.

## TennCare Introduced Statewide Prepaid Managed Care to Medicaid

To implement its prepaid managed care system, the state contracted with 12 MCOs to provide delivery of all Medicaid acute and primary care services and to handle claims processing in exchange for a monthly payment per enrollee. In addition to these monthly payments, MCOs having enrollees with high-cost chronic conditions and higher than average utilization rates would receive additional payments. [10] Subject to the availability of unallocated TennCare funds, [11] MCOs could also receive payments for the cost of providing the first 30 days of care to uninsured and uninsurable enrollees and one-time payments for financial difficulties attributed to TennCare start-up. MCOs are not responsible for long-term care services or for special services to the severely and persistently mentally ill or to Children's Plan [12] enrollees.

TennCare contracts with health maintenance organizations (HMO) and preferred provider organizations (PPO) to operate as MCOs. The state requires HMOs to be licensed as such. The primary contractual distinctions between these types of organizations are that (1) administrative fees and operating profits are restricted for PPOs but not for HMOs and (2) the TennCare Bureau required on January 1, 1994, that HMOs assign each of their enrollees to a primary care physician responsible for managing and coordinating the enrollee's care; the contract with PPOs allows them until January 1, 1997, to assign enrollees to primary care physicians. [13]

Most enrollees have a choice of four MCOs, and enrollees in metropolitan areas have a choice of as many as seven. Figure 1 [figure 1 not reproduced by CCH] shows the geographic divisions of the state and the number of MCOs participating in each division. (Figure omitted by CCH.)

The two largest MCOs, BlueCross BlueShield and Access MedPLUS, operate statewide and account for 73 percent of enrollees. Table 1 lists each MCO and shows the type of contract, number of enrollees, and percent of total enrollees. The table lists MCOs in descending order according to the percentage of total TennCare enrollees in the MCO.

```
          Table 1: TennCare Enrollment by MCO
```

| MCO | Type | Enrollment | Percent of total |
|---|---|---|---|
| BlueCross BlueShield of Tennessee | PPO | 602,361 | 49.87 |
| Access MedPLUS | HMO | 286,639 | 23.73 |
| Health Net | PPO | 75,276 | 6.23 |
| OmniCare Health Plan | PPO | 64,006 | 5.30 |
| Preferred Health Partnership | PPO | 61,514 | 5.09 |
| TLC Family Care Healthplan | HMO | 35,421 | 2.93 |
| Phoenix HealthCare | HMO | 34,821 | 2.88 |
| John Deere HealthCare/Heritage National Health Plan | HMO | 17,155 | 1.42 |
| VHP Community Care | HMO | 12,558 | 1.04 |
| Prudential Community Care | HMO | 7,989 | 0.66 |
| Total Health Plus | HMO | 6,316 | 0.52 |
| TennSource | PPO | 3,834 | 0.32 |
| Total | | 1,207,890 | 100.00 |

Source: TennCare Bureau, "Statewide Summary Eligibles by MCO," May 12, 1995.

In addition to making capitated payments to MCOs, TennCare seeks to encourage managed care in several ways. TennCare requires that by 1997, all MCOs assign their enrollees to primary care physicians responsible for managing and coordinating enrollee care. As of February 1995, MCOs had assigned approximately half of all enrollees to primary care physicians. TennCare promotes continuity of care by requiring enrollees to stay with the same MCO for a year, by providing extended enrollment periods to many Medicaid eligibles, and by allowing persons to continue in TennCare as "uninsured" if they lose their Medicaid eligibility. TennCare also encourages preventive care by not allowing deductibles and copayments for preventive.

**148**

GAO Report on TennCare (Sep. 01, 1995)
COPYRIGHT 2003, CCH Incorporated

care services.

## Supplemental Payments Assist Participating Hospitals and Physicians

TennCare provides for incentive payments to physicians and allows several types of supplemental payments to hospitals based on the availability of unallocated funds. TennCare's design provides for two types of annual incentive payments to participating physicians: one to physicians that have a greater than average TennCare patient load and another to physicians whose practices are at least 10 percent TennCare to pay a portion of their malpractice insurance premiums.

Subject to the availability of unallocated funds, TennCare may also make supplemental payments to hospitals for graduate medical education and care provided to those eligible for, but not enrolled in, TennCare as well as payments to hospitals that provide care to large numbers of TennCare or indigent persons.

## Savings from Capitation Discounts and Discontinued Disproportionate Share Hospital (DSH) Program Allow Expanded Coverage

To finance expanded coverage while keeping Medicaid expenditures within the budget limits set by the waiver agreement, Tennessee set capitation rates that are substantially below historical Medicaid costs. Further, it discontinued its DSH program and established a smaller Primary Care Provider Fund.

In setting capitation rates, the state began with the average annual cost per Medicaid-eligible person and then made "charity care" adjustments, which reduced the average capitation rate by 22 percent. [14] The state's rationale for making these adjustments was that the costs of charity care that had been built into the rates paid historically to providers would be significantly reduced by expanded insurance coverage.

To save additional funds, Tennessee also discontinued its DSH program and established a smaller Primary Care Provider Fund. Under its Medicaid DSH program in state fiscal year [15] 1993, the state provided $438 million in supplementary payments to hospitals that served large numbers of Medicaid enrollees or low-income persons. The Primary Care Provider Fund, budgeted for $185 million in state fiscal year 1994, was intended to provide essential provider payments, a reserve for MCO adverse selection of enrollees or other unforeseen circumstances, and payments to primary care physicians with large TennCare caseloads. [16]

Table 2 illustrates how savings from capitation discounts and the elimination of the DSH program offset the expected costs of expanded coverage and the new Primary Care Provider Fund.

Table 2: Estimated State Fiscal Year 1995 Costs for Expanded Coverage

(Dollars in millions)

Additional costs

| | | |
|---|---|---|
| Capitation payments for 500,000 [a] uninsured net of discounts | $ 519 | |
| Primary Care Provider Fund | 171 | |
| Net additional costs | | $ 690 |

Costs avoided

| | | |
|---|---|---|
| Reduction in capitation rate for 1 million Medicaid eligibles for charity care, including local government contributions [b] | (382) | |
| Discontinued DSH payments [c] | (438) | |
| Net costs avoided | | $(820) |
| Net cost of state fiscal year 1995 coverage expansion | | $(130) |

Note: The numbers used for Medicaid eligibles, uninsured, and the Primary Care Provider Fund are for the second year of the waiver.

[a] Based on the maximum enrollment of 500,000 allowed to enroll in years

**141**

2 to 5 of the waiver. Discounts are for charity care, local government, and enrollee cost-sharing deductions to the capitation payments.

b  The average enrollee monthly charity care and local government deductions equal $31.83.

c  Amount is the state fiscal year 1993 actual payments.

As shown in the table, savings from charity discounts and foregone DSH payments would more than offset the costs associated with the expanded coverage.

## Waiver Imposes Limit on Federal Spending

In accordance with the requirement that demonstration waivers be budget neutral, the TennCare waiver agreement includes an overall available federal funding limit for the 5-year waiver period and sets interim limits on the availability of federal funding. The federal spending limits apply to the total TennCare program expenditures, including Medicaid expenditures for services not covered under capitated payments, such as long-term care.

For the 5-year TennCare waiver period, the federal government will provide no more than $12.165 billion. For every $1 in TennCare expenditures, the federal government pays approximately $.67 and the state pays approximately $.33. The overall federal funding limit for the waiver period was established by estimating what the federal funding for Tennessee's Medicaid program would have been during the first year without TennCare [17] and increasing federal funding 8.3 percent or by the amount of the growth caps included in the President's 1993 health care reform proposal, whichever is lower, each subsequent year. For the first year, HCFA estimated that federal expenditures under Tennessee's existing Medicaid program would be slightly more than $2 billion, a 15.5-percent increase over the previous year's federal funding. Increases in federal funding for the subsequent years would range from 5.1 to 8.3 percent. Table 3 shows the annual spending limits calculated for each year.

### Table 3: TennCare Federal Funding Spending Limits

(Dollars in billions)

| State fiscal year | Spending limit |
|---|---|
| 1994 | $2.108 |
| 1995 | 2.283 |
| 1996 | 2.454 |
| 1997 | 2.594 |
| 1998 | 2.726 |
| Total | $12.165 |

However, because HCFA allows budget neutrality to be achieved over the waiver's duration and not each year, the state has flexibility in annual spending. HCFA established cumulative federal funding targets that allow federal TennCare funding to exceed the spending limits as long as the cumulative annual spending limits are not exceeded by more than the set percentage. Table 4 shows the cumulative annual spending targets and the percentage by which they exceed the sum of the cumulative annual spending limits.

### Table 4: TennCare Cumulative Federal Funding Targets

(Dollars in billions)

| State fiscal year | Cumulative limit | Percent cumulative limit exceeds sum of federal spending limits |
|---|---|---|
| 1994 | $ 2.277 | 8 |
| 1995 | 4.654 | 6 |
| 1996 | 7.119 | 4 |
| 1997 | 9.628 | 2 |
| 1998 | $ 12.165 | none |

If TennCare exceeds the cumulative limit for the first year, it must downsize the program or otherwise reduce expenditures.

In its waiver application, Tennessee stated that it would control TennCare spending to stay within the available resources. The waiver provides for cost containment by beginning to restrict new enrollment of uninsured persons when enrollment reaches 85 percent of the limit.

The federal spending limits apply to the entire TennCare program, which includes services that are not part of TennCare's capitated managed care program. Long-term care and special services to severely and persistently mentally ill and Children's Plan enrollees are not included in TennCare's capitated program. The year before TennCare's implementation, the increase in long-term care expenditures was over 18 percent.

Our analysis of federal spending ceilings in the waiver agreement shows that the amount of federal spending allowed in the first year of TennCare exceeds the federal funds estimated to be spent if the state's Medicaid program had continued. However, the amounts allowed in the second through fifth years are less than we estimate would be spent under Medicaid, and the federal spending limit of $12.165 billion for the entire waiver is less than would be spent if the state's current Medicaid program had continued. [18]

### Financing Arrangements and Expansion of Coverage Favor the State

TennCare's financing mechanisms and program expansions have enabled Tennessee to reduce its revenue contributions while increasing the federal dollars it receives. The waiver agreement explicitly allows the state to claim losses incurred by some nonstate hospitals in caring for TennCare eligibles and to keep most of the premiums paid by TennCare participants. In addition, the waiver permits federal cost sharing for expenditures for services to enrollees in state mental hospitals that are not normally covered by Medicaid. The TennCare waiver provides other, indirect benefits to the state by expanding coverage for those not previously eligible under Medicaid but who received services through other state-funded programs, which allows the state to reduce its funding of such programs. In addition, since TennCare is a capitated program, the state obtains revenue from state taxes on capitation payments made to MCOs.

The state is allowed to claim hospital losses incurred in caring for TennCare eligibles at certain public and private hospitals [19] as TennCare expenses, which makes these claims eligible for federal cost sharing. However, the state is not required to forward any of the resulting federal payments to the hospitals. For the first 6 months of 1994, the state estimated that qualifying hospitals would incur total losses of approximately $64 million; however, these hospitals incurred only $34 million in such losses, according to a subsequent analysis by the Tennessee Office of the Comptroller of the Treasury. The federal government paid its share on the $34 million claim, which is approximately $23 million. [20]

The state is also allowed to keep most of the premiums paid by TennCare participants who are required to pay premiums--about half of the non-Medicaid TennCare enrollees. The state and HCFA agreed that for the first $75 million in premium revenues collected annually, the state gets $.90 of each dollar and shares the remaining $.10 with the federal government, according to the standard sharing rate. As revenue collections surpass $75 million, the percentage of premium revenue allowable as state share gradually decreases. The state initially estimated that it would collect $21 million for state fiscal year 1994 and an additional $101 million for state fiscal year 1995 but subsequently revised its state fiscal year 1995 estimate to $30 million. Actual collections to date have been less than estimated. [21]

The state benefits from federal funding provided to state mental hospitals for expanded TennCare coverage, some of which is not covered under Medicaid rules. Most significantly, Medicaid does not cover persons between the ages of 21 and 65 in state mental hospitals. TennCare allows short-term coverage [22] of this population and reimburses mental hospitals directly for the actual costs of such services. Federal TennCare cost sharing for this population reduces the amount of state subsidy needed for state mental hospitals. As a result, Tennessee officials identified $69 million in annual state funding of state mental hospitals that could be used to fund TennCare. [23]

Indirect benefits to the state result from covering persons not previously included in Medicaid and making capitated payments to MCOs instead of fee-for-service reimbursements to individual providers. Covering the uninsured and uninsurable allows the state to reduce its funding for other state programs that had served these populations. Therefore, in addition to the state funding of mental hospitals, state officials identified $91 million in annual funding of other state programs that could be used to fund TennCare, which now provides such services to the uninsured. Most of this funding--$65 million--comes from reduced state funding of community mental health services. Also included is $5 million in reduced state funding for the Tennessee Comprehensive Health Insurance Program [24] and $21 million for public health services, such as communicable diseases and hemophilia services.

Making capitated payments to MCOs indirectly benefits the state because these payments are then subject to certain taxes;

fee-for-service payments to providers generally were not. The state has a tax of 2 percent on payments made to HMOs and 1.75 percent on payments to PPOs. The tax on HMOs existed before TennCare, and a tax on accident and health insurers that existed before TennCare was extended to include PPOs. [25] Although the HMO tax existed before TennCare, only one HMO, which covered about 25,000 Medicaid-eligible persons, had been subject to the tax for Medicaid revenues. Total capitation tax payments for 1994 were approximately $24 million, $16 million of which are essentially federal dollars returned to the state treasury. [26]

## Waiver Includes Various Access and Quality Assurance Standards

Under the waiver agreement, HCFA permitted new requirements to address enrollee access to care and systems to evaluate the quality of care provided to substitute for the usual Medicaid quality assurance requirements and systems. HCFA waived the requirement that beneficiaries have the freedom to choose any participating provider and the requirement that participating HMOs have at least 25 percent private enrollment. Under TennCare, HCFA requires the TennCare Bureau to ensure adequate enrollee access to providers and quality of care. HCFA further requires the state to submit quarterly progress reports on quality of care, access, utilization of health services, financial results, benefits packages, and other operational issues.

HCFA's primary care access standards for TennCare MCO networks include a minimum primary care provider to patient ratio (1 to 2,500), maximum travel distances and times (30 miles or 30 minutes for rural areas and 20 miles or 30 minutes for urban areas), and maximum allowable delays for scheduling and waiting for appointments (3 weeks for nonemergency scheduling and 45 minutes for waiting). In addition, TennCare has standards for specialty care, hospitalization, and other services. TennCare's planned monitoring of these standards includes periodically evaluating the ratio of primary care providers to enrollees, surveying recipients, including measuring waiting periods for health care services, and measuring referral rates to specialist physicians.

HCFA's quality standards for TennCare include ensuring the implementation of quality monitoring programs and evaluating MCO data to assess quality of care. TennCare's quality monitoring program derives from the National Committee for Quality Assurance quality monitoring program requirements for its MCO quality assurance programs. These requirements include credentialing of providers, grievance procedures, and utilization review. In addition, the state has included a required minimum data set of quality indicators.

## TennCare has Initially Met its Objectives, but Access and Quality Assurance Measures Have Been Delayed

For the first year, TennCare essentially met its objectives of expanding coverage and controlling costs. The state had expanded eligibility to include 300,000 of the state's uninsured, yet actual program costs for the state fiscal year ending June 30, 1994, were less than budgeted. However, the operation of a key monitoring system to determine the accessibility and quality of medical care provided through TennCare has been delayed. [27]

### Cost and Control Objectives Largely Met

In January 1995, more than 400,000 uninsured persons and almost 800,000 Medicaid-eligible persons were enrolled in TennCare. The state expanded eligibility as of October 1, 1994, by allowing persons to enroll who had (1) lost private coverage from March 1993 to July 1994 or (2) insurance that offered limited coverage. However, on January 1, 1995, TennCare stopped new enrollment for most uninsured. Only persons who (1) had applications pending before January 1, 1995, or they would lose Medicaid eligibility or (2) could not obtain commercial insurance because of serious medical conditions continued to be eligible. Because of this, enrollment may decrease as the formerly uninsured leave the program and the currently uninsured are not allowed to enroll. [28]

During state fiscal year 1994, the first year in which the waiver became effective, TennCare expenditures were $2.7 billion, less than 1 percent over the prior year's Medicaid expenditures and significantly less than the 10 percent increase in national Medicaid expenditures for federal fiscal year 1994. [29] The state achieved these savings even though (1) Tennessee's regular Medicaid program remained in effect for the first 6 months of the year, (2) enrollment increased by hundreds of thousands in the last 6 months of the year, and (3) long-term care costs increased 11 percent for the year. Our analysis shows that the overall increase in expenditures was attributable to lower than expected Medicaid expenditures during the first 6 months and the introduction of a capitated payment system [30] on January 1, 1994, that paid rates far below historical Medicaid payments.

### Access and Quality of Care Uncertain

Delays in the MCOs' implementation of information systems have severely affected the state's ability to monitor enrollee

144

cost variations. [34] In addition, the report stated that the (1) capitation rates were not based on commonly accepted actuarial methods, (2) calculations had inconsistencies, and (3) bases for capitation rate reductions were not explicit or well documented. The report also estimated that since MCOs would incur administrative costs, which are not reflected in the capitation payment, they would have to significantly reduce medical costs to succeed financially.

Despite these criticisms, state officials maintain that the capitation rates were reasonable. For example, the former Assistant Commissioner in charge of the TennCare Bureau [35] indicated to us his belief that the health costs for the uninsured averaged less than those for Medicaid beneficiaries. He also stated that Medicaid had had a lot of overutilized services and that he believed the minimum savings from managed care was 15 percent. He further stated that historical cost was only one piece of information used in setting the capitation rates. The state used several factors and knowledge of the health care system to develop the rates.

While HCFA officials said that they believed that the capitation rates were low, they believed that the willingness of several MCOs to contract for the capitation rate indicated that the rates were adequate. (A detailed discussion of the TennCare capitation rates and their actuarial soundness appears in app. I.)

## MCOS Report Losses

Financial data reported by MCOs for the first year of TennCare show that 5 of the 12 MCOs, which cover 60 percent of beneficiaries, experienced losses. BlueCross BlueShield, the largest MCO, reported an $8.8 million loss. And although Access MedPLUS, the second largest MCO, reported a slight gain, its financial condition may be worse than reported. [36] In addition, the reported net income for some PPOs does not reflect the impact of capitation taxes or substantial deficits incurred for medical services costs. (A detailed discussion of MCOs' financial performances appears in app. II.)

The MCOs' reported financial conditions would have been worse except for supplemental payments, which are likely to be reduced in 1995. Without these payments, all of the HMOs would have incurred losses. The MCOs' 1994 financial statements included more than $100 million in both actual and anticipated supplemental payments [37] for (1) a supplement to capitation rates paid for 1994, (2) the first 30 days of care to formerly uninsured enrollees, and (3) adverse selection. As of May 1995, the TennCare Bureau had paid MCOs the capitation rate supplement and some payments for the first 30 days of care for the formerly uninsured. However, although one-half of the MCOs had included anticipated adverse selection payments in their 1994 financial results, the TennCare Bureau had made no such payments as of May 1995, almost 1 year and 6 months since the MCOs began participating in the program.

Only one PPO included the 1.75-percent capitation tax expense in its computation of net income, which, according to state officials, PPOs are required to pay. Officials from two of the five PPOs said that they were not aware that they were liable for the tax until they received a February 1995 notice. The additional cost of the capitation tax would reduce these PPOs' net income or the amount available to pay for medical services by approximately $4 million.

Two PPO financial reports included only the results from administrative operations and not the surplus or deficit for medical service expenses. One of these PPOs has a contractual arrangement with providers that puts them at risk for deficits resulting from excess medical costs. Officials from both PPOs indicated that their plans experienced a medical operating deficit of over $5 million representing about 7 percent of total capitation payments received by each plan. However, these medical deficits did not reduce these MCOs' net incomes. One plan established an accounts receivable of over $5 million due from providers, while the other PPO did not reflect the excess medical costs on its financial statement because officials said it was the providers' liability.

## TennCare's Financial Impact on Providers Uncertain

TennCare's financial impact on providers--hospitals, health centers, and physicians--is uncertain. Although available analyses suggest that TennCare has negatively affected providers, these analyses are not conclusive because they do not (1) compare TennCare reimbursements received with Medicaid reimbursement, (2) consider all TennCare reimbursement, or (3) provide actual financial data on which to base a conclusion. In addition, comparing physician reimbursement rates under BlueCross BlueShield, the largest TennCare MCO, and under the prior Medicaid system yields mixed results: the rates are generally lower under BlueCross BlueShield, except for office visits and consultations.

### Hospitals and Health Centers Analyses Inconclusive

Analyses conducted by the Tennessee Office of the Comptroller of the Treasury and the Tennessee Hospital Association

GAO Report on TennCare (Sep. 01, 1995)
COPYRIGHT 2003, CCH Incorporated

(THA) of hospitals' and federally qualified health centers' costs under TennCare are inconclusive. The two analyses of hospital finances indicate that hospitals incurred losses under TennCare, but neither analysis compared the TennCare experience with the hospitals' experience under Medicaid. A comparison of federally qualified health center finances under TennCare and under Medicaid showed that most of the centers' profits were reduced under TennCare, but the Comptroller's office expressed concerns about the reliability of the data submitted.

Tennessee's Comptroller's office analyzed whether TennCare payments to publicly funded, nonstate hospitals covered the cost of caring for TennCare enrollees from January 1, 1994, through June 30, 1994. [38] Even accounting for supplemental payments, 27 of 34 hospitals incurred $34 million in estimated losses by treating TennCare patients. All 34 hospitals would have reported losses, and total losses would have been much greater if the analysis had not accounted for supplemental TennCare payments. [39] THA claimed that TennCare payments did not cover hospitals' estimated costs of treating TennCare patients. [40] But this analysis did not compare TennCare hospital reimbursement with prior Medicaid reimbursement. In addition, the THA analysis did not include supplemental payments made to hospitals for caring for large numbers of TennCare and indigent persons because the payments had not been made at the time of the study. THA officials told us that hospitals subsequently received $50 million in such supplemental payments. However, this is only half of the $100 million that hospitals had expected to receive from the state.

As part of the state's waiver agreement with HCFA, the Comptroller's office reviewed cost reports from participating federally qualified health centers for the first 6 months of TennCare and concluded that, "it appears the clinics are not performing as well under TennCare compared to Medicaid." However, the Comptroller's office said that its analysis was not conclusive because it could not be sure that changes in costs were caused solely by TennCare nor that health centers accurately reported revenues, particularly pending payments. Our review of the Comptroller summary of the health centers' data shows that although 14 of 20 health centers had reduced total clinic profits during the TennCare period, only 3 reported an overall loss.

## Physicians Report Their Practices are Financially Worse Off Under TennCare

An opinion survey conducted by the TMA in October 1994 found that, compared with Medicaid, more than three-quarters of the physicians reported that their practices were somewhat or much worse off financially under TennCare. [41] Because the TMA survey was an opinion survey, it does not provide financial data on physicians' TennCare and Medicaid experiences. Further, a TMA official said that the physicians' financial situations may be worse than the survey reported because the physicians may have included in their assessments supplemental payments from the TennCare Bureau that had not been received as promised. In addition, physicians may have expected MCOs to return withheld reimbursements for 1994, but much of these have not been returned.

At the time of the survey, no supplemental TennCare payments had been made to the physicians, and withholds of physician reimbursement by the largest MCO had not been settled. The TennCare Bureau accrued $15 million in supplemental funds for payments to physicians for January to June 1994 but had not made any payments. As of March 1995, payments had still not been made. For state fiscal year 1995, $15 million has again been budgeted for supplemental physician payments.

At least six MCOs withhold part of their physician reimbursements, ranging from 5 to 25 percent. We talked to two MCOs that used such withholds to offset excess costs, as necessary. According to their physician contracts, these MCOs assess their plan's performance for the year and decide how much of the withhold to return, if any. BlueCross BlueShield had a 5-percent withhold on physician reimbursement and kept the entire amount for most of the providers. John Deere has a withhold of up to 25 percent of physician reimbursement and paid back approximately one-fourth of the withheld funds and may make further distributions.

## Comparing Bluecross Blueshield TennCare Physician Reimbursement Rates With Medicaid is Inconclusive

A TMA physician survey indicated that the reimbursement levels offered under TennCare had the most negative impact on physician practices. A comparison of BlueCross BlueShield TennCare reimbursements for selected services to Medicaid reimbursements shows that TennCare rates are generally lower than Medicaid rates, except for visits and consultations.

In comparing selected BlueCross BlueShield TennCare rates to Medicaid rates, BlueCross BlueShield pays at least slightly better for visits and consultations and significantly less for other services. For example, BlueCross BlueShield reimbursement rates for office, inpatient, and outpatient visits and consultations are higher than Medicaid rates; however, BlueCross BlueShield rates for other selected surgery and radiology services are significantly less than Medicaid rates, with differences for many services ranging from 20 to 50 percent less than Medicaid rates. The impact on a particular physician practice depends on the frequency and type of services provided.

147

COPYRIGHT 2003, CCH Incorporated

## TennCare's MCO and Provider Networks Threatened

The success of TennCare will also depend on the continued participation of the MCOs and providers for the duration of the 5-year demonstration. MCO officials are hesitant about continuing to participate in TennCare, given their financial performance in the first year; and providers--disconcerted about low reimbursement rates, heavy administrative burdens, payment delays, and lack of involvement in developing TennCare--could withdraw in large numbers.

### Continued MCO Participation Uncertain

Although all participating MCOs have renewed their contracts for state fiscal year 1996, concerns remain. We talked to officials from three MCOs about TennCare's future, and they expressed several concerns about operating without supplemental TennCare revenues, compensating for 1994 operations shortfalls, and maintaining an adequate provider network.

The TennCare Bureau budgeted less for MCO supplemental payments for 1995 than were paid and accrued for 1994. In 1994, TennCare supplemental payments designated for MCOs totaled $128 million. However, only $76 million had been paid as of May 1995, although the TennCare Bureau says it will make additional payments. For 1995, the TennCare Bureau has designated only $40 million in supplemental payments to MCOs and plans a 5-percent increase in capitation payments effective July 1, 1995. [42]

BlueCross BlueShield officials told us that they incurred a loss of $8.8 million in 1994, and they forecast a loss of $35 million for their 1995 TennCare operations, even though they plan to implement cost-control measures during the year. BlueCross BlueShield's projected deficit increase reflects expected reduced supplemental payments from the TennCare Bureau and higher utilization, which officials believe was low in 1994 due to the initial confusion over TennCare. To control costs, BlueCross BlueShield plans to (1) retain reimbursement rates at initial 1994 levels, (2) increase the percentage withheld from providers in some areas of the state, (3) control utilization by emphasizing outpatient visits over hospital admissions, and (4) aggressively address billing of unnecessary services.

BlueCross BlueShield officials have indicated that the company does not intend to continue to lose money. They have said that unless capitation rates are increased 10 percent retroactively to January 1, 1995, BlueCross BlueShield will face a decision about its participation. Since BlueCross BlueShield had enrolled nearly 50 percent of the beneficiaries and is one of only two statewide MCOs, changes in its participation could significantly affect TennCare.

Officials from two other MCOs that are holding providers responsible for their plans' 1994 medical services operating deficits expressed uncertainty about whether these deficits can be recouped. Officials said that efforts to reduce provider reimbursement would jeopardize their providers' continued participation. An official from one MCO said that if cost-containment efforts fail, the MCO will simply make payments until it can no longer do so.

### Continued Provider Participation Also Uncertain

In early 1995, officials from THA, as well as from several major hospitals, expressed concern because the TennCare Bureau had announced that hospitals would not receive supplemental payments in 1995. Supplemental payments to hospitals for graduate medical education, care for TennCare eligible but not enrolled persons, and special payments to hospitals that cared for large numbers of TennCare and indigent persons totaled approximately $220 million for 1994. Subsequently, on the basis of a June 27, 1995, agreement with HCFA, the TennCare Bureau announced that it intends to make $55 million in one-time payments to two hospitals [43] and resume medical education payments to hospitals.

In addition to low reimbursement rates, other MCO actions may affect physician participation. For example, at least two other MCOs did not return all withholds to physicians on reimbursements for the first year of operation, and at least two MCOs held physicians liable for medical services deficits. As MCOs try to further control and contain costs, their network providers may assume additional administrative burdens as well as reduced reimbursement. These pressures will add to the dissatisfaction that providers already have with the program. An October 1994 TMA satisfaction survey of TennCare physicians reported that 86 percent of respondents felt dissatisfied with the program, and 77 percent felt that TennCare reimbursement was worse than under Medicaid.

Physician dissatisfaction was evident from TennCare's inception, when many doctors reported feeling coerced to participate. To guarantee a sufficient network, BlueCross BlueShield implemented a policy requiring physicians who participated in an existing network that operated for state employees and others to participate in TennCare. The policy, which became known as

148

GAO Report on TennCare, (Sep 01, 1995)
COPYRIGHT 2003, CCH Incorporated

the "cram down" provision, prompted about a third of the 6,500 physicians in the existing network to drop out. Although most physicians returned to the network, their dissatisfaction with the cram down policy has persisted, and stakeholders and policymakers continually discuss eliminating it. If the policy were eliminated, BlueCross BlueShield officials believe many network providers might choose to stop treating TennCare patients.

## Conclusions

Tennessee's capitated managed care program has enabled the state to control costs and provide health care coverage to hundreds of thousands of uninsured persons. In addition, it has established a system that enables persons who lose their Medicaid eligibility to keep health care coverage. But serious questions exist about the program's future. The quality and accessibility of medical care are largely unknown, but early indications are that quality and access could be improved.

Moreover, the rates paid to MCOs were substantially below prior Medicaid per beneficiary costs. Overall, MCOs lost money in the first year, even after receiving substantial one-time supplemental payments. In the absence of these supplements, MCOs may need to cut payment rates for providers and/or pressure providers to hold down costs to remain in the program.

Most providers have already indicated that their financial situations are worse off under TennCare than they were under Medicaid. MCO cost-control efforts and the termination of large supplemental payments to hospitals will only exacerbate their condition. If providers decide to reduce their TennCare participation or leave the program in significant numbers, the viability of the MCOs and TennCare could be threatened.

## Agency Comments

### Recent State Efforts

Both HCFA and the TennCare Bureau said that recent actions by the new state administration to address some of the problems we identified should be included in our report. We recognize that the organizational change regarding MCO financial oversight, forums for discussion and input provided by the TennCare Roundtable,[44] and the proposed plan to provide MCO performance-based incentive payments of up to 4.5 percent of the capitation payments are potentially significant. However, because of the recency of the changes, their impact on the problems we identify is uncertain at this time.

### MCOS' Renewals

HCFA and the TennCare Bureau also pointed out that MCOs have renewed their contracts to participate in TennCare for at least the next 12 months. As a result, the TennCare Bureau said that our concern about the uncertainty of continued MCO participation is inconsistent with the MCOs' behavior. Our concern is that MCOs continue to participate for the duration of the 5-year demonstration project and that MCOs' financial difficulties not threaten TennCare enrollees' access to and quality of care. On the basis of our review of MCO financial information, discussions with MCO officials, and the uncertainty of supplemental funding from the TennCare Bureau, we remain concerned about the continued participation of MCOs and their ability to maintain adequate provider networks.

### MCO Start-Up Costs

The TennCare Bureau also wanted our report to recognize that MCOs incurred start-up costs during the first year, writing that "the profits and losses in any business situation during the first year do not typically reflect what may result during ongoing operations." Although we recognize that start-up costs were incurred and that they do contribute to reduced profits or increased losses for the year, other factors should be considered. First, MCOs shared in an unexpected $54 million in additional capitation supplements for 1994 to address MCO financial difficulties, as well as additional payments of more than $20 million for the first 30 days of care provided to the uninsured. Similar payments are not planned in the future. Second, start-up costs were offset to some extent by lower utilization resulting from beneficiary and provider confusion during the first few months. Third, system development and start-up-like costs will continue to be incurred by some MCOs; for example, BlueCross BlueShield officials said that they will incur an additional cost in 1995 to purchase an HMO information system to operate as a gatekeeper. Fourth, MCO officials we talked to expected to experience financial difficulty in the second year, both because of the medical costs they expect to incur and reduced supplemental TennCare funding they expect to receive so they saw the need to act to mitigate future losses.

### Federal Cost Sharing

On the issue of cost sharing, HCFA officials reiterated several times that HCFA has not changed the federal matching rate in

149

Case 1:06-cv-00549-RJL   Document 10-2   Filed 06/22/2006   Page 155 of 212

COPYRIGHT 2003, CCH Incorporated

the TennCare demonstration. We agree with HCFA that the federal matching rate applied to qualifying TennCare expenditures has not changed. However, a number of waiver provisions effectively increased the federal cost-sharing rate by reducing the net financial contribution required of the state. In particular, certain hospital losses are treated as qualifying TennCare expenditures, although the state does not pay the hospitals for those losses. The state can also recoup a share of both its and the federal government's contribution to MCO capitation payments through a tax on the capitation payment and by retaining 90 percent of premium collections. How such arrangements can effectively increase federal cost sharing is fully described in Medicaid: States Use Illusory Approaches to Shift Program Costs to the Federal Government (GAO/HEHS-94-133, Aug. 1, 1994).

**Quality Assurance Programs**

HCFA officials described the difficulties of the state staff and MCOs due to their lack of experience and having to simultaneously address their financial and organizational problems. HCFA officials also said that the state is working with an external organization to help fully implement quality programs at the MCOs. HCFA indicated that the state's progress in implementing its quality assurance monitoring plan is slow and that HCFA is requiring the state to develop interim monitoring strategies to ensure access and quality. We agree with HCFA's assessment and attribute the magnitude of these problems to inadequate planning and TennCare's rapid implementation. (See apps. IV and V for comment letters from HCFA and the TennCare Bureau, respectively.)

As arranged with your office, unless you announce its contents earlier, we plan no further distribution of this report until 30 days after the date of this letter. At that time, we will send copies to the Secretary of Health and Human Services, Tennessee officials, and the chairmen and ranking minority members of congressional committees with an interest in these matters. We will make copies available to others on request.

Please contact me on (202) 512-7123 if you or your staff have any questions. Major contributors to this report are listed in appendix VI.

Sincerely yours,

William J. Scanlon

Associate Director, Health Financing and Public Health Issues

**Appendix I**

**Tennessee's Methodology for Setting Capitation Rates and Concerns About the Methodology**

To control its health care costs, TennCare makes monthly capitation payments to MCOs for each of their enrollees. The state's methodology for setting the capitation rates, however, has raised some concerns. For example, consultants to the state legislature reported that the aggregate capitation was understated by more than 25 percent.

The capitation rates are based on historical Medicaid costs and set by enrollee type; the rates are then reduced by charity care deductions and enrollee cost sharing. Before the capitation rates were established, consultants to Tennessee's Bureau of Medicaid reviewed the state's historical Medicaid cost information. Although the consultants found this information to be generally acceptable, they recommended that the capitation rates (1) reflect historical costs for eligible months and (2) account for regional cost variations. The TennCare Bureau did not follow either recommendation.

After the capitation rates were established, consultants to the state legislature reviewed the state's rate-setting methodology and found it actuarially unsound. As a result, the consultants recommended that capitation rates be increased 20 percent, even when allowing for cost savings from potential utilization reductions.

**Establishment of Capitation Rates**

To set monthly capitation rates, Tennessee used 1992 Medicaid costs projected to 1994 for each enrollee type. These rates were then reduced for charity care, local government funding, and enrollee cost-sharing adjustments. The state also calculated an overall average capitation rate used for budgeting purposes and not for paying MCOs. The overall average rate for 1994 was $136.75 a month. After a reduction of $35.65 for charity care, local government expenditures, and coinsurance and deductibles, the rate was $101.10. Effective July 1, 1994, the TennCare Bureau increased capitation rates 5 percent.

Tennessee set rates for eight categories of eligibles determined by factors such as age, gender, and whether the enrollee has a

150

COPYRIGHT 2003, CCH Incorporated

disability. Deductions to the capitation rates are based on various assumptions about charity care, local government funding, and medical costs incurred by the uninsured.

The charity care deduction--meant to capture approximately one-half of the estimated cost of charity care provided in the state--was estimated at $595 million annually. [45] The state assumed that Medicaid and other payers had been paying for charity care when medical providers shifted charity care costs to others. Because coverage of the uninsured would reduce charity care, the state reduced the capitation rate accordingly. On average, a monthly charity care deduction of $27.96 was applied to each monthly capitation rate on the basis of the state's estimated upper limit of the total number of Medicaid and uninsured people.

The deduction for local government funding--meant to capture an amount equal to the local government funding that would be expected to be provided without TennCare--was estimated at $50 million annually. On average, a local government deduction of $2.35 was applied to each monthly capitation on the basis of the state's estimated upper limit of the total number of Medicaid and uninsured people.

The third deduction, for copayments and deductibles, applies only for non-Medicaid eligible TennCare enrollees with incomes above the federal poverty level and is computed on an individual basis. For budget purposes, the state computed an average deductible and copayment deduction equal to $5.35 monthly. In calculating these deductions, the state assumes that everyone will exhaust their deductible and make copayments. For example, the monthly capitation rate for a non-Medicaid TennCare enrollee with income above the federal poverty level would be reduced for one-twelfth of the annual deductible and up to an additional 10 percent of the reduced capitation to account for expected copayments. Enrollees subject to cost sharing are required to pay the deductible and copayments to MCOs or providers as they incur medical costs.

**Validity of Capitation Rates Questioned**

In May 1993, Peat Marwick, as consultants to the state's Bureau of Medicaid, reviewed the historical Medicaid cost information on which the Bureau planned to base its capitation rates. Peat Marwick found that the data underlying the state's cost projections were sound, except for an understatement of incurred claims. [46] However, it made several recommendations on factors to include in setting rates. Among the recommendations was that claims data should be used to set monthly rates on the basis of eligible months rather than the number of eligibles participating in Medicaid for some period during the year. Peat Marwick also recommended that regional capitation rates be established. The state did recompute the capitation rates, but it used total number of eligibles to establish an annual cost regardless of eligible months, and it did not establish regional rates.

When TennCare's capitation rates were announced about 3 months after the Peat Marwick review, concerns were raised. To address these concerns, the Legislative Oversight Committee on TennCare [47] contracted Milliman and Robertson, Inc. (in conjunction with Schubert & Associates) to review the TennCare Bureau's capitation rate-setting methodology.

In its November 1993 report, Milliman and Robertson stated that in the aggregate, the capitation rates were about 25 percent below projected 1994 fee-for-service Medicaid costs. Further, since MCOs would incur administrative costs not reflected in the capitation payment, Milliman and Robertson estimated that MCOs would have to significantly reduce medical costs to succeed financially. In addition, Milliman and Robertson agreed with Peat Marwick's recommendation that rates should address regional variation and said that the variations were too significant to be ignored. According to Milliman and Robertson, the state's analysis showed that costs by region were as low as 83 percent and as high as 122 percent of statewide average costs.

The report made several conclusions: (1) the gross capitation rates were not based on commonly accepted actuarial methods, (2) inconsistencies existed between the Bureau's reported methodology and the actual calculations, (3) no explicit assumptions existed on cost reductions in the gross capitation rate development, and (4) capitation rate reductions were not well documented.

Milliman and Robertson found that the gross capitation rates were not based on commonly accepted actuarial methods because the state used the total number of people who received Medicaid during the year regardless of length of time on the program to determine capitation rates and ignored Medicaid cost variations by area. The state's computation of capitation rates, in effect, assumed that every Medicaid recipient in 1992 was covered for the entire 12 months. Milliman and Robertson calculated that on average, Medicaid recipients were only enrolled for 8.72 months during 1992, which understated the aggregate capitation by 26.2 percent. Also, the state projected 1994 fee-for-service 1992 data, on the basis of a 5.5 percent annual inflation rate. [48] However, the state may have understated actual inflation increases since it had provided information in its TennCare application that showed an average annual increase of 8.7 percent from fiscal years 1988-1989 to 1991-1992.

In addition, Milliman and Robertson said that the average gross capitation rate that TennCare used for budget purposes overstated the actual rates paid by eligibility category. This was due to an error in how Tennessee weighted the eligibility

151

categories. In calculating each of the eight capitation rates, the state counted people equally regardless of how many months they had been in the program and whether they were in more than one capitation category. For example, a 9-month-old child qualifying for Medicaid halfway through the calendar year would be counted in determining the capitation rate for each of two categories—"less than one year of age" and "aged 1 to 13"—even though the child would have been in each category for only a few months. This understates the per capita costs because the child is treated, in effect, as having received services for an entire year in each capitation category. Milliman and Robertson calculated that the gross capitation rates by eligibility category were about 6.2 percent too low to achieve the TennCare Bureau's reported average gross capitation rate because of this error.

Milliman and Robertson also reported that no explicit assumptions existed about cost savings under TennCare. They said that the state's utilization data indicated the potential for significant utilization reductions. Given this and other states' experiences, Milliman and Robertson said that a 10-percent reduction for 1994 would have been appropriate to apply to otherwise actuarially sound rates. Even when allowing for the utilization cost reduction, Milliman and Robertson said that an overall increase of 20 percent was still needed to address problems in the rate-setting methodology.

Further, Milliman and Robertson noted that the Bureau did not provide them with the necessary information to evaluate the capitation reductions for charity care, local government funding, and enrollee cost-sharing adjustments. They also said that the data available to them suggested that the deductible reductions were too high because they are based on the assumption that all enrollees would incur costs exceeding the deductible.

## Appendix II

### Financial Performance of TennCare's MCOS

The overall financial performance of the five PPOs and seven HMOs that TennCare contracted with appears to have been weak for the first year of participation. According to its financial analysis, [49] BlueCross BlueShield, the largest TennCare MCO, with almost half of the state's TennCare enrollees, estimated that its losses on TennCare revenues total almost $9 million. These losses could be more than twice that amount if incurred claims expenses have been underestimated—even though the MCO withheld payments from providers and limited its administrative costs. The financial condition of Access MedPLUS, the second largest TennCare MCO, with nearly a quarter of the state's TennCare enrollees, is unknown, but examiners of the HMO's records have discovered weak controls in its financial reporting and have questioned its financial viability.

For our review, we used the annual financial reports that HMOs submitted to the Tennessee Department of Commerce and Insurance, and we obtained financial reports from participating PPOs. Four PPOs provided us with unaudited information, and one PPO, BlueCross BlueShield, provided us with an audited report, although it contained little specific information on its TennCare operations and additional financial analyses.

### BlueCross BlueShield Reported Losses for the First Year of TennCare

BlueCross BlueShield, the state's largest PPO, [50] estimated that it lost about $8.8 million on TennCare revenues of about $610 million even though it (1) retained about $17 million that it had withheld from providers to cover losses and (2) limited administrative costs to 7 percent of premiums plus the $9 million in premium taxes it paid. According to BlueCross BlueShield officials, the loss could be as much as $18.8 million if incurred claims expenses have been underestimated. In calculating its loss, BlueCross BlueShield included received and anticipated supplements to the capitation rate of $45.9 million. These consisted of a retroactive premium increase payment of $23.8 million, anticipated adverse selection payments of $9 million, and anticipated payments of $3 million for the first 30 days of care for formerly uninsured enrollees, as well as $10.1 million that had already been received for the first 30 days of care.

### Other PPOS' Financial Reports Raise Concerns

Most of the data provided to us by the other four PPOs were unaudited or informally produced, and differences in their reporting methods preclude combining their results in a meaningful way.

One PPO's unaudited financial statements did not include income or expenses related to medical costs. Its income statement, which showed a net income of about $93,000, was limited to administrative costs because PPOs are not considered at risk for medical costs. The PPO's financial statements only record the liabilities for medical services equal to the amount of available funds. A PPO official told us that approximately $5 million in excess medical services liabilities is not recorded because this is the medical providers' liability. On the basis of discussions with a PPO official, the medical deficit could be reduced to less than $3 million if the PPO receives estimated adverse selection payments and additional payments for the first 30 days of care

152

provided to uninsured enrollees. The PPO plans to recover the deficit through utilization reduction efforts during 1995; according to the official, providers would leave the network if the PPO reduced its fees.

Officials from another PPO provided us with unaudited financial statements that showed a $77,212 loss for 1994, which did not account for the 1.75 percent state tax on capitation payments. However, the PPO's deficit would have been $5.3 million higher had it not established a $5.3 million accounts receivable item for provider-shared risk. This item, which equals about 7 percent of the capitation payments received from the state, represents the amount of operating deficit to be recovered from future provider reimbursements. Officials from the first PPO gave several examples of plans to contain costs, but they were uncertain what impact their efforts would have. Officials from both PPOs expressed concern about maintaining their provider network.

A third PPO reported a loss of over $2 million. However, according to the PPO TennCare contract, PPOs must account for their administrative and medical operations separately. Using the PPO's unaudited financial statements, we computed that the PPO incurred about a $3 million loss, after taxes, even though it realized a gain of $1 million on its medical operations—of which 90 percent would have to be returned to the state and 5 percent distributed to providers, according to the contract provisions.

## HMOs' Reported Earnings Mixed

Table II.1 shows the reported earnings for the first year of TennCare for the seven HMOs.

### Table II.1: First-Year Earnings for Seven TennCare HMOs

| HMO | Net income | Enrollees [a] |
|---|---|---|
| Access MedPLUS ................................... | $66,127 | 286,639 |
| John Deere Health Care/Heritage National Health Plan .............................................. | 0 [b] | 17,155 |
| TLC Family Care Health Plan ...................... | 391,305 | 35,421 |
| Phoenix Healthcare ............................... | 794,433 | 34,821 |
| Prudential Community Care ........................ | 94,743 [c] | 7,989 |
| Total Health Plus ................................ | (1,016,839) | 6,316 |
| VHP Community Care ............................... | ($4,301,614) | 12,558 |

[a] TennCare enrollment as reported by the state as of May 12, 1995.

[b] Both John Deere and Prudential reported for their overall health care organizations rather than only for their TennCare plans. An official of John Deere Health Care, which reported earnings of $3.8 million on its Heritage National Health Plan of Tennessee, told us that it broke even on its TennCare plan.

[c] The Prudential Health Care Plan reported a net income of $25,497,539 for all its health care plans. Information provided to us by a Prudential official showed that it earned $94,743 from its TennCare operations after receipt of a supplemental capitation payment.

## Adequacy of Reserves Questioned for Three HMOs

Reports reviewed by the Department of Commerce and Insurance for the quarterly period ending June 30, 1994, indicated problems with the adequacy of reserves for three HMOs. The problem was eliminated for one HMO and largely eliminated for another when the Commissioner of Finance and Administration assured the Commissioner of Commerce and Insurance that the state would make adverse selection payments that would address the reserves question. However, financial problems of the third HMO—Access MedPLUS, which is one of the two statewide MCOs serving TennCare beneficiaries and about 2.3 times the size of all other HMOs combined—may not have been resolved. [51]

Examiners for the Department of Commerce and Insurance have raised questions about Access MedPLUS' financial viability. [52] They reported that a major asset—advance payments to medical providers—on the MCO's financial statements,

COPYRIGHT 2003, CCH Incorporated

representing about half of Access MedPLUS assets, was questionable. They also could not reconcile the data in the financial statements to the MCO's general ledger and noted that the MCO did not appear to have sufficient management and accounting controls to ensure that funds were available to pay claims. They recommended that the MCO be placed under the supervision of the Department of Commerce and Insurance.

Further efforts to determine the financial performance of Access MedPLUS have been problematic. According to Department of Commerce and Insurance records, a Deloitte & Touche LLP review of the MCO, contracted through the state, included determining (1) claims processing ability, (2) amounts owed to providers, and (3) solvency or the degree of insolvency. We sought the results of this review, but the State Attorney General's office would not release the report without a subpoena, maintaining that the documents are confidential in accordance with state law and that the report and its confidentiality were the subject of pending litigation. To avoid the delay and expense that could result from issuing and enforcing a subpoena, we decided not to use GAO's statutory authority to subpoena such records and to proceed without them.

State officials subsequently advised us that they were committed to ensuring that MCOs are in full compliance with all statutory and contractual requirements mandated by their participation in the TennCare program. They stated that if any MCO is found not in compliance, the state will either act to bring the MCO into compliance or pursue other remedies to protect TennCare. They noted that, at this point, the state has taken no action to place Access MedPLUS under supervision.

## Appendix III

### Start-Up Problems

Less than 7 months after submitting its waiver application to HCFA, Tennessee placed its entire Medicaid population in a statewide prepaid managed care program and opened enrollment to the uninsured. Before TennCare, the state Medicaid program had little capitated managed care experience nor a model to follow since Tennessee was the first state to place its Medicaid population into such a program. Rapid program implementation and lack of managed care experience led to several problems, such as confusion among enrollees, providers, and MCOs; provider resistance; and delays in enrollment, claims processing, and premium payments.

Although many of these problems have been addressed to some degree, the Assistant Commissioner in charge of the TennCare Bureau testified in March 1995 that TennCare continues to experience several problems as does any program in its "infancy."

### Limited Managed Care Experience Led to Confusion Among MCOS, Beneficiaries, and Providers

TennCare introduced a prepaid, capitated system, in which the TennCare Bureau makes monthly payments to MCOs for enrollee care, and the Bureau assumes responsibility for MCO oversight. The state Medicaid program had primarily operated a fee-for-service reimbursement system. As a result, state staff were inexperienced with the characteristics and complexities of MCOs, and the state's relationship with physicians and hospitals changed dramatically under TennCare. Despite this lack of experience and the magnitude of these changes, Tennessee began operating its statewide program within 9 months of announcing it.

According to TennCare Bureau officials, they met with parties interested in contracting as TennCare MCOs beginning in the summer of 1993. However, interested parties did not enter into TennCare contracts until late November, little more than a month before actual enrollment was to begin. Of the 12 contracted MCOs, only 1 had experience serving the Medicaid population before TennCare, and most of the MCOs developed their TennCare products in response to TennCare. This inexperience caused confusion for the contracted MCOs as well as TennCare beneficiaries and participating providers. TennCare reported that after program start-up, the state's hotline averaged 50,000 calls a day, from beneficiaries, MCOs, and providers—compared with 9,000 calls a day in the following quarter. For all parties involved, the transition to TennCare was "traumatic," according to a National Association of Public Hospitals (NAPH) report in April 1994. [53]

The state reported general start-up problems for MCOs, such as inability to handle the large volume of enrollee calls, adjusting to the increased enrollment, and claims processing problems. According to the NAPH report, the MCOs were unprepared to assume many of the contractual responsibilities for TennCare. One MCO's enrollment grew overnight from 35,000 to over 260,000, and officials from the MCO reported receiving 2,000 calls each hour in the first days of implementation. In addition, HCFA Region IV's 1994 Monitoring Report found that during the first months of TennCare, multiple changes to enrollment and eligibility—some retroactive—further burdened the MCOs. The president of one MCO said that enrollment changed by over a third in 1 week. Officials from the MCOs we visited found that verifying participant enrollment was nearly impossible in the first months of the program.

154

## Providers Take Action Against TennCare

In December 1993, the Tennessee Medical Association (TMA) filed an injunction to stop TennCare's implementation. The court dismissed the case, but TMA appealed the ruling. TMA opposed TennCare in part because it had been implemented without opportunity for public comment on its development and payment rates for providers were inadequate. TMA also opposed BlueCross BlueShield's "cram down" provision, which required physicians who participated in a network that operated for state employees and others to participate in TennCare. The provision prompted about a third of the 6,500 providers in the network to drop out in the early months of TennCare and providers in some parts of the state, particularly rural Western Tennessee, to boycott the program. The state, however, characterized initial problems with provider participation as the providers' unwillingness to accept change.

## Poor Communication and Outreach Led to Delays in Enrollment

Several start-up problems have been attributed to poor communication and outreach, which affected providers and TennCare beneficiaries alike. HCFA reported that (1) provider directories were not available to enrollees, (2) information on operational guidelines for the general Medicaid population was insufficient, and (3) notifications of MCO enrollment were delayed. As a result, beneficiaries were confused about the number and type of plans and the available providers, and some families signed up with more than one MCO, exacerbating difficulties in managing enrollment. Some beneficiaries were further frustrated when they found that their primary care physicians were not participating in TennCare. A TMA satisfaction survey of physicians in October 1994 reported lack of patient understanding of TennCare as a major problem and recommended better efforts by MCOs to educate and manage patients. In its 1994 monitoring report, HCFA recommended expanding education and outreach efforts to raise awareness of the availability of services and the method of obtaining these services as well as frequent mailings to enrollees to explain benefits and services.

Delays in signing providers with MCO networks and assigning patients to primary care providers also presented several problems. To complicate matters, providers—like the MCOs—had difficulty in obtaining information on patient eligibility and identifying with which TennCare MCO a patient was enrolled. Providers we talked to reported problems getting through by phone to the state and MCOs to verify patient information. As a result, providers needed to hire additional staff to manage the increased administrative burden in dealing with more than one MCO.

## Claims Processing and Premium Payments Delayed

Delays in claims processing and collecting premium payments have been a problem. According to the state, MCOs had difficulty fully developing their claims processing systems. For example, Access MedPLUS initially was processing claims manually, which delayed provider reimbursement. In addition, state external review organization reports from July to November 1994 reported that 5 of the 12 MCOs exceeded the state 30-day requirement to process claims. The largest discrepancy reported was a 76-day average from receipt of claim to the payment date.

The state initially estimated that it would collect premiums from qualifying uninsured people of about $21 million during the first 6 months of TennCare; however, it collected only $2.4 million. Over the next 12 months (state fiscal year 1995), TennCare initially estimated collections of $101 million and subsequently reduced this estimate to $30 million. However, as of March 1995, with less than 4 months left in the state fiscal year, only $10 million had been collected.

These collection shortfalls were due in part to the state's delay in establishing its premium billing process. Although enrollment of uninsured people began in January 1994, the initial billings were not mailed until June 1994. In addition, enrollees were given two alternatives to reduce the burden of paying the full accumulated premiums for the prior months: (1) pay reduced premiums by retroactively changing from a low cost-sharing plan to a cost-sharing plan with a higher deductible and higher total out-of-pocket liability or (2) pay no premiums by changing their effective enrollment dates to June 1, 1994. Enrollees were to receive premium booklets and begin scheduled monthly payments in July 1994. However, the state contractor failed to mail some of the booklets, and this error was not discovered until November 1994. In February 1995, the TennCare Bureau sent letters to nearly 60,000 TennCare households notifying them of past due premiums totaling $31 million. As of June 1995, a TennCare Bureau official said it had terminated TennCare coverage of approximately 62,000 people for not paying premiums. In addition, 17,000 family units are now on a payment plan to pay past due premiums.

[Appendices IV, V, and VI not reproduced by CCH.]

[1] The freedom-of-choice requirement allows Medicaid beneficiaries to choose any provider willing to accept Medicaid

**155**

COPYRIGHT 2003, CCH Incorporated

reimbursement. The 75-25 requirement specifies that the patient load of health maintenance organizations (HMO) serving Medicaid beneficiaries be more than 25 percent private patients.

[2] States may also obtain waivers of the freedom-of-choice requirement and establish managed care programs under section 1915(b) of the Social Security Act. However, significantly more flexibility is available under section 1115.

[3] Arizona has operated its Medicaid program under a statewide 1115 waiver since 1982; however, it did not have a Medicaid program before the waiver.

[4] Until 1995, the TennCare Bureau was part of the Tennessee Department of Health. It is now under the Department of Finance and Administration.

[5] According to the TennCare Bureau this date was chosen to avoid employers' dropping their health plans in favor of TennCare, which was announced in April 1993.

[6] As of October 1994, the TennCare Bureau allowed people to enroll in the program as "uninsured" if they did not have health insurance available to them on or after July 1, 1994. However, enrollment of additional uninsureds was severely curtailed as of January 1, 1995.

[7] In its application, Tennessee stated that recent studies showed that it had approximately 392,000 to 775,000 uninsured residents.

[8] Capitation payments to MCOs for the uninsured are reduced on the assumption that the MCOs will collect the deductibles and copayments. However, at least two MCOs waived the requirement due to the difficulty of collecting the deductibles and copayments.

[9] As of December 31, 1994, over 500,000 Medicaid-eligible enrollees in particular eligibility categories had been guaranteed 12 months of TennCare eligibility due to this change.

[10] On July 17, 1995, HCFA approved a Tennessee proposal to use only the high chronic condition payment methodology and not the higher than average utilization rates in determining adverse selection payments to MCOs.

[11] Tennessee has designated an unallocated fund pool equaling the difference between the capitation payments required if TennCare reached its total enrollment cap and the actual capitation payments made.

[12] The Children's Plan is a total care program that addresses the needs of children in state custody or at risk of being in state custody. The state covers special services for this population, such as case management and therapeutic intervention, and MCOs cover basic medical services. Special services to severely and persistently mentally ill enrollees include both inpatient and outpatient mental health services.

[13] PPOs' administrative fees cannot exceed 10 percent of their total TennCare revenues. The TennCare Bureau requires that any savings on overall PPO operations be shared: 5 percent with the PPO, 5 percent with the medical providers, and 90 percent with the TennCare Bureau. The TennCare Bureau does not share in MCO losses.

[14] The state's methodology in setting capitation rates by using average annual cost per Medicaid eligible rather than average costs during participating months understates the historical cost of Medicaid. See appendix I for a complete discussion.

[15] Tennessee's state fiscal year runs from July 1 to June 30. For example, state fiscal year 1993 runs from July 1, 1992, through June 30, 1993.

[16] After TennCare enrollment began, the Primary Care Provider Fund terminology was no longer used. Supplemental payment components, methodology, and amounts have continued to change during the program.

[17] To determine the expenditure estimate, HCFA multiplied the prior year's expenditures by the average percentage

COPYRIGHT 2003, CCH Incorporated

expenditure growth over the prior 5 years, separately for the medical component and administrative component, then added in the prior year's DSH spending.

[18] We obtained these results by comparing the ceiling on expenditures under the demonstration with the administration's "current services" estimate for the year in which TennCare was approved. The current services estimate is the projected amount of federal and state spending necessary to maintain the current level of Medicaid services.

[19] HCFA agreed that the state could claim unreimbursed TennCare expenditures for private hospitals in the Knoxville and Nashville areas, up to the amount of indigent care funds that the counties transfer to these hospitals for such expenditures.

[20] State officials have also claimed $22 million for the first 6 months of 1994 in local government funding of three hospitals as TennCare expenses, which would draw $15 million in federal cost-sharing funds. However, HCFA deferred federal funding for the claim, asserting that local government funding is not a TennCare expense because it would, in effect, be a duplicate claim. The state subsequently agreed to withdraw its claim.

[21] See appendix III for more detailed information on premium collections.

[22] Coverage is limited to the first 30 days of an inpatient episode, subject to an annual aggregate limit of 60 days.

[23] Although a Tennessee Department of Mental Health and Retardation official said that the majority of residents in state mental institutions are between the ages of 21 and 65, the funds transfer also accounts for savings resulting from federal cost sharing for state mental hospital services for uninsured and uninsurable TennCare enrollees aged 21 and younger and 65 and older.

[24] Tennessee Comprehensive Health Insurance Program is a state insurance program for the uninsurable, who are automatically eligible for TennCare.

[25] The state legislation that made TennCare MCOs subject to the requirements of accident and health insurers was effective on May 2, 1994. However, a state official told us that PPOs are liable for the tax for the entire calendar year 1994.

[26] According to the Deputy Commissioner, Tennessee Department of Commerce and Insurance, PPOs paid the taxes under protest and may file a suit against the state.

[27] See appendix III for a discussion of start-up problems that affected the implementation of the monitoring system.

[28] Although the formerly uninsured may leave the program for many reasons, the TennCare Bureau reported that it had terminated TennCare coverage of approximately 62,000 people as of June 1995 for failure to pay premiums. See appendix III for more information on the state's collection of premiums.

[29] Tennessee's reported expenditures for federal fiscal year, October 1, 1993, to September 30, 1994, were also less than 1 percent greater than the previous federal fiscal year's.

[30] From January through June 1994, the TennCare Bureau paid or accrued about $620 million in basic capitated payments to MCOs and about $250 million for supplemental payments to MCOs, hospitals, and physicians.

[31] In the TennCare Bureau's response to a draft of this report, it said that, as of June 1995, the 1994 encounter data are now available to TennCare staff to perform quality assurance reviews. It noted that it has problems with some of the data.

[32] We used the responses for the head of household. The survey sometimes also asked the same questions for the youngest child and the child most in need of medical attention.

[33] The 30-minute travel requirement was not met for the youngest child and the child most in need of medical attention; the survey reported 31 minutes and 35 minutes, respectively.

[34] According to Milliman and Robertson, Inc., the state reported regional cost variations ranging from 83 to 122 percent of

**157**

COPYRIGHT 2003, CCH Incorporated

statewide average costs.

[35] The former Tennessee Department of Health Assistant Commissioner in charge of the TennCare Bureau, who served from January 1994 to April 1995, was previously in charge of the Tennessee Bureau of Medicaid.

[36] We did not verify the financial condition of Access MedPLUS. The state required that we subpoena the information that would have enabled us to do so. We chose not to issue a subpoena because it would have delayed this report.

[37] Reported total supplemental payments received and expected for 1994 are as much as $26 million less than the $128 million the TennCare Bureau said is available for 1994. Thus, the Bureau could make some additional supplemental payments to MCOs, improving their financial position.

[38] The purpose of the study was to calculate the allowable TennCare claim for federal reimbursement on the basis of losses at publicly funded, nonstate hospitals.

[39] The analysis included $30 million in medical education payments that had been paid to these hospitals; in addition, the Comptroller included $48 million in estimated high-volume payments that had not been received by the hospitals. The Comptroller did not include estimated TennCare payments made to the hospitals for care to TennCare eligible but not enrolled people. This was not included because the actual cost of providing services to such people had not been determined.

[40] THA contracted with Ernst & Young LLP to compare TennCare payments for 35 hospitals with the estimated costs of providing care for the first 6 months of TennCare.

[41] TMA reported that the 1,221 responses it received from practices represented more than 4,631 physicians.

[42] In the TennCare Bureau's response to our draft report, it said that for state fiscal year 1996 an additional 4.5 percent capitation supplement will be made available to MCOs that meet the performance standards specified in a contract amendment being sent to the MCOs.

[43] HCFA requires that the hospitals be allowed to retain at least $18 million of these payments and allows the remainder of the payments to be transferred from the hospitals to the state.

[44] The TennCare Roundtable was a group of providers, MCOs, and beneficiary advocates appointed by Governor Sundquist to hold public hearings and make recommendations on how the program can be improved. It issued a report on June 29, 1995.

[45] The estimate is based on information from the University of Tennessee and estimates made by health care providers in meetings with state officials.

[46] Peat Marwick's analysis was based on the assumption that TennCare benefits would be the same as Medicaid, with the exception of eliminating prescription limitations, and that cost reductions due to managed care aspects of the new provider arrangements would offset this benefit expansion. A Peat Marwick letter stating that the methodology used in calculating the cost per eligible month was actuarially sound was attached to the TennCare waiver application.

[47] Formally established by Tennessee law on April 18, 1994, as the Select Oversight Committee on TennCare, the Committee is made up of seven members each from the State House and the Senate. The Committee has broad oversight responsibility and authority.

[48] Although the state reported that it increased the 1992 costs by 5.5 percent for each of 2 years to arrive at the 1994 costs, we found that the actual average rate applied to Medicaid enrollees was about 6.4 percent. According to state officials, increases were originally calculated using a 5.5 percent rate. However, the amount budgeted for TennCare exceeded the expected capitation payments required for the number of people believed to be eligible for TennCare. The state consequently increased the individual capitation rates to reflect the higher amount budgeted.

[49] As part of their contract with TennCare, MCOs are required to file an audited annual report 9 months after the end of their 158

COPYRIGHT 2003, CCH Incorporated

corporate operating year. In addition, HMOs are required to file quarterly financial reports with the Tennessee Department of Commerce and Insurance.

[50] BlueCross BlueShield has about half of the state's TennCare enrollees and about three times as many enrollees as the combined total of the other four PPOs.

[51] Access MedPLUS has been criticized for its nonpayment of claims and an inadequate provider network. A Tennessee Medical Association member survey ranked Access MedPLUS last among the MCOs in physician satisfaction with MCOs' fulfillment of their duties.

[52] The financial reports are filed by the Tennessee Managed Care Network, Inc. TennCare beneficiaries in Access MedPLUS constitute nearly all of the network's enrollment.

[53] National Association of Public Hospitals, *Assessing the Design and Implementation of TennCare; A National Health Reform Briefing Paper* (Washington, D.C.: 1942).

159

P-12



DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C2-21-15
Baltimore, Maryland 21244-1850

CENTERS for MEDICARE & MEDICAID SERVICES

January 31, 2002

Mr. John F. Tighe
Deputy to the Governor for Health Policy
Deputy Commissioner of Finance and Administration
Tennessee Department of Finance and Administration
706 Church Street
5th Floor Doctor's Building
Nashville, TN 37247-0492

Dear Mr. Tighe:

This is to inform you that pursuant to section 1115(a) of the Social Security Act
(the Act), we have partially approved the State of Tennessee's request for a 3-year extension of
Medicaid demonstration project No. 11-W-00002/6 entitled "TennCare." We are approving a
one year extension of the project from February 1, 2002, through January 31, 2002.

Approval of this one year extension permits the TennCare program to proceed under the same
Special Terms and Conditions (STCs) that applied previously with three changes. You have
requested an increase of the budget neutrality trend rate from 5.1 percent to 15.202 percent. We
have carefully reviewed the supporting documentation for your request and cannot approve a
budget neutrality trend rate of 15.202 percent for each of the three years of the extension period,
as you requested. We are however, approving a budget neutrality trend rate of 8 percent for the
one year extension period. At this rate, budget neutrality may be maintained throughout the nine
years of the demonstration. We will work closely with you to develop an appropriate budget
neutrality cap beyond January 2003 as part of addressing a demonstration redesign.

The second change is in response to your request to continue your practice of allowing enrollees
to change MCOs once without cause within the first ninety days of enrollment, and annually
thereafter. This approval letter indicates this change under "Costs Not Otherwise Matchable."

The third change is to delete the waiver related to "Payment to Federally Qualified Health
Centers (FQHCs) and Rural Health Clinics (RHCs)" (Section 1902(a)(13)(C) and Section
1902(a)(10)). We have determined, in consultation with your staff, that such waivers are not
necessary to enable the State to only provide FQHC and RHC services through managed-care
providers. In addition, we are clarifying that you must comply with the FQHC/RHC payment
provisions under sections 1902(a)(15) and 1902(aa) of the Social Security Act.

Enclosed is a copy of the STCs, which will apply to this extension. STC 16 has been modified to
reflect the new budget neutrality calculation using the 8 percent trend rate for the February 2002
to January 2003 period.

Page 2 – Mr. John Tighe

All requirements of the Medicaid program expressed in law, regulation, and policy statement—not expressly waived or identified as not applicable to this letter—shall apply to the Tennessee demonstration.

Our approval of this extension of TennCare is contingent upon your continued compliance with the approved special terms and conditions set forth for this demonstration. This extension approval is also subject to our receiving your written acceptance of the special terms and conditions within 30 calendar days from the date of this letter.

<u>List of Sections Waived</u>

The following waivers of provisions of the Social Security Act remain in effect to enable Tennessee to carry out the TennCare demonstration through the extension period:

1. Amount, Duration and                   Section 1902(a)(10)(B)
    Scope of Services

    To enable the State to modify the Medicaid benefit package and to permit coverage of benefits for the demonstration population which are not covered for the non-demonstration population.

2. Uniformity                                    Section 1902(a)(1)

    To enable the State to provide certain types of managed-care plans only in certain geographical areas of the State and to permit non-demonstration populations, e.g., those requiring long-term-care, to receive current Medicaid benefits, whereas demonstration recipients will receive modified services.

3. Eligibility                                  Section 1902(a)(34)

    To enable the State to waive the requirement to provide medical assistance for up to 3 months prior to the date that an application for assistance is made.

4. Freedom of Choice                  Section 1902(a)(23)

    To enable the State to restrict freedom of choice of provider.

5. Upper Payment Limits for            Section 1902(a)(30)
    Capitation Contract Requirement

    To enable the State to set capitation rates that would exceed the costs to Medicaid on a fee-for-service basis.

6. Disproportionate Share              Section 1902(a)(13)(A)
    Hospital (DSH) Payments

Page 4 – Mr. John ( ) Tighe

We look forward to working with you over the next 90 days to develop a viable approach to
continue the demonstration in a new form beyond January 2003. If you have any questions
regarding this approval, please contact Mr. Joseph Millstone, Project Officer, at (410) 786-2976.

Sincerely,

Thomas A. Scully
Administrator

Enclosure

163

P-13

## CENTERS FOR MEDICARE AND MEDICAID SERVICES
### SPECIAL TERMS AND CONDITIONS

**NUMBER:**   11-W-00002/6

**TITLE:**      **Tennessee TennCare Demonstration**

**AWARDEE: Tennessee Department of Health**

1. All contracts and modifications of existing contracts between the State and managed care organizations (MCOs) must be approved by CMS prior to the effective date of the contract or modification of an existing contract. In addition, for any contract in which there exists a clause allowing cost effective alternatives, alternative services that were not included in the list submitted by the State to HCFA on April 11, 1996 must be approved in advance by CMS. No Federal financial participation (FFP) will be available for any contract, modification, or services not approved by CMS in advance of its effective date, or in the case of services, the date of use. Within 30 days of the receipt of a complete and final document, CMS will either approve the document or notify the State of issues that will require additional discussion.

2. Prior to the start date of delivery of services by any managed care organization(s) (MCO) in any area of the State, the State must submit evidence that the managed care organization(s) capacity is adequate in that area of the State to serve the expected enrollment. CMS will base its evaluation of adequacy on the attached standards. The State has provided assurance of continuation of adequate services for the vulnerable populations, including the disabled, chronically mentally ill, and Children's Plan enrollees. No FFP will be provided until CMS supplies written approval that the delivery system for that MCO is acceptable. Copies of the individual provider agreements with the managed care organizations shall be provided to CMS, if requested.

3. The State will conduct beneficiary surveys each operational year of the demonstration. The State shall conduct a statistically valid sample survey of all TennCare enrollees. The survey will measure satisfaction and include measures of out-of-plan use, average waiting time for physician office visits, and the number and causes of disenrollment. Results of the survey and an electronic file containing the raw data collected must be provided to CMS by the ninth month of each operational year. The CMS project officer must approve the survey and sampling methodology in advance. Within 30 days of the receipt of a complete and final document, CMS will either approve the document or notify the State of issues that will require additional discussion.

4. The State shall require all providers to submit data as defined in the minimum data set submitted to HCFA in project year one. The State must perform periodic reviews, including validation studies, in order to ensure compliance. The State shall have provisions in its contracts with health plans to provide the data and be authorized to

impose financial penalties if accurate data are not submitted in a timely fashion. If the State fails to provide accurate and complete encounter data for any managed care plan, it will be responsible for providing to the designated CMS evaluator data abstracted from medical records comparable to the data which would be available from encounter reporting requirements.

5.   At a minimum, the State=s plan for using encounter data to pursue health care quality improvement must focus on the following priority areas:

Childhood immunizations
Prenatal care and birth outcomes
Pediatric asthma
Two additional clinical conditions to be determined by the State based upon the population(s) served

6.   The State must fully meet the usual Medicaid disclosure requirements at 42 CFR 455, Subpart B, for contracting with MCOs.

7.   The State shall require health plans to contract with Federally Qualified Health Centers (FQHCs). If FQHCs implement their own managed care plan, other managed care plans in the same service area will not be required to contract with FQHCs. If a managed care plan can demonstrate to the U.S. Department of Health and Human Services and to the Tennessee Department of Human Services that both adequate capacity and an appropriate range of services for vulnerable populations exists to serve the expected enrollment in a service area without contracting with FQHCs, the plan can be relieved of this requirement. All contracts between the State and MCOs must include a provision that health plans shall be required to address cost issues related to the scope of services provided by FQHCs and shall reimburse FQHCs either on a capitated (risk) basis considering adverse selection factors or reimburse FQHCs on a cost-related basis.

8.   For those plans (both health maintenance organizations (HMOs) and preferred provider organizations (PPOs)) that do not meet section 1903(m) requirements, prior to award of contracts to these plans, the State shall submit for CMS approval a description of their delivery system, their financial viability, and their quality assurance system.

9.   The State must develop internal and external audits to monitor the performance of the plans. At a minimum, the State shall monitor the financial performance and quality assurance activities of each plan. The State will submit to the Office of Research and Demonstrations (ORD) and to the CMS Regional Office copies of all financial audits of participating health plans and quality assessment reviews of these plans.

10.  Within 30 days of this notice, the State will submit a revised budget detailing sources and uses of State funds for the second operational year.

11.  The State must submit detailed information regarding any changes to supplemental funding pools, including the State's intention to begin or end payments from these pools.

A detailed and specific description of the source of pool funds, how payment amounts will be determined, how bills will be paid, and what audit trail will exist must be provided. The State will not make payments from the supplemental pool until CMS has approved the supplemental pool payment methodology change and documentation requirements.

12.  CMS will provide FFP at the applicable Federal matching rate for the following:

a.  The actual cash capitation payments (net of charity from hospitals, physicians, and other health care providers, local government indigent care funds, and patient coinsurance and deductible) made by the State to MCOs for each TennCare enrollee.

b.  Expenditures made as State disbursements from a supplemental pool, but only to the extent that the FFP matches actual State cash expenditures to account for unreimbursed TennCare costs (including medical education costs) borne by participating TennCare providers. These expenditures may be for unreimbursed costs of TennCare services provided to individuals who are eligible for but not enrolled in TennCare.

Payments from supplemental funding pools to MCOs made in accordance with methodologies approved by CMS.

Payments to non-cost-based providers, such as physicians, will be exempt from cost reconciliations.

c.  Actual expenditures certified by public hospitals for TennCare enrollees and eligibles, only to the extent that the public hospital is able to document that it has an actual unreimbursed expenditure for providing TennCare services to a TennCare enrollee or eligible which exceeds the amount paid to that hospital by the MCO, the TennCare eligible, any supplemental pool or other source (except for local government indigent care funds) for the cost of providing such services to TennCare enrollee or eligible (as established through the hospital's audited Medicare cost report). Claims for certified public expenditures for local government appropriations are not allowable.

d.  Actual expenditures for unreimbursed TennCare services provided to TennCare enrollees and eligibles in private hospitals in Knox and Davidson Counties, as certified by Knox and Davidson Counties, only up to the amount of Knox and Davidson Counties indigent care funds that the Counties actually transfer to the private hospitals in Knox and Davidson Counties for these otherwise unreimbursed TennCare expenditures.

e.  Actual expenditures for providing services to a TennCare enrollee residing in an Institution for Mental Diseases (IMD) for the first 30 days of an inpatient episode, subject to an aggregate annual limit of 60 days.

f.  Actual ongoing non-TennCare costs (i.e., long-term care, home- and community-based services (HCBS) waivers, Medicare cost sharing, administration) of the Medicaid program, and allowable accrued costs for periods prior to the implementation of TennCare, as such costs are paid by the State. The State will claim FFP for such costs in the same manner as is done under the current Medicaid program.

g.  A one-time payment to the Regional Medical Center in Memphis and Metro General/Hubbard hospital in Nashville, not to exceed $21,922,478 to the Regional Medical Center and $32,576,552 to Metro General/Hubbard hospital. These amounts are based on the calculations of 100 percent of uncompensated care costs in the named institutions submitted by the State on June 1, 1995. These amounts have been submitted by the State and accepted by HCFA.

Of the federal share of the one-time, $54.5 million unallocated fund pool payments, $12 million will remain with the Regional Medical Center, $6 million will remain with Metro General/Hubbard, with the remainder (net of the federal share of the final, audited amount of allowable certified public expenditures (CPE) paid for the Regional Medical Center and Metro General/Hubbard in state fiscal year 1995) to be used for unallocated fund pool payments for medical education. Based on the current estimate of CPE and unreimbursed costs, the net remainder is $4.2 million. The State agrees that the $18 million plus the net remainder will be distributed as one-time pool payments to medical institutions or medical universities and shall not revert back to the State or county government through intergovernmental transfers or any other reversionary transactions.

Because of the flexibility provided the State by this demonstration, Federal matching funds must be accounted for in a manner which CMS agrees provides assurance that these Federal funds are not used as the State share for additional expenditures.

13.  The standard Medicaid funding process will be used during the TennCare demonstration. Tennessee must estimate matchable Medicaid and TennCare expenditures on the quarterly Form HCFA-37. CMS will make Federal funds available each quarter based upon the State's estimates, as approved by CMS. Within 30 days after the end of each quarter, the State must submit the Form HCFA-64 quarterly Medicaid expenditure report, showing actual Medicaid and matchable TennCare expenditures made in the quarter just ended. CMS will reconcile the allowable, actual expenditures reported on the Form HCFA-64 with the Federal funding previously made available to the State for that quarter, and include the reconciling adjustment in a separate grant award to the State. The Forms HCFA-37 and HCFA-64 must clearly identify all categories of Medicaid and TennCare expenditures (i.e., cash MCO payments, supplemental pool payments, CPE, actual ongoing non-TennCare costs, allowable accrued costs for periods prior to the implementation of TennCare, allowable IMD costs, FFP reductions related to excess premiums, etc.)

With regard only to hospital certified public expenditures (CPE) described in items 12.c and 12.d above, the State will report actual CPE within 9 months after the end of each fiscal year, based on audited hospital cost and revenue data. At that time, the State will revise its FFP claim to reconcile actual CPEs with the CPE estimates used during the preceding fiscal year.

14. The State may count premium revenues as matching funds, subject to the following restrictions.

| Premium Revenue Bracket | % Allowable as State Share | $ Allowable as State Share |
|---|---|---|
| First $75,000,000 | 90% | Up to $67,500,000 |
| Next $50,000,000 | 80 | Up to $40,000,000 |
| Next $50,000,000 | 50 | Up to $25,000,000 |
| Remainder | 20 | Unspecified |

The premium revenue brackets listed above apply to TennCare for State fiscal year 1994–95. In later years, the bracketed amounts will be increased annually by the same percentage increase applicable to the spending limit on federal funding described in special term and condition 16, below.

15. The State will cooperate with the ORD evaluation. The State will provide the ORD evaluator and its subcontractors with all the information necessary to carry out the evaluation. The State shall provide the information requested by the evaluator within the time frame requested and without charging any fee. The ORD project officer for the evaluation will screen all evaluator data requests in advance to determine that they are reasonable.

16. The State shall provide quarterly expenditure reports (HCFA-64s) that provide expenditures on those currently eligible and those eligible under section 1115 waivers. CMS will provide FFP, not to exceed the following limits. If Congress mandates a different limit, then the different limit shall apply.

| State Fiscal Year | Spending Limit (Federal Funding) in millions) |
|---|---|
| 1993-1994 | $ 2,108 |
| 1994-1995 | $ 2,283 |
| 1995-1996 | $ 2,454 |
| 1996-1997 | $ 2,594 |
| 1997-1998 | $ 2,726 |
| 1998-1999 | $ 2,865 |
| 1999-2000 | $ 3,011 |

169

| | |
|---|---|
| 2000-2001 | $ 3,165 |
| 2002 (July-Dec.) | $ 1,663 |
| January 2002 | $   284 |
| Feb.2002-Jan.2003 | $ 3,527 |
| Total | $26,680 |

Budget neutrality will be determined on a nine-year plus one month basis rather than on an annual basis. Any savings from budget neutrality may only be applied to an eligibility expansion or to offset demonstration costs in excess of the budget neutrality caps during this period. The State must submit for CMS approval a waiver amendment requesting the expansion. In its amendment, the State must demonstrate that the expansion is sustainable, even when the accrued savings from the initial eight-year waiver period are exhausted.

To ensure that the State does not deviate significantly from the annual caps, CMS will limit cumulative annual FFP under the demonstration according to the following schedule:

| | | Cumulative Target (Federal Funding) (in millions) |
|---|---|---|
| - Year 1 target | + 8 percent | $ 2,277 |
| - Years 1-2 target | + 6 percent | $ 4,654 |
| - Years 1-3 target | + 4 percent | $ 7,119 |
| - Years 1-4 target | + 2 percent | $ 9,628 |
| - Years 1-5 target | | $12,165 |
| - Years 1-6 target | + 4 percent | $15,631 |
| - Years 1-7 target | + 2 percent | $18,402 |
| - Years 1-8 and next 6 months target | | $22,869 |
| - Years 1- January 2003 target | | $26,680 |

If the State exceeds the cumulative target in any year, the State will be required to submit, within 90 days, a plan either to downsize its program or to otherwise reduce expenditure growth. If expenditures growth continues to exceed the targets in the two subsequent quarters, the subsequent year targets will be adjusted to assure budget neutrality over the eleven year life of the demonstration program.

17.   The State shall, within the time frame specified in law, come into compliance with any changes in Federal law affecting the Medicaid program that occur after January 1, 1994, to the extent that the changes are applicable to programs being operated under section 1115 demonstration waivers. If the change requires a reduction in federal financial participation in expenditures under such a demonstration, the State will adopt, subject to CMS approval, modified budget limits for TennCare as necessary to comply with such change. The modified budget limit would be effective upon implementation of the change in Federal law, as specified in the law.

170

18.  Tennessee must maintain procedures so that hospitals will be able to distinguish individuals who are eligible under current law from individuals who are only eligible because of the demonstration.

19.  The State will submit quarterly progress reports, which are due 60 days after the end of each quarter. The reports should include a discussion of events occurring during the quarter that affect health care delivery, quality of care, access, financial results, benefit package, and other operational issues. The report should include a separate discussion of State efforts related to the collection and verification of encounter data. The report should also include proposals for addressing any problems identified in the quarterly report. Utilization of health services based on encounter data should be reported on a quarterly and cumulative basis by health plan. At a minimum, this should include physician visits, hospital admissions, and hospital days per 1,000 member months, broken out by pregnant women, other adults, and children.

20.  The State will submit a draft annual report, documenting accomplishments, project status, quantitative and case study findings, and policy and administrative difficulties no later than 120 days after the end of each calendar year of operation. Within 30 days of receipt of comments from ORD, a final annual report will be submitted.

21.  During the last 6 months of the demonstration, no enrollment of individuals who would not be eligible under current law will be permitted.

22.  Tennessee will implement modifications to the demonstration by submitting revisions to the original proposal for CMS approval. The State shall not submit amendments to the approved State plan relating to the new eligibles.

23.  The State must continue to insure that an adequate MIS is in place and provide evidence of such to CMS upon request. One feature of the system must be to report current enrollment by plan.

24.  The State must continue to assure that its eligibility determinations are accurate.

25.  The CMS project officer or designee will be available for technical consultation at the convenience of the awardee within 5 working days of telephone calls and within 10 working days on progress reports and other written documents submitted. The State will be similarly available for consultation with CMS.

26.  The awardee shall, within a reasonable period of time to be defined by the Secretary, conform the demonstration to any national health care reforms that may be enacted.

27.  A draft final report should be submitted to the CMS project officer for comments. CMS's comments should be taken into consideration by the awardee for incorporation into the final report. The awardee should use the CMS, Office of Research and Demonstrations' Author's Guidelines:  Grants and Contracts Final Reports in the preparation of the final report. The final report is due no later than 90 days after the termination of the project.

171

28. CMS may suspend or terminate any project in whole, or in part, at any time before the date of expiration, whenever it determines that the awardee has materially failed to comply with the terms of the project. CMS will promptly notify the awardee in writing of the determination and the reasons for the suspension or termination, together with the effective date. CMS reserves the right to withdraw waivers at any time if it determines that continuing the waivers would no longer be in the public interest. If a waiver is withdrawn, CMS will be liable for only normal close-out costs.

29. The awardee shall assume responsibility for the accuracy and completeness of the information contained in all technical documents and reports submitted. The CMS project officer shall not direct the interpretation of the data used in preparing these documents and reports.

30. The awardee shall develop and submit detailed plans to protect the confidentiality of all project-related information that identifies individuals. The plan must specify that such information is confidential, that it may not be disclosed directly or indirectly except for purposes directly connected with the conduct of the project, and that informed written consent of the individual must be obtained for any disclosure.

31. At any phase of the project, including at the project's conclusion, the awardee, if so requested by the project officer, must submit to CMS analytic data file(s), with appropriate documentation, representing the data developed/used in end-product analyses generated under the award. The analytic file(s) may include primary data collected, acquired, or generated under the award and/or data furnished by CMS. The content, format, documentation, and schedule for production of the data file(s) will be agreed upon by the principal investigator and the CMS project officer. The negotiated format(s) could include both file(s) that would be limited to CMS internal use and file(s) that CMS could make available to the general public.

32. At any phase of the project, including at the project's conclusion, the awardee, if so requested by the project officer, must deliver to CMS any materials, systems, or other items developed, refined, or enhanced in the course of or under the award. The awardee agrees that CMS shall have royalty-free, nonexclusive and irrevocable rights to reproduce, publish, or otherwise use and authorize others to use the items for Federal Government purposes.

33. In order to track expenditures under this demonstration, Tennessee must submit the following forms for TennCare on a quarterly basis. Submit only one set of HCFA-64s for the project.

| | |
|---|---|
| HCFA-64.9 | HCFA-64.9a |
| HCFA-64.9p | HCFA-64.9o |
| HCFA-64.10 | HCFA-64 Certification |
| HCFA-64.10p | HCFA-64 Summary |

**172**

Report all administrative and service expenditures allowed under the waivers approved for this demonstration. Do not include expenditures related to research and evaluation activities. These activities are funded separately.

34. By August 1, 1995, the State will provide to HCFA a complete explanation of the availability and sources for funding TennCare for SFY 96 and later. Within 60 days of that submission, the State will submit a written plan for funding the project for the remainder of the 5-year term of the waivers. The plan should include approaches that will demonstrate that the size of the project comports with the level of expected State funding. Appropriate support for the adequacy and sources of funding must be included in the written plan.

35. By August 15, 1995, the State will provide a detailed explanation of the grievance procedures currently in place at the State level and at each MCO, as well as planned modifications to those procedures, including a timetable for any changes.

36. By August 15, 1995, the State will provide a detailed explanation of the circumstances and process for changes in individuals' plan enrollment. This discussion must include, at a minimum, who may initiate changes in enrollment, the process for handling such change requests, including the amount of time to effect such a change, the criteria for allowing plan enrollment changes, and a discussion of the State's current systems capabilities and planned improvements with respect to an audit trail of enrollment changes.

37. Alternative monitoring approaches will be required until the State can demonstrate that it can use valid encounter data for monitoring the demonstration. The State will provide a work plan by August 15, 1995, for monitoring provision of services by MCOs, documentation of actual participation by providers, and a separate action plan for detecting fraud.

P-14



**Centers for Medicare & Medicaid Services**

Home | About CMS | FAQs | Feedback    Search now

Professionals    Governments    Consumers

Public Affairs

**Programs**
★ Medicare
★ Medicaid
★ SCHIP
★ HIPAA
★ CLIA

**Topics**
★ Advisory Committees
★ Coverage
★ Manuals
★ New Freedom
★ Open Door Forums
★ PRIT
★ Quality Initiatives
★ Quarterly Provider Update
★ Regulations
★ State Waivers
★ Statistics & Data

**Resources**
★ Acronyms
★ Contacts
★ Forms
★ Glossary
★ Mailing Lists
★ Search

July 10, 2000

Dear State Health Officials:

The purpose of this letter is to provide you with a policy clarification related to Medicaid and the State Children's Health Insurance Program (SCHIP) concerning the interpretation of the term "optional targeted low-income child."

We included a definition of optional targeted low-income children in the Notice of Proposed Rulemaking that was published in the Federal Register on November 8, 1999 (HCFA 2006-P, 64 FR 60882) and will respond to public comments when the final SCHIP rule is published later this year. However, in order to provide guidance to States in the interim, we are issuing this policy clarification in advance of the final rule.

**Background**

Section 4911 of the Balanced Budget Act (BBA) established a new Medicaid definition for the term "optional targeted low-income children" by adding section 1905(u)(2)(B) to the Social Security Act. Section 1905(u)(2)(B) defines an optional targeted low-income child as a child who meets the definition of "targeted low-income child" in section 2110(b)(1) of the Act and who would not qualify for medical assistance under the Medicaid State plan in effect on March 31, 1997. This definition is referenced in the definition of a new eligibility group for optional targeted low-income children, at section 1902(a)(10)(A)(ii)(XIV) of the Act. The statute also provides an enhanced Federal matching rate for States providing coverage to children meeting the definition of optional targeted low-income children (whether they are in that new Medicaid eligibility group or another Medicaid eligibility group).

The enhanced matching rate is thus available only for eligibility expansions since March 31, 1997. The Department has generally interpreted this restriction to apply to statewide section 1115 demonstration projects in effect on that date. This interpretation assures that the enhanced matching rate is reserved for eligibility expansions. Moreover, the Department believes it is reasonable to accord parallel treatment to States that had expanded eligibility through adding optional eligibility groups to their regular Medicaid program and States that had expanded eligibility by offering equivalent coverage under section 1115 demonstration projects.

**Policy Clarification**

While we intend, in general, to continue interpreting the statute as set forth above, we believe that a more refined definition of "optional targeted low-income child" is appropriate to recognize circumstances in which eligibility under a section 1115 demonstration project was never intended to be or... **175**

regarded as equivalent to traditional Medicaid eligibility. Limited exceptions to the general interpretation would help States provide coverage to uninsured children, as intended by the statute, without compromising the provisions of the law that are designed to assure that SCHIP funds are spent on new coverage.

Thus, we will no longer consider demonstrations that were significantly limited in scope to be part of the Medicaid State plan in effect for these purposes. Specifically, demonstrations that granted coverage to a new group of eligible children but that did not provide a comprehensive benefit package that included inpatient hospital coverage will not be considered part of the State plan in effect for purposes of this definition. We will also exclude demonstrations that did not time-limit coverage, but that limited eligibility both by allowing only children who were previously enrolled in Medicaid to qualify and imposing premiums as a condition of participation in the demonstration.

We are excluding these types of demonstration projects because they are particularly narrow in scope and did not provide coverage equivalent to that ordinarily available under a Medicaid State plan. We believe this clarification is consistent with the statutory definition, which seeks to ensure that States receive the enhanced Medicaid matching rate only for expansions of Medicaid eligibility. Because of the limited nature of these demonstration projects, we believe it is consistent with this purpose to permit States to receive the enhanced matching rate when expanding traditional Medicaid eligibility to children who could have been eligible only under the limited terms and benefits of the demonstration.

Based on this interpretation, States may claim enhanced match for "optional targeted low-income children" who were previously eligible for the types of demonstration projects described above, to the extent that the State expands traditional Medicaid eligibility to these children. In order to extend traditional Medicaid eligibility to these children and receive enhanced Federal matching payments, States will be required to have an approved title XXI State plan, and to submit any necessary amendments to their title XXI plans and title XIX plans or demonstration projects under section 1115, and must comply with applicable Medicaid rules.

We will apply a parallel interpretation to the language "under the State plan under title XIX" for purposes of the SCHIP maintenance of effort provision at section 2105(d)(1) of the Act, and for purposes of the definition of "Medicaid applicable income level" at section 2110(b)(4) of the Act. As a result, children previously eligible for the types of demonstration projects described above may also be included in a separate child health program as "targeted low-income children."

We continue to interpret the statute and Congressional intent to generally exclude children from the definition of "optional targeted low-income child" who would be eligible under a statewide demonstration project authorized through section 1115(a) of the Act. The Administration also continues to support its budget proposal to allow States to receive enhanced match for all children above Medicaid mandatory eligibility, irrespective of when the State expanded coverage to them, if allotments are increased through legislation.

**176**

I hope this information is helpful. Please contact Cynthia Shirk at (410) 786-6614 if you have questions about this guidance. We look forward to continuing to work together toward accomplishing the goal of providing health care to uninsured children.

Sincerely,

Tim Westmoreland
Director

cc:
All HHS Regional Directors
All HCFA Regional Administrators
All HCFA Associate Regional Administrators for Medicaid and State Operations
Lee Partridge, American Public Human Services Association
Brett Ewig, Association of State and Territorial Health Officials Joy Wilson,
National Conference of State Legislatures
Matt Salo, National Governors' Association

Last Modified on Thursday, May 16, 2002



Health and Human Services | FirstGov | Privacy & Security | Accessibility | Help | FOIA | Medicare.gov

**Centers for Medicare & Medicaid Services**
7500 Security Boulevard, Baltimore MD 21244-1850
CMS Telephone Numbers

*CMS*



**TriSpan**

HEALTH SERVICES
MEDICARE PART A INTERMEDIARY
A CMS Contracted Intermediary

*www.trispan.com*

P. O. Box 23046 • Jackson, MS • 39225-3046
1064 Flynt Drive • Flowood, MS • 39232-9570

July 19, 2005

Mr. Wilson C. Leong
Director, Medicare Operations/Prime Contracts
Blue Cross Blue Shield Association
225 North Michigan Avenue
Chicago, Illinois  60601
(312) 297-5869

**RECEIVED**

JUL 21 2005

PROVIDER REIMBURSEMENT
REVIEW BOARD

Re:    Intermediary's Preliminary Hearing Brief
        Methodist Hospitals of Memphis
        Provider Number: 44-0049
        FYE:  December 31, 2000
        PRRB Case Number:  05-0678

Dear Mr. Leong:

Enclosed please find one copy of the Intermediary's preliminary hearing brief for the referenced case.

If you have any questions, please contact me at (601) 664-4266 or Ms. Jan Hyde at (601) 664-4573.

Sincerely,

Wanda Mathis /JH

Wanda W. Mathis
State Manager, Mississippi Provider Audit

Enclosure

cc: Ms. Susanne Cochran
     Chairperson, Provider Reimbursement Review Board
     Ms. Mary Susan Philp – Powers, Pyles, Sutter & Verville PC

**178**



BEFORE THE PROVIDER REIMBURSEMENT REVIEW BOARD

| | | |
|---|---|---|
| Methodist Hospital of Memphis<br>Provider No. 44-0049 | )<br>)<br>) | |
| (Provider) | )<br>) | PRRB Case No. 05-0678 |
| vs. | )<br>) | FYE 12/31/2000 |
| TriSpan Health Services,<br>a Member of the Blue Cross and Blue Shield<br>Association, An Association of Independent<br>Blue Cross and Blue Shield Plans/Blue Cross<br>and Blue Shield Association | )<br>)<br>)<br>)<br>)<br>) | |
| (Intermediary) | ) | |

## INTERMEDIARY'S POSITION STATEMENT

Submitted by:

Wanda Mathis
State Manager
TriSpan Health Services
1064 Flynt Drive
Jackson, MS 39232

601.664.4266

**179**

INTERMEDIARY'S FINAL POSITION PAPER
METHODIST HOSPITALS OF MEMPHIS
PROVIDER NO. 44-0049
FYE 12/31/00
PRRB CASE NO. 05-0678

BEFORE THE PROVIDER REIMBURSEMENT REVIEW BOARD

| | |
|---|---|
| Methodist Hospitals of Memphis<br>Provider No. 44-0049 | )<br>)<br>) |
| (Provider) | )<br>)<br>) PRRB Case No. 05-0678<br>) |
| vs. | ) FYE 12/31/00<br>) |
| TriSpan Health Services,<br>a Member of the Blue Cross and Blue Shield<br>Association, an Association of Independent<br>Blue Cross and Blue Shield Plans/<br>Blue Cross and Blue Shield Association | )<br>)<br>)<br>)<br>)<br>) |
| (Intermediary) | )<br>) |

## INTERMEDIARY'S POSITION PAPER

Submitted By:

Wanda M. Mathis
State Manager
Mississippi Provider Audit
TriSpan Health Services
1064 Flynt Drive
Flowood, MS 39232

601.664.4266

    and

Raymond C. Pietrucha
Consultant
Strategic Government Initiatives
Blue Cross and Blue Shield Association
225 North Michigan Avenue
Chicago, IL 60601

312.297.5753

September 15, 2005

**181**

## TABLE OF CONTENTS

PAGE

I.   INTRODUCTION                                              1

II.  ISSUES AND ADJUSTMENTS IN DISPUTE                         2

III. INTERMEDIARY'S POSITION                                   3

Issue 1: Was the Intermediary's adjustment of the Graduate
Medical Education (GME) per resident amount proper?

A. Facts                                                      4
B. Argument                                                   4
C. Conclusion                                                 5

Issue 2: Was the Intermediary's adjustment of the disproportionate
share (DSH) payment proper?

A. Facts                                                      6
B. Argument                                                   6
C. Conclusion                                                 7

IV.  CITATION OF PROGRAM LAWS,
     REGULATIONS AND INSTRUCTIONS                              8

V.   EXHIBITS                                                  9

I. INTRODUCTION

The Provider is a general short term acute care hospital located in Memphis, Tennessee. The Provider is one of several hospitals and other providers, which are part of Methodist Healthcare. The Provider also operates a hospital-based psychiatric unit and a hospital-based skilled nursing facility.

Relevant statistics are as follows:

| | |
|---|---|
| Date Certified for Program Participation | |
| Hospital | 7/1/66 |
| SNF | 6/1/89 |
| | |
| Number of Adult, Pediatric and Intensive Care Unit Beds | |
| Hospital | 1,211 |
| Subprovider | 72 |
| SNF | 22 |
| | |
| Medicare Discharges | |
| Hospital | 19,388 |
| Subprovider | 771 |
| | |
| Total Discharges | |
| Hospital | 58,146 |
| Subprovider | 1,223 |
| | |
| Percent of Medicare Discharges to Total Discharges | |
| Hospital | 33.34% |
| Subprovider | 63.04% |
| | |
| Date of Notice Program Reimbursement: | |
| Original | 8/23/2004 |
| | |
| Date of Appeal Request | 02/02/2005 |

**183**

II.   REMAINING ISSUES AND ADJUSTMENTS IN DISPUTE

Issue 1: Was the Intermediary's adjustment of the Graduate Medical Education (GME) per resident amount proper?

Adjustment Number 28
Reimbursement Effect                              $236,137

Issue 2: Was the Intermediary's adjustment of the disproportionate share (DSH) payment proper?

Adjustment Number 41 and 43
Reimbursement Effect                              $128,979

184

## III.  INTERMEDIARY'S POSITION

### General

42 U.S.C. Section 1395x(v) sets forth the general principle that Medicare reimbursement be based on the reasonable costs of furnishing services to Program beneficiaries, subject to applicable limitations.

42 U.S.C. Section 1395hh establishes the Secretary's authority to prescribe the related Program regulations and instructions that are consistent with Program laws.

42 U.S.C. Section 1395ww (in various subsections) sets forth the basis for payment to hospitals inpatient hospital services under the prospective payment system (PPS).

Section IV of this position paper summarizes the Program laws, regulations and instructions that supported the Intermediary's determinations, adjustments or arguments.

**185**

Issue 1: Was the Intermediary's adjustment of the GME per resident amount proper?

A. Facts

The Provider (Methodist Hospital of Memphis) operated a graduate medical education (GME) program through an affiliation with the University of Tennessee. In October of 1995, the Provider merged with LeBonheur Children's Hospital which also had a GME program. The Intermediary computed an aggregate weighted average per resident amount for primary care residents, and an aggregate weighted average per resident amount for all other residents. The Intermediary's adjustment number 28 (Exhibit 4) identifies the updated per resident amount for primary care and all other residents.

B. Argument

The Provider argues that there is not authority in the Medicare statute, regulations, or any manual provisions to support the use of an average per resident amount after the merger of two providers. The Provider states that in all other context, the Medicare program has applied the rates applicable to the surviving provider after a merger. Accordingly, the Provider requests that the Intermediary use the surviving provider per resident amounts instead of the weighted average per resident amount.

The question of computing a per resident amount for merged hospitals appears in the <u>Federal Register</u>, dated May 12, 1998, *FY 1998 PPS Response to Comments*, (Reg-Adopt, Med-Guide 1998-1 Med-Guide TB¶46,285, CCH).

> Comment: Several commenters asked about application of the cap for hospitals that merged after December 31, 1996 but before the Balanced Budget Act (BBA), where only one hospital maintains its provider number and participation agreement. Another commenter stated that the law and regulations do not address application of the resident cap for hospital mergers and acquisitions. These commenters do not believe that it was the intent of the BBA to eliminate funding for residents when hospitals merge. Another commenter stated that applying the limits based on cost reports ending on or before December 31, 1996, does not allow for the long-term plans of providers attempting to reduce medical education costs and consolidate programs. The commenters recommended that the Center for Medicare and Medicaid Services (CMS) interpret the BBA provisions to allow hospitals that merged after the base year to include the count of both hospitals. Some commenters suggested that another approach would be to redefine an affiliated group to include hospitals that merged after the December 31, 1996, cost reporting period. Another commenter stated that where there is a merger involving two

**186**

hospitals, the merged cap should reflect a 12-month cost reporting period. This commenter suggested we amend the regulations specifically to ensure that the Full-time Equivalent (FTE) cap is based on the equivalent of a 12-month cost report in the context of a merger.

Response: We agree with the commenters that when there is a merger, the cap for the hospital should reflect the base year FTE counts for the hospitals that merged. This is consistent with the principle of limiting payments based on the base year specified in the statute. Also, in implementing the COBRA 1985 provision establishing a hospital-specific per resident amount in the situation of a merger, we have calculated the revised per resident amount for the merged hospital using an FTE weighted average of each of the respective hospital's per resident amount which is part of the merger. We believe that it would be appropriate to address the FTE caps using the same principle. For purposes of this final rule, where two or more or more hospitals merge after each hospital's cost reporting period ending during FY 1996, the merged hospital's FTE cap will be an aggregation of the FTE cap for each hospital participating in the merger. We are modifying Sec. 413.86(g)(6) to reflect this change.

With regard to the comment that we modify the regulations to ensure that the FTE caps are applied on the basis of a 12-month cost reporting period specifically in the context of mergers and acquisitions, the existing regulations state that the fiscal intermediary may make appropriate modifications to apply the FTE cap based on the equivalent of a 12-month cost reporting period. We do not believe that additional regulatory revisions are warranted.

The Intermediary's use of the weighted average per resident amount for the primary and other residents is in conformance with CMS instructions.

C. Conclusion

The Intermediary requests that the Provider Reimbursement Review Board affirm its adjustment.

**187**

Issue 2: Was the Intermediary's adjustment of the disproportionate share (DSH) payment proper?

A. Facts

The intermediary excluded the Section 1115 waiver days for the DSH payment calculation (Exhibit 5).

B. Argument

The Intermediary notes in the Federal Register Vol. 65, No. 13 dated Thursday, January 20, 2000, section I (B) that, "Under the current policy, hospitals were to include in the Medicare DSH calculation only those days for populations under the section 1115 waiver who were or could have been made eligible under a State plan. Patient days of the expanded eligibility groups, however, were not to be included in the Medicare DSH calculation." In addition, section VI (B) states in part, "our policy was that these days were not allowable prior to the effective date of this interim final rule with comment period."

42 CFR 412.106 (b)(4)(ii) states, "effective with discharges occurring on or after January 20, 2000, for purposes of counting days under paragraph (b)(4)(l) of this section, hospitals may include all days attributable to populations eligible for Title XIX matching payments through a waiver approved under section 1115 of the Social Security Act." It is clear to the Intermediary that section 1115 days were to be excluded from the DSH computation prior to January 20, 2000.

Program Memorandum A-01-13 dated January 25, 2001 re-issues Program Memorandum A-99-62, Change Request 1052 dated December 1999. In Program Memorandum to Intermediaries A-01-13, CMS clarifies their policies to Intermediaries for the hold harmless provision for cost reporting periods beginning before January 20, 2000 concerning Section 1115 days. The Program Memorandum addresses (1) Hospitals That Received Payments Reflecting the Erroneous Inclusion of Days at Issue and (2) Hospitals That Did Not Receive Payments Reflecting the Erroneous Inclusion of Days at Issue. The Intermediary has not knowingly allowed the provider to include the Section 1115 days in the DSH computation. Therefore, the Intermediary contends the provider should be treated according to the instructions under (2) as noted previously.

The instructions in Program Memorandum to Intermediaries A-01-13 for Hospitals That Did Not Receive Payments Reflecting the Erroneous Inclusion of Days at Issue is as follows:

"If a hospital did not receive payment based on the erroneous inclusion of general assistance or other State-only health program, charity care, Medicaid DSH, and/or waiver or demonstration population days for cost reports that were settled before October 15, 1999, and the hospital never filed a jurisdictionally proper appeal to

188

6

the PRRB on this issue, you are not to pay the hospital based on the inclusion of these types of days for any open cost reports for the cost reporting periods beginning before January 1, 2000.  Furthermore, on or after October 15, 1999 you are not to accept reopening requests for previously settled cost reports or amendments to previously submitted cost reports pertaining to the inclusion of these types of day in the Medicare DSH formula.

The Intermediary contends that 42 CFR 412.106 clearly indicates section 1115 days were not to be included in the DSH computation prior to January 20, 2000. In addition, the provider did not qualify under the hold harmless provision as set forth in Program Memorandum to Intermediaries A-99-62 dated December 1999 later re-issued as Program Memorandum to Intermediaries A-01-13 dated January 25, 2001.

C. Conclusion

The Intermediary requests that the PRRB affirm its adjustment.

189



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671          FAX: 410-786-5298

Suzanne Cochran, Chairperson
Martin W. Hoover, Jr., Esq.
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, CPA
Aniall Mulchandani-West

## CERTIFIED MAIL

FEB 2 4 2005

Powers, Pyles, Sutter & Verville, P.C.
Mary Susan Philp, Esq.
Twelfth Floor
1875 Eye Street, N.W.
Washington, DC 20006 5409

RE:  Acknowledgement and Critical Due Dates
     Case Number: 05-0678
     Date Filed: 2/2/2005
     Provider Name: Methodist Hospitals of Memphis
     Provider Number: 44-0049
     Appealed Year – FYE: 12/31/2000

The Provider Reimbursement Review Board ("Board") has received your request for a hearing.  You will need to obtain a copy of the Board's instructions which are located on the Board's web site at http://www.cms.hhs.gov/providers/prrb/prrb.asp.  If internet access is not available to you, you may call the Board at (410) 786-2671 and request that a copy be mailed to you.

You must reference the case number and provider information on all correspondence with the Board.  If any of the above information is incorrect, you must inform the Board, in writing, within 30 days of this letter.

DUE DATES

**1st of June 2005**
Provider's Preliminary Position Papers due to Intermediary (with letter to the Board certifying that preliminary position paper due date has been met and copy of the first page only of the preliminary position paper).

**1st of August 2005**
Intermediary's Preliminary Position Papers due to Provider (with letter to the Board certifying that preliminary position paper due date has been met and copy of the first page only of the preliminary position paper).

**1st of October 2005**
Final position papers due to the Board from both Parties.

**Certified Article Number**

7160 3901 9848 4619 6718

**SENDERS RECORD**

**Certified Article Number**

7160 3901 9848 4619 6725

**SENDERS RECORD**

Page 2

DISMISSALS

You are responsible for pursuing your appeal in accordance with the Board's procedures, which are outlined in the Board's Instructions. You must file your position papers, regardless of any outstanding jurisdictional challenges, motions or subpoena requests. If you miss any of your due dates including meeting either position paper due date, the Board will dismiss your appeal. The Board will not send a due date reminder. If the Intermediary fails to meet its deadlines, the Board will contact the Centers for Medicare and Medicaid Services (CMS) about contract compliance and will schedule a hearing date.

TENTATIVE HEARING DATE

**February 2006:** Tentative month and year of hearing.

The Board will send you a Notice of Board Hearing to notify you of the specific time, date and location of the hearing. The Notice of Hearing will be issued at least 30 days prior to the actual hearing date.

OPTIONS

You may make a written request, at any time, that:
    Your month of hearing be rescheduled to an earlier month;
    Your case be heard based on the submitted record;
    Your case be conducted by video or teleconference;
    Your case be resolved through alternative dispute resolution/mediation;
    Your case be reviewed in a pre-hearing conference with a Board member.

If you request any of these options, you must continue to meet with the due dates set forth in this letter until you are advised regarding your request by the Board.

Steven R. Kirsh, Director
Division of Jurisdiction & Case Management

cc:   TriSpan Health Services
      Gary Gerber, CPA
      Director, Provider Audit
      P.O. Box 23046
      Jackson, MS 39225

      Wilson C. Leong
      BC & BS Association
      225 North Michigan Avenue
      Chicago, IL 60601-7680

**191**

**POWERS
PYLES
SUTTER &
VERVILLE PC**
ATTORNEYS AT LAW

Twelfth Floor
1875 Eye Street, NW
Washington, DC  20006-5409
Phone: (202) 466-6550
Fax: (202) 785-1756
www.ppsv.com

MARY SUSAN PHILP

(202) 872-6735

Susan.Philp@ppsv.com

February 2, 2005

**FEDERAL EXPRESS**

Suzanne Cochran, Esq.
Chairman
Provider Reimbursement Review Board
2520 Lord Baltimore Drive, Suite L
Baltimore, Maryland  21244-2670

FEB - 3 2005

PROVIDER REIMBURSEMENT
REVIEW BOARD

> Re:    Methodist Hospitals of Memphis;
>        Provider No. 44-0049;
>        Fiscal Year Ending December 31, 2000

Dear Ms. Cochran:

Pursuant to Section 1878(a) of the Social Security Act, the above-captioned provider hereby appeals the notice of program reimbursement ("NPR") issued for its fiscal year ending December 31, 2000.  A copy of the NPR is attached as Exhibit 1.

The provider appeals the following issues:

> (1)    Adjustment of GME per-resident amount; audit adjustment number 28;
>        approximate reimbursement effect - $236,137;
>
>        The Provider contends that the Intermediary's use of a weighted average
>        per-resident amount following the Provider's merger with LeBonheur
>        Children's Hospital is contrary to the Medicare statute and regulations. 42
>        U.S.C. § 1395ww(h); 42 C.F.R. § 413.86(e)(1). The Intermediary should
>        have used the Provider's pre-merger per-resident amount. The audit
>        adjustment for this issue and calculations showing the approximate
>        reimbursement impact are attached as Exhibit 2.

192

POWERS, PYLES, SUTTER & VERVILLE PC

Suzanne Cochran, Esq.
February 2, 2005
Page 2

       (2)      Adjustment of disproportionate share ("DSH") payment (Medicaid days percentage); audit adjustment numbers 41; approximate reimbursement effect - $131,493.

              The Provider contends that the Intermediary's calculation of the Provider's DSH payment is contrary to the Medicare statute and regulations. 42 U.S.C. § 1395ww(d)(5)(F); 42 C.F.R. § 412.106. Specifically, the Provider contends that the days attributable to all patients eligible for Medicaid through the State of Tennessee's Section 1115 waiver program, not just the days for patients who would have been eligible for Medicaid absent the waiver, should have been included in the number of Medicaid eligible days used for purposes of the DSH calculation for the entire cost reporting period (not just the period after January 20, 2000). The audit adjustment for this issue and calculation showing the approximate reimbursement impact are attached as Exhibit 3.

The amount in controversy exceeds the required jurisdictional amount of $10,000. The NPR is dated August 23, 2004. Therefore, this appeal is timely filed.

The provider contends that the intermediary's determinations on these items were arbitrary and capricious, contrary to the Medicare statute, regulations and manual provisions, and otherwise contrary to law. The provider reserves the right to add other appeal items prior to the commencement of the hearing.

The provider appoints as its legal representative the law firm of Powers, Pyles, Sutter & Verville, P.C., located at 1875 Eye Street, N.W., Twelfth Floor, Washington, D.C. 20006 (Exhibit 4).

                        Sincerely,

                        Mary Susan Philp

Enclosures

cc:    TriSpan Health Services
       Blue Cross and Blue Shield Association
       Lewis T. Peeples

**POWERS**
**PYLES**
**SUTTER &**
**VERVILLE PC**
ATTORNEYS AT LAW

Twelfth Floor
1875 Eye Street, NW
Washington, DC  20006-5409
Phone: (202) 466-6550
Fax: (202) 785-1756
www.ppsv.com

MARY SUSAN PHILP

(202) 872-6735

Susan.Philp@ppsv.com

February 2, 2005

**FEDERAL EXPRESS**

Suzanne Cochran, Esq.
Chairman
Provider Reimbursement Review Board
2520 Lord Baltimore Drive, Suite L
Baltimore, Maryland  21244-2670

   Re: Methodist Hospitals of Memphis;
     Provider No. 44-0049;
     <u>Fiscal Year Ending December 31, 2000</u>

Dear Ms. Cochran:

   Pursuant to Section 1878(a) of the Social Security Act, the above-captioned provider hereby appeals the notice of program reimbursement ("NPR") issued for its fiscal year ending December 31, 2000.  A copy of the NPR is attached as Exhibit 1.

   The provider appeals the following issues:

     (1) Adjustment of GME per-resident amount; audit adjustment number 28; approximate reimbursement effect - $236,137;

       The Provider contends that the Intermediary's use of a weighted average per-resident amount following the Provider's merger with LeBonheur Children's Hospital is contrary to the Medicare statute and regulations.  42 U.S.C. § 1395ww(h); 42 C.F.R. § 413.86(e)(1).  The Intermediary should have used the Provider's pre-merger per-resident amount.  The audit adjustment for this issue and calculations showing the approximate reimbursement impact are attached as Exhibit 2.

**194**

POWERS, PYLES, SUTTER & VERVILLE PC

Suzanne Cochran, Esq.
February 2, 2005
Page 2

(2)    Adjustment of disproportionate share ("DSH") payment (Medicaid days
       percentage); audit adjustment numbers 41; approximate reimbursement
       effect - $131,493.

       The Provider contends that the Intermediary's calculation of the Provider's
       DSH payment is contrary to the Medicare statute and regulations. 42
       U.S.C. § 1395ww(d)(5)(F); 42 C.F.R. § 412.106. Specifically, the
       Provider contends that the days attributable to all patients eligible for
       Medicaid through the State of Tennessee's Section 1115 waiver program,
       not just the days for patients who would have been eligible for Medicaid
       absent the waiver, should have been included in the number of Medicaid
       eligible days used for purposes of the DSH calculation for the entire cost
       reporting period (not just the period after January 20, 2000). The audit
       adjustment for this issue and calculation showing the approximate
       reimbursement impact are attached as Exhibit 3.

The amount in controversy exceeds the required jurisdictional amount of $10,000. The
NPR is dated August 23, 2004. Therefore, this appeal is timely filed.

The provider contends that the intermediary's determinations on these items were
arbitrary and capricious, contrary to the Medicare statute, regulations and manual provisions, and
otherwise contrary to law. The provider reserves the right to add other appeal items prior to the
commencement of the hearing.

The provider appoints as its legal representative the law firm of Powers, Pyles, Sutter &
Verville, P.C., located at 1875 Eye Street, N.W., Twelfth Floor, Washington, D.C. 20006
(Exhibit 4).

Sincerely,

*Mary Susan Philp*

Mary Susan Philp

Enclosures

cc:    TriSpan Health Services
       Blue Cross and Blue Shield Association
       Lewis T. Peeples

**195**

1



**TRISPAN**
**HEALTH SERVICES**
**MEDICARE PART A INTERMEDIARY**
A CMS Contracted Intermediary

*www.trispan.com*

P. O. Box 23046 • Jackson, MS • 39225-3046
1064 Flynt Drive • Flowood, MS • 39232-9570

August 23, 2004

NOTICE OF
PROGRAM REIMBURSEMENT

Ms. Marybeth Nagle, Director of Reimburs
Methodist Healthcare- Memphis Hospitals   (440049)
1211 Union Avenue
Suite 600
Memphis, TN  38104

RE: Cost Settlement for Provider No. 440049 and all Sub-Units: 443500 445225
44S049

Dear Ms. Nagle:

This is a Medicare NOTICE OF PROGRAM REIMBURSEMENT based on a Cost Settlement
for the cost report period ended 12/31/00. See the attached Transaction
Summary.

According to our calculations, we show an amount due the provider as follows:

        Net Amount Due the Provider:  $ 599,065

        See Attached Transaction Summary

This amount will appear on your Remittance Advice dated 08/25/04.

We have issued our report on your cost statement for this reporting period, and
your copy is enclosed.  This is a final report subject to interpretations of
the "Principles of Reimbursement for Provider Cost" by the Health Care
Financing Administration.  These adjustments include the appropriate reference
to applicable laws, regulations, and general instructions used as a basis for
these adjustments. Please be informed that the Intermediary Determination
communicated by this NPR may be revised in accordance with 42 CFR 405.1885.

**197**



**CMS**
CENTERS for MEDICARE & MEDICAID SERVICES

Methodist Health care- Memphis Hospitals
440049 12/31/00

If you disagree with the cost report adjustments which have been made by this office, you have the right to appeal in writing within 180 days from the date of this notice.  If you disagree with adjustments aggregating $10,000 or more in Program reimbursement, your appeal should be made to the Provider Reimbursement Review Board (PRRB).  To request a group appeal, the amount in controversy must be at least $50,000 for any group of providers, including those under common ownership or control, where the matters in controversy involve a common question of fact, law or regulation, or HCFA ruling.  Appeal information and procedures are available in HCFA Pub. 15-I, Chapter 29, and in the CCH Medicare and Medicaid Guide, paragraphs 7679-7791. Copies of the HCFA Pub. 15-I sections may be obtained from:

> National Technical Information Service
> 5858 Port Royal Road
> Springfield, VA  22161
> (703) 487-4650

Should you request an appeal to the PRRB, your written request should be directed to:

> Chairman
> Provider Reimbursement Review Board
> P.O. Box 31712
> Baltimore, MD  21207-8712
> (410) 786-2671

Please also submit copies of your request to Mr. Gary Gerber, Director of Provider Audit, at our office and to the following address:

> Provider Reimbursement Review Board
> Appeals Coordinator
> Blue Cross Blue Shield Association
> 225 North Michigan Avenue
> Chicago, IL  60601-7680

If you disagree with adjustments aggregating at least $1,000 but less than $10,000, your appeal should be made to the Blue Cross Blue Shield Association under its Medicare Provider Appeals Procedures and is referred to as an Intermediary Appeal.  Your written request should be directed to the following address:

> Intermediary Hearing Officer
> Reimbursement and Provider Appeals Department
> Blue Cross Blue Shield Association
> 225 North Michigan Avenue
> Chicago, IL  60601-7680

A copy of this request should also be submitted to Mr. Gary Gerber, Director of Provider Audit, at this office.

2

**198**

Methodist Healthcare- Memphis Hospitals
440049 12/31/00

For information on the proper form and required content of an appeal request, please refer to 42 CFR 405.1809 - 405.1833 and HCFA Pub. 15-I, Section 2910-2918 for Intermediary Appeals and 42 CFR 405.1835 - 405.1890 and HCFA Pub. 15-I, Section 2920-2929 for PRRB Appeals. The appeal requests for either an Intermediary or PRRB Appeal must include the following:

     1.)   Identification of items in dispute by adjustment number, amount, and description.

     2.)   Reasons for disagreement with the Intermediary's determination on these items.

     3.)   One copy of the NPR, or determination disputed and the pertinent portion of the adjustment report.

     In addition, Intermediary Appeal requests must include an estimate of the reimbursement in controversy for each item        appealed.

We strongly urge that you discuss with us any questions concerning the adjustments we have made.  As you have 180 days from the date of the Notice of Corrected Program Reimbursement to formally file a request for appeal, there is ample opportunity for discussion without risk of any prejudice to your appeal rights.

If you have any questions regarding this settlement, please contact our Provider Settlement Department at (601) 936-0105, extension 4683. For questions regarding specific audit adjustments, please contact our Baton Rouge Audit Office at ()343-0276.

Sincerely,

*Eddie Price*

Eddie Price
Supervisor, Provider Reimbursement

Attachments

3

199

2

# CMS-2552-96 Audit Adjustment Report

TRISPAN HEALTH SERVICES
PROVIDER NAME: METHODIST HLTHCARE-MEMPHIS HOSP        PROVIDER NUMBER: 44-0049

RUN DATE: 08/02/2004    PAGE 15
FISCAL PERIOD: 01/01/2000 TO 12/31/2000

| ADJ # | WS P F T | LINE | COLUMN | A6/A8 LTR | A6/A8 LINE | EXPLANATION OF AUDIT ADJUSTMENTS | AS REPORTED | INCREASE/ DECREASE | AS ADJUSTED | W/P REF. |
|---|---|---|---|---|---|---|---|---|---|---|
| 27 | B1 | 55 | 1.06 | | | Medical Supplies Charged to Pat | 3594 | -3594 | 0 | |
| 27 | B1 | 56 | 1.06 | | | Drugs Charged to Patients | 4430 | -4430 | 0 | |
| 27 | B1 | 57 | 1.06 | | | Renal Dialysis | 3490 | -3490 | 0 | |
| 27 | B1 | 60.05 | 1.06 | | | PEDIATRIC CLINICS | 18554 | -18554 | 0 | |
| 27 | B1 | 61 | 1.06 | | | Emergency | 18121 | -18121 | 0 | |
| 27 | B1 | 83 | 1.06 | | | Kidney Acquisition | 153 | -153 | 0 | |
| 27 | B1 | 84 | 1.06 | | | Liver Acquisition | 38 | -38 | 0 | |
| 27 | B1 | 86 | 1.06 | | | OTHER ORGAN ACQUISITION (SPECIF | 9 | -9 | 0 | |
| 27 | B1 | 96 | 1.06 | | | Gift, Flower, Coffee Shop & Can | 1235 | -1235 | 0 | |
| 27 | B1 | 98 | 1.06 | | | Physicians' Private Offices | 6984 | -6984 | 0 | |
| 27 | B1 | 100.17 | 1.06 | | | LEAD PROGRAM | 13574 | -13574 | 0 | |
| 27 | A6 5 | 15 | 5 | AA | 3.06 | RECL TO: NEW CAP REL COSTS - LEBONHEUR | 0 | 690018 | 690018 | |
| 27 | A6 5 | 15 | 9 | AA | 1.06 | RECL FROM: OLD CAP REL COSTS - LEBONHEUR To remove Old CRC Lebonheur PRM 1:2328, 42 CFR 413.9 WP reference A-5.28D | 0 | -690018 | -690018 | |
| 28 | E3 4 | 18 | 3.19 | 1 | | Enter the primary care physician per resident amount | 64402.00 | -3431.06 | 60970.94 | |
| 28 | E3 4 | 18 | 3.20 | 1 | | Enter the other program per resident amount To properly report Per Resident Amount PRM 1:2702, 42 CFR 413.170 WP Reference A-5.39 | 60983.00 | -2447.35 | 58535.65 | |

**201**

**METHODIST HEALTHCARE - MEMPHIS HOSPITALS**
**FYE DECEMBER 31, 2000**

**DIRECT GRADUATE MEDICAL EDUCATION (GME)**

| | MHM Using MHMH rate | Per cost repor TOTAL |
|---|---|---|
| **PRIMARY CARE/OB GYN** | | |
| NUMBER OF FTE RESIDENTS (WEIGHTED) | 94.63 | **94.63** |
| UPDATED PER RESIDENT AMOUNT | 64,402 | **60,971** |
| AGGREGATE AMOUNT | 6,094,408 | 5,769,680 |
| | | |
| **ALL OTHER** | | |
| NUMBER OF FTE RESIDENTS (WEIGHTED) | 74.22 | **74.22** |
| UPDATED PER RESIDENT AMOUNT | 60,983 | **58,536** |
| AGGREGATE AMOUNT | 4,526,194 | 4,344,516 |
| | | |
| TOTAL AGGREGATE AMOUNT | 10,620,602 | 10,114,196 |
| DIFFERENCE | 506,406 | |
| MHMH MEDICARE UTILIZATION RATE | 46.63% | |
| REIMBURSEMENT EFFECT | $236,137 | |

3

# CMS-2552-96 Audit Adjustment Report

TRISPAN HEALTH SERVICES
PROVIDER NAME: METHODIST HLTHCARE-MEMPHIS HOSP    PROVIDER NUMBER: 44-0049

RUN DATE: 08/02/2004    PAGE 18
FISCAL PERIOD: 01/01/2000 TO 12/31/2000

| ADJ # | WS | P | F | T | LINE | COLUMN | A6/A8 LTR | A6/A8 LINE | EXPLANATION OF AUDIT ADJUSTMENTS | AS REPORTED | INCREASE/ DECREASE | AS ADJUSTED | W/P REF. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 39 | S3 | 1 | | | 1 | 1 | | | Hospital Adults & Peds. | 963 | 13 | 976 | |
| 39 | S3 | 1 | | | 10 | 1 | | | CVICU | 28 | -1 | 27 | |
| 39 | S3 | 1 | | | 10.02 | 1 | | | ICU SOUTH | 20 | 4 | 24 | |
| 39 | S3 | 1 | | | 10.03 | 1 | | | ICU NORTH | 33 | 1 | 34 | |
| 39 | S3 | 1 | | | 15 | 1 | | | Skilled Nursing Facility To adjust number of beds PRM 1:2308, 42 CFR 413.53 WP reference B-1 | 24 | -2 | 22 | |
| 40 | S3 | 1 | | | 1 | 2 | | | Hospital Adults & Peds. | 352458 | 4667 | 357125 | |
| 40 | S3 | 1 | | | 10 | 2 | | | CVICU | 10248 | -366 | 9882 | |
| 40 | S3 | 1 | | | 10.02 | 2 | | | ICU SOUTH | 7320 | 1464 | 8784 | |
| 40 | S3 | 1 | | | 10.03 | 2 | | | ICU NORTH | 12078 | 366 | 12444 | |
| 40 | S3 | 1 | | | 11 | 2 | | | Nursery | 30660 | 84 | 30744 | |
| 40 | S3 | 1 | | | 15 | 2 | | | Skilled Nursing Facility To adjust bed days available on Worksheet S-3 PRM 1:2408, 42 CFR 413.53 WP reference B-1 | 8784 | -853 | 7931 | |
| 41 | E | A | H | | 4.04 | 1 | | | Disproportionate share adjustment To adjust DSH payment amount PRM 1:2408, 42 CFR 413.53 WP reference Q-7 | 19914412 | -573111 | 19341301 | |
| 42 | L | 2 | H | 18 | 5 | 1 | | | Total capital payments under 100% federal rate (see instructions) To adjust Total Capital under 100% Federal PRM 1:2408, 42 CFR 413.20 WP reference Q-7 | 12919555 | -49411 | 12870144 | |

**Per Audit**

| | |
|---|---:|
| Total M'Caid | 64,542 |
| Total DSH Reimbursement | $19,341,301 |
| | |
| Addition of Waiver Days | 482 |

**Appeal**

| | |
|---|---:|
| Total M'Caid Days | 65,024 |
| Total DSH Reimbursement | $19,472,794 |
| | |
| **Additional Reimbursement** | $131,493 |

4


**Methodist**
Healthcare

January 19, 2005

Suzanne Cochran, Esq., Chairman
Provider Reimbursement Review Board
2520 Lord Baltimore Drive, Suite L
Baltimore, Maryland 21244-2670

      Re:    Methodist Healthcare - Memphis Hospitals;
                 Provider No. 44-0049;
                 Fiscal Year Ending December 31, 2000;
                 <u>Appointment of Provider Representative</u>

Dear Ms. Cochran:

      Methodist Healthcare – Memphis Hospitals appoints the law firm of Powers, Pyles, Sutter, Verville, P.C. as its Provider Representative in its appeal for the above fiscal year. Please direct all communications related to this appeal to:

          Mary Susan Philp
          Powers, Pyles, Sutter & Verville, P.C.
          1875 Eye Street, N.W., 12th Floor
          Washington, D.C. 20006-5409

Thank you.

                 Sincerely,

                 Trip Peeples
                 Director of Reimbursement

**207**